Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 1 of 84 PageID 237

PAGE 1

IN THE UNITED STATES **DISTRICT COURT**
FOR THE **MIDDLE DISTRICT** OF FLORIDA
**TAMPA DIVISION**


**BARBARA CERANEK,**

    Plaintiff,

vs.                                  CASE NO.: **8:20-cv-02292-JSM-SPF**

**UNITED AIRLINES, INC.,**
a Foreign Profit Corporation,

    Defendant.

_____/




**ZOOM VIDEOCONFERENCE DEPOSITION OF BARBARA CERANEK**



| | |
|---|---|
| **TAKEN:** | Pursuant to Notice by Counsel for Defendant |
| **DATE:** | June 22, 2021 |
| **TIME:** | 10:05 AM to 4:20 PM |
| **LOCATION:** | All participants at their respective remote locations |
| **BEFORE:** | Patricia Tomory Halliday Professional Court Reporter Notary Public |

TAMPA COURT REPORTING ASSOCIATES

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 2 of 84 PageID 238

PAGE 2

**REMOTE APPEARANCES VIA ZOOM VIDEOCONFERENCE:**

    **MIGUEL BOUZAS, ESQUIRE**
    miguel@fgbolaw.com
    Florin Gray Bouzas Owens, LLC
    16524 Pointe Village Drive, Suite 100
    Lutz, Florida 33558

        Counsel for Plaintiff


    **MONICA WILLIAMS HARRIS, ESQUIRE**
    monica.harris@jacksonlewis.com
    Jackson Lewis, P.C.
    100 South Ashley Drive, Suite 2200
    Tampa, Florida 33602

        Counsel for Defendant


**ALSO PRESENT:**  Mary O'Neil
        Senior Managing Counsel
        United Airlines

Upon Ms. O'Neil's departure:

        Dorothy Karpierz
        Paralegal
        United Airlines


**I N D E X**

                                    **PAGE**

DIRECT EXAMINATION BY MS. WILLIAMS HARRIS............   5

CERTIFICATE OF REPORTER.............................  221

CERTIFICATE OF OATH.................................  222

CORRECTIONS AND/OR AMENDMENTS and SIGNATURE SHEET..... 223/224

PAGE 3

**E X H I B I T S**

PAGE

EXHIBIT NO. 1                                              48
(Job description titled Reservations Sales & Services
Representative.   DEF 000191)

EXHIBIT NO. 2                                              56
(Continental policy titled OnePass & Reservations,
Family and Friends Account Policy, signed 03/14/94.
DEF 000007)

EXHIBIT NO. 3                                              58
(Continental OnePass & Reservations, Family and Friends
Account Policy, signed 10/12/92.   DEF 000006)

EXHIBIT NO. 4                                              60
(Continental Code of Ethics and Business Conduct policy.
DEF 438 through DEF 465)

EXHIBIT NO. 5                                              65
(Working Together Guidelines.   DEF 466 through 657)

EXHIBIT NO. 6                                              85
(Barbara Ceranek certificate of completion of course titled
Doing Your Part: United's Compliance Training for Frontline
Co-Workers, dated 2/10/2105.   DEF 000170)

EXHIBIT NO. 7                                              86
(Barbara Ceranek certificate of completion of training and
testing on Doing Your Part, dated 7/15/2109.   DEF 000172)

EXHIBIT NO. 8                                              87
(Doing Your Part: United's Compliance Training.
DEF 000667 through 000686)

EXHIBIT NO. 9                                              90
(Screenshot of Leisure Pass Travel training module page
with indication of completed for Barbara Ceranek.   DEF 000171)

EXHIBIT NO. 10                                             93
(Travel Pass Guidelines.   DEF000335.

EXHIBIT NO. 11                                             111
(Barbara Ceranek Statement on 06/04/2019 as submitted to
Cindi Hamburg.   DEF 000001 and 000002)

EXHIBIT NO. 12                                             125
(Recorded call between Cindy Hamburg, Barbara Ceranek, and
Anthony Cotoia)

PAGE 4

**E X H I B I T S**

**PAGE**

**EXHIBIT NO. 13 - SKIPPED**

**EXHIBIT NO. 14**                                                    **175**
(Letter from Cindi Hamburg to Barbara Ceranek dated
June 22, 2019, regarding follow-up to 6/04/19 meeting.
DEF 000213)

**EXHIBIT NO. 15**                                                    **174**
(Notification, Investigative Review Meeting, from
Cindi Hamburg to Barbara Ceranek and Anthony Cotoia,
dated August 8, 2019.  DEF 000195 and 000196)

**EXHIBIT NO. 16**                                                    **175**
(Forwarded E-mails and original E-mail from Barbara Ceranek
to Oscar Munos, et al, sent August 11, 2019; Subject:
Official complaint against Ms. Hamburg in regards to the
Code of Ethics and Business Conduct Policy.  DEF 000215
through 000221)

**EXHIBIT NO. 17**                                                    **186**
(Revised Notification, Investigative Review Meeting, from
Cindi Hamburg to Barbara Ceranek and Anthony Cotoia,
dated August 12, 2019.  DEF 000225 and 000226)

**EXHIBIT NO. 18**                                                    **199**
(United (Unise Rosner) decision letter to Barbara Ceranek
dated August 26, 2019.  DEF 000872 through 000874)

**EXHIBIT NO. 19**                                                    **199**
(E-mails between Unise Rosner, Anthony Cotoia, and
Barbara Ceranek sent September 4 and 6, 2019, regarding
revised decision letter.  Ceranek000020)

**EXHIBIT NO. 20**                                                    **200**
(United (Unise Rosner) decision letter to Barbara Ceranek
dated September 9, 2019.  DEF 000875 through 000877)

**EXHIBIT NO. 21**                                                    **201**
(United (Monique Morris) decision letter to Barbara Ceranek
dated October 16, 2019.  DEF 000257)

**EXHIBIT NO. 22**                                                    **203**
(Summons and Complaint in the subject matter)

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 5 of 84 PageID 241

## PAGE 5

1          BARBARA CERANEK,

2   the witness herein, present with her counsel at his remote

3   location, after first being duly sworn on oath, was examined

4   and testified as follows:

5          DIRECT EXAMINATION

6   BY MS. WILLIAM S HARRIS:

7      Q.   Ms. Ceranek, good morning. My name is Monica

8   Williams Harris. I am the attorney or United Airlines and

9   I'll be asking you some questions today in relation to the

10  lawsuit that you filed.

11         You've already been sworn under oath. Do you

12  understand the format of a depo?

13     A.   I do.

14     Q.   Okay. So this is little different, because

15  we're not in person, so we're virtual. So I think it's

16  probably going to be of the utmost importance that we don't

17  speak over each other, because Patsy is typing everything

18  down that we say today, and so it's important that I'm able

19  to get my question out and, in turn, that I permit you an

20  opportunity to answer the questions fully.

21         If I ask a question that you don't understand or

22  you need more clarification, feel free to ask me to clarify

23  or just let me know that you don't understand and I will

24  attempt my best to restate the question.

25         Also uh-huhs, even though we're virtual and

## PAGE 6

1   video, she's still recording and typing everything down, so

2   uh-huhs and hu-huhs look exactly the same on a transcript,

3   so it's important that you answer yes or no and answer

4   verbally. Head nods aren't going to reflect as clearly on

5   paper. And, so, I will try to remind you to do that. I'm

6   not perfect at that, but I will try to remind you to answer

7   verbally. Any questions so far?

8      A.   No. I just wanted to mention that I appreciate

9   your patience with me, because English is my second language.

10     Q.   Understood. Understood.

11         Okay. So Patsy has already sworn you in and I'm

12  sure that your attorney has already explained this to you,

13  but that you've been sworn under oath, which is the same as

14  if you were being sworn under oath in a courtroom. And so

15  your answers need to be truthful, under penalty of perjury,

16  so it's the same effect.

17         And you understand that if I say United, that

18  I'm referring to your former employer, United Airlines; is

19  that correct?

20     A.   Yes, ma'am.

21     Q.   At some point, I'm hoping that he wouldn't, but

22  Miguel may interject and say objection to the form. That

23  really is just for the record. That's nothing for you to be

24  concerned about. Answer the question that's asked unless he

25  tells you not to answer the question.

## PAGE 7

1          If you need a break at any time, let me know.

2   We can take a break. This is not a test of endurance. We

3   may have to take a periodic break. I don't know if you want

4   to work through lunch or not. As we get closer to that

5   hour, we can have that conversation then. But if at any

6   point you do need a break, just let me know. The only thing

7   I ask is that if a question has been posed, that you go

8   ahead and answer that question before we take the break.

9   Do you understand?

10     A.   Yes, ma'am.

11     Q.   Do you have any questions about any of the

12  instructions that I've given you thus far?

13     A.   Not at this time.

14     Q.   Great. Did you talk with anyone, other than

15  your attorney, to prepare for this deposition today?

16     A.   No.

17     Q.   Did you review any documents in preparation for

18  your deposition?

19     A.   No.

20     Q.   Do you have any notes, diaries, journals, or

21  other records of events during your employment that you have

22  not already produced in this matter?

23     A.   No.

24     Q.   Have you discussed with anyone the fact that you

25  are suing United? Other than your --

## PAGE 8

1      A.   No.

2      Q.   Okay. No current employees?

3      A.   No.

4      Q.   No friends or relatives?

5      A.   No, in the respect to that I'm suing United.

6      Q.   Okay. So have you had a conversation about your

7   claims at all, with anyone, aside from your attorney?

8      A.   No.

9      Q.   Have you talked to anyone, aside from your

10  attorney, about your belief that you've been discriminated

11  against?

12     A.   One more time with the question. I apologize.

13     Q.   Have you discussed with anyone, other than your

14  attorney, your belief that you were discriminated against

15  during your employment with United?

16     A.   Um, yes. José Farfan, co-worker.

17     Q.   Spell his last name for me?

18     A.   F as in Frank, A, R, F as in Frank, A, N as in

19  November.

20     Q.   And what does Mr. Farfan do? Is he still

21  currently an employee of United?

22     A.   He retired.

23     Q.   Do you know when he retired?

24     A.   No.

25     Q.   When did you have a conversation with M. Farfan

**PAGE 9**

1 about what you perceived to be discrimination that you faced
2 while with United?
3     A.   Um, it was after my supervisor discriminated at
4 me and make derogative comments, Like when are you going to
5 retire?  Aren't you too old to be doing this job?  Are you
6 going to die at the computer taking the reservations?  When
7 are you going to retire and take the time off?  And finally,
8 If you don't retire, I will fire you sooner or later.
9         After those random comments that she make to me
10 on the phone, I would cry and then call him to complain
11 about it, or to share, or to get mental support.
12    Q.   And where did Mr. Farfan live?
13    A.   In Riverview.
14    Q.   Do you remember when you made these phone calls?
15    A.   No, I don't.
16    Q.   So all of the comments that you're saying that
17 your supervisor made -- and we'll get into that later --
18 those were all made in one phone call, or were they made
19 over a course of several different situations?
20    A.   Multiple calls.
21    Q.   And did you call Mr. Farfan after every call?
22    A.   No.
23    Q.   How many times did you speak to Mr. Farfan about
24 the alleged comments that your supervisor made to you?
25    A.   I don't recall the exact number.

**PAGE 10**

1    Q.   Do you have Mr. Farfan's phone number?
2    A.   Yes, ma'am.  It was provided in the documents to
3 United.  And the address.
4    Q.   Okay.  Do you know who Mr. Farfan's supervisor
5 was?
6    A.   No.
7    Q.   What was Mr. Farfan's job when he was with
8 United?
9    A.   Remote agent, customer service.
10    Q.   Aside from Mr. Farfan, did you have any
11 conversation with any other United employees about the
12 alleged discrimination you believe you faced?
13    A.   No.
14    Q.   Do you recall what Mr. Farfan said to you in
15 response to your comments to him about what you say
16 Ms. Hamburg said to you?
17    A.   I would have to, um, ask you to ask me the
18 question one more time, but if I may go back one step back
19 to the previous question, because you asked me if I ever
20 discussed the case with any other United employee.  Do you
21 consider, like, Monique Morris, that was a corporate
22 security, United employee?  Or she is part of the management
23 and your question didn't pertain to that?
24    Q.   No.  I want you to answer the question have you
25 had any discussion with any United employee, regardless of

**PAGE 11**

1 their rank, about your lawsuit against United?
2    A.   Not about the lawsuit, no.
3    Q.   So the second question that I asked was have you
4 had any conversation with any United employee about the
5 discrimination you believe you faced while working for
6 United?
7    A.   Exactly.  So in regards to discrimination, if
8 I may, I had, um -- well, I sent the E-mail to United CEO.
9 I sent the E-mail to my manager, Tracey Bartlett.  I sent it
10 to Tony Cotoia, union rep.  I sent it to Monique Morris,
11 corporate security.  Mr. Stepanski, corporate security.
12 I, um. . . That's what I can recall right now.
13    Q.   So the E-mail that you're talking about, where
14 you complained about discrimination, you sent to United's
15 CEO, Tracey Barkett, Tony Cotoia, Monique Morris,
16 Mr. Stepanski.  Are those the names that you provided me?
17    A.   Yes, ma'am.  And also -- oh, yeah, Tony Cotoia.
18 And that's all I can remember right now.  There was more,
19 um, but I don't recall right now.
20    Q.   And did you call any of those people?  The
21 people that you just listed, did you call any of those
22 people to complain about discrimination?
23    A.   Only Mr. Farfan and Ms. Monique Morris at
24 corporate security.
25    Q.   Anyone else?

**PAGE 12**

1    A.   Not that I recall right now.
2    Q.   Have you talked to Mr. Farfan since you filed
3 your lawsuit against United?
4    A.   No.
5    Q.   Okay.  I asked a question previously.  I'm not
6 sure I got an answer from you, so I'll ask it again.
7        When you called Mr. Farfan to complain about the
8 various comments that you alleged your supervisor said to
9 you, do you recall what Mr. Farfan said, if anything, in
10 response?
11    A.   I don't recall.
12    Q.   Have you had any conversations with any friends
13 or relatives about your belief that you've been
14 discriminated against?
15    A.   Yes.
16    Q.   And who would those people be?
17    A.   My husband and my daughter.
18    Q.   Anyone else?
19    A.   No.
20    Q.   What is your husband's name?
21    A.   It's a Polish name, so let me spell it, if I may.
22 It's Przemyslaw, but it's spelled P as in Peter, R as in
23 Robert, Z as in zebra, E, M as in Mary, Y, S as in Sierra,
24 L as in Lima, A, W as in William?
25    Q.   Okay.  And your daughter's name?

**PAGE 13**

1    A.    It's Sonia, S-O-N-I-A.

2    Q.    Does she still retain her maiden name --

3    A.    Yes.

4    Q.    -- Ceranek?

5    A.    Yes, ma'am.

6    Q.    Any other relatives that you discussed your

7    belief that you've been discriminated against?

8    A.    No.

9    Q.    Aside from the co-workers or employees of United

10    and your family members, have you had any other discussions

11    with anyone else about your belief that you were

12    discriminated against by United?

13    A.    I filed the complaint with the Equal Employment

14    Opportunity Commission.

15    Q.    Do you remember who you spoke with at the EEOC?

16    A.    It was filed on my behalf by Mr. Thompson.

17    Q.    And who is Mr. Thompson?

18    A.    Lawyer.

19    Q.    Oh, okay.  A former attorney?

20    A.    Yes, ma'am.

21    Q.    Did you speak with anybody at the EEOC after

22    your complaint was filed?

23    A.    No, I did not.

24    Q.    All right.  So aside from the employees that

25    we've listed, current and former employees of United, your

**PAGE 14**

1    family and the EEOC, anyone else that you spoke with about

2    your belief that you were discriminated against by United?

3    A.    Not that I recall right now.

4    Q.    Did you speak to any reporters about your belief

5    that you were discriminated against?

6    A.    I did not.

7    Q.    Were you aware that there was an article in the

8    newspaper?

9    A.    Yes, I was.

10    Q.    And you didn't speak to the reporter?

11    A.    I did not.

12    Q.    Going back to your conversations with Mr. Farfan,

13    was that one call or several calls?  I'm not sure if I asked

14    you that.

15    A.    Right.  Several calls.

16    Q.    Several calls.  How long did these calls last,

17    if you recall?

18    A.    I don't recall the length of the call.

19    Q.    Was it over an hour?

20    A.    One could have been over the hour; the other one

21    could have been shorter.  I'm sorry.  I don't recall.

22    Q.    And when you say several, is that more than two?

23    A.    Of course.

24    Q.    Is it less than five?

25    A.    No.  I would say that it would be more than 10.

**PAGE 15**

1    Q.    And all those 10 calls, were all of those calls

2    related to the alleged comments that your supervisor made to

3    you?

4    A.    Yes.

5    Q.    Are you taking any medications that would affect

6    your ability to testify here today?

7    A.    No.

8    Q.    Are you taking any kind of narcotic or other

9    controlled substance that would affect your ability to

10    testify?

11    A.    No.

12    Q.    Have you taken or ingested any kind of alcohol

13    that would affect your ability to testify this morning?

14    A.    No.

15    Q.    Are you suffering from any illness or condition

16    that would affect your ability to testify here today?

17    A.    No.

18    Q.    Are you currently under the care of a physician,

19    psychiatrist, psychologist, social worker, counselor, or

20    therapist?

21    A.    Yes, I am.

22    Q.    Who?

23    A.    Dr. Viaj Tanua.  It is spelled V as in victory,

24    I-A-J.  And then last name is T as in tango, A-N-U-A.

25    Q.    And how long have you been under the care of --

**PAGE 16**

1    and is it Dr. Tanua [TAN-NOO]?

2    A.    Tanua [TAH-UHN-K], Tanua [TAH-UHN-K].

3    Q.    Tanua [TAH-UHN-K].  How long have you been under

4    his care?

5    A.    More than 10 years.

6    Q.    And what is Dr. Tanua -- I'm going to

7    mispronounce his name again.  What is Dr. Tanua?

8    A.    Family doctor.

9    Q.    Is he your primary care physician?

10    A.    Exactly.  Yes.

11    Q.    Any other physician, psychiatrist, sociologist,

12    social worker, counselor, or therapist that you are under

13    the care of?

14    A.    Um, I suffered heart attack, so, you know, I do

15    have cardiologist and I provided the name and the address in

16    the documents to United.

17    Q.    When did you suffer your heart attack?

18    A.    The heart attack was a couple of years ago.

19    Q.    Do you remember the year?

20    A.    I don't recall.

21    Q.    Was it after you were terminated from United?

22    A.    No.

23    Q.    It was before?

24    (Audible electronic device chime).

25    A.    Oh, I'm sorry.  One more time.

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 8 of 84 PageID 244

## PAGE 17

1    Q.    It was before you were terminated, correct?
2    Your heart attack was before you were terminated.
3    A.    Right.
4    Q.    What is your cardiologist's name?
5    A.    I don't remember. I'm sorry. But we provided
6    the name, the phone, and the address in the documents to
7    United.
8    Q.    So I take it you're not currently seeing your
9    cardiologist?
10   A.    Not at this time.
11   Q.    When is the last time you saw Dr. Tanua?
12   A.    It was about a week ago, approximately. I would
13   have to look up the specific date.
14   Q.    Was that just for a regular checkup?
15   A.    No. I, um -- I called her crying, because I
16   have -- after Cindi -- well, after my supervisor fired me,
17   I suffer from insomnia. I cannot sleep. I'm depressed.
18   I cannot get out of bed. (Begins crying). So, um. . . So,
19   it's like the whole life lost its meaning when I lost the
20   job.
21        DEPONENT: I'm sorry. I don't mean to cry.
22        MS. WILLIAMS HARRIS: That's okay.
23        MR. BOUZAS: Monica, I'm just going to grab some
24   tissues. Okay?
25        MS. WILLIAMS HARRIS: Okay. That's fine.

## PAGE 18

1         Do you need a second? Do you need a minute,
2    Ms. Ceranek?
3         DEPONENT: I apologize again for crying and
4    losing the composure.
5         MS. WILLIAMS HARRIS: Do you need to take a
6    moment?
7         DEPONENT: No, no, no. Not at all.
8    Q.    (By Ms. Williams Harris) So you said that you
9    called your -- this is a woman. Your doctor is a woman?
10   A.    Yes, ma'am.
11   Q.    So you called her about a week ago because you
12   were crying and you were suffering from insomnia, et cetera.
13   Is that the first time that you went to see her to complain
14   about the issues that you just mentioned?
15   A.    No. It was -- I complained to her before and
16   she was aware that I was fired from United after 29 years of
17   service.
18   Q.    When was the first time you saw Dr. Tanua
19   complaining about insomnia and the crying and your
20   representation that you were depressed? When was the first
21   time you spoke to her about those concerns you had?
22   A.    After my supervisor fired you.
23   Q.    Do you remember the date of the first --
24   A.    I don't recall it, but, um, there's the release,
25   right, for the medical documents?

## PAGE 19

1    Q.    Are you seeing a psychiatrist?
2    A.    Not at this time. She recommended, but not at
3    this time.
4    Q.    What about a therapist?
5    A.    I haven't set up an appointment yet, but I will.
6    Q.    Do you remember how soon after you were
7    terminated that you initially reached out to your doctor,
8    Dr. Tanua, complaining about the insomnia, the crying,
9    et cetera?
10   A.    I'm sorry. I don't remember. It was two years
11   ago.
12   Q.    Okay. Was it shortly after the termination?
13   A.    It's hard for me to determine.
14   Q.    Has Dr. Tanua prescribed you any medication to
15   address the concerns and issues that you say you're
16   experiencing?
17   A.    Yes, ma'am.
18   Q.    What has she prescribed you?
19   A.    I don't. . . I cannot pronounce it. I don't
20   know what it is. I don't. . . I'm sorry. I would have to
21   ask the doctor.
22   Q.    How frequently are you -- strike that. Do you
23   know what the medication is for?
24   A.    Yes. The medication is for depression and not
25   to get suicidal.

## PAGE 20

1    Q.    Okay. How frequently do you take it?
2    A.    Every day.
3    Q.    Do you take it in the morning or the evening?
4    A.    Morning.
5    Q.    Did you take it this morning?
6    A.    Uh, no.
7    Q.    But you don't recall the name of the
8    prescription that she gave you?
9    A.    No.
10   Q.    Do you remember when she initially first
11   prescribed this medication that you're taking?
12   A.    After Cindi Hamburg fired me.
13   Q.    Okay. But you do specifically remember when she
14   prescribed it?
15   A.    No, I don't. I'm sorry.
16   Q.    Did she prescribe it this year?
17   A.    No. It was in 2019.
18   Q.    Besides the medication that your doctor
19   prescribed and you don't know the name of it, you can't
20   remember the name of it, any other medication that you're
21   taking?
22   A.    I'm taking medication for high blood pressure.
23   I'm taking medication for, um. . . Um, I forgot. I forgot.
24   Yeah. Sorry. I'm nervous.
25   Q.    If you remember it, then just let me know.

**PAGE 21**

1    How long have you been taking your high blood
2  pressure medication?
3    A.   Um, for the last, uh, two years.
4    Q.   Did Dr. Tanua prescribe that to you, as well?
5    A.   Yes, ma'am.
6    Q.   Do you recall when she first prescribed you the
7  high blood pressure medication?
8    A.   I don't.
9    Q.   Do you know the name of the high blood pressure
10  medication that you're taking?
11    A.   I have it in my purse, if I could --
12    Q.   That's fine.
13    (Deponent moves away from camera momentarily).
14    A.   I know I'm going to have high blood pressure
15  after the deposition.
16    Q.   I will try to make it easy for you.
17    A.   This is what it is.  Lisinopril.
18    (Holding medication bottle up to camera).
19    Q.   Can you spell it for me?
20    A.   Sure L as in Lima, I, S as in Sierra, I, N as in
21  November, O, P as in Peter, R as in Robert, I, L as in Lima.
22    Q.   Okay.  And how frequently are you taking this?
23    A.   One tablet by mouth every day.
24    Q.   Have you already taken it for today?
25    A.   Not yet.  I'm planning to take it after

**PAGE 22**

1  deposition.
2    Q.   Okay.  So aside from the medication that your
3  doctor prescribed to you to address the -- let me back up
4  for a second.  Strike that.
5    Aside from the medication that you say your
6  doctor prescribed you to address the depression, that you
7  say you're experiencing, and your high blood pressure, any
8  other medications that you're taking?
9    A.   I take medication that prevents for the plaque --
10  plaque, P-L-A-Q-U-E -- to build in your bloodstream, but
11  I forgot the name.  I'm sorry.  I'm stressed out.
12    Q.   That's okay.  And who prescribed that medication?
13    A.   Dr. Tanua.
14    Q.   Any other medication?
15    A.   No.
16    Q.   The medication that you say she prescribed to
17  address the plaque buildup in your bloodstream, did you take
18  that this morning?  Whoop.  Woop.
19    How frequently do you take that?
20    A.   Once a day in the evening.
21    Oh, one more medication that I forgot to mention,
22  and it is the pill that you put under your tongue if you
23  suffer heart attack, if your blood pressure goes up and you
24  suffer heart attack and then you have to immediately call
25  9-1-1.  So I have that medication, but I forgot the name of

**PAGE 23**

1  it.
2    Q.   But you don't take that every day, do you?
3    A.   No.  This is for emergency only.  Yes, ma'am.
4    Q.   Okay.  Do you have any reason to believe that
5  your insomnia -- well, let me strike that.
6    You said you suffer from insomnia.  Did you get
7  a good night's rest last night?
8    A.   No.  I couldn't sleep and, uh. . .
9    Q.   Do you think that your inability to have slept
10  last night is going to affect your ability to testify
11  truthfully today?
12    A.   No.
13    Q.   You also indicated that you suffer from high
14  blood pressure and you're taking medication for that.  Do
15  you think that your high blood pressure will affect your
16  ability to testify truthfully today?
17    A.   No.
18    Q.   You also indicated that you believe that you
19  suffer from depression.  Let me back up.  Strike that.
20    Has Dr. Tanua diagnosed you with depression?
21    A.   I'm not a medical doctor.  I cannot attest to
22  that.
23    Q.   But you say that you have expressed to her that
24  you feel depressed?
25    A.   Yes, ma'am.  And I cry all the time and, yes.

**PAGE 24**

1    Q.   But as far as you know, she has not diagnosed
2  you with depression?
3    MR. BOUZAS:  Object to form.
4    A.   (By the Deponent)  That, I don't know.
5    Q.   All right.  So are your feelings of depression,
6  would those impact your ability to testify truthfully today?
7    A.   No.
8    Q.   What is your residential address?
9    A.   16104 Worlington -- it's W as in William, O, R,
10  L as in Lima, I, N, G, T as in tango, O, N.  So it's
11  Worlington Place, and it's Odessa, Florida, 33556.
12    Q.   Does anyone live at that address with you?
13    A.   Yes.  My husband.
14    Q.   Anyone else?
15    A.   No.
16    Q.   How long have you lived at 16104 Worlington
17  Place?
18    A.   Since 2009.
19    Q.   Do you own the property or are you renting?
20    A.   I own it.
21    Q.   It's a home?
22    A.   Home.  Yes.
23    Q.   What is your residential phone number?
24    A.   (813) 966-9191.  It's a cell.
25    Q.   I was going to be very impressed if you had a

Case 8:20-cv-02292-CEH-SPF    Document 25-1    Filed 02/18/22    Page 10 of 84 PageID 246

**PAGE 25**

1 residential phone number. I do not know mine, because I
2 don't have one.
3         All right. What is your Social Security number?
4 A. 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.
5 Q. What is your date of birth?
6 A. September 5th, 1957.
7 Q. And your place of birth?
8 A. Poland.
9 Q. What city in Poland?
10 A. I have to spell it. It's B as in bravo, Y,
11 D as in David, G, O, S, Z, C as in Charlie, Z.
12 Q. Can you pronounce that?
13 A. Bydgoszcz [BID-GAASHT].
14 Q. How long have you and your husband been married?
15 A. It's going to be 40 years this year.
16 Q. Congratulations.
17 A. Thank you.
18 Q. You mentioned earlier that you have a daughter
19 named Sonia. How old is Sonia?
20 A. Sonia is 30 years old.
21 Q. And where does she live?
22 A. She lives in Sacramento, California.
23 Q. Do you have any other children besides Sonia?
24 A. Yes. I have a son.
25 Q. And what is his name?

**PAGE 26**

1 A. Alexander.
2 Q. And how old is he?
3 A. He is 33.
4 Q. And where does he live?
5 A. In Tampa, Florida.
6 Q. Do you know Sonia's current address?
7 A. I know it, but I would have to look it up to
8 provide it.
9 Q. What about your son?
10 A. The same. I would have to look it up to provide
11 it.
12 Q. Do you provide any financial support to your
13 children?
14 A. No.
15 Q. Now, is Sonia working?
16 A. Yes.
17 Q. Where does she work?
18 A. She works at a medical center.
19 Q. Do you know the name of the medical center?
20 A. I would have to look it up.
21 Q. What about your son, Alexander?
22 A. He works as a salesman.
23 Q. Do you know who he works for?
24 A. He's self-employed.
25 Q. What is the name of his company?

**PAGE 27**

1 A. I would have to look it up.
2 Q. How long has he been self-employed?
3 A. For a long time.
4 Q. Ten years?
5 A. I don't know specifically.
6 Q. You said he's a salesman. What does he sell?
7 A. CBD. He had different employments in between
8 being self-employed. That's why I'm not sure as far as the
9 length of employment.
10 Q. Aside from Sonia and Alexander, do you have any
11 other dependents?
12 A. Um, I do --
13 Q. Strike that. Do you have any dependents, since
14 your children aren't dependent on you. Do you have any
15 dependents?
16 A. No.
17 Q. Does your husband work?
18 A. He does.
19 Q. Where does your husband work?
20 A. Westchester nursing home.
21 Q. Nursing home?
22 A. Nursing home.
23 Q. And what does he do at Westchester nursing home?
24 A. He is a Physical Therapist.
25 Q. How long has he been at Westchester nursing

**PAGE 28**

1 home?
2 A. Over 15 years.
3 Q. How old is your husband?
4 A. The same as me, 64.
5 Q. So what are the monetary damages that you are
6 seeking in this case?
7 A. So for me, the most important part is the
8 retirement flight benefits, United Airlines retirement
9 flight benefits. All the other, um. . . All the other, um,
10 monetary compensation was actually sent to United in the
11 documents, and of course it is for the jury to decide.
12 Q. And when you say that it was sent to United,
13 you're referring to the Interrogatory answers that your
14 attorney provided?
15 A. Exactly. Yes, ma'am.
16 Q. Have you ever been convicted of a felony or a
17 misdemeanor?
18 A. No.
19 Q. Have you ever been convicted of a crime of
20 dishonesty?
21 A. No.
22 Q. Where did you go to high school?
23 A. In Bydgoszcz, Poland.
24 Q. And did you graduate from there?
25 A. Yes, ma'am.

**PAGE 29**

1   Q.   When did you move to the United states?

2   A.   In 1984.

3   Q.   And did you become a citizen at some point?

4   A.   Yes, ma'am.  In 1989.

5   Q.   After high school, did you attend any college,

6   either in Poland or here?

7   A.   In Poland, I attended college.

8   Q.   And how long did you attend college in Poland?

9   A.   Four years.

10  Q.   Did you graduate?

11  A.   Yes, ma'am.

12  Q.   What did you receive your degree in?

13  A.   Business administration.

14  Q.   What was the name of your college in Poland?

15  A.   University of Adam Mickiewicz.  I can spell it.

16  Q.   Go ahead.

17  A.   So it's University, and it's of Adam, A-D-A-M,

18  and then Mickiewicz is M as in Mary, I-C-K-E-I-C-Z [sic].

19  Q.   Okay.  Thank you.

20       Aside from your degree from college in Poland,

21  any other certificates that you hold?

22  A.   I attended Emily Griffith Opportunity School in

23  Denver, Colorado.

24  Q.   Emily Griffith Opportunity School?

25  A.   Right.

**PAGE 30**

1   Q.   And what is that?

2   A.   It was, um -- I was learning data entry,

3   data entry, 10 key.

4   Q.   And how long were you if that program or in that

5   school?

6   A.   One year.

7   Q.   Did you graduate from that school?

8   A.   Yes, I did.

9   Q.   Did you receive a certificate?

10  A.   Yes, I did.

11  Q.   And so when you graduated from the Emily

12  Griffith O pportunity School, you were certified in what?

13  A.   In data entry.

14  Q.   And when did you graduate from Emily Griffith

15  Opportunity School?

16  A.   On or about '85, '86.

17  Q.   Any other certificates that you possess?

18  A.   No.

19  Q.   Any other degrees?

20  A.   No.

21  Q.   Where were you employed prior to your employment

22  with United?

23  A.   I worked for First Bank of Colorado from 1988

24  till 1990.

25  Q.   What did you do there?

**PAGE 31**

1   A.   I was hired as a teller and then I got promoted

2   to new accounts.

3   Q.   Okay.  And in 1980, you transitioned to another

4   job; is that correct?

5   A.   In 1990.

6   Q.   I'm sorry.  1990, you transitioned to another

7   job?

8   A.   Yes.  I got hired by Continental Airlines.

9   Q.   And when you began working for Continental, what

10  was your job title at that time?

11  A.   It's a reservation agent.

12  Q.   And where were you located when you began

13  working for Continental in 1990?

14  A.   Denver, Colorado.

15  Q.   And how long were you with Continental?

16  A.   So, till 2009.  In 2009, United and Continental

17  merged together as equal partners and all the Continental

18  employees were, um. . . I don't want to say allowed, but

19  were preserved the original hire date and there was a lot of

20  um, company, um, training to treat us as a whole, not

21  differentiating between United and Continental, because at

22  that point we were one company.

23  Q.   And at the time of the merger between United and

24  Continental, what was your job title at that time?

25  A.   I was Reservation Sales and Customer Service,

**PAGE 32**

1   international.  I was also empowered agent.

2   Q.   A who agent?

3   A.   Oh, I'm sorry.  Empowered, empowered.  Like you

4   have a lot of power, but it's empowered agent, giving me

5   empowerments to do different waivers and make judgment calls

6   as long as I document the reservation and, uh, use the,

7   uh. . . basically your judgment when applying the waiver.

8   There were other waivers, that I can go into describing it,

9   but, um, yeah.

10  Q.   Okay.  So as a reservation -- you said

11  reservation -- at the time of the merger, you were still a

12  Continental employee, correct?

13  A.   Yes, ma'am.

14  Q.   And at that time, you said that your title was

15  reservation sales, customer service, international?

16  A.   International is not in the name of the, um. . .

17  of the position.  So it's, um, reservation, um. . .

18  reservation sales agent and customer service.  But I was

19  international also, yes, ma'am, and empowered agent.

20  Q.   So what does international -- is it

21  international empowered agent or is it international and you

22  were an empowered agent?

23  A.   The empowered part refers to all the functions

24  of my job, so domestic and international and customer

25  service.

PAGE 33

1    Q.    So the international piece, what does that mean?
2   Because you said international, as well. What did that mean?
3        A.    International means that I was -- I was
4   basically booking, changing, and refunding international
5   tickets. I was able to -- based on my judgment or on the
6   specific waiver, I was able to waive the $450.00 change fee.
7   That's for the international tickets. I was able to waive
8   the difference, that on international ticket is significant.
9   And I was able to do it basically because of the flight
10  being late, meaning missed connection, or the flight got
11  cancelled, or reprotecting on other carriers for different
12  reasons, like, um, the passenger, um, wanted to change to a
13  different carrier, but, yeah.
14       Q.    So those were responsibilities that you were
15  given because of the empowered status that you had?
16       A.    Yes, ma'am.
17       Q.    So I would assume and, correct me if I'm wrong,
18  that all Reservation Sales and Customer Service agents did
19  not have that same empowerment.
20       A.    That, I don't know if it's all, but there were
21  couple hundreds of us. I would assume that we're empowered
22  agent and if there is a rule, with your empowerment, you can
23  make the waiver, document it. The waiver has to be, um,
24  justified, but it's based on your judgment and on your
25  training.

PAGE 34

1           We got extensive training regarding the waivers.
2   The waivers were encouraged, promoted, and required by
3   United, because then one of the biggest responsibility,
4   I would say, was to, um, deescalate the problems with
5   passengers, so the problem would not escalate to customer
6   service. So, use your empowerment. Give the -- whatever it
7   takes to resolve the situation. If it's compensation, I was
8   able to give compensation up to $500.00. I was able to give
9   miles back to United account based on the judgment, based on
10  whatever happened.
11          If there was any doubt in the situation, I --
12  you know, there was a saying that the tie always goes to the
13  customer and, um. . . and then the waivers, um -- see the
14  waivers, once you document -- everything has to be documented
15  and justified. Right? So you document the waiver and it
16  goes on a queue to a senior agent that checks if the waiver
17  was, um, called for. And after that, I don't know if
18  there's another level of security, because I'm at the bottom
19  of it. So, I don't know the whole security system.
20       Q.    So the -- because I just want to deal with
21  Continental right now, before we switch over to United.
22       A.    Sorry, sorry.
23       Q.    No. That's okay. So with Continental, all the
24  things you just explained to me, were those the rules when
25  you were an employee of Continental?

PAGE 35

1        A.    Um, yes, and they transferred to United, because
2   we were at the same level. We transfer at the same level as
3   far as responsibilities and duties and empowerment.
4        Q.    Okay. So when the merger happened, your
5   understanding is that the same responsibilities you had as a
6   reservation sales, customer agent that was empowered, that
7   carried over when you made the transition as a United
8   employee. That's your understanding.
9        A.    That's my understanding and that's what we were
10  told.
11       Q.    Okay. So what was your -- did your job title
12  change after the merger in 2009?
13       A.    No. The only reason -- the only -- I take it
14  back, if I may.
15          It has changed in a way that remote was added to
16  it. So, I was now -- since the merger, I was remote
17  reservation agent and customer service, international,
18  empowered.
19       Q.    Okay. So the only thing, from your
20  understanding, that changed in that merger was that you
21  became a remote agent?
22       A.    Yes, ma'am.
23       Q.    Meaning that you did not work in a particular
24  center. You worked from home?
25       A.    Yes. I worked in my bedroom.

PAGE 36

1        Q.    Prior to the merger, where did you work?
2        A.    In an office here in Tampa.
3        Q.    Do you know if after the merger, that whole
4   office closed? Or do you have any knowledge about what
5   happened to that office after the merger?
6        A.    The office closed for everybody. Everybody
7   became remote or transferred to a different office
8   systemwide. Let's say somebody wanted to go to Chicago,
9   they would go to Chicago office. But whoever wanted to,
10  say, in Tampa, stay in Tampa, would stay in -- would have to
11  be remote.
12       Q.    Okay. So at the time of the merger, everyone
13  that was in that office became remote?
14       A.    Exactly, or transferred to a physical office
15  outside of Tampa.
16       Q.    Okay. Do you recall where their office was
17  located?
18       A.    Boy Scout.
19       Q.    So over by the airport?
20       A.    Exactly. Yes.
21       Q.    At the time of the merger, who was your
22  supervisor?
23       A.    You know, I cannot recall. It was 12 years ago,
24  11 years ago. Sorry.
25       Q.    That's okay. Now, you mentioned that you

Case 8:20-cv-02292-CEH-SPF    Document 25-1    Filed 02/18/22    Page 13 of 84 PageID 249

## PAGE 37

1 received trainings, extensive training, um. . . and I will --
2 instead of assuming, I'll ask a question. Did you receive
3 training, extensive training, while you were at Continental?
4  A.  Yes, I did.
5  Q.  Did you also receive extensive training when you
6 became an employee with United?
7  A.  I received extensive training regarding waivers
8 when I was with United.
9  Q.  Tell me about the training that you received
10 when you became an employee of United. Specifically with
11 respect to waivers.
12  A.  Okay. So as an empowered agent, I was able to
13 make an exception based on my judgment.
14  So, this is the blanket waiver. However, it has
15 to be substantiated by documentation. And so I was able to
16 waive $25.00 booking fee if there was a problem with the
17 computer. Somebody tried to set up a reservation on
18 United.com and couldn't get the flights he wanted, or the
19 price was higher, then we would verify everything and make
20 an exception or not, but after fact-finding. So $25.00,
21 $50.00 redeposit fee, $50.00 change fee, $75.00 change fee.
22 There were different amounts. Or $450.00 change fee on
23 international ticket. And so there was the. . . there was
24 the blanket waiver based on your judgment.
25  There was the tie always goes to customer when

## PAGE 38

1 you're in doubt and the customer is arguing, and from the
2 previous documentation in the reservation, it could have
3 gone different way, either this way or that way. Then you
4 always. . . you always do it for the customer. Okay?
5  And then there were other waivers. So, fear of
6 flying small equipment. So I could waive the change fee if
7 you called and said *I have a fear of flying small equipment*
8 *and I was never advised that I'm on a propeller flight.*
9  Then there is the, um. . . you can waive the fee
10 due to funeral. So every agent can waive the fee to the
11 funeral documented for a close family member. Close family
12 member was defined as mostly brother, sister, son, daughter,
13 uncle, aunt. So, that's the rule. For me, as an empowered
14 agent, I could do the waiver and go outside of the, um. . .
15 of the family member description, because I'm empowered and
16 I can do it based on the judgment call.
17  Q.  Did you have to get permission to go out -- if
18 that's the rule, even if you were empowered, before you made
19 a waiver for someone that wasn't a close family member, as
20 it's defined, did you have to get permission?
21  A.  No, I did not. It was required by United to use
22 your waivers and it was encouraged, to prevent the calls to
23 go to customer care.
24  There was also other waivers. Let's say you're
25 traveling with a pet and, on this particular flight, we

## PAGE 39

1 already have, you know, limited number of pets. I will
2 change the flight to the different connections to be able to
3 accommodate your pet onboard.
4  Or if the flight got delayed, I will change,
5 free of charge, to the next available flight, because the
6 flight got delayed.
7  Or if the flight got delayed and your arrival to
8 the final designation was more than four hours, according to
9 the rules, I could put you on a different carrier.
10  I did hundreds and hundreds of waivers, like all
11 the other United employees that were empowered. We all did
12 the same thing and had the same empowerment, and I would
13 say -- I would estimate that, you know, at least couple
14 hundreds of us.
15  Q.  Okay. And so your understanding is that the
16 reason that you were given this empowerment in terms of
17 waivers -- and I think I heard you say this -- is to avoid
18 customers calling customer service. The request or the
19 expectation, from your understanding, was as a reservation
20 specialist, your goal was to make the customer happy and
21 we're going to give you the empowerment to make certain
22 types of waivers to avoid the customer getting disgruntled
23 and calling customer service.
24  A.  So it's not as much as making customer happy,
25 but keeping the middle ground, figuring out what happened,

## PAGE 40

1 and then take your empowerment, whatever your judgment is,
2 document it -- so, I always documented my waivers -- and
3 either give the compensation, so it doesn't escalate to
4 customer care. And it was so important, because customer
5 care was slammed with the calls from dissatisfied customers
6 and we were told to take care of it on the lowest level
7 possible. And it would come up in a meeting then, *Why*
8 *didn't you use your empowerments and you allowed this*
9 *customer to be so dissatisfied that it escalated to customer*
10 *care?*
11  Because usually customer care would issue
12 compensation that would be higher. It would be
13 time-consuming for them, tying up the whole department. We
14 were told, let's say, how many pieces of mail they have to
15 answer to the dissatisfied customer because we don't
16 properly use our empowerments.
17  Q.  And I also understand -- you were talking about
18 training. I also understand that as a United employee, you
19 were permitted certain benefits, and one of those benefits
20 was flying privileges for you and your family. What was
21 that called, the privileges that you were allowed as an
22 employee of United?
23  A.  Um, it was under Flying Together on United
24 Website and it was pass privileges.
25  Q.  Pass privileges. Okay. Were you trained on

## PAGE 41

1    pass privileges?

2         A.    I was trained. Yes, I was.

3         Q.    Was that training an annual training? How

4    frequently was that training?

5         A.    I don't recall. I had hundreds of different

6    trainings, between Continental and United, over the 29

7    years. And I'm sorry, I don't remember the frequency.

8         Q.    But with respect to the pass privileges and

9    Flying Together, were you trained one time or more than one

10   time?

11        A.    I don't recall.

12        Q.    Do you recall what that training was with

13   respect to Flying Together pass privileges?

14        A.    It's too broad of a question.

15        Q.    Okay. You were trained on pass privileges; is

16   that correct?

17        A.    Yes, ma'am.

18        Q.    Do you have any recollection about what that

19   training involved?

20        A.    No. I'm sorry. I would have to see the document

21   to verify.

22        Q.    Do you have any recollection about what the rule

23   was regarding how you, as a reservation agent, were to

24   handle reservations made on behalf of family?

25        A.    Yes, ma'am. It was set specifically that

## PAGE 42

1    because I worked in reservation, I was able to book myself

2    and my family members for the pass travel.

3         Q.    Do you remember what the rule was with respect

4    to waivers and your ability to issue waivers to family

5    members under the pass privileges?

6         A.    No, I don't, but I would like to mention that

7    once my family member purchased a ticket, he became like any

8    other United customer and had the same rights and obligation

9    under the Contract of Carriage, like any other passenger.

10   So, that's what I wanted to say.

11        Q.    What was the rule? What was United's rule with

12   respect to waivers that you were able to provide to family

13   members?

14        A.    I don't recall specifically.

15        Q.    Were you able just to do any waiver you wanted

16   with respect to family members?

17        A.    So we would have to narrow down the situation,

18   because it is too broad of a question. So, if I may.

19               If I -- If I -- you know, if I purchased the

20   ticket for my husband and the flight was delayed, and

21   I accommodated all the passengers from that flight on the

22   next available flight, because he simply could not make a

23   connection, I would do it and document it, because he was

24   entitled to be treated like any other passenger. And I did

25   not try to hide the waiver. I documented it. I documented

## PAGE 43

1    the reason. And otherwise, it would be like reverse

2    discrimination. Everybody gets re-accommodated, but because

3    your husband -- you purchased the ticket like anybody else,

4    but you cannot go on the next flight or you have to pay the

5    $50.00 change fee on it?

6         Q.    So even though that's your perspective, was that

7    a violation of United's rules?

8         A.    We have to differentiate between the pass travel

9    and a confirmed ticket.

10               Pass travel is when there is an empty space on

11   the plane, the agent at the gate would clear me and I go on

12   the flight.

13               When you buy the ticket, you are like any other

14   passenger on United. And then if you have extenuating

15   circumstances that are justifiable, then the waivers should

16   apply to them like to any other passenger.

17        Q.    Okay. I --

18        A.    So --

19        Q.    I'm sorry. Go ahead. I'm sorry.

20        A.    So my point is that I never broke any rules or

21   regulations for United. I always documented. I followed

22   what I was told to do and I did what other empowered agents

23   were doing at the same time.

24        Q.    So other than the one lawsuit that you filed

25   against United, have you ever filed a lawsuit, raising

## PAGE 44

1    claims related to your employment, against any other

2    employer?

3         A.    No.

4         Q.    Other than this lawsuit, have you been a party

5    or filed any other type of lawsuit against anyone else?

6         A.    No.

7         Q.    Have you ever filed for or declared bankruptcy?

8         A.    No.

9         Q.    Have you ever filed for Workers' Compensation

10   benefits?

11        A.    No.

12               MS. WILLIAMS HARRIS: Can we take a quick break,

13        because the next portion is going to be a little

14        lengthy? Can we take a quick five or six-minute break?

15               (Court reporter on mute nodding affirmatively;

16        recess taken 11:09 to 11:15 AM).

17        Q.    (By Ms. Williams Harris) Ms. Ceranek, before we

18   went on break, we talked a little bit about some of the

19   training that you had as a reservation sales and service

20   representative with Continental first and then United. Do

21   you recall a policy or a training called Ding Your Part?

22        A.    I recall it. Yes.

23               MR. BOUZAS: Hey, Monica. Who is Mary O'Neil?

24               MS. WILLIAMS HARRIS: Mary O'Neil is my

25        corporate rep.

## PAGE 45

1    MR. BOUZAS: Okay. What's her position?

2    MS. WILLIAMS HARRIS: She's in-house counsel.

3    MR. BOUZAS: Okay. Thank you.

4    MS. WILLIAMS HARRIS: You're welcome.

5    Just a second.

6    (Brief pause accordingly).

7    Q.    **(By Ms. Williams Harris) So I asked you about**

8    **do you remember Doing Your Part training.**

9    A.    Um, I do recall the name of it. Yes.

10   Q.    **Do you recall taking that training?**

11   A.    Um, no. I'm not sure.

12   Q.    **Do you recall taking a Leisure Pass Travel**

13   **training?**

14   A.    I would have to review the documents to be sure.

15   Q.    **Previously you had mentioned that in 2009,**

16   **Continental and United merged, and at that point in time you**

17   **became a United employee; is that correct?**

18   A.    Yes, ma'am.

19   Q.    **And when that merger happened, where were you?**

20   **I'm not sure if I asked that question previously. Where**

21   **were you located physically?**

22   A.    I was already remote, to the best of my

23   knowledge.

24   Q.    **From your home? Working remotely from your**

25   **home?**

## PAGE 46

1    A.    Yes, ma'am.

2    Q.    **And did your title change at all when the merger**

3    **happened between United and Continental?**

4    A.    It did not, because I was already remote. So

5    the same title, um. . . the same title and the same hire

6    date continued.

7    Q.    **Did your job responsibilities change at all**

8    **after the merger?**

9    A.    I was added on more responsibilities, yes, but

10   the title did not change. Sorry.

11   Q.    **Do you remember what your pay rate was at the**

12   **time of the merger?**

13   A.    At the merger, I don't remember.

14   Q.    **Did you have an assigned shift at the time of**

15   **the merger, a particular shift that you worked?**

16   A.    I did not have assigned shift. We bidded our

17   shifts based on seniority. The more senior --

18   Q.    **I'm sorry. Go ahead. I interrupted you.**

19   A.    The more senior the agent, the more choices of

20   shifts that you would have.

21   Q.    **What was your shift at the time of the merger?**

22   A.    I don't remember.

23   Q.    **At some point, Cindi Hamburg became your**

24   **supervisor?**

25   A.    Cindi Hamburg became my supervisor on or about

## PAGE 47

1    November of 2018.

2    Q.    **At the time that she became your supervisor,**

3    **were you still a reservation sales and service**

4    **representative?**

5    A.    Yes, I was. Remote.

6    Q.    **So would remote be different than like a contact**

7    **center?**

8    A.    Yes.

9    Q.    **And at the time that Cindi became your**

10   **supervisor, what shift were you working?**

11   A.    At the end of my employment, my shift, as

12   I recall, was five hours, from 9:00 AM to 2:00 PM Central

13   Standard Time.

14   Q.    **Were you considered full time or part time?**

15   A.    Part time.

16   Q.    **Do you know what the difference between part**

17   **time and full time was per United?**

18   A.    I don't.

19   Q.    **How many hours a week did you work typically?**

20   A.    Typically 25 hours.

21   Q.    **And I'm talking about the time period that**

22   **Cindi Hamburg became your supervisor. So during the time**

23   **that she was your supervisor, on average, you worked about**

24   **25 hours?**

25   A.    25 hours or more, because I picked up hours to

## PAGE 48

1    make additional income.

2    Q.    **Did you ever work over 40 hours?**

3    A.    There were times where we were mandated to work

4    additional hours, additional dates. On a snow day or, um,

5    when there was a lot of calls waiting, it was mandatory, it

6    was per union agreement, and, um, so, yes, I did.

7    Q.    **And were you paid for all the time you worked if**

8    **you worked over 40?**

9    MR. BOUZAS: Object to form.

10   MS. WILLIAMS HARRIS: Go ahead.

11   A.    (By the Deponent) I received correct payment

12   for the hours worked.

13   Q.    **I'm going to show you. . . We'll hope that this**

14   **works very well.**

15   (Ms. Williams Harris screen sharing

16   Exhibit No. 1 linked hereto).

17   **Can you see this?**

18   A.    I do.

19   Q.    **Okay. So what I'm showing you has been**

20   **previously marked as Exhibit 1 to the depo. This is**

21   **Reservations Sales & Services Representative. Take a minute**

22   **to look at this and let me know when you're done.**

23   A.    I'm done.

24   COURT REPORTER: I cannot hear what, Miguel,

25   you're saying. I'm sorry. I didn't hear a word of

**PAGE 49**

1  that.

2      MR. BOUZAS:  Is that 189 through 191?

3      MS. WILLIAMS HARRIS:  No.  It's 191, Miguel.

4      (Indiscernible communication from Mr. Bouzas).

5      Okay.  You printed them and you're going to show

6  them to her?

7      MR. BOUZAS:  Yeah.  I think that's easier.

8      MS. WILLIAMS HARRIS:  So do I need to share my

9  screen going forward?

10      COURT REPORTER:  I cannot hear you, Miguel.

11  I cannot hear you.

12      MR. BOUZAS:  Okay, okay, okay.

13      I would probably recommend that you show it just

14  to make sure that we're looking at the same thing, but

15  we can see how it goes.

16      MS. WILLIAMS HARRIS:  Okay.

17  Q.    **(By Ms. Harris)  So Ms. Ceranek, are you**

18  **finished reviewing it?**

19  A.    Yes, ma'am.

20  Q.    **What I'm showing you is -- what is it that I'm**

21  **showing you?**

22  A.    Reservations Sales & Service Representative.

23  Q.    **And this appears to be the job description for**

24  **that role.  Would you agree?**

25  A.    It looks like it.  Yes, ma'am.

**PAGE 50**

1  Q.    **So under** *Job overview and responsibilities,* **you**

2  **see a summary at the top and then some bullet points**

3  **underneath.  Do those bullet points accurately represent**

4  **your responsibilities as the Reservations Sales & Service**

5  **Representative during your time with United?**

6  A.    It describes some of the responsibilities, but

7  not all of them, like ability to apply waivers.

8  Q.    **Okay.  Is there anything else under** *Job overview*

9  *and responsibilities* **that you performed during your time**

10  **with United that's not listed there?**

11  A.    Yes.  De-escalated the calls; provide

12  compensation; provide waivers to the customer based on

13  different type of waivers that we talk about; um, refund

14  tickets; um, refund service charges.

15      And if I mention -- if I may mention, because,

16  um, within the last couple of years, um, United was, um,

17  going through the transition period and it was transferring

18  from one, um, computer platform to another.  During that

19  transition period, a lot of different, um, sites wouldn't

20  work or different components of the reservation center, the

21  reservation agent's work, they would malfunction.  When they

22  malfunction, uh, then, uh, it would overcharge the passenger

23  or charge the passenger twice.  It was my responsibility to

24  go through the reservation and check if the complaint, um,

25  that the passenger had, was right, I refund the money, put

**PAGE 51**

1  in the waiver.

2  Q.    **But that particular situation that you described**

3  **did not happen all the time, correct?**

4  A.    No, but it consumed a lot of our times in remote

5  reservations, because if people could do it on their own,

6  they would do it.

7      They called us and they said, *Hey, your Website*

8  *doesn't work,* and immediately I would waive the $25.00 fee,

9  because that's what we were told.  You know, the passenger

10  is already upset.  He wants to spend money.  He wants to buy

11  the ticket.  Are you going to argue about the $25.00 booking

12  fee?

13      So, uh. . so that was the main thing, to

14  assist in different inabilities for the passenger.  Because

15  the passengers are very savvy in a way that they can do it

16  on their own.  They can book the ticket, assign the seat,

17  process the upgrade.  Only if there's a problem, they would

18  call us.

19      So we were, you know, putting out fires,

20  problem-solving agents, and that was the main job.  Very

21  seldom people called for, *Hey, I want to book the reservation.*

22  Q.    **So aside from what you've already described in**

23  **terms of things that are not identified on here, anything**

24  **else that you did on a day-to-day basis that's not included**

25  **on this job description?**

**PAGE 52**

1  A.    No, but I would like to concentrate on one

2  bullet point that's here, if I may.

3  Q.    **Okay.**

4  A.    And it's the one that says *Efficiently handle*

5  *special requests; assist all customers using United's*

6  *guidelines.*

7      So that's why I'm turning back to the waivers,

8  because to effectively assist customer in their, let's say,

9  time of grief, when they are calling and crying and it's not

10  the, um, you know, close family member, but it was

11  significant other or somebody, and you hear the person

12  crying, I would make the waiver of the $50.00 fee to change

13  the reservation.  Okay?  Free of charge.

14  Q.    **Anything else?**

15  A.    No, not that I can, you know, like, immediately

16  identify at this time.

17  Q.    **Thank you.**

18  A.    Thank you, ma'am.

19      (Screen share ended).

20  Q.    **Do you recall what your employee number was when**

21  **you worked for United?**

22  A.    U15902.

23  Q.    **155092?**

24  A.    I'm so sorry.  U15902.

25  Q.    **What is 155092?**

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 17 of 84 PageID 293

**PAGE 53**

1    A.    You know, I'm nervous.  I could be mixing it up.
2  Could I quickly check, because I have my form here?
3    Q.    That's fine.
4    A.    Thank you.
5       (Deponent moves away from camera momentarily).
6       155092.
7    Q.    What is an agent sine, S-I-N-E?  Wat is that?
8    A.    This is the, um. . .  This is -- the agent sine
9  documents every reservation.  So whatever the agent touches,
10  it leaves the agent sine in the history of the reservation.
11  It's easily identifiable by the supervisor and the manager
12  and whatever you did, it's in the reservation.
13    Q.    Do you recall what your agent sine was?
14    A.    One more second, if I may.
15    Q.    That's fine.
16       (Deponent moves away from camera momentarily).
17    A.    It doesn't say on the piece of paper, so I'm
18  sorry, and I forgot.  I'm so stressed out that I forget
19  simple things.
20    Q.    That's okay.  That's okay.  And as an employee
21  of United, did you have a MileagePlus account?
22    A.    Yes, I did.
23    Q.    Do you remember what that MileagePlus number
24  was?
25    A.    No.  I'm sorry.  I don't recall.

**PAGE 54**

1    Q.    Does FP176711 sound familiar?
2    A.    Sounds right.
3    Q.    So if there were documents that have your
4  Mi leagePlus number FP -- F as in Frank, P as in Paul,
5  176711, would you have any documentation or evidence that
6  would say that was incorrect?
7    A.    One more time.  Would I have any
8  documentation . . .
9    Q.    Would you have any dispute that that was the
10  correct MleagePlus account?
11    A.    No, no.  That sounds correct.  If you're looking
12  at the document that, you know, Ms. Cindi Hamburg talked
13  about before, that is correct.  That's my MileagePlus number,
14  yes, ma'am.
15    Q.    I'm going to show you another document very
16  quickly.  Now, you mentioned previously that during your
17  time with Continental, that you had lots of training.  And I
18  will presume that during your time as a Continental employee
19  and, in addition, your time as a United employee, that there
20  was lots of employment policies that you received.
21    A.    Um, yes, I received hundreds of different
22  policies within Continental and United over 29 years.  Yes.
23    Q.    Were those policies contained in a handbook or
24  handbooks?
25    A.    Sometimes it was in the form of an online

**PAGE 55**

1  handbook; sometimes it was interactive training.
2    Q.    But you had access to those policies, correct?
3    A.    When I was an active employee, yes, I had.
4    Q.    And when a new policy came out or when a policy
5  was revised, did you-all get information that a policy had
6  either been updated or revised?
7    A.    Um, we would have to narrow that question to,
8  um, which revised policy you're referring to, because the
9  last policy was very confusing.  But I specifically, um. . .
10    Q.    If there was a change in a policy or there was a
11  new policy unveiled, would employees be aware of the change
12  in policy or the new policy?
13    A.    I would make a general statement that all
14  employees were notified about the changes.
15    Q.    And you had access to the changes?
16    A.    And at that point, I would have access to the
17  changes.
18    Q.    Did you read the policy manuals or the handbook
19  when either you had access to them or when you received them?
20  Did *you* specifically read them?
21    A.    I read what was required at that time, but I
22  cannot make a, you know, blank statement saying that I read
23  all of them, because I don't even know if I was sent all of
24  them to my mailbox.
25    Q.    But you had access to them on the intranet

**PAGE 56**

1  system is that correct?
2    A.    That is correct.  However, if I was not aware of
3  that change to the policy, I would not access that to read
4  it, because I didn't know that it has changed.
5    Q.    I'm going to show you another document.
6       (Ms. Williams Harris screen sharing
7    Exhibit No. 2, linked hereto).
8       MS. WILLIAMS HARRIS:  And this is -- Miguel, for
9    you, it's DEF 7.  Do you have it, Miguel?
10       I don't know if that was a yes or a no.
11    Q.    (By Ms. Harris)  But, Ms. Ceranek, can you see
12  what's on the screen?
13    A.    Yes, ma'am, I can.
14    Q.    Okay.  Let me know when you've finished
15  reviewing it and then I'll ask you questions about it.
16    A.    Sure.
17    Q.    Are you done?
18    A.    No.  No, I'm not.  Sorry.
19    Q.    That's okay.  Let me know.
20       (Brief pause accordingly).
21       MR. BOUZAS:  I found it.
22    A.    (By the Deponent)  I'm done reading it, yes.
23    Q.    At the bottom, there's a signature above
24  Employee Signature.  Is that your signature?
25    A.    Yes, it is.

**PAGE 57**

1   Q.   Now, this again is a Continental policy, but
2   it's entitled *OnePass & Reservations, Family and Friends*
3   *Account Policy.*  Based on your recollection, and you've read
4   it now, what was this policy?  What did this policy advise
5   employees?
6   A.   As it states, um, you know, you should not use
7   your MileagePlus number to book the reservation for friends
8   and family, and it was signed in '94.
9   Q.   Okay.  And you'll agree that it also says *while*
10  *you may make any routine reservation for them* -- and them is
11  your family members, friends -- *do not make exceptions,*
12  *waivers, or take any other action outside of the simple*
13  *reservation.*
14       Do you see that it says that?
15  A.   I do see that.  However, if I might point out
16  that the reservations in question are dated from 2013 to
17  2018, so it is out of the scope of the investigation.
18  Q.   I understand.  I understand.  Do you know
19  whether United had a similar policy?
20  A.   I don't know.
21  Q.   But this was -- that's your signature that
22  says -- it confirmed that you had this policy and I presume
23  that you read it before you signed it?
24  A.   Yes, ma'am.
25       (Screen share ended).

**PAGE 58**

1   Q.   I'm going a little backwards here.  I'm going to
2   show you another document.
3        (Ms. Williams Harris screen sharing
4   Exhibit No. 3, linked hereto).
5        Can you see that?
6   A.   Yes, ma'am.
7   Q.   This is Exhibit 3.
8        MS. WILLIAMS HARRIS:  Patsy, just for your notes,
9   to go back, DEF 7 is going to be Exhibit 2.  And then
10  this, which is DEF 6, will be Exhibit 3.
11  Q.   (By Ms. Williams Harris) Ms. Ceranek, let me
12  know when you're finished looking at that, please?
13       (Brief pause accordingly).
14  A.   Yes, I'm done looking at it.
15  Q.   Is that your signature?  This again is the
16  Continental OnePass & Reservations, Family and Friends
17  Account Policy.  There's a date.
18  A.   Yes, ma'am.  So it's dated 1992 and, yes, it is
19  my signature.
20  Q.   And this, you would agree, was the same policy
21  that I showed you previously as Exhibit 2?
22  A.   You know, I would have to go back to compare.
23  Q.   Okay.  Feel free to compare.
24  A.   Sorry.
25  Q.   That's okay.

**PAGE 59**

1        (Brief pause accordingly).
2   A.   It's the same copy.  Yes, ma'am.
3   Q.   Okay.  I presume that you -- so you would agree
4   that this policy says the same thing as the previous -- this
5   paper, this exhibit says the same thing as the previous
6   exhibit, correct?
7   A.   It is.  So, the only difference is, so one is
8   dated 1992, the other one is dated 1984.
9   Q.   Right.  And I would presume that you also read
10  this policy before you signed it?
11  A.   Yes, ma'am.
12       (Screen share ended).
13  Q.   Now, when you made the transition to United, um,
14  same question, you had access to policies as well, correct?
15  A.   Yes, ma'am.
16  Q.   And those policies were could be found on
17  United's intranet?
18  A.   Yes.
19  Q.   And you would have access to the intranet?
20  A.   Yes.
21  Q.   Do you remember the Code of Ethics and Business
22  Conduct policy?
23  A.   It sounds familiar, but I don't recall the
24  specifics.
25  Q.   All right?  I'm showing you, in a second, what

**PAGE 60**

1   we will admit as Exhibit 4 to the depo.
2        (Ms. Williams Harris screen sharing
3   Exhibit No. 4, linked hereto).
4        MS. WILLIAMS HARRIS:  And Miguel, for your
5   purposes, it's --
6        MR. BOUZAS:  I've got it.
7        MS. WILLIAMS HARRIS:  You've got it?  Okay.
8   This is DEF 438 through DEF 465.
9   Q.   (By Ms. Williams Harris) So Ms. Ceranek, take a
10  minute to look through this document.  And let me know when
11  you're done?
12       MR. BOUZAS:  Did you say 438?
13       MS. WILLIAMS HARRIS:  430, I think that's the
14  first number.  I'm sorry.  438 is the front page, and
15  there's a blank page at 439, and then it starts at 440.
16  A.   (By the Deponent)  Okay.  So I'm looking at the
17  policy, ma'am.
18  Q.   Okay.  Have you had an opportunity to review it?
19  A.   Too many pages to review it.
20  Q.   Okay.  Okay.  All right.  Did you have an
21  opportunity -- when you were an employee of United, did you
22  review this Code of Ethics and Business Conduct policy?
23  A.   It looks familiar.
24  Q.   Did you review it, was my question?
25  A.   I don't remember.

## PAGE 61

1   Q.   Did you have access to it, at least?

2   A.   Um, I should have, yes.

3   Q.   I'm going to draw your attention to 440. . .

4   Page 444, right here (scrolling in document). Where it says

5   Ethics and Compliance Helpline, do you see those numbers?

6   A.   Yes.

7   Q.   Were you familiar with the Ethics and Compliance

8   Helpline?

9   A.   Let me quickly read through it, if I may.

10   Q.   Okay.  That's fine.

11        (Brief pause accordingly).

12   A.   So, I'm sorry.  What was the question?

13   Q.   During the time that you were a United employee,

14   were you familiar with the Ethics and Compliance Helpline?

15   A.   I read it.

16   Q.   But that wasn't my question.  My question was

17   were you familiar with it?

18   A.   Yes.

19   Q.   Were you aware of it?

20   A.   I was aware of it, yes.

21   Q.   And if you had a concern or a problem at work,

22   you would know how to use the Ethics and Compliance Helpline,

23   correct?

24   A.   Unless, of course, I was scared of retaliation,

25   and that's what happened in my case.

## PAGE 62

1   Q.   Okay.  Well, let me just -- and that wasn't the

2   question I asked you, but you were aware of how to use it,

3   correct?

4   A.   Yes.  It's self-explanatory.  Yes, ma'am.

5   Q.   And there is a Website, correct?

6   A.   Yes.  There is a Website address.  Yes, ma'am.

7   Q.   And there is an E-mail address?

8   A.   Yes.

9   Q.   There's a phone number?

10   A.   Yes.

11   Q.   And then there's a mailing address, as well?

12   A.   Correct.

13   Q.   And if you look at the second paragraph under

14   that big blue box, the second sentence says *you can choose*

15   *to use the Helpline anonymously in most locations.*  Do you

16   see that?

17   A.   Yes, got it.  Yes, ma'am.

18   Q.   And the very last sentence says *Please note that*

19   *if you choose to remain anonymous it is important that you*

20   *provide sufficient detail so we can address your concern.*

21   Do you see that?

22   A.   Yes, ma'am.

23   Q.   All right.  I'm going to fast-forward to the

24   next page, which is 445.

25        (Brief pause accordingly).

## PAGE 63

1        Let me know when you're finished reading that

2   particular page.

3   A.   I am finished.

4   Q.   If you look under the paragraph titled *Customers*

5   *who are family members, friends or co-workers*.

6   A.   Okay.

7   Q.   Let me go back for a second.  What is this page

8   entitled?

9   A.   It's *Making ethical decisions*.

10   Q.   I want to focus your attention on the paragraph

11   under *Customers who are family members, friends or co-workers*.

12   Do you see that?

13   A.   Yes, ma'am.

14   Q.   And if you could read that paragraph for me.

15   A.   *Customers who are family members, friends or*

16   *co-workers.*

17        *You should exercise care when providing travel*

18   *services to family members, friends, people with whom you*

19   *have close personal relationships and co-workers. You must*

20   *avoid providing preferential treatment such as unauthorized*

21   *deviation from established rules for pricing, issuance,*

22   *exchange or refunding of tickets, waiving of travel*

23   *restrictions or other terms applicable to discount fares,*

24   *inappropriate upgrades, improperly withholding seats from*

25   *inventory or blocking space.*

## PAGE 64

1   Q.   Next page over.

2   A.   Okay.

3   Q.   It continues on the next page.

4   A.   Sorry.

5   Q.   That's okay.

6   A.   *And ignoring boarding priorities.  Should there*

7   *be a valid business reason for deviating from established*

8   *rules, you must receive prior written approval from your*

9   *supervisor or manager.*

10   Q.   Okay.

11        (Screen share ended).

12        All right.  During your time at United, there

13   was also -- were you familiar with the Working Together

14   Guidelines?

15   A.   Um, sounds familiar, but I would have to see it

16   to verify.  Sorry.

17   Q.   No problem.

18   MS. WILLIAMS HARRIS:  And Miguel, for you, it's

19   the big thick one.  It's DEF 466 through 657.  It's

20   really long.

21   MR. BOUZAS:  What number are we on?

22   MS. WILLIAMS HARRIS:  This is 5.  I'm trying to

23   keep track of my count.

24   So, Patsy, if I didn't say it, the Code of

25   Ethics and Business Conduct is Exhibit 4 and this

**PAGE 65**

1  Working Together Guidelines, that I'm about to show,
2  will be Exhibit 5.
3        MR. BOUZAS:  That's the only one I didn't print.
4        MS. WILLIAMS HARRIS:  Okay.  Well, let me share
5  my screen quickly.
6        (Ms. Williams Harris screen sharing
7  Exhibit No. 5, linked hereto).
8        All right.  Let me know if I need to make it
9  bigger.
10       Q.    (By Ms. Williams Harris)  Okay.  So this is the
11  Working Together Guidelines and this is going to be
12  Exhibit 5 to the depo.  It's pretty lengthy, um, so instead
13  of you having to go through all of that, I'm going to tell
14  you specifically the pages I need you to review.
15       Well, first of all, before we do that, do you
16  recall seeing these guidelines?
17       A.    I recall seeing them, yes.
18       Q.    Did you review the guidelines?
19       A.    I don't remember.
20       Q.    But you had access to them while you were an
21  employee with United?
22       A.    Yes, ma'am, I believe so.
23       Q.    So I want to -- a couple of pages.  At the
24  bottom, you'll see right here it says -- well, you didn't
25  print this.  I'm going to show it to you.  The first page is

**PAGE 66**

1  485.
2        (Displaying DEF 000485 on screen).
3        All right.  Tell me when you're done reading
4  that?
5        A.    Could we make it bigger?
6        Q.    Yeah, I can make it bigger.
7        (Enlarging view accordingly).
8        Is that better?
9        A.    Oh, oh, sorry.
10       Q.    That's okay.  Is that better?
11       A.    Yes.  Thank you, thank you.
12       Q.    You're welcome.  Just let me know when you want
13  to scroll down.
14       (Brief pause accordingly).
15       A.    Okay.  Could you scroll down, please?
16       (Displaying on screen bottom half of DEF 000485;
17  brief pause accordingly).
18       Okay.  Thank you.
19       Q.    Do you remember hearing anything about or
20  understanding what United's anti-discrimination policy was
21  while you were an employee with United?
22       A.    Yes.
23       Q.    And so does this *Protection from harassment and
24  discrimination*, is that what you recall?
25       A.    That seems like the document, yes.

**PAGE 67**

1        Q.    I'm going to scroll down to 487.  Let me know
2  when you're finished reading.
3        (Brief pause accordingly).
4        A.    Okay.  I'm done reading.  Okay.  I'm done
5  reading, ma'am.
6        Q.    And you'll agree that this paragraph, that I'm
7  circling right here, *What you should do about retaliation*,
8  this tells you how to report retaliation, does it not?
9        A.    It does.
10       Q.    During the time that you were an employee with
11  United, were you aware of how to report discrimination or
12  retaliation?
13       A.    In general, yes.
14       Q.    And based on your recollection, what were the
15  means by which you could report discrimination or
16  retaliation?
17       A.    One more time.  I'm sorry.
18       Q.    That's okay.  While you were an employee with
19  United, you indicated that you were aware of how to report
20  discrimination or retaliation.  Did I summarize what you
21  said earlier correctly?
22       A.    I was aware how to report it, but, nevertheless,
23  I was afraid to do it, because there is no such a way as
24  doing it anonymously, you know, without being specific about
25  person or who you are.  Because if you don't identify the

**PAGE 68**

1  person, um, that, um, is, um, you know, um, harassing you,
2  and if you don't, um. . . if you don't name yourself as the
3  person being harassed, then they cannot proceed with the
4  investigation.
5        Q.    That would be your opinion.  Would you agree?
6        A.    It is my opinion, my belief.  Yes, ma'am.
7        Q.    But there were ways to report either
8  discrimination or retaliation when you were an employee with
9  United, correct?
10       A.    There were ways that United offered, yes.
11       Q.    Do you remember what those ways were?
12       A.    Yes, ma'am.
13       Q.    And what were they?
14       A.    I could call and complain about Cindi Hamburg
15  discriminating against me.
16       Q.    Was calling the only -- who would you call?
17       A.    I would call the number, um. . . I would call
18  the number and, uh. . . and leave them the message.  And
19  I actually complained to Ms. Morris, you know,
20  Monique Morris, but I didn't make it anonymous.  I actually
21  filed an official complaint and I sent an E-mail, you know,
22  complaining about the age discrimination, harassment.
23       Q.    Okay.  Besides calling, was there any other way
24  that you could report discrimination, harassment, or
25  retaliation?

**PAGE 69**

1    A.   Send an E-mail, yes, ma'am.

2    Q.   **Any other way, besides sending an E-mail?**

3    A.   Mailing the letter.

4    Q.   **And we talked about it a little bit earlier, so**

5  **those are the ways that you recall the means by which you**

6  **could report discrimination or retaliation, correct?**

7    A.   Yes, ma'am.

8    Q.   **So I'm going to focus your attention on this**

9  **next section of the handbook** *Reporting offensive workplace*

10  *behavior.* **Let me know when you're finished reading this and**

11  **I'll scroll down.**

12    (Brief pause accordingly).

13    A.   Okay. I'm done.

14    (Displaying on screen bottom half of DEF 000488;

15  brief pause accordingly).

16    Okay. I'm done.

17    Q.   **Do you see right here where it says** *if you*

18  *aren't comfortable speaking directly with the individual*

19  *causing the issue,* **they give you the Employee Service Center**

20  **that you can call?**

21    A.   Yes, ma'am.

22    Q.   **Did you ever contact the Employee Service Center?**

23    A.   I wasn't aware that I was able to call Employee

24  Service Center with the complaint of harassment, no. But I

25  didn't call. I apologize.

**PAGE 70**

1    Q.   **But you would agree that this -- the Employee**

2  **Service Center, as an option, is contained in this Working**

3  **Together handbook that you had access to?**

4    A.   Yes, ma'am.

5    Q.   **I'm going to scroll down.**

6    (Displaying on screen top half of DEF 000489;

7    **This is a continuation of the** *Reporting*

8  *offensive workplace behavior* **policy. Let me know when**

9  **you're done and I'll continue scrolling down.**

10    (Brief pause accordingly).

11    A.   Okay. I'm done.

12    Q.   **And at the very top, in addition to here, where**

13  **it says Employee Service Center, you would agree that it**

14  **provides at least three other ways that you could report**

15  **either discrimination, harassment, or retaliation?**

16    A.   I would agree. However, it is my belief that

17  I would never keep it anonymous, you know, without giving

18  the name of the person. And that was my sole reason for

19  being afraid of retaliation.

20    Q.   **Okay. But you would agree that this provides a**

21  **way for you to report it.**

22    A.   Yes. The way was provided, yes.

23    Q.   **I'm going to scroll down a little bit more,**

24  **because there's other things I want you to review. Let me**

25  **know with you're done.**

**PAGE 71**

1    (Brief pause accordingly).

2    A.   I wanted to address the paragraph that it says,

3  *Keep in mind, however, that we can only investigate*

4  *anonymous reports if the person gives enough information to*

5  *identify the problem, the location and the individuals about*

6  *whom the complaint is made.*

7    So that very paragraph defines that you have to

8  name the person that you're complaining about and you have

9  to give your name, um, as the person that is discriminated

10  against and it's never private.

11    Q.   **Well, where in this paragraph does it say that**

12  **you have to give your name? Where does it say that the**

13  **person who's complaining has to provide their name? The**

14  **paragraph you just read, where does it say that?**

15    A.   Um, it doesn't specify the name of the caller,

16  but bringing the logic to the equation is that how would you

17  know who is she discriminating against if you didn't

18  identify the person that she discriminates against?

19    I'm sorry. Maybe I'm not clear. But, you know

20  what I mean? It's, like, it doesn't say here, but it is

21  self -- to me, that's my personal understanding, that it's

22  self-explanatory that, um, you have to give your name,

23  because how will they know that she is discriminating about

24  somebody if she's got 30 people on a team?

25    Q.   **Okay. But you would agree that this says that**

**PAGE 72**

1  **you can make an anonymous report?**

2    A.   That's what it says, yes.

3    Q.   **And you would agree that right here (using hand**

4  **tool to indicate), right before the bullet point, right**

5  **before that paragraph, says** *Go online to our secure an*

6  *confidential Website.* **You agree that says that, as well?**

7    A.   Yes, ma'am.

8    Q.   **If you scroll down, there's two phone numbers**

9  **that you could call if you felt that you were subjected to**

10  **discrimination or harassment or retaliation.**

11    A.   Yes, ma'am. Correct.

12    Q.   **And those two numbers are what?**

13    A.   Employee Service Center and Ethics and

14  Compliance Helpline.

15    Q.   **I'm going to scroll down to DEF 626.**

16    All right. I'm showing you DEF 626, which is a

17  **policy contained in this Working Together Guidelines. What**

18  **is the name of this policy?**

19    A.   The *Pass travel guidelines.*

20    Q.   **Okay. And we talked a little bit about that**

21  **previously, correct?**

22    A.   Yes.

23    Q.   **And I think you indicated that you didn't have a**

24  **real good recollection about what the guidelines were. And**

25  **if I'm misstating what you said, then please correct me.**

**PAGE 73**

1   I think that's what your testimony was.

2      A.   Yes, it was.

3      Q.   So go ahead review this and then I have a couple

4   of questions about it.  Just let me know when you're

5   finished reading what you see and then I'll scroll down.

6      (Brief pause accordingly).

7      A.   I'm done.

8      (Displaying on screen bottom half of DEF 000626;

9   brief pause accordingly).

10      I'm done.

11      (Displaying on screen top half of DEF 000627;

12   brief pause accordingly).

13      I'm done.

14      (Displaying on screen bottom half of DEF 000627;

15   brief pause accordingly).

16      I'm done.

17      (Displaying on screen top half of DEF 000628;

18   brief pause accordingly).

19      Okay.  I'm done.

20      (Displaying on screen bottom half of DEF 000628;

21   brief pause accordingly).

22      Okay.  And, um, I'm done, and what's the

23   question, if I may?

24      Q.   I want you to read the whole policy, unless

25   you'd like to stop, but there's questions I have once you

**PAGE 74**

1   read the whole policy.

2      A.   Okay.

3      (Displaying on screen top half of DEF 000629;

4   brief pause accordingly).

5      I'm done with that part also.

6      (Displaying on screen bottom half of DEF 000629;

7   brief pause accordingly).

8      I'm done with this part, ma'am.

9      (Displaying on screen top half of DEF 000630;

10   brief pause accordingly).

11      I'm done

12      (Displaying on screen bottom half of DEF 000630;

13   brief pause accordingly).

14      I'm done.

15      Q.   Just a couple of more pages.

16      A.   Oh.

17      (Displaying on screen top half of DEF 000631;

18   brief pause accordingly).

19      MR. BOUZAS:  Hey, Monica, can you scroll back to

20   the previous page?

21      MS. WILLIAMS HARRIS:  Right here?

22      (Displaying on screen bottom half of DEF 000630).

23      MR. BOUZAS:  Yeah.  Okay.  Thank you.

24      (Displaying on screen top half of DEF 000631;

25   brief pause accordingly).

**PAGE 75**

1      A.   (By the Deponent)  Okay.  So I'm done with this

2   page, ma'am.

3      (Displaying on screen bottom half of DEF 000631;

4   brief pause accordingly).

5      I'm done.

6      (Displaying on screen top half of DEF 000632;

7   brief pause accordingly).

8      I'm done.

9      (Displaying on screen bottom half of DEF 000632;

10   brief pause accordingly).

11      I'm done.

12      Q.   One last page.

13      (Displaying on screen top half of DEF 000633;

14   brief pause accordingly).

15      A.   I'm done.

16      Q.   All right.  So you would agree it's a pretty

17   lengthy policy.  Are you familiar with the policy?  Does

18   reviewing it now spark your recollection in terms of the

19   *Pass travel guidelines*?

20      A.   Exactly.  Yes, it did.

21      Q.   So if you want -- I'm going to go down to

22   *Responsibility*.

23      (Displaying on screen top half of DEF 000627).

24      And it says -- you would agree that the second

25   paragraph under *Responsibility* says, *Misuse of pass travel*

**PAGE 76**

1   *privileges - by you or your pass riders - could mean big*

2   *problems for you, including disciplinary action and/or*

3   *suspension or termination of your travel privileges.*

4      Do you see that?

5      A.   I do see that.

6      Q.   I'll scroll down further on that page, and this

7   is Page 627.  The paragraph under the bullets, it says, *It's*

8   *important to remember that you're responsible for all pass*

9   *travel transactions, including service fees and taxes, for*

10   *you and your pass riders.*

11      It says that you should maintain confidentiality

12   of information and, *If you want your pass riders be able to*

13   *book and manage their own pass travel, you'll need to set*

14   *each of them up with their own employeeRES login.*

15      Do you see that?

16      A.   Yes.

17      (Displaying on screen middle portion of

18   DEF 000628).

19      Q.   *Booking or managing revenue reservations.*  Can

20   you read that paragraph, what's underneath that paragraph,

21   for me?

22      A.   Sure.  *Employees and pass riders are not allowed*

23   *to book or manage revenue reservations for friends or family*

24   *members unless it's part of their job duties.  If you're*

25   *allowed to book or manage revenue reservations, you will*

**PAGE 77**

1 *need to follow all fair and booking rules.*

2     Q.    **Okay. Under** *Multiple bookings,* **it talks about**

3 **requirements and responsibilities for doing multiple**

4 **bookings. Would you agree that the second sentence,**

5 **beginning with** *Holding,* **says** *Holding a confirmed reservation*

6 *(a revenue/myUAdiscount or mileage award ticket) along with*

7 *a positive space or space available booking for the same*

8 *route and/or the same trip is not allowed.*

9     **What is a positive space or space available**

10 **booking? What is that?**

11     A.    Positive space is for managers and supervisors

12 for people traveling on a company business. I was never

13 issued a positive space pass and I didn't have access to

14 them.

15     Q.    **Okay. So** *holding a confirmed reservation.*

16 **What's a confirmed reservation?**

17     A.    When you pay money for it or pay miles for it,

18 you have confirmed seat on a flight.

19     Q.    **Okay.**

20     A.    If I may, um -- if I may point out to the area

21 where it says, um, holding a confirmed reservation along

22 with, in my case, space available booking for the same route

23 or the same trip is not allowed, or neither is holding more

24 than one positive space booking. That does not apply to me.

25     So I wanted to mention here that I'm holding the

**PAGE 78**

1 confirmed -- because that was one of the points that

2 Cindi Hamburg made, that I hold one of the reservations in

3 the form of purchased reservation and the other one was in

4 the form of a listing. And this doesn't apply to me,

5 because see how it says for the same route or and/or the

6 same trip? Okay. In a previous Friends and Family travel,

7 it was allowed to hold the same. . . I'm sorry. That's the

8 airline lingo.

9     See, you travel from point of origin to the

10 destination. And let's say you go from Tampa to

11 San Francisco and you connect in Houston. Okay? So that's

12 one listing.

13     Now I'm talking about two listings, if I may

14 bring it up, because we're talking about the multiple

15 bookings.

16     So, this is listing. Listing meaning if there

17 is a space on the plane, they will take me. If there's no

18 space, I'm not going. So I'm not taking the seat out of

19 inventory. I'm not holding the seat. I'm not causing any

20 damage to United.

21     So this is the first ticket,

22 Tampa-Houston/Houston-San Francisco. The second ticket

23 would be from Tampa to Chicago to Sacramento. Is it the

24 same routing? It's not. It's a different ticket. And that

25 was allowed.

**PAGE 79**

1     In this case -- so, those are two listings. You

2 know, listing is like if there's a seat available, we'll

3 take you. United is not losing anything by putting me on a

4 standby list.

5     In this case, I wanted to explain that when you

6 have a revenue ticket and you have a listing, space available

7 listing -- so one is space ticket. One is listing if there

8 is space available. And they are for two different routings.

9 See, different routings. It says here it has to be the same

10 routing and it's not allowed, or the same trip. It's not

11 the same trip when we talk specifics at United. Those are

12 two different trips.

13     But let's say I purchase the United ticket. By

14 the rules of United ticket, I'm entitled to -- I bought the

15 ticket like anybody else, not using my United privilege.

16 I bought the ticket. I'm entitled to 24-hour full refund

17 policy. So I can refund that ticket and get my money back,

18 and then the other ticket is for totally different routing.

19     So you cannot accuse me that I took the seat out

20 of inventory, because it was the first ticket. I was

21 entitled to get my money back, 24-hour refundability. It's

22 the standard policy for United, for all the tickets.

23 So. . . and this is the pass, so I'm sorry.

24     Q.    **That's okay. Tell me what space available**

25 **booking is. What is space available booking?**

**PAGE 80**

1     A.    Space available booking is -- and it also talk

2 about charges. I want to concentrate on charges.

3     Q.    **Well, right now, I just want you to answer the**

4 **question.**

5     A.    I'm sorry. I'm getting too many --

6     Q.    **That's okay. Right now, I want you to answer**

7 **the question that I asked, which is what is space available**

8 **booking?**

9     A.    Space available booking is putting your name on

10 the list at the gate. If there is space available, she will

11 clear you from the standby list and you board the flight

12 with assigned seat.

13     Q.    **Okay. So space available booking is what we**

14 **would know as standby, flying standby?**

15     A.    Exactly. And it does not take a revenue seat

16 from capacity.

17     Q.    **Okay. So is that your definition or is that**

18 **United's definition?**

19     A.    It is definitely United definition. I wouldn't

20 be able to come up on my own.

21     Q.    **Okay. So your understanding is that if you hold**

22 **a confirmed reservation seat and you also hold a standby**

23 **seat, that does not damage United in any way? Is that**

24 **what I understood you to say?**

25     A.    There is one more, um, point to it, because

Case 8:20-cv-02292-CEH-SPF  Document 25-1  Filed 02/18/22  Page 24 of 84 PageID 260

## PAGE 81

1  those two reservations has to be for different routing.

2  And, yes, you're right in a way that revenue ticket gives

3  you the seat and takes the seat out of inventory, revenue

4  ticket, but the standby ticket is just showing that you want

5  to travel on a specific flight. But what's important -- and

6  it's not -- it was not against the rules until 2019, was

7  that I could have -- and it pertains more to the -- not to

8  the revenue ticket and a standby ticket. It pertains to a

9  listing for a flight. Because one flight could have been

10  booked up to capacity and the other could have been booked,

11  but sometimes there is the no-show factor, that people

12  no-show.

13  So as long as it wasn't. . . as long as it

14  wasn't for the same routing, it was allowed. I couldn't

15  list for two flights, one at 10:00 AM and one at 12:00 noon

16  going from Houston to Tampa, but I could list from Houston

17  to Tampa for the 10:00 AM and I could list going from

18  Houston to San Francisco for 4:00 PM.

19  Q.  Okay. So in your mind, the situation that

20  you're explaining doesn't violate this particular policy,

21  because it's not the same route or the same trip?

22  A.  Exactly.

23  Q.  Okay. Do you know whether United believed that

24  the example that you gave was considered the same route or

25  the same trip?

## PAGE 82

1  A.  Um, it was written in the new policy, that was

2  issued in 2019. That created a lot of confusion about other

3  agents, because that was one of the premises of the new

4  policy. New policy would not have allowed it, but it was

5  2019.

6  Q.  Okay. Do you see at the bottom this says 2019?

7  (Using hand tool to indicate).

8  A.  Yes. So, that's what it is. That's if you --

9  if you hold the -- well, that's pertaining to the positive --

10  that pertains to space available versus ticket, but most of

11  us, we're concerned with the standby ticket, but, um, space

12  available passes.

13  Q.  Okay. I'm going on scroll down.

14  (Displaying middle portion of DEF 000630).

15  This *Pass travel audit*s, did you understand, as

16  an RSSR, that your pass travel could be audited randomly?

17  And it wasn't just you. It was all RSSR's pass travel

18  could be audited.

19  A.  Yes, of course. And, so, it was audited by the

20  company. We also had an access to audit the charges that

21  was automatically taken from the payroll.

22  See, it talked about charges, that you cannot

23  waive the charges. When you list for a flight with your

24  employee number, there's a program. The program will

25  automatically collect all the applicable charges. When you

## PAGE 83

1  cancel the reservation, the system -- or the listing,

2  sorry -- the listing, the program will automatically refund

3  the taxes. Okay? So it's a program, so meaning you cannot

4  manipulate the charges, the taxes, the services, on a

5  listing, because it's a program and it's guided by the

6  United system to make sure that all the money is collected

7  and it's collected from your paycheck.

8  Q.  Okay.

9  A.  And what I was going to mention -- I'm sorry --

10  that the pass travel audit, we can also -- as an employee,

11  we were able to audit if the charges were incorrect,

12  especially -- for domestic, it's not as important, but for

13  international, um, it's like couple hundred dollars just for

14  the taxes, departure tax out of the foreign country, and

15  it's expensive and we could review it on our own also.

16  Q.  And then finally, do you see this little comment

17  box, *Any misuse, abuse or other unauthorized use of pass*

18  *travel privileges will result in disciplinary action up to*

19  *and including full-fare reimbursement and termination of*

20  *employment.* Do you see that?

21  A.  I do see that and I wanted to state that, um,

22  I never, uh, misused or abused pass travel privileges.

23  Whatever I did was within the rules and I always follow the

24  rules and policy regarding revenue ticket and pass travel

25  privileges.

## PAGE 84

1  (Screen share ended).

2  MS. WILLIAMS HARRIS: It's 12:17. Miguel, do

3  you want to keep going or do you want to take a break?

4  (Inaudible speaking by Mr Bouzas).

5  Can't hear you.

6  MR. BOUZAS: Are you done with the, um. . . with

7  that handbook we were just talking about in Exhibit 5?

8  MS. WILLIAMS HARRIS: Yes.

9  MR. BOUZAS: All right. So that's probably a

10  good time to take a break for lunch.

11  MS. WILLIAMS HARRIS: Okay.

12  MR. BOUZAS: Take like, what, 40 minutes or so?

13  MS. WILLIAMS HARRIS: That's fine.

14  MR. BOUZAS: 1:00 o'clock? Just call it

15  1:00 o'clock?

16  MS. WILLIAMS HARRIS: 1:00 is fine. We'll come

17  back at 1:00.

18  MR. BOUZAS: Okay. Thank you.

19  MS. WILLIAMS HARRIS: You're welcome.

20  (Recess taken 12:17 to 1:05 PM).

21  Q.  (By Ms. Williams Harris) So Ms. Ceranek, we are

22  back from lunch. And before we went on break, we talked

23  about two of the handbooks, Code of Ethics and Business

24  Conduct and the Working Together Guidelines.

25  I also asked you before -- previously you

---

**PAGE 85**

1  mentioned that you received lots of extensive training,
2  I think is the phrase that you used, while with United.  Is
3  that an accurate statement?
4      A.    It is accurate statement as far as the waivers,
5  yes.
6      Q.    And so do you recall taking a training course
7  entitled Doing Your Part: United's Compliance Training for
8  Frontline Co-Workers?
9      A.    I don't recall that one specifically.  Sorry.
10     Q.    But if there was a certificate indicating that
11 you completed the training, would you have any evidence or
12 information to suggest that that certificate would not be
13 accurate?
14     A.    No, no.  I would say that it is accurate.
15     Q.    I'll showing you a document.
16         (Ms. Williams Harris screen sharing
17 Exhibit No. 6, linked hereto).
18         Can you see that?
19     A.    Yes, I do.  Yes, ma'am.
20         MS. WILLIAMS HARRIS:  And Miguel, this is
21 Defendant's 170.
22         (Brief pause).
23         MR. BOUZAS:  You can go ahead.
24         MS. WILLIAMS HARRIS:  Okay.
25     Q.    (By Ms. Williams Harris)  And so, Ms. Ceranek,

**PAGE 86**

1  you would agree that this, what is Exhibit No. 6, we're
2  going to introduce as Exhibit No. 6 to this depo, is a
3  certificate awarded to you indicating successful completion
4  of the course United's Compliance Training for Frontline
5  Co-Workers.  Do you see that?
6      A.    Yes, ma'am.
7      Q.    You agree that's what this document is, correct?
8      A.    Yes, it is.
9      Q.    And the date on the bottom is February 10th,
10 2015.
11     A.    Correct.
12     Q.    So would it be fair to say that in February of
13 2015, you completed this course, United's Compliance
14 Training for Frontline Co-Workers?
15     A.    Yes, I did.
16         (Screen share ended).
17     Q.    I'll show you another document, which we will
18 introduce as Exhibit 7 to this depo.
19         (Ms. Williams Harris screen sharing
20 Exhibit No. 7, linked hereto).
21         Let me know if you see that.
22         MS. WILLIAMS HARRIS:  And Miguel, this is 172.
23         MR. BOUZAS:  Okay.
24     Q.    (By Ms. Williams Harris)  Let me know when
25 you've finished reading that.

**PAGE 87**

1      A.    Um, I see it, however, I wanted to point it out
2  that it is 2019, July of 2019, and, uh, the, uh -- I was
3  investigated for Friends and Family passes from 2013 to
4  2018.  I'm sorry.
5      Q.    Okay.  But you would agree that this again is a
6  certificate indicating that you satisfactorily completed
7  training and testing on Doing Your Part?
8      A.    Yes, on 5th of July 2019.  Yes, ma'am.
9      Q.    And this document also says that *this training*
10 *program is an overview of the various compliance policies*
11 *associated with working at United.*
12     A.    At 2019.  Yes, ma'am.
13         (Screen share ended).
14     Q.    I'll show you another document.
15         (Ms. Williams Harris screen sharing
16 Exhibit No. 8, linked hereto).
17         I'm going to introduce this as Exhibit 8.
18 I think my numbers are correct.
19         Ms. Ceranek, what I'm showing you is Doing Your
20 Part: United's Compliance Training.
21         MS. WILLIAMS HARRIS:  And Miguel, for you, 667
22 through 686.  Did you print it out, Miguel, or do
23 I need to scroll through on the screen.
24         MR. BOUZAS:  667 through what?
25         MS. WILLIAMS HARRIS:  667 through 686.

**PAGE 88**

1          MR. BOUZAS:  Yeah.  I didn't print that one
2  either, I guess.
3      Q.    (By Ms. Williams Harris)  All right.  So,
4  Ms. Ceranek, I'm going to try to kind of scroll through this
5  so that you can see it.  I'll make it a little bit bigger so
6  it's easier to read.  But this is United's compliance
7  training and let me know if this looks familiar.
8          (Scrolling slowly through Exhibit No. 8).
9      A.    If I may ask you, when was it issued?
10     Q.    This I believe is 2015.  Does it look familiar
11 at all?
12     A.    Yes.
13         (Continues scrolling slowly).
14     Q.    Okay.  And so do you have a recollection of
15 completing this training?  We saw the certificate, but I
16 just want to know if you have a recollection of doing these
17 modules.
18     A.    I don't.  I don't.  I don't know specifically
19 what it says there.  It was six years ago.  I apologize.
20 Hundreds of documents that I had to sign through the
21 29 years, so I don't.
22     Q.    I'm going to scroll down to one of the last
23 slides.
24         (Displaying on screen top half of DEF 000686).
25         And do you see this says Pass Travel Guidelines?

**PAGE 89**

1    A.    I do.  Uh-huh.

2          (Screen share ended).

3    A.    If I may, in the last screen that you showed me,

4    ma'am, it just showed Pass Travel Guidelines and it referred

5    to travel when you're on a sick leave.  So, um, um. . .

6          (Displaying on screen top half of DEF 000686)

7    Q.    Well, this says -- I'm sorry.  Go ahead.

8    A.    So in general -- okay.  So in general, yes,

9    I read it, uh. . . um, and I -- I'm familiar with it.

10   Q.    The paragraph that you're talking about, it

11   says, *It is your responsibility to understand all Pass

12   Travel Policies such as inappropriate use of sick leave,* but

13   it's not just specific to sick leave.  You would agree that

14   it says Pass Travel Guidelines, correct?

15   A.    Yes, but I would have to -- in order to agree to

16   all of it, we would have to go to specific area where it

17   really talks about booking the space available travel.

18   Q.    Okay.

19   A.    Because this is general statement that you

20   should take responsibility for, um, booking and using your

21   passes.  Yes, I'm aware of it.  Yes, ma'am.

22         (Screen share ended).

23   Q.    Do you recall also taking a training course for

24   Leisure Pass Travel?

25   A.    No.  I'm sorry.  See, there are too many

**PAGE 90**

1    documents with similar names over the years.  Hundreds of

2    documents.  I don't remember specific content of the

3    document.

4    Q.    Okay.  But if there was a document that

5    indicated that you completed the Leisure Pass Travel

6    training, would you have any information or documentation to

7    say that the document is incorrect?

8    A.    I don't have information that it would be

9    incorrect, no.

10   Q.    I'll show you what is Exhibit 9.

11         (Ms. Williams Harris screen sharing

12   Exhibit No. 9, linked hereto).

13         Do you see this?

14   A.    Um, yeah, I do.  And I also see the date that

15   it's 15 of February 2019.

16   Q.    Correct.  So you see that this says Leisure Pass

17   Travel.  And this is your name, Barbara Ceranek, up at the

18   top, where's it highlighted?

19   A.    Yes, it is.  Yes, yes.

20   Q.    And it says that it was completed.  The little

21   box, it's a pop-out, says that this Leisure Pass Travel

22   Module was completed on February 15th, 2019.  Do you see

23   that?

24   A.    Yes, ma'am.

25   Q.    It states you did pretty well, because you got

**PAGE 91**

1    100%.  Do you see that?

2    A.    I do see that.  Yes, ma'am.

3    Q.    Okay.  Do you have any recollection of taking

4    this particular online course?

5    A.    No.  Specifically, no.

6    Q.    But you would agree that this document indicates

7    that you did and that you completed it in February of 2019

8    and you obtained a perfect score?

9    A.    Sure.  If that's what the document says, I would

10   agree with it, yes.

11         (Screen share ended).

12   Q.    I want to go back to one of the previous I just

13   showed you.  Previously you mentioned something about the

14   pass guidelines, that there weren't details contained in

15   them.  This is Exhibit No. 8.

16         (Ms. Williams Harris screen sharing

17   Exhibit No. 8).

18         You'll see that there's like a little blue link

19   right here.

20         (Using hand tool to indicate).

21   A.    Yes, I do you.  Uh-huh.

22   Q.    This paragraph right before the blue link that

23   says *Click Next to count,* you would agree that this

24   paragraph reads *Review the Pass Travel Policies Guidelines

25   found in the Resources section, which you can access by*

**PAGE 92**

1    *clicking the Resources button below.*  Do you see that?

2    A.    Yes.

3    Q.    So you would agree that if there were questions

4    about the specifics of the guidelines, there is a link here

5    for you to click to go to the Pass Travel Policies

6    Guidelines?

7    A.    Correct.

8    Q.    Do you have any recollection of clicking that to

9    get more information about the Pass Travel Guidelines?

10   A.    No.  I'm sorry, not.

11   Q.    But you would agree that you had access to the

12   specifics of the guidelines by clicking on this link?

13   A.    Of course, yes.

14         (Screen share ended).

15   Q.    Tell me, when you started your day -- I didn't

16   ask this question previously, but when you started your

17   day -- and you said your shift began at 5:00 PM

18   A.    No, no, no.  It started at 9:00 AM and it ended

19   at 2:00 PM Central Standard Time.

20   Q.    Okay.  I apologize.  You're correct.  I misstated

21   that.  So when you logged into your computer at 9:00 AM,

22   kind of walk me through what you would do to start your day.

23   A.    First I would log into the computer and I would

24   read my E-mails.  Because in the E-mails, there were

25   updates.  And we had couple minutes that we were allowed to,

## PAGE 93

1  um. . . to actually read the updates. Because the updates
2  were very important, because they referred to the waivers.
3  Because if there was a snow day somewhere, there were
4  procedure how to waive the charges and re-accommodate the
5  passenger. So, that was the first thing.
6      Q.   Okay.
7      A.   And then I would sign into -- so sign into the
8  computer, sign into the phone tab, put the headset on and
9  make myself available. And I had the -- like all the other
10  agents, I had the prerecorded statement, welcoming
11  statement, and the calls would start dropping in
12  automatically. You don't touch the phone tab unless you
13  need to call other department.
14     Q.   Okay. Okay. And so when you logged into your
15  computer, you would have to use a login and password to get
16  into your --
17     A.   Yes, ma'am. Yes.
18     Q.   And so periodically, would there be prompts that
19  would pop up on your computer screen that you have to click
20  at the bottom in order to advance to the next screen?
21     A.   No.
22     Q.   Let me show you something quickly.
23        (Ms. Williams Harris screen sharing
24     Exhibit No. 10, linked hereto).
25        Can you see -- this is going to be Exhibit

## PAGE 94

1  No. 10. Can you read that, Ms. Ceranek?
2      A.   Could you please enlarge it a little bit?
3        (Enlarging view accordingly).
4        Wait. Lost it, lost it now. Oh. *Holding*
5  *either a confirmed reservation or a positive-space booking* --
6      Q.   You don't have to read. I just wanted to see
7  if --
8      A.   Oh, not to read it. I apologize greatly.
9      Q.   That's okay. Does this look familiar?
10     A.   Oh. Um, yes, and I would like to point out, if
11  I may, how it says at the end that you're not allowed to do
12  it for the same routing for the same trip.
13     Q.   Right. I'm going to ask you questions about it
14  in a minute, but I just want to make sure that you recognize
15  this document.
16     A.   I do.
17     Q.   The *Accept* at the bottom, so would this pop up?
18  Would this be something that you have to accept before you
19  were -- like you log into your computer. Would this be
20  something that popped up on your screen, after you logged
21  in, that you would have to accept before you were able to
22  advance on your computer?
23     A.   No.
24     Q.   So when did this come? When did you see this
25  particular document?

## PAGE 95

1      A.   It would be if I went into the Core. Core was
2  like a bible for, um. . . for all the reservation agents.
3  It has all the policy and procedure and rules regarding the,
4  um. . . regarding travel, um, on the space available pass.
5        When you go into the pass information, space
6  available pass information, that would come up as one of the
7  pages. If you tried to look up policy and procedure, rules,
8  stuff like that.
9      Q.   So would you have to accept this before you were
10  able to make a reservation?
11     A.   No, not at all. That has nothing to do with the
12  reservation.
13     Q.   Okay.
14     A.   Sorry.
15     Q.   That's okay. No, no, no. So when -- I'm still
16  confused about when this would pop up.
17     A.   When you look it up on your own to, um. . . If
18  you have a question about policy, procedure, you would go to
19  Core. And in Core, one of the bullet points would be the
20  pass travel, and you pull up the rules of the pass travel
21  and that's how it would come up.
22     Q.   Okay. If you look at the bottom of this, the
23  paragraph before the *Accept* button, it says *Clicking Accept*
24  *confirms your acceptance and understanding of the Pass*
25  *Travel Guidelines, acknowledging your responsibility to be*

## PAGE 96

1  *fully familiar with all of the Pass Travel Policies and*
2  *Travel Tax Calculations.*
3        The second sentence says *Co-Workers, retirees*
4  *and early-out participants will be prompted to accept these*
5  *Guidelines every 90 days and may view them at any time by*
6  *selecting the Pass Travel Guidelines link on the Travel tab*
7  *of Flying Together.*
8        So do you recall being prompted to accept these
9  guidelines every 90 days?
10     A.   I don't recall it. And I wanted to mention that
11  because I worked in reservations, I was able to set up the
12  listing, you know, the non-revenue travel, in the computer
13  system and it would put me on a standby list. So, I wouldn't
14  have to accept it and I don't recall accepting it.
15     Q.   You don't recall accepting this?
16     A.   I do not recall accepting it.
17     Q.   If there was information indicating that you
18  had, do you have anything that would be able to contest that
19  or dispute that?
20     A.   No.
21     Q.   But you're familiar with these guidelines?
22     A.   Yes, I am.
23     Q.   Okay. So there's a highlighted portion that I
24  think that previously you were attempting to share with me
25  your interpretation of that. It says *Holding either a*

**PAGE 97**

1  *confirmed reservation or a positive-space booking takes a*
2  *revenue seat out of inventory that could otherwise have been*
3  *sold.*
4  It says, *Pass riders -- what is a pass rider?*
5  A.  Co-workers, me, my husband, my kids, you know,
6  traveling on a space available ticket. Those are the passes.
7  Q.  *Pass riders may not hold a confirmed reservation*
8  *and a positive-space or space-available booking over the*
9  *same routing for the same trip.*
10  That's the highlighted part you wanted to bring
11  to my attention. So my interpretation of this is if you
12  were a pass rider, which means that you are an employee or
13  immediate family of an employee of United, that you can't
14  have any confirmed reservation and a standby booking at the
15  same time for either the same route or the same trip -- or
16  for the same route for the same trip. That's my
17  interpretation of what this says. Was that your
18  understanding of this?
19  A.  Right, it is my understanding. If I might just
20  say that it wasn't my interpretation of it, because it's
21  specified for over the same routing for the same trip. So
22  if your point of origin is different. . .
23  You're going from point of origin to the
24  destination, right? So let's go from Tampa to San Francisco
25  on confirmed reservation and let's go from Orlando to

**PAGE 98**

1  Oakland, California on a standby ticket. Those are not the
2  same routing. This is not the same routing. The same
3  routing would describe that you're going from point of
4  origin to the destination the same for both tickets. And
5  that's not my interpretation. It is United that ingrain in
6  me, and Continental, this is the routing. This is what it
7  means, same routing. Because when passenger wanted to
8  change the ticket, they would also bring it up. Sorry.
9  Q.  That's okay. So your definition -- your
10  understanding of same routing for the same trip is if all
11  parties on the trip are leaving -- all pass riders, to use
12  your example, are leaving from Orlando, heading to
13  San Francisco on the same flight. That, in your definition,
14  would be that's the same route for the same trip.
15  A.  Point of origin to the destination has to be the
16  same. And if it's different, it's not the same trip.
17  Q.  Do you know if the folks at United have that
18  same understanding of same routing?
19  A.  That's what we were taught, you know. That's
20  what it is. It's not -- see it's not part to the
21  interpretation, because for the, um -- it's very specific
22  and it's very clear, point of origin to the destination.
23  And if the passenger calls in and wants to change it, *Oh, I*
24  *only want to change it -- instead of going to San Francisco,*
25  *I want to go to Oakland.* Well, it's a different destination

**PAGE 99**

1  and we have to charge the change fee and the rate difference,
2  if there is any.
3  So, it wasn't up to the interpretation. It was
4  a requirement and that's how it was presented to the
5  employees.
6  Q.  So say that again. If they changed their flight,
7  there was a change fee and you could not waive that? Is
8  that what you said?
9  A.  On a revenue ticket -- sorry. So, I just made a
10  comparison to, um -- to a customer that wanted to change the
11  trip. Instead of landing in San Francisco, he wanted to
12  land in Oakland. So, I was just referring to the revenue
13  ticket. That revenue ticket, most of the tickets would
14  require the change fee and possible rate difference. And
15  because of that little change going from -- you know, to
16  change from point of origin to destination, we had to
17  collect money.
18  So, I just wanted to underline that it's not the
19  interpretation. It is the rule that United have it ingrain
20  in us, because that's the way we had to handle tickets. And
21  that's what it refers to, that it has to be the same. . .
22  Could you scroll up a little bit, if I may.
23  (Scrolling accordingly.)
24  Thank you. So, um --
25  (Mr. Bouzas tenders document to Deponent).

**PAGE 100**

1  DEPONENT: Oh, thank you so very much.
2  A.  (By the Deponent) I apologize.
3  Q.  That's okay.
4  A.  So for the same trip, so if you -- so if point
5  of origin and point of the destination is different, it's
6  not the same trip.
7  Q.  Okay. And that's your understanding?
8  A.  Yes, ma'am.
9  (Screen share ended.)
10  Q.  All right. So I'm going to fast-forward. Do
11  you recall having a meeting with Cindi Hamburg on June 4th?
12  A.  Um, I would say that was the meeting when the
13  reservation -- my daughter's reservation came to light.
14  Q.  Yes. That was -- yes. Yes. D you remember
15  who else was at that meeting with you, between you and Cindi?
16  A.  There was a union rep, but I don't remember her
17  name. I'm sorry.
18  Q.  Is it Stephanie Ratcliff? Does that sound
19  familiar?
20  A.  No. See, I don't know. I do not remember.
21  I cannot say.
22  Q.  That's okay. So tell me what you recall about
23  this meeting on June 4th with you and Cindi and the
24  union rep.
25  A.  So she called me and she said that she found the

**PAGE 101**

1  reservation that I purchased the miles -- no. I didn't

2  purchase. I apologize.

3  I issued the ticket for my daughter using miles

4  from my MileagePlus account by opening United credit card.

5  That's how I obtained the miles. So I promoted United

6  business by getting the credit card. And for getting the

7  credit card, I got the promotional miles.

8  I issued the ticket and then, um, her, um,

9  girlfriend, her mother passed away and they were not able to

10  travel on the -- well, Sonia was not able to travel on the

11  existing ticket. I documented the reservation applying the

12  waiver.

13  See how normally the waiver for regular agent

14  would be close family member, and the friend's mother is not

15  a close family member, so -- but she was like any other

16  customer in distress, so I decided to document it and apply

17  the waiver and waive -- and I don't recall the service

18  charge, but $50.00, $75.00 fee to redeposit the ticket back

19  to the account. So, the miles were redeposited.

20  Q.  **Back to the MileagePlus account? You said you**

21  **redeposited back to the MileagePlus account?**

22  A.  Right. Because it was a mileage ticket, so the

23  miles were simply reversed back to the account and I waived

24  the fee and I documented the reservation. And it was in my

25  empowerment.

**PAGE 102**

1  She then went and bought a revenue ticket to

2  travel to the funeral.

3  At that point, Ms. Hamburg also told me that I

4  had to give her the explanation and I provided the

5  explanation that I utilized my empowerment to do it. And

6  she mentioned as long as you document the reservation,

7  you're okay.

8  Q.  **Okay.**

9  A.  For the waiver, you know.

10  Q.  **So, let me back up. You mentioned that you**

11  **treated your daughter as any other customer. I think that's**

12  **what you said.**

13  A.  Right. She had the, um -- see, the mileage

14  ticket or when you purchase with money, it's confirmed space.

15  So like any other passenger at the time of distress -- and

16  we're actually trained for it. For the passenger in the

17  time of distress, you go -- if you think it's justifiable,

18  you go ahead and waive the fee and assist the passenger the

19  best way you can, so then the supervisor cannot come back to

20  you and say, *Oh, Barbara. Why didn't you de-escalate the*

21  *situation? The passenger had to rise to customer care and*

22  *being all upset and it took us two hours to send letters and*

23  *fix the situation.*

24  Q.  **But you would agree that your daughter is not**

25  **any other customer?**

**PAGE 103**

1  A.  Once she purchased a revenue ticket, either

2  paying with money or mileage, she was protected by Contract

3  of Carriage, that United is obligated to fulfill. And like

4  any other customer, she had the same rights and the same

5  obligations.

6  Q.  **But you would agree that while that may be true,**

7  **because she's your immediate family member, that under**

8  **United's policy, because she has access to your pass**

9  **privileges, that she would not be considered any other**

10  **customer?**

11  A.  I would disagree with that statement, because

12  like any other passenger, you have the right once you buy

13  the ticket.

14  Q.  **Do you believe that United shares your same**

15  **viewpoint, that your daughter, an immediate family member,**

16  **is any other customer even if she purchases a revenue**

17  **ticket?**

18  A.  If I may, I don't know, um, what. . . I believe

19  United position was the same. However, what I wanted to

20  point out, that during the 29 years, until Ms. Hamburg

21  became my supervisor, even though there were security sweeps

22  for the reservations and listings, my reservation never came

23  up. And it was Ms. Hamburg culmination of her harassment,

24  one of the ways that she harassed me and did the age

25  discrimination for me, to get rid of me, to retire. So, uh,

**PAGE 104**

1  I basically -- yeah, like any other passenger.

2  Q.  **Okay. So do you remember what my question was?**

3  A.  The question was would United, um, share my

4  view.

5  (Inaudible comment by Mr. Bouzas).

6  I cannot speak on behalf of United.

7  MS. WILLIAMS HARRIS: Okay. Can you read the

8  last question that I asked, Patsy, please?

9  (Question on Page 103, Line 14 read back by

10  court reporter).

11  Okay. And you answered that question.

12  Q.  **(By Ms. Williams Harris) I thought you told me**

13  **that initially you purchased the ticket with your MileagePlus**

14  **miles.**

15  A.  Yes, ma'am.

16  Q.  **Okay. And you purchased that ticket for your**

17  **daughter?**

18  A.  Yes.

19  Q.  **Is purchasing a ticket for your daughter a**

20  **violation of the Pass Travel Guidelines or United --**

21  A.  No -- oh, sorry. No. You can use your miles

22  for anybody that you wish to issue the ticket for.

23  Q.  **Now, once you purchased that ticket with your**

24  **miles, then I think you indicated that your daughter then**

25  **purchased a revenue ticket. Is that what I heard you say?**

**PAGE 105**

1    A.    To travel to the funeral.  Yes, ma'am.

2    Q.    **And then you reimbursed yourself the mileage**

3  **miles that you previously used to purchase your daughter's**

4  **ticket?**

5    A.    I did not reimburse myself.  I refunded the

6  miles based on my waiver.

7    Q.    Okay.  And then did you waive -- is there a

8  **redeposit fee associated --**

9    A.    Right.  It was -- yes, and I waived the $50.00.

10  I cannot remember specific amount, 50 or 75 dollar fee to

11  redeposit the miles due to funeral and I documented the

12  reservation.

13    Q.    **Okay.  And --**

14    A.    And if I -- oh, I am so sorry.

15    Q.    **No.  Go ahead.**

16    A.    And I wanted to underline that I never wanted to

17  hide any of the information.  The information, every

18  reservation that I did the waiver, it's always there and the

19  reason for it.  And that's what the supervisor, Hamburg,

20  Ms. Hamburg, told me, that as long as I document it, I can

21  use my waiver.  So, I -- so that's it.

22    Q.    **Do you know how Ms. Hamburg learned of you**

23  **waiving the redeposit fee or learned of the situation?**

24    A.    I don't know.  She said it was random.  However,

25  like I said, until she became my supervisor, none of the

**PAGE 106**

1  other supervisors or manager ever mentioned that my waivers

2  were in, uh. . . uh. . . they were not in compliance with

3  United's rules and regulations.  And that's why I am saying

4  that I never did any favors for my family members, because

5  I always followed the rules and regulations and only when

6  she became the supervisor it all started.

7    Q.    **But again, do you know how she learned of this**

8  **particular incident, you waiving --**

9    A.    I don't know.

10    Q.    **Let me finish the question.  Do you know how**

11  **Ms. Hamburg became aware of you waiving the redeposit fee**

12  **for your daughter?**

13    A.    I don't know.

14    Q.    **Now, you indicated that you documented the**

15  **waiver in the file.  How did you document you doing the**

16  **waiver of the redeposit fee for this particular situation?**

17    A.    So I waived, um. . . I cannot remember verbatim,

18  but it was, um, due to the friend's funeral, I'm waiving the

19  fee.  Friend's funeral mother.  I'm sorry.  Friend's funeral

20  mother.  And that way, I applied the waiver.  Otherwise, if

21  it was close family member, anybody can do it.  But I applied

22  my waiver being an empowered agent, like any other empowered

23  agent.

24    Q.    **But you testified previously that you documented**

25  **it --**

**PAGE 107**

1    A.    Yes.

2    Q.    **-- documented the waiver, and I'm asking you how**

3  **you documented it.**

4    A.    It's in the history, all of it, for all the

5  reservations that are in question.  In all of the

6  reservations, each and every one reservation -- and there

7  are 37 reservations that came up at the review.  For each

8  and every one of those reservations, there is my

9  documentation and it's in the history of the reservation.

10    Q.    **I'm talking about this specific time.  This**

11  **specific time when you made the waiver to redeposit the --**

12  **to do the redeposit fee for your daughter, you indicated**

13  **that you documented it, and I'm asking you how you**

14  **documented your waiver.**

15    A.    Sure.  You type in, um, redeposit fee waived due

16  to friend's mother funeral, and then it's your agent sine

17  and the timestamp and the date.  And then it goes -- since

18  I waived it, it goes on a queue so that other more senior

19  agent review it if it was appropriate.  And from that point,

20  I don't know where it goes or if somebody else review it

21  again.  That, I don't know.

22    Q.    **Did you attach like a copy of a death**

23  **certificate or the obituary, or anything --**

24    A.    No, I did not.

25    Q.    **Let me finish.  Did you attach the death**

**PAGE 108**

1  **certificate or obituary to substantiate the attendance of**

2  **the funeral or the death, since that's what you noted in the**

3  **file?**

4    A.    No, because with the waiver, you could make a

5  decision that that wouldn't have to be substantiated.

6        See, other agents that were not empowered agent

7  would have to ask for the death certificate or they would

8  have to call the supervisor to get the waiver for the death

9  certificate, regular agent.  But empowered agents could make

10  the decision and not require, because it was outside of the

11  rule.  See, the rule, family members.  Outside the rule, if

12  you're waiving, you're waiving that in its own entity.  And

13  I document it.  I type in waive the $50.00 redeposit fee due

14  to the funeral, and I specify.

15    Q.    **Do you know if United considered the**

16  **documentation that you did sufficient, since this was not an**

17  **immediate family member?**

18    A.    It was -- immediate member would be for a

19  regular agent to collect the death certificate and then

20  waive the fee.  That would be a regular United agent.

21        Empowered agent use the empowerment that gives

22  you the little power that you can waive that requirement

23  and, um, basically do not require that from the customer.

24    Q.    **What policy is there, within any of the**

25  **guidelines I showed, that says that an empowered agent**

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 31 of 84 PageID 267

**PAGE 109**

1  doesn't have to follow that policy, that you can waive a fee
2  for a funeral for a non-immediate family member?
3      A.    It is under -- I don't have the document showing
4  it, but I was trained, required, and encouraged by United to
5  use the empowerment and. . . Well, on top of having
6  specific waivers for different situations, this is the one
7  that goes under the judgment call.  If you think that this
8  is justifiable to waive the $50.00, go ahead and waive the
9  $50.00, document the reservation.  That's what I was told by
10  Ms. Hamburg.
11      Q.    Ms. Hamburg told you what now?
12      A.    That as long as I document the reservation for
13  the waiver, I'm good, I'm okay.  *Make sure you document it.*
14      Q.    When did she tell you that?
15      A.    In one of the conversation when she became my
16  supervisor.
17      Q.    Okay.  So what you're suggesting is that
18  Ms. Hamburg told you that it was okay to waive the $50.00
19  fee if you did what you did for your daughter?  I'm very
20  confused.  What did she tell you?
21      A.    I apologize.  So that was in regards to
22  generally handling the reservation, the empowerment of the
23  agent.  That's not specifically to Sonia.  No.  That was for
24  all the reservations.  And I waived the fees for, you know,
25  hundreds of United customers over the years.  For all of

**PAGE 110**

1  them, that's what's required, to document it, why you did
2  it.
3      Q.    But in those other situations, were you waiving
4  the fee for a family member?
5      A.    United is now saying that I -- they call it
6  fraudulent activity, that I engaged in fraudulent activity.
7      Q.    My question was, in those other situations that
8  you're talking about, did you waive the fee for a family
9  member?
10      A.    I only applied the waiver and whatever I did was
11  within the rules of empowerment.
12      Q.    Okay.  That wasn't my question.  In those other
13  situations, did you waive the fee for a family member?  You
14  mentioned that there were hundreds of other customers that
15  you waived fees for, and so my question is, in those
16  hundreds of other cases that you referenced, were you
17  waiving fees for an immediate family member?  That's yes or
18  no, Ms. Ceranek.
19      A.    Okay.  37 reservations that were brought up and
20  questioned over five years, yes.
21      Q.    So after you had this conversation with
22  Ms. Hamburg about the waiver of the redeposit fee for your
23  daughter, did she indicate, during that conversation, that
24  you doing that was a violation of company policy?
25      A.    That's what she said.

**PAGE 111**

1      Q.    And did she ask you to do anything -- tell me
2  what she -- if you recall, tell me what was discussed during
3  that meeting.
4      A.    She said to send her an explanation, and I did.
5      Q.    And was that explanation in writing or was it
6  verbal?  How did you --
7      A.    E-mail.  I sent an E-mail.
8          (Ms. Williams Harris screen sharing
9  Exhibit No. 11, linked hereto).
10      Q.    I'm showing you what's Exhibit 11.  Do the words
11  on this paper look familiar?
12      A.    Um, they do.
13      Q.    Okay.  Is this the information that you provided
14  Ms. Hamburg in response to the meeting that you had on
15  June 4th, 2019?
16      A.    Yes, ma'am.
17      Q.    This says that Sonia's mileage ticket was
18  redeposited and you waived the 125 redeposit fee due to the
19  funeral.  So, it was the 125 and not the 50 we said earlier?
20      A.    Yes, ma'am.  Correct.
21      Q.    And you say in here that you -- you apologized
22  for waiving the 125, but did not realize I was not complying
23  with the Friends and Family Policy.
24          At any time, did you tell -- during your
25  June 4th conversation with Ms. Hamburg, did you represent to

**PAGE 112**

1  her that this was the only time you've done this, in terms
2  of waiving fees for family members?
3      A.    I was not aware that it was in, um. . . that it
4  was, uh, not according to United rules.  So my understanding
5  was that was the only one, because everything else from 2013
6  to 2018 was never brought up to my attention by a security
7  sweep or managers or supervisors, and my waivers were okay
8  after the point when she became the supervisor.
9      Q.    So, say that one more time.  I'm sorry.  Say
10  that again.
11      A.    So the question was if I waived any more fees
12  for family members.
13      Q.    The question -- let me be clear on the
14  question.  The question was did you advise M Hamburg,
15  during your conversation on June 4th, whether you waived any
16  other fees for a family member, previously?
17      A.    I don't recall specifically what I said, but my
18  waivers were okay and in compliance until she became my
19  supervisor, and then of course that was wrong, she said.
20  That was not in compliance anymore.  But for previous
21  managers and for previous security, everything was in
22  compliance up till 2000 -- from 1990 to 2018.  I didn't have
23  a single -- you know, I haven't had a single complaint or
24  anything in my file.  Zero write-up.
25      Q.    What makes you say -- you said M Hamburg

**PAGE 113**

1  became -- strike that.  You said M. Hamburg became your
2  supervisor in 2018, correct?
3         A.    Yes, ma'am.
4         Q.    And according to you, there were no violations
5  of any -- you never did anything wrong prior to her becoming
6  your supervisor.  Is that what I'm hearing you say?
7         A.    Yes, ma'am.
8         Q.    Is it possible that you were in violation and
9  just you never got caught?
10        A.    No, because United has extended security
11 measures in the computer, and especially remotes are
12 monitored by -- whatever you say -- if I may just describe
13 the situation from what I know as far as security.
14               We know at queue desk, that every waiver goes on
15 and gets looked over, but United has very sophisticated
16 system in a way that, um, you say a bad word and it
17 generates the recording.  You say something in elevated tone
18 of voice and it generates the recording.
19               So it's hard for me to believe that with the
20 sophisticated security as we have, with the, um -- you know,
21 we get calls from FAA, calls from training desk, the
22 manager.  Anybody can at any time call into your phone line
23 and I was never advised that my waivers were wrong.
24               If I was going to hide it, I wouldn't document
25 every waiver specifically why I was doing.  So it is not a

**PAGE 114**

1  matter of not being caught, because for five years I handled
2  over 52,000 reservations.  And out of those 52,000, they
3  pulled 37 and they said, you know, the waivers are not good.
4         Q.    So according to the family -- or the pass
5  privileges policy has been in existence for as long as
6  you've been an employee with United, correct?
7         A.    Correct.
8         Q.    And you became an employee in 2009?
9         A.    No, no, no.  I'm sorry.  Wrong.  1990.
10        Q.    Is when you became an employee of Continental.
11 So the Friends and Family travel policy has been -- whether
12 with Continental or United, has been in effect since you
13 were an employee in 1990.
14               MR. BOUZAS:  Object to form.
15               MS. WILLIAMS HARRIS:  Go ahead.  You can answer.
16        A.    (By the Deponent) So it has been the policy,
17 yes.
18        Q.    Okay.  And you've been aware of the Friends and
19 Family pass travel policy since you began your employment in
20 1990.
21        A.    Yes, ma'am.
22        Q.    Has the policy changed at all during the time
23 that you've been an employee either with Continental or
24 United?
25        A.    I cannot speculate on that, but if I could point

**PAGE 115**

1  out the one thing that changed, and that was the 2019 policy
2  that we talk about, point of origin to the destination.
3  That is not allowed anymore, but it was allowed before,
4  until 2019.
5         Q.    But you were trained on that, correct?  Whatever
6  changes happened, you were trained on that?
7         A.    Yes, ma'am.
8               (Screen share ended).
9         Q.    All right.  And so you have a meeting with
10 Ms. Hamburg on June 4th of 2019.  Then you subsequently
11 wrote your statement, and did M. Hamburg express to you
12 that you should provide as much information as you can,
13 particularly if you've done this previously?  Did she tell
14 you that?
15        A.    She didn't state that if you done it previously,
16 but she said to send her an explanation.
17        Q.    Okay.  At the time you had that June 4th meeting
18 with M s. Hamburg, did you feel at that moment that you
19 were -- that she was having that meeting with you because of
20 your age?
21        A.    Yes, ma'am, and even previously, if I may.
22               So when she became my supervisor, she would
23 randomly get into my phone line and she would start saying
24 like, *Barbara, how are you?*
25               *Well, I'm fine.*

**PAGE 116**

1               *Why are you still here?*
2               *Well, my shift doesn't end until 2:00 PM Central*
3  *Standard Time.*  She was in Houston.
4               And she would say, *No, no.  That's not what*
5  *I meant.  What I mean is why are you still here?  Aren't you*
6  *too old to do the job?  Why are you still here?  Where have*
7  *you been hiding, under a rock?*  And, you know, *You should*
8  *retire, enjoy life.  Why are you still here?  Retire, retire*
9  *retire.*
10               And that's all I heard from her.  And the
11 conclusion of it was actually when she said, *If you don't*
12 *retire, I'm going to fire you sooner or later.  Are you*
13 *going to die at the computer taking the calls?*
14        Q.    Are the phone calls recorded.  When you're a
15 travel agent, are those calls recorded?
16        A.    All the calls are assumed to be recorded.  Yes,
17 ma'am.
18        Q.    Do you know if Ms. Hamburg said any of those
19 things to any other reservation agents?
20        A.    Um, during one conversation in June, when she
21 did my eval -- I'm sorry I'm crying.  When she did my eval,
22 she said, *You have to improve your performance selling cars,*
23 *car rentals, because I already fired somebody for that.*  But
24 I don't know specifically what that person was.  But I
25 wanted to underline that for June, July and August,

**PAGE 117**

1    I received multiple rewards for car transfers.

2    Q.    What year was this?

3    A.    2019.

4    Q.    Well, my question was -- you listed a lot of

5    things Ms. Hamburg said to you on the headset.  Do you know

6    if she made any of those same comments to any other RSSRs

7    that she supervised?

8    A.    Yeah.  I don't know.

9    Q.    Do you know whether or not she had any

10   performance conversations with any other RSSRs?

11   A.    I don't know.

12   Q.    You don't know?

13   A.    With other, no.

14   Q.    When she got on the phone and she made those

15   statements, did you report any of them?

16   A.    No, because I was afraid.  I was at the end of

17   my retirement years and I was just afraid to, um, start

18   something that I would later regret.

19   Q.    Did, at any point in time, Ms. Hamburg threaten

20   you and say that *if you report this, you're going to get*

21   *fired*?

22   A.    No.  She never said if you report it.  No.  No.

23   Q.    And your testimony is that she made these

24   comments via your headset.  She would call in on your

25   reservation line and she made these comments on that line.

**PAGE 118**

1    A.    Yes, ma'am.  And if I may add on, the culmination

2    of her harassment was the 22nd of July, when she offered me

3    the retirement package.  And within a couple of minutes, she

4    took it away from me and, um. . . I don't know if I should

5    continue on that meeting.

6    Q.    Well, I'm going to get to that in a second.

7    A.    Okay.

8    Q.    During this June 4th meeting, did Ms. Hamburg

9    advise you that she was going to ask for a documented verbal

10   warning, because she believed that you were a good employee

11   with a good record?  In that June 4th meeting.

12   A.    I don't recall.  I was so stressed out, I don't

13   recall half of the conversation.  I apologize.

14   Q.    This June 4th meeting, the initial meeting, you

15   were stressed out then?

16   A.    Yes, ma'am.

17   Q.    Do you recall Ms. Hamburg telling you that --

18   the incident where you waived the redeposit fee for your

19   daughter, do you recall her telling you that that incident

20   was under review by HR, by Human Resources?

21   A.    She probably did.

22   Q.    Do you recall Ms. Hamburg, during this June 4

23   conversation, advising you how she got this information

24   about the waiver of the redeposit fee for your daughter?

25   A.    No.

**PAGE 119**

1    Q.    So the next meeting that you had with Ms. Hamburg

2    was July 22nd, 2019.  Do you recall that meeting?

3    A.    Yes, ma'am.

4    Q.    At any point between the June 4th, 2019 meeting

5    and the July 22nd, 2019 meeting, did you complain to anybody

6    about any discrimination by Ms. Hamburg?

7    A.    I never complained to anybody except for the

8    co-worker, Mr. Farfan.

9    Q.    Okay.  Between June 4th, 2019 and July 22nd,

10   2019, do you have any recollection of speaking to Mr. Farfan

11   about what you believed was discrimination by Ms. Hamburg?

12   A.    I don't remember specifically.  Sorry.

13   Q.    But aside from him, you never called the ethics

14   hotline during that period of time?

15   A.    I did not.

16   Q.    You never contacted Ms. Monique Morris during

17   that time?

18   A.    Not at that time, no.

19   Q.    You never sent an E-mail during that period of

20   time?

21   A.    No.

22   Q.    All right.  So fast-forwarding to the July 22nd,

23   2019 meeting, do you recall who was in that meeting with you

24   with Ms. Hamburg?

25   A.    Yes.  Mr. Cotoia, union rep.

**PAGE 120**

1    Q.    Do you know if that meeting was recorded?

2    A.    I don't.

3    Q.    Was it a virtual meeting or an in-person meeting?

4    A.    Virtual.  Everything was virtual.

5    Q.    Was it via Webex?

6    A.    Webex.  But if I may correct here.  It was

7    Webex, but there was no Zoom meeting like this one.  Just

8    the voice.

9    Q.    The audio?

10   A.    Audio, yes.

11   Q.    All right.  So do you recall what was discussed

12   in that July 22nd meeting?

13   A.    Yes, ma'am.  I remember specifically.

14   So she sent me IM not to get any more calls and

15   to, um -- and to call her.

16   When I called her, she said that with us online

17   was Mr. Cotoia, the union rep.  She said that she has an

18   offer for me, and that's the retirement package.  And, um,

19   she said if I don't take the package right now, the

20   retirement package, she's going to move on to the

21   investigation process, including termination, and I will

22   never get the retirement at all.

23   I was -- if I might just say that I was so

24   shocked, I was. . . I couldn't believe that, because. . . I

25   couldn't realize what was happening to me.  I covered the

**PAGE 121**

1   microphone and I started to cry and I was shaking, and it
2   was like I had a gun put to my head and had to decide, it's
3   now or never. And I cannot remember even what I was saying
4   or what decision I make, because I couldn't even comprehend
5   the offer she make. I felt like I was getting another heart
6   attack at that point.
7        But I recall she said you have two hours to,
8   um. . . you have two hours to decide on it, and, um. . .
9   And then I was, um -- I was asking her, *What did I do wrong?*
10  *Why do you push me to retire? I want to know what I did*
11  *wrong. I didn't do anything wrong.*
12       And Mr. Cotoia said, *It is like the courtroom*
13  *proceedings. You know, she's not going to disclose what*
14  *she's got against you until you either take the retirement*
15  *or you go and, uh. . . into the investigation process.*
16       And I said could I get it in writing, you know?
17  Because she said you have till business, um -- till 5:00 PM,
18  um, till close of business day. And, um, I asked her if I
19  could get it in writing, the package, what it consisted of.
20  And she was very sarcastic and she said, *Just wait a minute.*
21  And within a minute, she sends me the out of service letter,
22  which basically closed that retirement option right away.
23       I remember her saying, *We're going to meet*
24  *tomorrow and, um. . . and we'll -- you tell us your decision,*
25  *right?*

**PAGE 122**

1        But with an out of service letter, she made the
2   decision for me right away. And even Mr. Cotoia, in a
3   written statement later on, confirmed that *Barbara was*
4   *confused. Barbara didn't know what's going on. If the*
5   *company is going to offer two hours for the employee to*
6   *retire, give her the two hours to contact the family and*
7   *make the rationale decision. If she knew what she was*
8   *giving up, she would never. . .* Sorry for crying.
9        MR. BOUZAS: Can we take a break?
10       (Mr. Bouzas and Deponent disconnected from Zoom
11  2:07 to 2:10 PM).
12       Sorry about that. I appreciate it.
13       MS. WILLIAMS HARRIS: No problem.
14       DEPONENT: If I may add on. If I may, ma'am.
15       MS. WILLIAMS HARRIS: Uh-huh.
16  A.   (By the Deponent) See, when the, um. . . when I
17  said no during that conversation, it was referring to I
18  cannot comprehend the conver -- I cannot comprehend the
19  offer. I cannot comprehend the conversation that's taking
20  place. And I asked her for the written description of the
21  retirement package because I thought that I still have till
22  5:00 PM to review it. And after she said *Wait a minute,* and
23  she send me the out of service letter that offer was
24  rescinded immediately, and. . . and she took it from me,
25  making the decision for me. Thank you.

**PAGE 123**

1   Q.   Do you recall, when Ms. Hamburg presented the
2   offer of retirement with full benefits, you saying no and
3   then -- do you recall saying no?
4   A.   Yes, ma'am. I recall saying no, but it was no
5   to the situation. It was no, what I did wrong. No, it's a
6   culmination of your harassment that started when she became
7   my supervisor, and then when -- remember how she told me
8   that *if you don't retire, I'm going to fire you sooner or*
9   *later,* and it was coming to it and she took the package from
10  me.
11  Q.   Okay. Do you recall that Ms. Hamburg suggested
12  that you think about it, accepting your retirement with full
13  benefits, and do you recall your answer being, *No. Final*
14  *answer?*
15  A.   I don't remember it. I don't remember that at
16  all. I know that I was in shock. I could barely speak and
17  I was -- I was shocked. See, one minute I'm on the phone
18  assisting the customer. The next minute I'm being forced to
19  retire by Ms. Hamburg. And, uh, yeah. Sorry.
20  Q.   Did you ever ask Ms. Hamburg if you could have
21  more time to consider -- when she told you 5:00 o'clock, did
22  you ever ask her if you could have more time to consider the
23  offer?
24  A.   I never asked her for more time, but I was under
25  the impression that I had till 5:00 PM, when she, within

**PAGE 124**

1   couple of minutes, closed the window of opportunity and that
2   was it.
3   Q.   Why would you say that she closed the window of
4   opportunity when she asked you if you wanted to accept the
5   offer and you said, *No. Final answer?*
6   A.   Because it's like having the gun stuck to your
7   head and asking you to make a decision now or never, so I
8   said no, for right now, but I have till 5:00 PM. I have
9   till 5:00 PM, because she said, *We'll meet tomorrow. We'll*
10  *meet tomorrow and you will tell us what your answer is.*
11       And she was asking me right now, pushing me
12  right now for an answer, and I said no, no, no, and it meant
13  for right now. I still had till 5:00 PM. And she made the
14  decision for me. And I thought it was the final harassment
15  that she did to me, you know, taking the retirement package
16  from me. And I was shocked, because I was -- I was a good
17  agent. I had 15 years of perfect attendance, 1,200, you
18  know, sick hours that I accumulated, never any write-ups in
19  my 29-year career, and here comes the supervisor telling me
20  to retire.
21  Q.   Do you know who was making the offer? Do you
22  know if it was Ms. Hamburg that was making the offer or if
23  it was someone else?
24  A.   I don't know.
25  Q.   Do you know who was responsible for allowing

## PAGE 125

1  that offer to be made to you at that time?

2       A.   I don't.

3            MS. WILLIAMS HARRIS:  This is an audio file.

4  It's going to be Exhibit 12.  It's long, so I'm not

5  going to play it all.  Hold on real quick.  Sorry.

6       (Ms. Williams Harris screen sharing

7  Exhibit No. 12, linked hereto).

8            Can you see that?  Can you see this?

9            DEPONENT:  Yes.

10           MS. WILLIAMS HARRIS:  All right.  So I'm going

11 to -- let me know if you can hear this.

12           And Patsy, I'm not sure if you're going to type

13 down everything that's said or kind of how you want to

14 do that.

15           COURT REPORTER:  I can try.  If I can hear it

16 well enough, I will try.

17           MS. WILLIAMS HARRIS:  And I'm going to --

18 because it's longer -- I mean, unless Miguel has some

19 objection, it's a pretty long recording.  I'm going to

20 kind of tell you where I'm starting and stopping for

21 purposes of the record, unless he wants me to play the

22 whole thing.

23           MR. BOUZAS:  Yeah.  I kind of would object to it

24 in the sense that it's not a complete call, but --

25           MS. WILLIAMS HARRIS:  Okay.  I can play the

## PAGE 126

1  whole thing.

2       (Recorded call being played).

3            AUTOMATED SPEAKER:  Welcome to the

4  teleconference service.  Please enter your access code

5  followed by the pound sign.

6            Please enter your attendee ID followed by the

7  pound sign.

8            There are three participants on the call,

9  including you.  You are joining your conference as a

10 participant.  For a menu of available commands, press

11 star, pound.

12           MS. CERANEK:  Hello.  This is Barbara Ceranek.

13 I'm sorry it took me a little bit longer to sign in.

14 I'm sorry.

15      (Recorded call paused).

16           MS. WILLIAMS HARRIS:  Okay.  I'm going to pause

17 right there.  Ms. Ceranek, do you recognize that as

18 your voice?

19           DEPONENT:  Yes, ma'am.

20      (Recorded call resumes).

21           MS. HAMBURG:  That's okay.  Hi, Barbara.  It's

22 Cindi.  How are you?

23           MS. CERANEK:  I'm fine.  Thank you.  How are you?

24           MS. HAMBURG:  I'm well.  Thank you.  I'm sorry.

25 I was trying to get the Webex set up myself and I had a

## PAGE 127

1  call that came in, so it took me a little bit longer

2  myself.  So, no worries.

3            Barb, could I ask, so I don't forget, what time

4  did you go supervisor?

5            MS. CERANEK:  It was, um -- let me check.  12:25.

6            MS. HAMBURG:  12:25.  Okay.  I just want to make

7  sure I get all your time covered.  Thank you.

8            Um, well, thank you for coming off the phones

9  and meeting with me.  Um, I'm sorry that this has taken

10 so long to get you follow-up.  I know we met back on

11 June the 4th, um, and then I was in Chicago for a week,

12 went out on two weeks of vacation, and I was hoping to

13 hear something right when I got back the first week of

14 July, and I reached out to my senior manager as well as

15 HR.

16           The problem was, is HR and Human Resources, we

17 had Cheryl Gorman before, who took -- who was over the

18 Chicago office and the contact centers and Cheryl

19 had changed jobs.  So when I came back from vacation, like

20 a day after I got back, it was announced, um, that

21 Cheryl was leaving the contact centers and going to a

22 different department, and then we were getting

23 Laurie LeDonne who was taking over.

24           So when Laurie stepped in, she said Can you

25 please send me everything you have on Barb, because I'm

## PAGE 128

1  now taking it over.  So it kind of got all started over

2  again and that's why the delay.  It's taken us until

3  today which is the 22nd of July, so I apologize for

4  leaving you in limbo this long.  Um, I don't like to

5  make excuses, that's the honest truth of what happened.

6            So, um, I got -- I was advised, you know, to

7  meet with you, so, um, I saw, you know, you were off --

8  I was off Friday, Saturday and then I saw today you

9  were working, so that's your first day that we could

10 meet.

11           So I have asked Tony Cotoia to join us.  I know

12 he spoke to you briefly before our call.  Tony is the

13 union rep for your area, since you reside in Florida.

14 Tony is over the chair for Florida.  That's why Tony is

15 on the call, as well.  Um, I know before, we had

16 Stephanie who was on, but everything moving forward

17 will go through Tony.  It's easier just to get Tony.

18 That way to cut out the middleman, so to speak.

19           Um, Barb, I'm meeting with you today, um, to

20 give you an option.  Um, the initial meeting that we

21 had back on June the 4th, I had brought up what was

22 found in a routine audit with your daughter, with the

23 MileagePlus account and a redeposit of the miles into

24 her -- into your account and the waiver of the

25 redeposit fees.  You had wrote me a letter, a statement

**PAGE 129**

1  of your explanation as to what has happened and how you
2  would do this for our customers and you didn't think
3  you were doing anything against company policy, um, and
4  I had explained this goes against our Friends and
5  Family Policy that we sign off on every year, you know,
6  saying that we won't do favors and waivers for our
7  friends or family.
8      I had asked you, during that time, whether any
9  other time in your, you know, history with the company,
10  that you have done these sorts of things, and you had
11  advised this was just a one-off, this is the only time
12  you had done this, and that there were no, you know,
13  other times that this had happened.
14      Um, the initial feedback that I'm getting from
15  the preliminary -- so they haven't done a full
16  investigation into you yet, which would mean a full
17  investigation goes back as long as you've been with the
18  company, to research, um, things, but they've just done
19  an initial, so I don't know if that's only over a
20  couple of years. I'm not really sure, uh, because I'm
21  not involved in that. But the initial feedback is that
22  there is a pattern of abuse and it's going to lead to
23  serious discipline. So before we move forward with an
24  investigation -- because once we start an investigation,
25  there is no turning back for you. And what that means

**PAGE 130**

1  for you, as Tony probably explained, is that the option
2  to retire with benefits from the company would not be
3  an option to you at that point. It could lead to
4  termination, which you would only then be terminated
5  from the company and I believe that your pension is all
6  you would leave with.
7      So I'm giving you the opportunity today, before
8  I move forward with the IRM, to give you the opportunity
9  to retire if you would like to. Um, I can give you
10  until end of business today, at 5:00 o'clock, to make
11  the decision. Um, I know it's a big decision to make
12  and here it's 1:00 o'clock. You have four hours to
13  decide, Central Time. So, I know you're in Florida.
14  It's currently 1:00 o'clock Central Time and I can give
15  you until 5:00 o'clock Central Time, so end of
16  business, to make a decision as to whether or not you
17  would want to retire and retain your benefits from the
18  company. That would be pass travel and everything
19  else, just as a regular retiree.
20      So tomorrow, I will have to meet with you. If
21  you decide against that, if that is not what you choose
22  to do, then tomorrow we would have a meeting with me
23  and you and Tony again, and we would move forward with
24  the investigative hearing, which is called an IRM.
25  It's an Investigative Review Meeting that they hold.

**PAGE 131**

1      It's basically like a trial, would you say,
2  Tony, kind of? You have your representation. The
3  Company has theirs. The Company presents all the
4  exhibits to the Union. On behalf of the Company, I
5  will speak for the Company.
6      They will give me all the information that they
7  have found in the review of the case. So they, you
8  know, go through Human Resources. They go through
9  corporate security. They review everything that they
10  found. We submit that all to the Union. They have 72
11  hours to review it before we go to the IRM meeting, or
12  the hearing.
13      And we have a hearing officer, which is somebody
14  who doesn't know anything about the case. Um, it's
15  usually someone from another office. It's a manager
16  from another office. So, it's not my manager. My
17  manager obviously already knows what's going on,
18  because, you know, you're part of our team. So it
19  would be somebody who doesn't know what's going on and
20  they are an unbiased person.
21      They hear all the facts. They see what's
22  presented to them, if the Union has anything to
23  present, and then they will see everything that's
24  presented on our side, from the Company, that we found,
25  and they will determine whether or not, um, you will,

**PAGE 132**

1  uh, you know, possibly be terminated at that point.
2      I would just like to tell you that so far, just
3  the initial feedback, it is very severe and I'm, you
4  know, strongly urging you to think about this and make
5  the best decision. I would hate to see someone with as
6  many years of service as you, Barb, not to be able to
7  retire with all of your benefits. And once this goes
8  to the Investigative Review Meeting, if you are
9  terminated at that point, at the end of the
10  investigation, like I said, you don't get to retire
11  with any benefits and you don't get any of the perks
12  from the company. You are just, um, terminated.
13      And, Tony, they just get their pension; is that
14  right?
15      MR. COTOIA: And 401(k).
16      MS. HAMBURG: Pension and 401(k) is all you
17  leave with. Anything else, you would not be entitled
18  to from the company once terminated. Again, I don't
19  know that it will go to a termination, um, because the
20  hearing has not happened yet, but based on just the
21  initial feedback and the severity of what I've seen.
22      I'm just asking you to make a, um, informed
23  decision with guidance from Tony, because he knows how
24  these things can go, too, um, and it's, um. . . I've
25  done all I can do, Barb. I had requested a written

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 37 of 84 PageID 273

## PAGE 133

1  warning for you, based on that, since you had no
2  discipline before, because you had told me this was a
3  single incident.  And based on your performance and
4  your attendance records and everything, I had requested
5  just for a written warning, um, and it seemed like that
6  was a pretty -- you know, I didn't think that was too
7  absurd in asking for that.  But now, had I have known
8  what I know now, I would not have asked for that before.
9  So, um, that's just my opinion.  So I can only imagine
10 what the hearing officer is going to say.
11       So, um, again, if you think back to any times
12 over the history of your, um, employment with the
13 company and if you've done any waivers and favors for
14 friends and family that you've done, whether it's, you
15 know, waiving of, um, change fees, penalties,
16 redeposits, add/collects, things like that, those
17 things are all traceable and trackable and those are
18 things that can get you into trouble, because we are
19 not supposed to be doing that.
20       Do you have any questions for me, Barb?
21       MS. CERANEK:  I do have, yes, if I may.
22       MS. HAMBURG:  Sure.
23       MS. CERANEK:  So, um, you said If I known what I
24 have right now, I wouldn't, um, recommend the warning,
25 so what do you know right now, if I may ask?

## PAGE 134

1        MS. HAMBURG:  I can't -- I can't disclose
2  anything until we go into a hearing and then everything
3  would be disclosed to you.  I have to present it first,
4  because these are just initial findings.  They haven't
5  done a full investigation yet.  But once the initial
6  investigation starts, there's no turning back.  But I
7  cannot advise you of what has already been, um --
8        MS. CERANEK:  Why not.
9        MS. HAMBURG:  -- presented to me or found by the
10 company.  So, you know, think of it like -- you know,
11 think of it like a case, you know, when you have a
12 criminal case or anything that's going on.  They never
13 want to tell the other person what they have going into
14 it, because they have to do all of their investigating
15 first, and that's the same thing the Company is doing.
16 The Company is investigating everything before they
17 present it to you and the Union and the hearing
18 officer.
19       So preliminarily, um, you know, I have asked,
20 you know, can I -- you know, She's a 29-year employee.
21 Can I let her know?  You know, they said, No, you can't
22 let her know what we know.  You can just tell her she
23 has until 5:00 o'clock today to make the best decision
24 for herself.
25       Because once we do move forward to hold you out

## PAGE 135

1  of service, um, so, uh -- like I said, tomorrow, if you
2  decide that you do not want to retire, you want to take
3  your chances and see what will happen with the
4  Investigative Review Meeting, or the IRM, then tomorrow
5  we will hold you out of service with pay.  So you will
6  be withheld from service until further notice.
7        We, the Company, will go through everything,
8  um -- and they go through it with a fine-toothed comb,
9  Barb, and they go through everything with Human
10 Resources and corporate security and they will gather
11 all their findings and let me know.
12       They send it to me.  I'll submit everything over
13 to the union and then we set a hearing date.  It could
14 be, you know, 30 days from now, um, and then we set up
15 a hearing date.  It goes to a hearing.  And then once
16 the hearing officer hears everything from both sides --
17 so they hear what we have found and if, you know, you
18 have anything that -- you know, if Tony talks to you
19 and you guys have things, data that you want to
20 present, or reasoning behind it, the hearing officer
21 listens to both sides, just like a judge would, and
22 then he will -- he or she will make her decision.  I
23 think they have like seven days to decide what will be,
24 um -- you know, either they're going to uphold what the
25 Company found and go ahead and terminate, um, or

## PAGE 136

1  they're going to let you come back with some other sort
2  of discipline, if it's recommended.
3        But at that point, like I said, if they decide
4  that, yes, there is substantial evidence that shows
5  that this is not a one-off and that you have been
6  abusing the Friends and Family Policy, um, you know,
7  they would go forward.  They would ask for termination
8  and you would be terminated immediately, only taking
9  your pension and your 401(k).
10       MS. CERANEK:  But you don't know that for sure.
11       MS. HAMBURG:  I do not know that for sure.  But
12 I'm going to tell you, the only reason I am meeting --
13 I'm telling you, as I would strongly suggest, just
14 because already the initial feedback that I have is
15 that it does not look well.
16       MS. CERANEK:  Right, but no specifics, so, you
17 know.  Okay.  So if I may, um --
18       MS. HAMBURG:  Uh-huh.
19       MS. CERANEK:  First of all, I wanted to clarify,
20 I never said -- and we probably were on a recorded
21 line, I would assume, on the first meeting, so I never
22 said that I don't -- I didn't do it or I did it.  What
23 I said is -- because I have it on my side here.  Okay?
24 Recorded.  I do not recall, that's what I said.
25 Because this is a legal proceeding and this is my

## PAGE 137

1  statement, I do not recall. Okay? That's first.
2       The option for me to retire, could I have it in
3  writing? Not just saying what you're saying, but it is
4  just way too important to have it, you know, over the
5  phone. Could I have it in writing, in my E-mail, those
6  are my options, if I may, please?
7       MS. HAMBURG: I will -- no. I'm meeting with you
8  today, with your Union rep, Barb, um, but I will not
9  send it to you in writing.
10      MS. CERANEK: Why not?
11      MS. HAMBURG: I'm advising you that you have
12  until tomorrow. We won't need to meet till tomorrow,
13  so I'm just -- and you can look at all of your options
14  that you want, you know, what you have available to you.
15      MS. CERANEK: I know, but it's a decision of a
16  lifetime and I don't have anything in writing, ma'am.
17      MS. HAMBURG: Well, I'm not sure what you would
18  need in writing. You would just -- you would retire
19  effective immediately, so we would start the paperwork
20  immediately. You would be retired effective as of today.
21      MS. CERANEK: But I would like it in writing as
22  far as my options, because, you know, those are serious
23  implications.
24      So, let me give you my point of view here. Okay?
25      MS. HAMBURG: Okay.

## PAGE 138

1       MS. CERANEK: So, um, you know, I want a full
2  investigation. I will hire a lawyer. I will sue for
3  age discrimination and the lawyer will make sure that
4  whatever is spent, United pays.
5       And I know that I am going against a giant.
6  I do realize that. But they do have good, you know,
7  um, lawyers that specialize in that area. So I will
8  sue for age discrimination and the lawyer will make
9  sure that the punishment I got is comparable to the
10  punishment in previous cases, when people, whatever
11  I did, did the same thing and they get punished the
12  same way.
13      I also wanted to emphasize that, you know, it
14  all started with my daughter, $125.00, um, that I, um,
15  waived for her, like for any other passenger. If you
16  would like a copy of the ticket that she traveled on to
17  the funeral services, I can provide it. Because I will
18  be providing all that information, all the dates, and
19  all that was said to the lawyer, who will take over to
20  make sure that I'm treated fairly and it's not pushing
21  me out of the door only because I make twice as much
22  money and you can get two agents for the price of one.
23      I have -- and I -- you know, how many years and
24  stuff. I work hard. I have good stats. You know, I do
25  the job I'm supposed to do, and that nobody appreciates.

## PAGE 139

1  And the loyalty, nobody appreciates that.
2       I mean, you know, why should I not start at the
3  top? And, you know, he always says If you have problem,
4  you know, you can call me and leave a message. You
5  know, why not? Because whatever I did, it doesn't
6  call -- yes, I would like to be -- it doesn't call for
7  termination.
8       So, please, with fine comb. Since you can go
9  back to Continental, you can see my perfect attendance
10  for years at a time. You can see that I accumulated
11  over 1,000 sick hours. Okay? Never sick, always
12  dragging myself to the position, to the desk to work.
13  And I consider that very loyal. But, oh well.
14      So this is where I stand. So, definitely not.
15  I thought maybe you could write me something so I can
16  then, you know, basically present all the stuff in
17  writing to the lawyer. Because you know what the
18  lawyer says, If it's not in writing, it doesn't exist,
19  you know, what was said. You know, yeah, we -- yeah,
20  we have the, you know, recorded conversations, right,
21  on both sides, but that's, um. . . that's just what was
22  said, nothing is in writing, and they like to have
23  everything in writing. So, that's why --
24      MS. HAMBURG: Well, Barb, if I may interject, if
25  you retire as of today, you retire as a fully vested

## PAGE 140

1  employee. You would retire effective immediately. So
2  you would retain all of your benefits just like any
3  other employee that advises me they want to retire. So
4  I'm not really sure what I give you in writing other
5  than you would be -- you would send me an E-mail
6  telling me that you would want to retire effective
7  immediately, as of the end of your shift today, and we
8  would start the paperwork to have you retire.
9       MS. CERANEK: I understand that part. However,
10  whatever -- you know, the lawyer would like to have,
11  Barbara on this day, at this time, was presented with
12  those options from Ms. Hamburg, and those are the
13  following options. Okay? And I don't have it in
14  writing, you know, because one is to retire, one is to
15  be fully investigated with the possibility of being
16  stripped of all the benefits and being fired. So
17  that's what I'd like in writing, because those are the
18  options and, you know, nobody can send me anything in
19  writing.
20      MS. HAMBURG: Well, and the only thing I can
21  tell you, Barb -- just a few things.
22      So per the Investigative Review Meeting, it's
23  between -- it's within company, so you don't bring a
24  lawyer to that. If you wanted to retain a lawyer on
25  your own behalf once the, um, Investigative Review

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 39 of 84 PageID 275

**PAGE 141**

1 Meeting is, you know, done, if they've made their
2 decision, that's up to you.
3         As far as age discrimination, we have never once
4 and nor have I ever once mentioned your age as part of
5 this, nor have I mentioned that it's your work ethic or
6 the way that you have done things while working, or your
7 loyalty to the company. Those are the three things
8 that you mentioned.
9         MS. CERANEK: Loyalty was questioned. Loyalty
10 was questioned. I'm sorry, ma'am.
11         MS. HAMBURG: No. What is questioned is that
12 you broke the Working Together Guidelines. You agree
13 every year to not do favors and waivers for friends and
14 family, and you have broken that by waiving -- by
15 buying your daughter a ticket with your miles and then
16 waiving the redeposit fee. And doing that, that goes
17 against company policy.
18         MS. CERANEK: They do that like any other
19 passenger. Okay. Yeah. We can talk about it later.
20 Not a problem at all. Yes, ma'am.
21         MS. HAMBURG: Okay.
22         MS. CERANEK: Let's go with the fine comb over
23 my, um -- I don't want to say career, because that
24 sounds sarcastic right now -- over my 29 years of
25 service to Continental, slash, United and see what

**PAGE 142**

1 would be the total damage that I did to the company.
2         MS. HAMBURG: Okay. So you -- so you would want
3 to move on? You want to move on with the Investigative
4 Review Meeting knowing that if you move forward and
5 you're terminated, you will end the company with only
6 your retirement and the 401(k) if this does go to
7 termination.
8         MS. CERANEK: That's fine. And at that point,
9 I will sue. So, yep. This is my final answer.
10         MS. HAMBURG: Okay. Well, then we will meet
11 tomorrow, Barb. I will meet with you tomorrow and, um,
12 we'll start our paperwork from there. Um, I, uh --
13         MS. CERANEK: Oh, let me ask you.
14         MS. HAMBURG: Sure.
15         MS. CERANEK: Okay. So, um, you're saying as of
16 tomorrow, um, I will be paid -- I will be placed on a
17 paid leave?
18         MS. HAMBURG: Tomorrow -- yeah. Tomorrow --
19 well, no. Tomorrow when I come in -- so you will log
20 in tomorrow. Tomorrow you will work. And then once
21 I start, I have to wait for, um, HR to send me over the
22 paperwork. But I'll meet with you. I'll present the
23 paperwork to you, as well as with Tony. He'll be on
24 the call, as well. We'll present the paperwork to you.
25 It will go --

**PAGE 143**

1         (Recorded call paused).
2         MS. WILLIAMS HARRIS: I'm going to pause really
3 quickly just to, um, advise that, um, Dorothy Karpier --
4 I'm going to mispronounce your last name, Dorothy.
5         MS. KARPIERZ: My last name is Karpierz.
6         MS. WILLIAMS HARRIS: Karpierz. So Mary had to
7 step off. Dorothy's a parallel in-house, so she's just
8 a client rep, as well.
9         (Recorded call resumes).
10         MS. HAMBURG: -- over the guidelines of what you
11 are and are not allowed to do, um, and what, um. . .
12 what is being withheld, um, you know. It will go into
13 details of everything, explaining everything, um, but
14 that will be -- I have to wait until I get the
15 paperwork from, uh, Human Resources and, um, then I'll
16 go ahead and present that to you and we'll go on from
17 there. I just wanted to make sure that, um, you know,
18 you knew and you had -- because once I put the wheels
19 in motion, there's no going back, and I wanted to give
20 you that option.
21         MS. CERANEK: Sure, and I'm starting to look for
22 a lawyer as we speak.
23         MS. HAMBURG: Okay. That's fine, Barb. That's
24 all on your own. That won't have any impact on what --
25         (Ms. Ceranek overspeaking).

**PAGE 144**

1         MS. CERANEK: ... (indiscernible) not to worry.
2         MS. HAMBURG: Okay. Um, okay. So it is, um. . .
3 Well, it is -- Tony, did you want to interject anything,
4 or anything you needed? Or, Barb, did you want to ask
5 Tony anything while you have him on the call, as well?
6         MS. CERANEK: No, no, but --
7         MR. COTOIA: Yeah. I'd like to interject one
8 thing here. And, Barb, please understand where this is
9 coming from. Okay?
10         MS. CERANEK: Sure.
11         MR. COTOIA: I am surprised that the offer is
12 being put out to you, first of all. Okay? I'm not
13 going to look a gift horse in the mouth. I hope this
14 happens more often than not, but this is first time, in
15 my last two-and-a-half years at this position, that
16 they have come and offered a retirement first. Normally
17 I'm called in and the agent is told that you are now
18 relieved of duty with pay and we're starting the
19 investigation review and there is no option for
20 retirement. So I just want to put that out there, that
21 I am blown away that you are given this option today.
22 I hope it does happen more and more, because, you know,
23 unfortunately there are people out there that went
24 right to IRM and lost their benefits of flying. And
25 they're pretty unhappy with that, of course, and they

## PAGE 145

1 were saying Why wasn't I ever offered retirement first?
2 So, I don't know if the Company is starting to listen
3 to the Union about that. I hope they are. But when
4 you -- this is the first one that I've I had that they've
5 offered retirement first. So --
6          MS. CERANEK: If I may --
7          MR. COTOIA: -- I understand that you want to
8 know what everything is against you, and I get that.
9 Okay?
10         MS. CERANEK: Uh-huh.
11         MR. COTOIA: But for people that know that
12 they've done things wrong, and not given the option to
13 retire, there's, you know, that side of it, too, you
14 know, that I have to look at. So I'm pleased with the
15 Company coming to you and offering it. And if you want
16 to fight it, that is in your right to fight it.
17 Absolutely.
18         MS. CERANEK: So if I may ask you, why would you
19 think that I'm so adamant about not taking the
20 retirement? What did I do wrong? What do you think?
21         MR. COTOIA: I can't spec --
22         MS. CERANEK: No, no. It's hypothetical
23 question. Right, Tony. I understand. Hypothetical
24 question. The pattern of abuse, you know, what was my
25 pattern of abuse? How much the company lost? And that

## PAGE 146

1 will be -- that will be on the first page of Tampa Bay
2 and how the employees are treated at United. Okay?
3 That's how it is. That's why I'm so adamant, because
4 I don't feel guilty. I don't feel that I did anything
5 wrong, you know, other than, yeah, maybe I waived a fee
6 here and there and it's, you know. And I do waive it
7 for the customer. And once you are paying customer,
8 you're entitled to the same right by, you know, the
9 right of the passengers. Okay? So, but that will be
10 the lawyer arguing in the courtroom, not me. So that's
11 why obviously I want to proceed with this fine-toothed
12 combing, because, please, let me know what you find.
13 Okay?
14         MR. COTOIA: Absolutely. I totally understand
15 that.
16         MS. CERANEK: Yeah.
17         MS. HAMBURG: Okay. Um, well, Tony, if you
18 don't have anything else that you want to say or add or
19 ask, um, then, uh, we will meet tomorrow. The three of
20 us will meet tomorrow.
21         Barb, I don't start till 10:30. I know you start
22 much earlier than me. Um, so, I come in at 10:30. As
23 soon as I get all of the paperwork from Human Resources,
24 I will set up a meeting just like today, a Webex, and
25 you, Tony, and I will meet and, uh, we will move forward

## PAGE 147

1 from there. But again, you have until 5:00 o'clock, as
2 I offered to you. Um, so if you should change your
3 mind before 5:00 o'clock Central Time, feel free to
4 call me back. I can give you my work number and my
5 cell phone number. Do you have a pen?
6          MS. CERANEK: No, thank you. Thank you, no.
7 This is my final answer.
8          MS. HAMBURG: Okay. Then we shall --
9          MS. CERANEK: We shall see you in court.
10         MS. HAMBURG: Well, I'll see you tomorrow at
11 work.
12         MS. CERANEK: Not you, not you. That's a saying.
13 Sorry. (Indiscernible speaking).
14         MS. HAMBURG: Okay. So I will talk to you
15 tomorrow. I will IM you tomorrow morning, when I come
16 in, as soon as I have everything, and we'll get on a
17 call. And then, Tony already said he's in the office
18 tomorrow, as well. You said you start at 11:00, Tony?
19         MR. COTOIA: Yes.
20         MS. HAMBURG: Okay. So we would probably be
21 closer to noon, I would think, since Tony comes in at
22 11:00. And then hopefully --
23         MR. COTOIA: Well, I come in at 11:00 my time,
24 10:00 o'clock Central Time.
25         MS. HAMBURG: Oh, okay.

## PAGE 148

1          MS. CERANEK: If I may. If I may.
2          MS. HAMBURG: Yes. Go ahead, Barb.
3          MS. CERANEK: When we meet tomorrow, could
4 I possibly -- and I know that you cannot quote the
5 names, but let's say they found this pattern of
6 abuse -- because this is what the lawyer is going to
7 ask. Okay? So they found the pattern of abuse and the
8 pattern will consist of that Barbara Ceranek did this,
9 this, and this. And then Mr. Smith did this, this, and
10 this. And for that, Mr. Smith was fired. And for
11 those three things, the same things that Barb Ceranek
12 did, she's going to get fired. Could I possibly get,
13 um, something similar tomorrow, when they're going to
14 come up with the punishment, um, or they won't know yet?
15         MS. HAMBURG: No.
16         MS. CERANEK: Is it possible to get a resolution,
17 a resolution to the -- whatever the resolution will be,
18 you know, hoping for the best, but the resolution
19 saying, Barbara, this is your punishment and you're
20 going to be fired. And so is Mr. Smith, who did the
21 same things, did this, this, and this, and he was also
22 fired. Could I get something like that?
23         MS. HAMBURG: No. So tomorrow when we meet,
24 Barb, what we do is we have a meeting to hold you out
25 of service. So tomorrow we just will meet and I'll say

Case 8:20-cv-02292-CEH-SPF    Document 25-1    Filed 02/18/22    Page 41 of 84 PageID 277

**PAGE 149**

1 that the Company is going to hold you out of service,
2 um, for, you know, X amount of days, while we start an
3 Investigative Review Meeting for termination.
4 So they are going to seek termination, is what
5 they will seek, is termination. That's what the
6 Investigative Review Meeting is for, because they're
7 looking to terminate you based on the information that
8 they found. So, they will go through. They will do a
9 deep-dive investigation. That will not be presented to
10 you until the hearing. It will be presented to the
11 Union 72 hours before our hearing.
12 So if we have a -- we will schedule a hearing
13 date. It's a date when the hearing officer is available,
14 you're available, Tony can be available, and I'm
15 available.
16 So let's say it's three weeks from now. We
17 schedule a meeting three weeks from tomorrow, or
18 whenever. It could be four weeks or five weeks,
19 because I have to wait for all the information to be
20 compiled and then to finish the investigation. So,
21 that's what takes a long time, so, is when they're
22 compiling the investigation.
23 So Like I said, they only did a preliminary
24 investigation and what they found already is enough to
25 lead us to an investigation for termination. And, yes,

**PAGE 150**

1 people have been terminated before. So, let's say --
2 let's say John Smith, or whoever you just said.
3 Mr. Smith has been fired because he did this, this, and
4 this. He did three things. Well, maybe you did 73
5 things over the life of your employment. So, you know,
6 they fired John for only doing three things, but they
7 found 73 things that you've done.
8 MS. CERANEK: You won't find it, though, but
9 that's okay. Um, that's why I --
10 MS. HAMBURG: So then when --
11 MS. CERANEK: So, yeah.
12 MS. HAMBURG: So then when we go to the
13 hearing -- so once the Company has provided or when
14 they have searched all their information and they have
15 it compiled, then we get with Tony, the Union rep, and
16 we get with the hearing officer. We have to find a
17 hearing officer from another office. We set up a date
18 and I have to give -- I present all the -- all the
19 information that we found, I send it over to the Union,
20 because they have 72 hours to look through it and they
21 know what we're presenting at the trial. Or the
22 hearing.
23 MS. CERANEK: Okay. So when can I bring my
24 lawyer to trial.
25 MS. HAMBURG: Once your terminated, Barb -- if

**PAGE 151**

1 you get terminated from the company, whatever you do
2 once you're terminated is up to you. If you decide to
3 seek a lawyer and sue the company, that would be after
4 your terminated from the company.
5 MS. CERANEK: I'm going to seek a lawyer
6 tomorrow, so, yeah.
7 MS. HAMBURG: That's fine. The lawyer -- these
8 are not proceedings with a lawyer. That is all done
9 after the fact. If you -- I've had people that have,
10 um, been terminated from the company and they decide to
11 sue afterwards. Um, I, you know -- and they -- that's
12 something you would do on your own and that would be
13 after the fact.
14 MS. CERANEK: I cannot bring them to the meeting
15 as my representation?
16 MS. HAMBURG: No. Hu-huh.
17 MS. CERANEK: Instead of Union. I cannot?
18 MS. HAMBURG: No. No. You're a Union
19 represented employee. The Union -- no. Hu-huh. This
20 isn't a legal proceeding. This is a company -- this is
21 how the company does it, because you're a Union
22 employee, so. . .
23 Before we had a Union, you would have just been
24 terminated, really. They would have just came in and
25 said, Hey, we found this, this, and this that you've

**PAGE 152**

1 done. You sign a waiver every year. You do training
2 every year saying that you aren't going to do these
3 things, but we found that you are doing these things,
4 so we're going to terminate you.
5 So because you have the Union representation and
6 you're a Union employee that you pay dues for, for the
7 Union, they represent you. So we have certain steps
8 that we have to go through and one of them is an
9 Investigative Review Meeting to say, Hey, we want to
10 know what did you find on her, what has she done, and
11 present it to us. And then we have a mediator, who is
12 an unbiased person that doesn't know what's going on
13 from either side. They come in. They review
14 everything. And they either determine, no, this is
15 not -- you know, this isn't against company policy, or
16 they say, Yes. She did sign a waiver for this. She
17 did do training on this every year and this goes --
18 this is clearly against company policy. We do need to
19 terminate her.
20 So they either make the determination that no,
21 or yes, and then from there we move forward and we
22 terminate.
23 MS. CERANEK: Okay.
24 MR. COTOIA: And let me interject one thing,
25 Barb. Okay? All of this leads up to your -- if it

**PAGE 153**

1  leads up to your being terminated -- okay.  You're
2  going to be put on leave with pay.  Then we're going to
3  have the Level 2 hearing that we go in and we have this
4  sort of file, if you want to call it that -- it's not
5  really that.  It's just a -- really it's a meeting that
6  we discuss things at and that's where it's discussed
7  whether you're terminated or you are just brought back
8  for whatever reason.  But once you are terminated --
9  okay?
10  MS. CERANEK:  Uh-huh.
11  MR. COTOIA:  Then at that point, you do have an
12  option to get a lawyer if you want.  Okay?  Once you
13  decide that you want to get a lawyer, though, the Union
14  would keep everything with you, they would not go to
15  the Level 3, and they would not take your case to
16  arbitration once you get a lawyer.  And any lawyer is
17  going to tell you that is the right of the Union, to
18  drop you at that point, if you're going to go the
19  lawyer way.
20  Now, if you want to wait until after the Level 3
21  hearing and the arbitration, then you can also get a
22  lawyer.  But just so you know, once you do bring a
23  lawyer in, the Union does drop everything at that point
24  and then you're on your own with the lawyer, just so
25  you know.

**PAGE 154**

1  MS. CERANEK:  If I may clarify, so I can exhaust
2  all the legal venues that we have as far as the Union,
3  with the Level 2 and 3 and then arbitration hearing.
4  And then -- and then have the lawyer -- so I can have
5  kind of lawyer on a standby reviewing the case, but to
6  bring him after I exhaust all the Union venues.
7  MR. COTOIA:  That is the recommendation.  Yes.
8  MS. CERANEK:  Okay.  Thank you.  That is very
9  helpful.  Thank you very much, Tony.  I very much
10  appreciate it.
11  MR. COTOIA:  We'll talk about that more as we go
12  along, of course, but I just wanted to let you
13  understand that once you bring in a lawyer after you're
14  terminated, the Union steps aside and we don't do
15  anything.
16  MS. CERANEK:  If I may clarify, though.  Let's
17  say Level 2 hearing, I get terminated, right?  I mean,
18  we're talking the worst-case scenario.  We're talking
19  unheard of scenario, but let's just say it.  Um, Level 2
20  hearing, what does it do?  What is it for?  If I'm
21  already terminated, what is it for?
22  MR. COTOIA:  You're not already terminated.
23  You're held out of service with pay pending the
24  termination hearing, which is the Level 2.
25  MS. CERANEK:  Oh, it's pending termination

**PAGE 155**

1  hearing.  Okay.
2  MR. COTOIA:  So there's a hearing itself, or the
3  IRM, which is a meeting -- you know, it depends on
4  which way you want to say it.  They're both the same
5  thing.  Okay?  But you could go into that meeting, last
6  hearing, and you could be found to be returned to work.
7  So even though it's called a termination hearing, it's
8  really called a review meeting, because they're
9  reviewing everything whether to terminate you or
10  whether to bring you back.
11  MS. CERANEK:  I see.  Okay.  Thanks.
12  I appreciate it very much, Tony, and I'm looking up
13  this stuff right now in the, um. . . in the passenger
14  service employee -- the, um -- that we got, the book.
15  So it shows all the legal stuff that has to be
16  followed, so this is very helpful.  Thank you very
17  much, Tony.  You really clarified it for me.  I will
18  hold on to the lawyer to exhaust all the Union options,
19  um, first.
20  MR. COTOIA:  Correct.  Because that's all stuff
21  you already paid for per your Union dues and everything
22  like that.  We're here to represent you.
23  MS. CERANEK:  I appreciate it very much, sir.
24  And, um. . . I'm sorry.  I was trying to look up one
25  other thing.

**PAGE 156**

1  MS. HAMBURG:  Barb, the reason I'm coming to you
2  is, um -- you know, it's an act of goodwill because of
3  your years of good service.  So I'm coming to you just
4  trying to make sure you know all your options.
5  I would hate to see -- I have seen other people
6  terminated and I would hate to see you, so, you know,
7  as a verbal act of goodwill, I'm, you know, trying to
8  offer you retirement, um, you know, because of your
9  years of good service.  But if -- you know, if that's
10  not what you want, uh, you know, it's just, uh -- but
11  that's the reason I can't give it to you in writing,
12  because it's, um. . . so, but, um. . . You know,
13  inevitably, it's your decision.
14  MS. CERANEK:  Okay.  So, no retirement, please.
15  Final answer.
16  MS. HAMBURG:  No retirement.  Okay.  Then, um --
17  I'm sorry.  Could you bear with me?  Can both of you
18  just hang on for one second?  I'm so sorry.
19  MS. CERANEK:  Not a problem at all.
20  MS. HAMBURG:  Thank you.  Hang on one second.
21  MS. CERANEK:  Of course.
22  MR. COTOIA:  And, Barb, I would recommend that
23  when you do have a chance, definitely read up on the
24  contract as far as your rights for the arbitration and
25  all that stuff.  Okay?

## PAGE 157

1 　　　MS. CERANEK: Okay. Yeah. I'm looking at it
2 right now. I appreciate it very much, sir. In my
3 worst dreams, I never thought I would have to look up
4 the section -- you know, the, um. . . yeah, information
5 here, but, oh, well. What can I say?
6 　　　MS. HAMBURG: Okay. I'm so sorry. I had,
7 um. . . HR was just messaging me.
8 　　　I am going to go ahead and share my screen,
9 then, actually, Barb. Um, I'm going to go ahead and,
10 Anthony and -- Tony and Barb, you know, I'm just going
11 to go ahead and hold you out of service today, Barb.
12 You repeatedly said that you do not want the retirement,
13 so I will send you over this letter and we will move
14 forward from here.
15 　　　So, can you both see my screen?
16 　　　MS. CERANEK: Um, yes. Let me see if I can
17 enlarge it. Let me take a screenshot and --
18 　　　MS. HAMBURG: I'm going to send you a copy, Barb.
19 You don't have to. I'm going to send you a copy
20 yourself. So I will E-mail this to you. But it's
21 dated today, July 22nd, with your name and your
22 employee number, U155092. Is that correct?
23 　　　MS. CERANEK:
24 　　　MS. HAMBURG: Okay. It says, Barbara, This will
25 serve as follow-up to our initial meeting that we had

## PAGE 158

1 on June the 4th, 2019 in the presence of your Union
2 Steward, Tony Cotoia, wherein you were being advised
3 that you're being held out of service pending an
4 investigation and determination. You are also being
5 advised that this will be a paid status.
6 　　　So effective immediately, you will be withheld
7 from service. You will be paid while you are out.
8 　　　This means that you're not permitted on United
9 Airlines property, which includes the buildings as well
10 as the parking facility, and that all travel privileges
11 will be suspended while the investigation continues.
12 　　　So you will not be able to use your travel
13 benefits, nor will anybody else in your family or on
14 your passes. Excuse me.
15 　　　Once a determination has been made, we will
16 contact you to discuss the next step. In the meantime,
17 feel free to contact our HR manager, who is
18 Laurie LeDonne, her number is 872-825-6183, or your IAM
19 Committee person -- who is Tony -- at 813-5 --
20 　　　Is this correct, Tony? Just to make sure,
21 813-546-9696?
22 　　　MR. COTOIA: Yes. What's that (Indiscernible)
23 behind my name now?
24 　　　MS. HAMBURG: Oh, you know, I don't know. But
25 that's your correct number, right?

## PAGE 159

1 　　　MR. COTOIA: Yes, it is.
2 　　　MS. HAMBURG: -- if you have any additional
3 questions. Also, please remember that the Employee
4 Assistance Program is confidential and available to
5 you. They can be reached at 866-324-4327.
6 　　　They're available 24 hours a day, seven days a
7 week. The Employee Assistance is if you need help.
8 It's completely confidential. And that's like if
9 you're looking to speak to counselors or, um, you know,
10 people who usually go through, um. . . like grief
11 counseling, if they've lost at spouse, or substance
12 abuse, or things like that, they'll reach out to
13 Employee Assistance. But if you are feeling that you
14 need to talk to somebody, you can reach out to them.
15 Again, it's confidential and it's available to you
16 24/7.
17 　　　It's signed by me. A copy of this will go over
18 to Mike Kempner, who is the director for Chicago
19 office, Laurie LeDonne, who is with HR. Tony Cotoia,
20 your committee person who is on the line, will get a
21 copy of this, as well, along with you, Barb.
22 　　　Um, so that is the letter. So we'll just do it
23 effective today. Um, so you will be held out of
24 service. You do not need to come in for work tomorrow.
25 Um, I, like I said, um. . .

## PAGE 160

1 　　　The time, the next steps from this will be an
2 Investigative Review Meeting, which we discussed. It
3 can take some time, so bear with me. The meeting, like
4 I said, will not be tomorrow or the next day. It could
5 take three, four weeks. Tony has probably done way
6 more of these than I've done. So it can be kind of,
7 um, lengthy until we, um, get all the information back
8 from the Company. So, um, I just don't want you to
9 expect that the hearing will be, like, next Monday at
10 this time, because it could be a couple of weeks out
11 from now. It could be, you know, six weeks.
12 　　　Um, but once we have our date set, we will
13 notify you. You will be sent a FedEx letter notifying
14 you of when the hearing date is going to be and that
15 you need to be present for it. Tony will also get a
16 copy of it. Like I said, 72 hours before that hearing
17 is when the Union will be presented with all of the
18 Company findings.
19 　　　MS. CERANEK: So if I may ask you, then, the
20 hearing will be in, um -- over the Web ex?
21 　　　MS. HAMBURG: Correct. It will be. You have
22 the option to select it, if you want it to be in
23 person, if you don't. Because you're a remote agent,
24 we usually do do them over Webex. And you are
25 presented -- everything is presented to you just like

**PAGE 161**

1  this. So the letter that you see in front of you --
2  like if we have -- let's say we have 57 exhibits. I
3  would present you with Exhibit No. 1. I will present
4  you with Exhibit No. 2.
5      Now, 72 hours before that, Tony would have
6  already received them. So he has a hard copy and I'm
7  sure he probably shares that with you and you could --
8  (audio cuts out) -- he is on the phone call. So, there
9  would be a hearing officer. There would be me. There
10 would be Tony. There would be you.
11     Um, and Tony, sometimes I think the Union might
12 have somebody else. Don't they sometimes have a second
13 chair or somebody that may sit in?
14     MR. COTOIA: We could have someone that sits in
15 there, an observer or also our scribe.
16     MS. HAMBURG: Okay. Yeah. And then there's a
17 scribe, someone who is taking notes, like a court
18 reporter. In a regular courtroom, we have someone
19 that's a scribe that takes notes, as well.
20     Um, so, those are the people who are on the call
21 and everything is presented like this. If you prefer
22 and you wish to do it in person, then it would be in
23 either Chicago or Houston, and you would -- we would
24 fly into the facility to do the, um, hearing there.
25     MS. CERANEK: Oh, no, no, no, no. No, no.

**PAGE 162**

1      MS. HAMBURG: So, but, again, um, just so you
2  know, now that you have been presented with, um -- like
3  I said, I was just offering you a verbal act of
4  goodwill before. However, now that we're moving
5  forward into the Investigative Review Meeting, if you
6  decided to retire, from here on out you would not be
7  able to retire with your full benefits, but you had the
8  option to before, because we already started the
9  process to move forward with an Investigative Review
10 Meeting, so. . . But that was something you didn't
11 want to do, so, um. . .
12     I will send you a copy of this. I will E-mail
13 you this letter that we're looking at right now, as
14 well as, Tony. And I will let you know as soon as we
15 have -- as soon as I have all the information back from
16 the Company and we are able to move forward with the
17 hearing, I will let you know. I am, um. . .
18     MS. CERANEK: I'm very interested what they
19 found with the fine-tooth combing. And I'm going to
20 complain to Oscar in writing also, so, um, he can learn
21 how the employees are treated; you know, this is the
22 offense and this is the corresponding punishment. But,
23 you know, just sharing.
24     MS. HAMBURG: Yeah. And that's fine, Barb.
25 That is your right as an employee to do, but you have

**PAGE 163**

1  to remember the bottom line is we have work rules that
2  you have to follow, and whether it's $2.50 that you --
3  we're not saying that you have stolen from the company.
4  We're not saying it's a valued amount. We're not
5  saying that it's because it's $2 million you've taken
6  from the company, as an example. We're saying that you
7  were presented with guidelines saying that you would
8  not provide any waivers or favors for any friends or
9  family while employed with United. Or Continental
10 Airlines. We have this with both companies. And you
11 have gone and broken those rules. You have done favors
12 and waivers, whether it's change fees, whether it's
13 add/collect, whether it's redeposit fees. And there is
14 a consistent pattern of breaking that and you agreed to
15 not do that while you were employed with the company.
16     So, again, it's because -- that is the reason
17 you're being investigated. It's not because we're
18 saying you embezzled $2 million from the company.
19 We're saying that you agreed to not do this and you
20 have and that is against the company rules.
21     MS. CERANEK: Exactly. But the punishment has
22 to fit the crime. So, you know, if I waive, let's say,
23 this and this, then I'm being fired like the same fired
24 as the same person who, you know, stole from the
25 company thousands of dollars. Okay? And because the

**PAGE 164**

1  end result is the same, and the punishment has to fit
2  the crime, and it's something for the lawyers to also
3  bring up in the courtroom.
4      MS. HAMBURG: But you know in the training --
5  you know in the training that we do, the training that
6  we do every year and the waiver that it says, it says
7  that this is punishable by termination. So, but we'll
8  see.
9      You know, I don't want to jump to conclusions or
10 jump the gun. I just -- you know, I want to be clear
11 that that's why -- I just know you brought up some
12 other things, you know, that I want to make sure that
13 you understand that that's not -- this has nothing to
14 do with age, work, or loyalty.
15     MS. CERANEK: Right, because, you know, that
16 brings me to the very subject. Okay. If that was a
17 little something that was not adhering to the policy
18 and you fire a 61-year-old person for doing it within
19 29 years of service, okay, because you couldn't find
20 anything else in the 29 years, would you do the same
21 for the person that makes $10.00 an hour and just
22 started the job --
23     MS. HAMBURG: Yes.
24     MS. CERANEK: -- and has two years of employment?
25     MS. HAMBURG: Barb, it doesn't matter if you're

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 45 of 84 PageID 291

## PAGE 165

1  a six-month employee or a six-year employee, or 56-year

2  employee, if you are not following the guidelines by

3  the company, you will be terminated.  And I can

4  guarantee you I have seen people from new hires to

5  people that have been loyal employees fired, but when

6  you're breaking the rules, it's breaking the rules.  It

7  doesn't matter.  And that's what it comes down to.

8      MS. CERANEK:  But it does matter what the crime

9  is to do the appropriate punishment.  So that's all I'm

10  saying, that the punishment seems to be so outrageous

11  that it brings to mind the question Why is that

12  61-year-old woman being pushed out the door.  She

13  doesn't want to retire on her own even though they are

14  throwing that in her mouth, you know, retire, retire.

15  What are you doing here?

16      Okay?  So that's -- I apologize.  I should stop.

17  I apologize.  I should not even bring it up.  Sorry.

18  Not for me to talk about it.

19      MS. HAMBURG:  That's okay.  We will meet again.

20  And I know it's a lot coming to you.  You're working

21  today and then to come to you today and say, Hey,

22  I think maybe retirement would be in your best interest,

23  but I just thought that would be a, um -- you know, a

24  goodwill act on, um, you know, my part, to bring to

25  you, um -- and I wanted -- I would hate -- you know. . .

## PAGE 166

1  Without being able to say anything, Barb --

2      MS. CERANEK:  I don't have anything.  You know,

3  go with the fine comb and see what you can find and I'm

4  not afraid.  Okay?

5      MS. HAMBURG:  Oh, that's fine.  That's fine,

6  Barb.  We will meet again.  I will, um. . . I will send

7  you a copy of this E-mail and I'll send it over to Tony

8  and then I'll let you know as soon as we have a date

9  for the investigation and we'll be in contact.

10      In the meantime, if you have anything -- I am

11  not able to speak to you about this, because I am going

12  to be working for the Company, representing them.  So

13  if you have any questions, I would urge you to reach

14  out to Tony and your Union representation from that.

15  But I do like what Tony said.  You paid for Union.  You

16  have the Union to back you.  You have them at your

17  disposal.  So I would exhaust all options with them

18  first, before you decide to do anything else.  And

19  let's not jump the gun.  The decision has not yet been

20  made.  This is only the beginning stuff.  So we'll see

21  where it goes from here, but I just wanted to, um, you

22  know, explain everything to you, because it's a lot to

23  take in.  Um, and Barb, you're off at 2:00 o'clock,

24  aren't you?

25      MS. CERANEK:  Yes, I am.  Yeah.  Well, I'm

## PAGE 167

1  actually terminated, so it doesn't matter.

2      MS. HAMBURG:  Well, I'll just put you on till

3  2:00.  I just wanted you to make sure that -- because

4  you went into supervisor at 12:25, correct?  And you

5  aren't currently terminated, Barb.  You're only being

6  withheld from service with pay, so, um. . .

7      And, um, Tony, I don't know.  How does that --

8  Barb, do you have any vacation that you're scheduled

9  for in the next few weeks?

10      MS. CERANEK:  Yes, I do, as a matter of fact.

11  Yeah, I do.  Let me check.  In August, I have vacation

12  from the 17th to the 25th of August.

13      MS. HAMBURG:  Okay.  17th to 25th.  So Tony,

14  does she just take her vacation as normal?  She still

15  just takes it because she's being paid for it, or. . .

16      MS. CERANEK:  But see, I cannot use the flight

17  benefits at the time.

18      MS. HAMBURG:  No.  Yeah, you cannot.  No.  You

19  can take the -- Tony, do you know how that works for

20  her with her vacation?

21      MR. COTOIA:  You know what?  We've never had

22  that before, so we're going to have to call up, uh,

23  Pat Manor (phonetic), payroll, to find out what we have

24  to do there.

25      Um, since she's, uh. . . She's being paid, so

## PAGE 168

1  that would still be that way, but as far as vacation

2  time, I don't know how they would make that up if she

3  came back whole, so. . .

4      MS. HAMBURG:  Yeah, so, I agree.  Barb, you can

5  still not use your travel benefit, but your -- as far

6  as your vacation, I don't know, if you're being

7  withheld from service, if you can use that vacation

8  week later on if you are brought back after the

9  investigation, because you were being withheld from

10  service.  So, that is something that we'll have to

11  figure out.  But that's not until August the 17th, so

12  that's almost a month away, so we might have the

13  hearing before then.

14      MS. CERANEK:  Yeah.  I would think that there

15  will be the resolution prior to that date, because, you

16  know, I'm being withheld from service, but being paid.

17  It's going to move pretty quickly.

18      MS. HAMBURG:  Um, well, sometimes it does,

19  sometimes it doesn't.

20      MS. CERANEK:  Someone is sitting home and being

21  paid.

22      MS. HAMBURG:  Yeah.  Well, yeah, sometimes it

23  takes longer than anticipated, depending on the work

24  that needs to be done.

25      Okay.  We'll keep that in mind, because it's not

PAGE 169

1 until the 17th, but, um, I will go ahead and E-mail
2 this over to you. And if you have any other questions,
3 please reach out to Tony. And, um, thank you for
4 meeting with me, Barb. I'm sorry that it has come to
5 this, but we will discuss it further. And, um, let's
6 see. What else? Um. . .
7     Tony, anything else from you?
8     MR. COTOIA: No. I'll go ahead send you my
9 paperwork, um, when I finish up here and, uh. . .
10     MS. HAMBURG: Okay.
11     MR. COTOIA: . . . And go from there and
12 everything.
13     MS. HAMBURG: That's fine. Just I am here
14 anytime, Tony, and then I'll, you know, just add
15 whatever you need into it. Do you want me to just put
16 like 2:30, do you think? Like 30 minutes?
17     MR. COTOIA: Well, no. I mean, whatever --
18 I won't go that far or everything. Like I said, I've
19 already got the form pretty much filled out, so I'll
20 just --
21     MS. HAMBURG: Oh, you do? Okay. I had one
22 filled out. Okay. If you've got one filled out, then
23 you just send it over to me, I'll sign it, and send it
24 back.
25     MR. COTOIA: Yeah. I'll send it off to Chicago

PAGE 170

1 and everything and I'll just Cc: you in on it. And
2 then you can --
3     MS. HAMBURG: Okay.
4     MR. COTOIA: -- you can give your okay in case
5 Chicago is wearing code red and everything so. . .
6     MS. HAMBURG: Okay. Perfect. Yes. Thank you.
7 All right. Well, thank you both for meeting with me.
8 I appreciate it.
9     MS. CERANEK: Okay.
10     MR. COTOIA: All right. And real quick, Barbara,
11 I will give you a call later on. Unfortunately, I'm on
12 support today, so I don't get off until 7:30, but I
13 will either call you tonight or tomorrow. Okay.
14     MS. CERANEK: Okay. Well, I told you your voice
15 sounded familiar. Yeah, yeah. I got you on support.
16 That's what it is. Not knowing that this is Mr. Cotoia,
17 so. . . I will show more respect, you know, but, yeah.
18     MR. COTOIA: Tuesdays, Wednesdays, and Thursdays
19 I'm on Union, so like Union work, put on Mondays and
20 Fridays I'm on support.
21     MS. CERANEK: Okay.
22     MR. COTOIA: Okay?
23     MS. HAMBURG: Okay. Wonderful. Okay. Well,
24 thank you both again for meeting today. I appreciate
25 it and we'll talk soon.

PAGE 171

1     MS. CERANEK: Okay.
2     MR. COTOIA: All right. Bye-bye now.
3     MS. HAMBURG: Okay. Bye-bye.
4     (Playing of recorded call concluded).
5     Q.    **(By Ms. Williams Harris)** All right. So that
6 was a very long video -- I mean very long audio, but,
7 Ms. Ceranek, you would agree that having listened to that,
8 that Ms. Hamburg never took the retirement benefits away
9 from you. In fact, you rejected them. Correct?
10     A.    No. I do not agree with your summary, ma'am.
11 She took it away from me. You could see the condescending
12 behavior, the friendly tone, and how she said I will see you
13 tomorrow, tomorrow, next day at 10:30. You gave me my
14 decision, you're going to give me my decision. Okay? And
15 then you cannot expect person to make a life-change decision
16 within three seconds because it's like holding a gun to your
17 head.
18     Q.    **Did you ask Ms. Hamburg if you could have more**
19 **time past the 5:00 o'clock hour?**
20     A.    No. I understood that I had the time till
21 5:00 PM, until she actually put the out of service letter.
22 And at that point, my retirement option was not available
23 anymore. So, she took it away from me. Yes, ma'am.
24 I thought that was culmination of the harassment.
25     Q.    **That wasn't my question. My question was did**

PAGE 172

1 **you ask Ms. Hamburg if you could have past 5:00 o'clock to**
2 **consider the retirement offer?**
3     A.    I did not ask, and the reason for it was that by
4 giving me the out of service letter at 2:15 Central Standard
5 Time, she closed the retirement option that originally was
6 presented to me until 5:00 PM.
7     Q.    **Do you agree, having listened to that recording,**
8 **that when she asked multiple times, your response was** *no.*
9 *Final answer. I will not take retirement?*
10     A.    For right now, but she gave me till 5:00 PM.
11     Q.    **Do you agree that in that recording, you said,**
12 **when she asked you multiple times** *would you like to consider*
13 *the retirement offer*, **that you said,** *no, not interested,*
14 *final answer?*
15     A.    She did not say consider. She said I have until
16 5:00 PM. And I do not agree with your assessment of the
17 situation. I had till 5:00 PM. And until she got upset,
18 she gave me that out of service letter and I thought I had
19 5:00 PM. So the reason I didn't ask for more time is
20 because I thought I had till 5:00 PM.
21     Q.    **Do you agree that -- you listened to the**
22 **recording, correct?**
23     A.    I did.
24     Q.    **Okay. And do you agree that, having listened to**
25 **the recording, that you said,** *no retirement, final answer?*

## PAGE 173

1    A.    I said that meaning I couldn't comprehend the

2  situation that I was in.  I was -- I was forced to take the

3  retirement and I didn't know what was going on and what was

4  taking place.  If I could give an answer, I couldn't give my

5  last name at the time.

6    Q.    At any point in time during that recording, did

7  you explain -- did you say to her *don't understand*?

8    A.    No, because I didn't think about it, that

9  I didn't understand.  I was in shock.  I was paralyzed.

10  I couldn't do anything.

11    Q.    I'm going to show you what is going to be

12  Exhibit 14.

13    (Ms. Williams Harris screen sharing

14  Exhibit No. 14 linked hereto; Exhibit No 13 skipped).

15    A.    If I may add on, how could I deny something --

16    Q.    No --

17    A.    How could I deny something if I --

18    Q.    Ms. Ceranek, there's not a question posed.  Your

19  attorney will have an opportunity to ask you questions after

20  I'm done.

21        So I'm showing you what's Exhibit 14.  Do you

22  recognize this letter?

23    A.    Yes, I do.

24    Q.    Okay.  And this is a letter that Ms. Hamburg

25  referenced in that audio recording we just listened to,

## PAGE 174

1  correct?

2    A.    Yes, ma'am.

3    Q.    Okay.  This is the letter that indicates that

4  you are being placed out of service pending the

5  investigation and termination.

6    A.    Yes.

7    (Screen share ended).

8    Q.    Now, in that recording, Ms. Hamburg mentions an

9  investigation review meeting, correct?

10    A.    Yes, ma'am.

11    Q.    Do you recall receiving a notification of the

12  Investigative Review Meeting?

13    A.    I recall the notice, yes.

14    Q.    I'm going to show you --

15    MS. WILLIAMS HARRIS:  And Miguel, for you, it's

16  195 and 196.

17    A.    (By the Deponent)  Yes, ma'am.

18    Q.    Hold on.  I have shown you.

19    (Ms. Williams Harris screen sharing

20  Exhibit No. 15 linked hereto).

21    A.    May I make a comment?

22    Q.    I haven't asked a question yet.

23        So this is the Investigative Review Meeting, the

24  notification, dated August 8, 2019.  Is that accurate?

25    A.    That's the date.  Yes, ma'am.

## PAGE 175

1    Q.    Do you recall receiving this notification?

2    A.    I do.

3    (Screen share ended).

4    Q.    Now, at some point in time after this July 22nd

5  meeting that you had with Ms. Hamburg and Mr. Cotoia, you

6  filed a complaint.  I think you referenced in that audio

7  that you were going to reach out to Oscar.  Who is Oscar?

8    A.    Oscar Munoz, CEO.

9    Q.    And at some point in time, you did send an E-mail

10  to Mr. Munoz and various other persons; is that accurate?

11    A.    Accurate.

12    Q.    Let me show you another document.  This will

13  be --

14        MS. WILLIAMS HARRIS:  Patsy the last exhibit,

15        DEF 195 and 196, is going to be Exhibit 15, and then

16        this next document that I am going to show is going to

17        be Exhibit 16.

18    (Ms. Williams Harris screen sharing

19  Exhibit No. 16 linked hereto).

20    Q.    (By Ms. Williams Harris)  Okay.  I'm going to

21  draw your attention to where, under forwarded message, it

22  says from Barbara Ceranek.  We've blacked that out, the

23  beginning portion of your E-mail address, but what is your

24  E-mail address?

25    A.    It's F as in frank, R as in Robert, Q as in

## PAGE 176

1  queen, number 1, @gmail.com.

2    Q.    And take a minute and opportunity to review

3  this.  I'm not sure if Miguel printed it out, but it's 215

4  through 221.

5    (Brief pause accordingly; Deponent provided

6    paper copy by Mr. Bouzas to testify from, so scrolling

7    through document was not necessary).

8        Let me know when you're finished.

9    A.    Oh, I'm sorry.  I review it.  Yes, ma'am.

10    Q.    Okay.  All right.  So is this the E-mail that

11  you sent to -- is this an E-mail that you sent?

12    A.    Yes, I did.

13    Q.    Who is Garrison Phillips?  I see in the To:

14  column there is Oscar Munoz, who we've already identified.

15  Who is Garrison Phillips?

16    A.    I don't recall their position within United, but

17  they were the managers position and I got the list off the

18  United internal Website.

19    Q.    Okay.  And so how did you identify the people to

20  send this E-mail to?

21    A.    Corporate security, HR, United CEO, and, um --

22  and managers, but I cannot recall specific positions for

23  those people.  Sorry.

24    Q.    So I'm going to draw your attention to some of

25  the things that you outlined in this E-mail.  And this is

**PAGE 177**

1 the first E-mail that you've sent complaining about

2 discrimination from Ms. Hamburg, correct?

3     A.   Yes, it is, because I realized once she took my

4 retirement away, she was going to fire me, like she promised

5 at the very beginning when she started the harassment with

6 me and the age discrimination.

7     Q.   Okay. And prior to this time, prior to sending

8 this August 11th E-mail, you never placed a phone call to

9 the ethics or compliance line, correct?

10     A.   Correct. I was afraid. Yes, ma'am.

11     Q.   You never provided any E-mails or phone calls,

12 to anybody internally, about any alleged harassment or

13 discrimination that you felt from Ms. Hamburg, correct?

14     A.   Correct. I was afraid.

15     Q.   So I want to draw your attention to No. 3.

16 Number 3 -- you have a list of a few things, but I want to

17 draw your attention to No. 3. It says *On May 31st, 2019 my*

18 *supervisor sent me an email regarding retirements benefits,*

19 *even though I never asked for it. Prior to this email I was*

20 *never aware of any rumors about losing my pension or*

21 *retirements benefits if I don't retire by August or*

22 *September 2019.* And then you say, *See email attached.*

23     And so if you scroll over to item 221, there are

24 three things that you attach to this E-mail, so you have to

25 tell which one you're referring to. Are you referring to

**PAGE 178**

1 221, the E-mail from *Cindi* dated May 30th, 2019? Is that

2 the E-mail you're talking about?

3     A.   The one that I'm referring to was sent on the

4 30th of May from Cindi Hamburg, and it's -- oh, I'm sorry.

5 It's 221 number at the bottom.

6     Q.   Okay. All right. And so you attached this to

7 this E-mail as evidence of what?

8     A.   As evidence of spreading rumors. See how it

9 shows here, *There are lots of rumors going on about losing a*

10 *big percentage of your pension if you don't retire by August*

11 *or September of this year, but [this is] not all true,* end

12 of quote.

13     So if it's not all true, some of it is true? Am

14 I going to lose some of it? I wasn't aware that there was

15 worry, that there was rumors. I wasn't aware of anything

16 like that. With her E-mail, she installed in me that I may

17 lose the money. Maybe I should retire. You know, so that's

18 what I was referring to.

19     Q.   Okay. You would agree that this E-mail is sent

20 to various people, not just yourself?

21     A.   To the whole team. Yes.

22     Q.   And the very first sentence in the E-mail says

23 Hello Team?

24     A.   Yes.

25     Q.   When you received this, because you were

**PAGE 179**

1 concerned, did you follow up with Ms. Hamburg to ask her --

2 to get more clarification about what she meant by *there are*

3 *lots of rumors going on?*

4     A.   No, I did not.

5     Q.   But you assumed that she sent this to you

6 because she was discriminating against you?

7     A.   To install the anxiety that you may lose the

8 money, you better retire, take it while you have it. And it

9 was -- I do understand that it was sent to the whole team,

10 but this is the type of behavior, for the whole team to be

11 intimidated, scared, and just do what you're supposed to do,

12 because -- see, the supervisor for remotes is like a God.

13 Whatever the God says, it goes. Okay? You're alone in the

14 room and you will do everything what they say.

15     Q.   Do you know the ages of the other people on

16 Ms. Hamburg's team?

17     A.   I'm sorry. I don't.

18     Q.   On No. 4 in your E-mail, you reference a

19 July 4th E-mail that she sent to you regarding customer

20 complaints [sic], and then you say *In bold letters she*

21 *asked "How would you like $33,333 deduction from your*

22 *paycheck? I guarantee no one would want to see that!"*

23     And then you say that *she instills fear, rather*

24 *than [promoting a] progressive work environment.*

25     And I'm assuming that the E-mail that you're

**PAGE 180**

1 referencing is 220, the number at the bottom?

2     A.   Yes, ma'am.

3     Q.   Okay. And again, this E-mail is from

4 Cindi Hamburg to a list of people, correct? It's not just

5 to you.

6     A.   Yes, ma'am. And I wanted to underline that this

7 is the DOT fine if you don't, um. . . if you fail the test

8 call. That's for each offense is $33,000. And I saw the

9 top of it and I panicked, because I didn't know what was

10 going on until I read the rest of it, the way she spinned it.

11     Q.   Did you call her to ask her for more

12 clarification about what she meant by sending this E-mail?

13     A.   No, because I know that the DOT fine is $33,000

14 and never, in my 29 years, I ever failed a DOT call to be

15 responsible for that fine, so I was familiar with the fine.

16     Q.   Okay. Why would you assume that she sent

17 this -- well, I don't want to assume. Strike that.

18     Did you believe, at the time that she sent this,

19 that she sent this to you because she was discriminating

20 against you based on your age?

21     A.   The E-mail was sent to install the anxiety in

22 all the agents, to be scared of her so she can be in

23 control, like God. That's why I attached the E-mail.

24     Q.   How do you that?

25     A.   By the time I opened the E-mail, I read it. So,

**PAGE 181**

1   I'm on the call with the passenger and I read it, *How would*
2   *you like to have $33,000 deducted from your paycheck?*
3   I don't make that amount of money in a year and I get the
4   E-mail like that?  By the time I realized, oh, it's from my
5   supervisor; oh, it's regarding the DOT, uh, you know, uh,
6   performance. . .  So, uh, that's what I meant when
7   I attached the E-mail.
8       Q.    But again, she didn't just send this E-mail to
9   you.  She sent it to the whole team.
10      A.    She sent it to the whole team.  Yes, ma'am.
11      Q.    And you don't know the ages of everybody on the
12  team?
13      A.    I do not.
14      Q.    Number 5, you mentioned the Instant Messenger
15  that she would send to the team members and you attached a
16  screenshot of an Instant Message that she sent.  And the
17  date on here is -- and this is Bates No. 219.  The date on
18  here is July 10th, 2019.  Do you see that?
19      A.    Yes, ma'am.
20      Q.    Why did you attach this Instant Message?
21      A.    Because it was unprofessional.  She would engage
22  all the team members into IM when we were on the call.  So
23  we had the passenger talking to your ear and you're doing
24  stuff for the passenger.  And on the split screen, here is
25  this IM and the supervisor is engaging you in the

**PAGE 182**

1   conversation and saying, stop, that they're not important;
2   saying stop, that they have no meaning.  And that's why
3   I attach it, because it's upsetting to other agents.
4             Judi Zitnak, that I know for sure she's my age
5   or older, that's what she put here.  But she had the guts to
6   say it to the supervisor, don't bother me when I'm working
7   because I could be on a test call with DOT for the $33,000
8   fine and you're telling me, oh, how are you doing, and how
9   is the weather, and what's new happened, what did you do
10  last weekend; oh, let's happy hour, drinks on me today.
11  You know?
12      Q.    So you assumed that she sent --
13      A.    Engaged in unprofessional behavior, bothering
14  agents --
15      Q.    Wait a minute.  I didn't ask a question.  Just
16  give me a second.
17      A.    I'm sorry.
18      Q.    That's okay.  So you attached this to your
19  E-mail because you believed she sent this because of your
20  age?
21      A.    No.  To send it that she engaged in
22  unprofessional behavior during our calls.
23      Q.    So this is an example of unprofessional behavior
24  and not necessarily discriminatory behavior or harassment?
25      A.    Right.  But I wanted to underline that I didn't

**PAGE 183**

1   have as much courage as Judi Zitnak, to tell her what she
2   said.
3       Q.    Who is -- who is -- not who is, but how old is
4   Gloria Darcy?
5       A.    Um, that, I don't know.
6       Q.    Do you know how old Ms. Hamburg is?
7       A.    She is in early 40s possibly, but I'm guessing.
8       Q.    Do you know how old Mr. Cotoia is?
9       A.    Mr. Cotoia is approximately over 60.
10      Q.    At the bottom of 216, the second page of the
11  E-mail, with the paragraph that says, *I heard back from her*
12  *45 days later on [July 22nd].*  It says, *In a few minutes*
13  *conversation she gave me a 2 hours deadline to make either a*
14  *decision to retire immediately or I will be terminated and*
15  *lose my flight benefits.*
16            That's not true, is it?
17      A.    It is.
18      Q.    She called you at 1:00 o'clock and she gave you
19  till 5:00.  That's not two hours.  That's four hours.
20      A.    But she took that option away right away when
21  I got the out-of-service letter.  Out of service letter
22  means I cannot retire anymore with benefits.  Out of service
23  letter is you're going to be terminated.
24      Q.    Okay.  But you would agree that 1:00 PM to
25  5:00 PM is not two hours.  It's four hours.

**PAGE 184**

1       A.    It is if I was given that timeframe.
2       Q.    That's not the question.
3       A.    The out of service letter that took my
4   retirement benefits away was sent to me at 2:15 Central
5   Standard Time.
6       Q.    And it was sent to you after you said Final
7   Answer and No, correct?
8       A.    When I said no for the moment, to take the
9   retirement at that very moment.  She said repeatedly, *I will*
10  *see you -- I will talk to you tomorrow at 9:30.*  Oh, 10:30.
11  Sorry.  *I will talk to you at 10:30 tomorrow and you will*
12  *give me your answer,* so that was my understanding that I had
13  it, until she send me this letter at 2:15 and my retirement
14  option was not available to me anymore.
15      Q.    If you scroll over to 217, you talk about the
16  phone call with her on July 22nd, in that paragraph
17  beginning, *One minute I am on the phone with a customer.*  Do
18  you see that?
19      A.    Yes, ma'am.
20      Q.    And you tell the folks in this E-mail that she
21  said, *If you don't take it right now, you will never get it,*
22  *ever.  Not in 3 hours, not tomorrow, never.*
23            Now, we just listened to that audio recording.
24  I don't recall Ms. Hamburg saying that.
25      A.    I could have -- I probably heard it wrong, but

**PAGE 185**

1  that was my perception of the whole conversation. That's
2  how I felt. I felt like it was the gun to my head, now or
3  never.
4  **Q.    But you would agree that that's not what she**
5  **said.**
6      A.    Now that I have this phone call, we cannot say
7  it verbatim, but this was my perception of the call and how
8  much I remember and how much -- how I felt about it.
9  **Q.    Okay. And so after you sent this E-mail, did**
10  **you get a phone call from anyone?**
11          (Screen share ended).
12      A.    Yes, ma'am, from Monique Morris, the corporate
13  security.
14  **Q.    And do you remember when Ms. Morris called you?**
15  **Like what date she called?**
16      A.    No. I'm sorry. I don't remember.
17  **Q.    Did Ms. Morris -- do you remember, the first**
18  **telephone call with Ms. Morris, what you discussed?**
19      A.    No. We discussed the harassment, how she would
20  get on my line and make the degrading comments, Ms. Hamburg.
21  We talked about the harassment and, uh, what she said at the
22  time, but I don't recall specifically what I said to
23  Ms. Morris.
24  **Q.    Do you recall sending Ms. Morris any information**
25  **to assist in her investigation of your complaint?**

**PAGE 186**

1      A.    I don't recall.
2  **Q.    Did Ms. Morris advise you, during that phone**
3  **call -- I'm assuming it was a phone call.**
4      A.    Yes, yes.
5  **Q.    So did Ms. Morris advise you, during that phone**
6  **call, that she would be doing an investigation into your**
7  **complaint?**
8      A.    Yes, she did.
9  **Q.    And do you know whether Ms Morris actually did**
10  **an investigation into your complaint?**
11      A.    So after I was fired, one month after I was
12  fired, I got a letter from Ms. Morris saying that, um, they
13  didn't find any basis for, um, harassment or age
14  discrimination.
15  **Q.    Now, at some point, you got a revised**
16  **notification of the Investigative Review Meeting. Do you**
17  **remember that?**
18      A.    Yes, ma'am. That was basically I was fired
19  twice.
20  **Q.    No. This is just the meeting.**
21      A.    Oh, the meeting? Yes. I recall that the
22  original date was different than the actual date.
23  **Q.    Okay. Do you see this?**
24      (Ms. Williams Harris screen sharing
25  Exhibit No. 17, linked hereto).

**PAGE 187**

1      A.    Yes, ma'am.
2          MS. WILLIAMS HARRIS:  And Miguel, for you, in
3  case you want to see, it's 225 to 226.
4  **Q.    (By Ms. Williams Harris)  And this just says**
5  **revised at the beginning. At the top rather. And the date**
6  **is different. Do you see that, Ms. Ceranek?**
7      A.    Yes, ma'am.
8  **Q.    And this indicates that your Investigative**
9  **Review Meeting will be held on Monday, August 19th, at**
10  **11:00 AM Central Daylight Time.**
11      A.    Correct.
12          (Screen share ended).
13  **Q.    And at some point, an Investigative Review**
14  **Meeting was had, correct?**
15      A.    Was held, yes.
16  **Q.    And it was held -- let me ask this question.**
17  **Strike that.**
18          How was it held? Was it virtual or was it in
19  **person?**
20      A.    It was virtual audio.
21  **Q.    Do you remember who was present at the**
22  **Investigative Review Meeting?**
23      A.    I don't remember all the people, but I provided
24  the names in the documents, with the Interrogatories also.
25  **Q.    A Unise Rosner, does that name same familiar?**

**PAGE 188**

1      A.    Yes. That's the woman that's actually fired me
2  twice, the manager.
3  **Q.    She was a hearing officer?**
4      A.    A hearing officer.
5  **Q.    Do you know how old Ms. Unise Rosner is?**
6      A.    I don't.
7  **Q.    This also says that Laurie LeDonne was present**
8  **at the IRM. And when I say IRM, you understand that I mean**
9  **the Investigative Review --**
10      A.    Investigative Review Meeting. Yes, ma'am.
11  **Q.    So Laurie LeDonne was there?**
12      A.    That's the Human Resources. Right.
13  **Q.    Do you know how old she is?**
14      A.    No.
15  **Q.    Richard Stepanski, does that name sound familiar?**
16      A.    Yes. Corporate security. See, I don't know how
17  hold those people are because I never met them.
18  **Q.    So the people at the IRM, um. . . I'll give you**
19  **the list: Cindi Hamburg, Ellen Kyrakopoulos -- it's**
20  **K-Y-R-A-K-O-P-O-U-L-O-S. Do you know who she is?**
21      A.    No.
22  **Q.    You know Anthony Cotoia.**
23      A.    Yes, ma'am.
24  **Q.    And then Stephanie Ratcliff?**
25      A.    Stephanie, yes. I know her in a way that she

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 51 of 84 PageID 287

## PAGE 189

1  was present during the first, uh, discussion of, uh, the

2  letter.

3     Q.     She was present at the first meeting that you

4  had with Ms. Hamburg on June 4th.

5     A.     Exactly.  Yes, ma'am.

6     Q.     And we've already talked about Ms. Hamburg's

7  age.  We've already talked about Mr. Cotoia's age.  Any of

8  these other people that I listed, do you know their ages?

9     A.     No, I don't.

10    Q.     So tell me, um. . .  Let me back up for a second.

11           In the July 22nd meeting that we just heard

12  between you, Ms. Hamburg and Mr. Cotoia, Ms. Hamburg

13  indicates that if you don't accept the retirement offer,

14  that they're going to continue with their investigation.  Do

15  you remember her saying that during that meeting?

16    A.     Yes, ma'am.

17    Q.     Do you know who was conducting the

18  investigation?

19    A.     I don't.

20    Q.     Do you know what was involved in the

21  investigation?

22    A.     I don't.

23    Q.     Do you know, whomever conducted the investigation,

24  how they determined the period of time to review?

25    A.     I don't.

## PAGE 190

1     Q.     So tell me what happened at this IRM meeting, to

2  the best of your recollection.

3     A.     If I may go back two days prior.  Three days

4  prior, Mr. Cotoia met me at the restaurant and brought close

5  to 200 pages of the 37 reservations in question, and I

6  wanted to get copies or screenshots of the reservations and

7  he told me that it's not allowed.

8           It was in clear violation of the agreement

9  between Union and United that three days prior, I'm entitled

10  to the copies of the reservations that will be discussed at

11  the IRM meeting, so I can prepare myself and defend myself.

12  So I was never given the copies prior to the meeting, so

13  I came to the meeting and I didn't know what's going to

14  happen.  I didn't know what documents will be presented.

15    Q.     So Mr. Cotoia had a copy of the documents,

16  correct?

17    A.     Yes, ma'am.

18    Q.     And Mr. Cotoia was representing you at the

19  hearing; is that accurate?

20    A.     Mr. Cotoia was representing Union at the meeting

21  and he said that he's not allowed to give me the copies of

22  the reservations in question, so -- oh, sorry.

23    Q.     No.  Go ahead, go ahead.

24    A.     So when I came to the meeting, it was like a

25  trial with Ms. Rosen [sic] presiding.  I was told I cannot

## PAGE 191

1  speak until the very end.  And Ms. Hamburg, um, see how she

2  was condescending at the meeting that she took my retirement

3  away, she actually recommended termination for that meeting

4  and went into the long display of reservations, making it

5  exhibit and telling me what I did wrong.

6           I could not respond to it, because I didn't have

7  the documents, and I couldn't respond.  Altogether, I

8  couldn't speak.

9           So, she made those exhibits.  Showed it to

10  everybody.  I looked at it.  I cried.  And, um. . .  And at

11  the end, she actually, uh -- she recommended termination.

12           And, um, when they allow me to speak, basically

13  I didn't have any way to defend myself, because I was never

14  given the document.  Within that timeframe, I handle over

15  52,000 reservations.  When they made me out of service

16  agent, I did not have access to any of the reservation,

17  regular reservations or reservations as pass travel

18  reservation.  So, I couldn't pull it up on a computer.

19  I didn't get it from Tony Cotoia.

20           And, however, Tony Cotoia, representing union,

21  um, there is a written statement from him, because it was,

22  um -- you know, there was a person that was taking notes

23  during that meeting, and it's a written statement from

24  Mr. Cotoia saying that *Barbara said no* -- when I was offered

25  retirement, *Barbara said no, but she tried to figure, at the*

## PAGE 192

1  *same time, what was going on.  If the company is giving the*

2  *agent two hours to decide, they shouldn't close it within a*

3  *couple of minutes, the option to retire.  So Barbara should*

4  *have been offered the original retirement.*

5           And I have a copy of it.

6     Q.     Okay.  Now, you indicated that Mr. Cotoia was

7  representing the union.  When Mr. Cotoia did not provide you

8  the copies of the documents that you asked him for, did you

9  tell him that you didn't want him to represent you at the

10  IRM?

11    A.     I didn't know I had a choice, so I didn't say

12  anything.  I started to cry and I went home.

13    Q.     But he presented -- he was the person that

14  presented on your behalf at the IRM meeting, correct?

15    A.     No.  It was, uh. . .  You mean the copies?  The

16  copies, um -- he had the --

17    Q.     My question is during the IRM meeting, I

18  understand Ms. Hamburg was able to present her evidence and

19  give her side, give the company's side, and then Mr. Cotoia

20  was able to present evidence and give your side.  Is that

21  how I'm understanding how things ran in the IRM?

22    A.     No, not at all.  Mr. Cotoia didn't do anything

23  as far as the reservation.  However, he confirmed, in his

24  final statement, that I should have been given time to

25  consider retirement.  Once you offer it to an agent, you

**PAGE 193**

1 should allow time. And most of all, you should go over the
2 package, what it contains. How could you decline something
3 if you don't know what it contains? The retirement package,
4 I'm referring to.
5    Q.    So your testimony is that M. Cotoia did not
6 present any exhibits?
7    A.    He only presented maybe, um, one or two exhibit,
8 and one exhibit was the conclusion of the union, that I
9 should have been given the time, and that I wasn't, and that
10 I said no to the whole situation. I wasn't declining the
11 retirement offer. That was Mr. Cotoia position and I have
12 it here in writing.
13    Q.    So Mr. Cotoia's position at the hearing was that
14 you did not reject the offer?
15    A.    Exactly. I was never given the two hour -- the
16 original two hours. You know, I was given 15 minutes, the
17 most, when we talk about it. And Mrs. Hamburg made the
18 decision for me by taking the retirement offer from me.
19    Q.    You've said that multiple times, Ms. Ceranek,
20 and my recollection of the audio is that Ms. Hamburg asked
21 multiple times if you wanted to take the retirement. Is
22 that not your recollection of what the -- I mean, the audio
23 speaks for itself, so we won't belabor it, but is that not
24 your recollection of what's in that audio?
25    A.    My recollection is I was put against the wall

**PAGE 194**

1 with the gun to my head --
2    Q.    That's not what I asked you. That's not what I
3 asked you. My question was simple. Is it your recollection
4 that Ms. Hamburg asked you multiple times if you wanted to
5 take the retirement offer?
6    A.    I did not understand her asking me.
7    Q.    Okay. So is that a yes, she asked you multiple
8 times, or no, she didn't ask you multiple times?
9    A.    I didn't understand what she asked me at that
10 time.
11    Q.    In that recording, did you say *I don't*
12 *understand?*
13    A.    No, because I was in shock. I was paralyzed
14 with what is happening to me and I couldn't comprehend it.
15    Q.    During the IRM meeting, do you have an
16 opportunity to speak?
17    A.    At the very end, I was not able to defend
18 myself, because I didn't, um -- I didn't, um, have access to
19 the documents.
20    Q.    But Mr. Cotoia has the documents, correct? He
21 had copies of the documents.
22    A.    Yes, ma'am. Correct.
23    Q.    Could you have asked M. Cotoia -- even if he
24 didn't provide you with copies, could you have asked
25 Mr. Cotoia if you could review the documents that he had

**PAGE 195**

1 copies of?
2    A.    No. He didn't review it me. He wouldn't allow
3 me to review it.
4    Q.    So your testimony is that Mr. Cotoia would not
5 allow you to look at the documents that United provided to
6 him?
7    A.    Exactly. It was we met at restaurant with
8 200 pages. Some of them redacted with documentation. And
9 I'm sorry. I didn't bring it here to show. But, um, there
10 was no way that I would be able to review close to 200 pages
11 in a restaurant. I would have to stay there for hours. He
12 wouldn't let me take copies or, you know, take the
13 screenshots. He would wouldn't let me do it. He said, *I
14 cannot do it, no. I cannot do it. You're probably going to
15 get fired.*
16    Q.    So even if he didn't allow you to take copies or
17 make copies or take screenshots, he never told you that you
18 couldn't stay at the restaurant and review the documents
19 that he had, did he?
20    A.    We met at. . . I don't know. In the evening.
21 I would have to stay hours.
22    Q.    That's not my question. My question was did you
23 Mr. Cotoia ever tell you that you could not stay at the
24 restaurant to physically review those documents?
25    A.    This question was never posed. I never asked

**PAGE 196**

1 him could I stay here and review the documents, because it
2 would take me four or five hours. So, I didn't ask the
3 question. He didn't offer to stay five, six hours at the
4 restaurant at Venice. I'm sorry.
5    Q.    Now, during the hearing, Mr. Cotoia -- you're
6 saying that he was not your spokesperson? Is that what I'm
7 hearing you say?
8    A.    I didn't have a spokesperson. Everybody was
9 speaking on their own behalf. He was speaking on behalf of
10 union.
11    Q.    Why would you suggest that he was speaking on
12 behalf of the union? I'm confused about that.
13    A.    Because he is a union representative.
14    Q.    So he's a union representative to represent you.
15 That's what he said in that audio, did he not?
16    A.    I don't know for sure the technicalities of the
17 union representation.
18    Q.    At any point in time during that meeting, did
19 you feel that he was not representing you effectively?
20    A.    I would say so, yes.
21    Q.    Did you tell him that during the IRM?
22    A.    No, because I was only allowed to make a final
23 comment, which I was crying uncontrollably.
24    Q.    So at the end --
25    A.    I was begging for the job. Okay?

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 53 of 84 PageID 289

**PAGE 197**

1   Q.   I'm sorry.  I cut you off.  What did you say?
2   I'm sorry.
3   A.   And I was begging for the job.
4   Q.   So at the end of the -- you said that you were
5   able to make a statement at the end of the IRM, and I'm
6   going to read -- there was a note-taker and I'm going to
7   read you what her recollection was that you said and you
8   tell me if this is what you recall.
9        *I apologize profusely for wrongdoing.  United is*
10  *my passion.  If my supervisor would not have treated me like*
11  *this, Ms. Hamburg.  She made me feel like I was being held*
12  *at gunpoint then took that option away from me.  Then in 10,*
13  *15 minutes, took that offer away from me.  I did not reach*
14  *out.  She stated that I am not able to reach out to her or*
15  *anyone else.  I had to wait for FedEx to send further*
16  *information.  She did not follow her own rule.  I thought I*
17  *could not do anything else or contact anyone.  I did not*
18  *take advantage when the retirement was presented to me.  I'm*
19  *begging to allow me to retire.*
20       Do you recall that being essentially what you
21  said at the end?
22  A.   Yes, ma'am.
23  Q.   Now, after the IRM concluded, do you know what
24  Ms. Rosner, who was the hearing office, do you know what her
25  process was in terms of coming to a final decision?

**PAGE 198**

1   A.   I don't know, but Cindi Hamburg recommended
2   firing.
3   Q.   Okay.  Do you know if Ms. Rosner was obligated
4   to accept that recommendation?
5   A.   I have to know.
6   Q.   Do you know what Ms. Rosner -- well, strike.
7   Let me back up for a second.
8        Do you know who made the decision to terminate
9   your employment?
10  A.   I don't.
11  Q.   Do you know what was considered or what was
12  reviewed when the decision to determine your employment was
13  made.
14  A.   I don't know.
15  Q.   I'm going to show you. . .
16       MS. WILLIAMS HARRIS:  This is exhibit -- I think
17  we're on 17, Patsy.  My numbers are probably all messed
18  up.
19       MR. BOUZAS:  I think you're on 18.  Did you,
20  um. . . Did you mark the revised Investigative Review
21  Meeting Notification as 17?
22       MS. WILLIAMS HARRIS:  I did not.  Thank you very
23  much, Miguel.
24       MR. BOUZAS:  Pardon?
25       MS. WILLIAMS HARRIS:  Thank you.  You're right.

**PAGE 199**

1        That's correct.  So, 18.  Thank you.
2        MR. BOUZAS:  You're welcome.
3   Q.   (By Ms. Williams Harris)  All right.  I'm going
4   to share this.
5        (Ms. Williams Harris screen sharing
6   Exhibit No. 18 linked hereto).
7   Q.   Ms. Ceranek, can you see this letter?
8   A.   Yes, ma'am.
9   Q.   Do you recognize this document?
10  A.   Yes, I do.
11  Q.   Okay.  And what is this document?
12  A.   This is the, um. . . This is the United letter
13  telling me that I'm being fired.
14  Q.   And whose signature is at the bottom of this
15  letter?
16  A.   Unise Rosner.
17  Q.   Okay.
18       (Screen share ended).
19       All right.  I'm going to show you what is
20  Exhibit 19.
21       (Ms. Williams Harris screen sharing
22  Exhibit No. 19 linked hereto).
23       Do you recognize this?  This is one of the
24  documents that you produced, Ceranek 20.  Do you recognize
25  this E-mail?

**PAGE 200**

1   A.   Yes, ma'am.  Yes, I do.
2   Q.   What is this E-mail?
3   A.   It's telling me that Ms. Rosner is retracting
4   her original decision letter and I will get a new letter
5   soon.
6   Q.   And that's your E-mail address, barbaraceranek@
7   -- when you were with United, barbara.ceranek@united.com was
8   your E-mail at that time?
9   A.   At that time, yes.
10  Q.   And your E-mail address -- your personal E-mail
11  address is identified in the E-mail of September 6, 2019,
12  frqfl1@gmail.com?
13  A.   Yes, ma'am.
14  Q.   That's the one that you mentioned before,
15  previously?
16  A.   Yes, ma'am.
17       (Screen share ended).
18  Q.   I'm going to now show you Exhibit 20.
19       (Ms. Williams Harris screen sharing
20  Exhibit No. 20 linked hereto).
21       Do you see Exhibit 20, Ms. Ceranek?
22  A.   Yes, ma'am.
23  Q.   Do you recognize this letter?
24  A.   Yes.  That's when I was fired the second time.
25  Q.   So if you go back to the E-mail where Ms. Rosner

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 54 of 84 PageID 290

**PAGE 201**

1  indicates that there was an administrative error and she was

2  retracting the original decision, do you know what the

3  administrative error was?

4  A.   No, I didn't.  She just advised me to tear up

5  the first, um. . . the first letter that she fired me with.

6  (Screen share ended).

7  Q.   And you mentioned previously that at some point,

8  Ms. Morris provided you a letter regarding your complaint

9  of discrimination.  Do you remember you testifying to that?

10  A.   Yes, ma'am.  The letter was dated 16th of

11  October 2019, and I was fired for the second time on the 9th

12  of September.

13  Q.   Is this the letter that you're talking about?

14  I'm showing you what's Exhibit 21.  Is this the letter

15  you're referring to?

16  (Ms. Williams Harris screen sharing

17  Exhibit No. 21 linked hereto).

18  A.   Yes, ma'am.

19  (Screen share ended).

20  Q.   Ms. Ceranek, let me ask this question.  We

21  talked -- a while back, we talked about your agent sine

22  number.  Do you recall if it was Rxi -- not sine number.

23  I'm sorry.  Your agent sine.

24  A.   Exactly.

25  Q.   Do you recall if it was RXI B as in boy

**PAGE 202**

1  O as in octopus?

2  A.   Correct.

3  MS. WILLIAMS HARRIS:  Can we take a quick break?

4  And I'm almost done, Miguel.

5  MR. BOUZAS:  Okay.

6  MS. WILLIAMS HARRIS:  Thanks.

7  DEPONENT:  Thank you.

8  (Recess taken 4:07 to 4:10 PM).

9  Q.   (By Ms. Williams Harris) Ms. Ceranek, I wanted

10  to go back really quickly to the July 22nd conversation that

11  you had with Ms. Hamburg and Mr. Cotoia.  Um, and I did not

12  hear this in the audio, but I wanted to make sure and just

13  ask the question.  Was there any conversation, prior to the

14  audio or after the audio that we heard, um, discussions

15  between you, Ms. Hamburg, and Mr. Cotoia?

16  A.   It was prior to the call that the three of us

17  were on the call.  I first talked to Mr. Cotoia.

18  Mr. Cotoia called me on my phone, to call him on

19  his cell, and he said that Ms. Hamburg is going to give me

20  an option and I have to take the option, and I was asking

21  him for more -- I was asking him more question, what is

22  going to be the option, why do I have to take the option.

23  Because it was all mysterious to me.

24  And in the meantime, the computer was, um--

25  Ms. Cindi Hamburg was sending the IMs and it's, like,

**PAGE 203**

1  constantly make the sound that this is the IM, Where are

2  you?  Why don't you answer my call?  Get on the call right

3  away.  So, I finished talking to Mr. Cotoia and then

4  I called.

5  Q.   But during the conversation with Ms. Ham -- but

6  you had no previous conversation with Ms. Hamburg prior to

7  the audio that we heard?

8  A.   Uh, no.

9  Q.   During the call with Ms. Hamburg and Mr. Cotoia,

10  did at any point in time -- and I did not hear this, but I'm

11  going to ask you for your recollection.  At any point in

12  time, did Ms. Hamburg offer you -- or ask you to sign a

13  release or a waiver of any rights that you had to file a

14  lawsuit?

15  A.   No.

16  Q.   Did Ms. Hamburg, or anyone at United, at any

17  time offer you any type of release or a waiver that said if

18  you signed it, you would say that I'm not going to file

19  suit?

20  A.   No.

21  (Ms. Williams Harris screen sharing

22  Exhibit No. 22 linked hereto).

23  I'm going to show you what we're going to mark

24  as Exhibit 22, and this is the Complaint -- this first page

25  is the Summons, but this is the Complaint that was filed on

**PAGE 204**

1  your behalf.  Take a minute to look at it.  Your attorney

2  may have it.

3  MS. WILLIAMS HARRIS:  It's not Bates stamped,

4  Miguel, but it's just the Complaint you filed, so. . .

5  A.   (By the Deponent) So I've seen it.  Yes, ma'am.

6  Q.   Did you review this Complaint before it was

7  filed?

8  A.   Yes, ma'am.

9  Q.   Did you ensure that everything that was in the

10  Complaint was accurate?

11  A.   It is accurate.

12  (Screen share ended).

13  Q.   So aside from what you've already shared with me

14  today, is there any other way that you believe Ms. Hamburg

15  discriminated against you?

16  A.   So, um, it consisted of the harassment and

17  getting on my phone line, asking me repeatedly when I'm

18  going to retire.  Culmination was that she took the

19  retirement option from me within a couple of minutes of

20  being offered, and, um. . .  And I cannot think of anything

21  else at this time.  I am sorry.  It's six, eight hours that

22  we're talking.

23  Q.   Yeah.  Okay.  Do you know whether or not -- and

24  I may have asked you this before, so if I did, I apologize.

25  We've already established that you don't know the ages of

Case 8:20-cv-02292-CEH-SPF    Document 25-1    Filed 02/18/22    Page 55 of 84 PageID 291

**PAGE 205**

1   all the individuals that Ms. Hamburg supervised, correct?

2       A.   I don't.

3       Q.   Do you know whether or not Ms. Hamburg got on

4   the phone with someone that was younger than you, under 40,

5   and asked when they were going to retire?

6       A.   I don't know.

7       Q.   Ms. Ceranek, do you know of any other

8   reservation sales -- I don't want to get your title wrong

9   I'll use RSSR.  If I use RSSR, you'll know what I'm

10   referring to, correct?

11       A.   Correct.

12       Q.   Do you know of any other RSSR, Reservation Sales

13   and Service Rep, who reported to M. Hamburg who used their

14   share sine to make waivers on 42 tickets who was not also

15   terminated?

16       A.   I don't have access to this type of information

17   and I don't know.

18       Q.   So the answer would be you don't know.

19       A.   I don't know.

20       Q.   Do you know of any RSSR, who reported to

21   Ms. Hamburg, who waived the ancillary booking fee service

22   fee who was not also terminated?

23       A.   I don't know the information.  It's privileged

24   for United.

25       Q.   What does PNR stand for?

**PAGE 206**

1       A.   Passenger, um. . . It's a passenger record.  So

2   instead of saying reservation, you say PNR, because it's

3   shorter and it's abbreviated.

4           But going back to your question, ma'am, if I may.

5   I mentioned my co-worker, um, and that's José Farfan, that

6   was also empowered agent and used his empowerment to, uh,

7   basically do the waivers that we supposed to do.

8       Q.   Do you know if Mr. Farfan did the waivers for

9   immediate family members?

10       A.   I don't know specifically, but it is whatever he

11   did and whatever I did was in the same, um, empowerment that

12   we had as empowered agent.  You were entitled to do it.

13       Q.   But do you know whether or not he did the

14   waivers for immediate family members?

15       A.   I don't know specifically.

16       Q.   Do you know if Mr. Farfan made waivers on 43

17   tickets?

18       A.   I don't.

19       Q.   And you said Mr. Farfan is over 40?  Is that

20   what you testified to before?

21       A.   He is close to 70.

22       Q.   Do you know how old he was when he was working

23   for United?

24       A.   About -- before he retired?  Possibly 66.

25       Q.   Okay.  Do you know of any other RSSR, to

**PAGE 207**

1   include -- well, let me back up.  Strike that.

2           Did Mr. Farfan report to Ms. Hamburg?

3       A.   No.

4       Q.   Do you know of any RSSR, who reported to

5   Ms. Hamburg, who waived close-in booking fees who was not

6   also terminated?

7       A.   I don't know.

8       Q.   Let me be more specific with that question:  An

9   RSSR, who reported to Ms. Hamburg, who waived close-in

10   booking fees for an immediate family member that was not

11   terminated.  Do you know anyone that did that?

12       A.   I do not.

13       Q.   Do you know an RSSR, who reported to

14   Ms. Hamburg, who waived redeposit fees for an immediate

15   family member?

16       A.   No, I don't know, because it's a lonely job and

17   we're all isolated at homes.

18       Q.   Do you know of another RSSR, who reported to

19   Ms. Hamburg, who waived change fees on tickets issued to an

20   immediate family member?

21       A.   I don't.

22       Q.   What a brother and a sister-in-law be considered

23   an immediate family member under United's policy, Family and

24   Friends Policy?

25       A.   No.

**PAGE 208**

1       Q.   A brother and a sister-in-law would not be

2   considered?

3       A.   No.  If I may, in order to use the benefit as a

4   family member, you have to -- you have to be spouse, son, or

5   daughter.

6       Q.   So if an RSSR waived an ancillary booking

7   service fee or a close-in booking fee or a redeposit fee for

8   a sibling and that sibling's spouse, would you consider that

9   a violation of company policy?

10       A.   I don't understand the question, but if I may

11   clarify that, um, there was a $25.00 fee that I waived for a

12   family member not being able to use Polish Website to book

13   the ticket, because United.com/PL didn't work and the Polish

14   credit card could not be processed through the United

15   system.  So, I waived the $25.00 booking fee for that

16   reason.  So, um. . .

17           See, you cannot travel on a pass being a brother

18   or, you know, um, the wife of the brother.  You cannot

19   travel on a pass.  The passes are only for immediate family

20   members, like, um, you know, my kids, my husband.  And then

21   you may enroll your parents, but not brother, not siblings.

22       Q.   Okay.  Now, would, um. . . under United's

23   policy, was it appropriate for you to book the revenue

24   tickets for your brother and your sister-in-law?

25       A.   I could book the ticket for anybody, you know,

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 56 of 84 PageID 292

**PAGE 209**

1  revenue ticket --

2  COURT REPORTER:  I'm sorry.  I completely lost

3  my screen and audio, but it came back all the sudden.

4  MS. WILLIAMS HARRIS:  Okay.  Where did you leave

5  off?

6  (Answer on Page 208, Line 25 read back by court

7  reporter).

8  Q.  **(By Ms. Williams Harris)  Okay.  Do you remember**

9  **what your response was, M. Ceranek?**

10  A.  Yes, because I bring the revenue to the company,

11  and for those two particular tickets, it was over $3,000 for

12  international travel.

13  Q.  **Do you know if United believed that was a proper**

14  **waiver?**

15  A.  I don't know what United believe, but if I may

16  go back to the previous question that you -- that you asked,

17  and the question was why I documented system failure.

18  System failure --

19  Q.  **You can't do that, because that's not on the**

20  **record and I'm not asking that question anymore.  She**

21  **doesn't have that question on the record, because it stopped.**

22  MR. BOUZAS:  There was a prior question about

23  why it was waived.  I don't know if that was captured

24  or not.

25  COURT REPORTER:  Hold on.  Let me look.

**PAGE 210**

1  MS. WILLIAMS HARRIS:  What was the last question

2  you were able to capture, Patsy, because that may be

3  helpful?

4  (Question on Page 208, Line 22 read back by

5  court reporter).

6  Q.  **(By Ms. Williams Harris)  Is there a reason that**

7  **you documented in the system, system service failure reason:**

8  **Unable to book the combination of flights on the UA.com?  So**

9  **it says the PNR reflected that the BSF fee was $25.00 per**

10  **person.**

11  A.  Yes, ma'am.

12  Q.  **But you documented that there was a service**

13  **system failure.  So was that inaccurate?  Or why did you**

14  **note that?**

15  A.  Because it is accurate.  System service failure

16  would be if the computer malfunction and you're not able to

17  set up reservation using specific combination of flight, if

18  you're not able to process the credit card, if you're not

19  able to do the seat assignment.  It would be -- you could

20  say specifically, but it could be a system failure that is

21  from the display of the waivers.  We have different waivers.

22  So your display, you click it, and it's more efficient.  And

23  I was accounted for number of calls I was getting per hour

24  and that's what I was told to do.  And it was understandable

25  that if that's what's put in, then they couldn't do it

**PAGE 211**

1  online.

2  Q.  **So March 22nd, it appears that you booked a**

3  **revenue ticket for your brother and his wife, so that's**

4  **basically what you just said you were able to do, correct?**

5  A.  I was able to do it and issue a revenue ticket.

6  Q.  **Okay.  And then it says that there was a BSF fee**

7  **of $25.00.00 per person.  And BSF, I think we established**

8  **booking service fee, and the booking service fee is because**

9  **they were trying to do it online.**

10  A.  Right.  They tried to do it online.  If they

11  cannot do it online, if they call us, there is a $25.00

12  booking fee.  If you come online and say, you know, I'm not

13  able to do it for this, this or that reason, we would waive

14  the fee and just go straight and assist the customer.

15  Q.  **Okay.  Then this says that two days later, on**

16  **March 24th, the ticket was issued using your credit card,**

17  **and then you deleted the previous documentation, but added**

18  **Attention:  Revenue booking fee waived due to system service**

19  **failure.  So why did you make that change and use your**

20  **credit card instead of I guess your brother's credit card**

21  **that you previously used?**

22  A.  The credit card with the Polish bank doesn't

23  work, doesn't work on United.com.  It will not process the

24  charge.  So I put in my own credit card and I deleted the

25  documentation, because I typed in more information to

**PAGE 212**

1  remember later on what happened.

2  So the same thing happened, but instead of using

3  the automated response, you know, system service failure,

4  I removed it and I type it in, like you said we should be

5  doing, but we use abbreviation and shortcuts to document the

6  reservation.  And that was the sole reason my credit card

7  was used, but I brought revenue to United.

8  Q.  **So let me ask this question.  Let's say this**

9  **happened with someone who was not your brother. Let's say I**

10  **was booking a flight and I couldn't book it via the United**

11  **Website.  Same situation.  Would you then have used your**

12  **credit card to book my flight?**

13  A.  No, I would not, but I would waive the service

14  fee of $25.00.00 because you couldn't do it online.  But the

15  form of payment has to be yours, because I'm not going to

16  pay for your ticket.  But I waived it.  See, here is the

17  waiver, the waiver of $25.00.00.

18  I waived hundreds of customers that during when

19  the platforms change, from being, um, easier to compass,

20  there was a lot of malfunction in the computer and it was

21  typical that we would get hundreds of calls regarding *I can*

22  *not do it online, I cannot do it online*, and we would just

23  go straight in and waive it and just assist the customer.

24  Q.  **So in the example I just gave, where I'm using**

25  **myself as the example, where you've already indicated that**

Case 8:20-cv-02292-CEH-SPF   Document 25-1   Filed 02/18/22   Page 57 of 84 PageID 293

**PAGE 213**

1  you would not use your credit card to help me in that
2  situation, let's say I'm in Poland, the same issue, but I'm
3  not related to you, you testified you would not use your
4  credit card.  Is that what I'm hearing you say?
5      A.   I would not use a credit card to purchase a
6  stranger's ticket.
7      Q.   So is the issue -- do you know if the issue for
8  United, in that situation, was the waiver or the fact that
9  you used your personal credit card to purchase a ticket for
10  your brother?
11      A.   It's a twofolded problem.  The first problem is
12  it's a Polish Website.  Okay?  So I don't know how it works
13  today, but at that time, you couldn't go United.com/PL.  So
14  for that reason, you cannot book the ticket yourself.  You
15  would have to call in to America to book the reservation.
16          The second issue is, it's a Polish credit card.
17  It is established through the bank of socialist banking
18  and --
19      Q.   And I don't want to interrupt you, but --
20  I understand, but my question is very simple.  You did that
21  because he's your brother, correct?  I'll be more specific.
22  You used your credit card to purchase your brother's ticket
23  because he is your brother.  Is that a fair statement?
24      A.   No.  The fair statement would be I used the
25  credit card because my brother was unable to use his own

**PAGE 214**

1  credit card being in a socialist country.
2      Q.   Okay.  I'm going to use myself as an example.
3  Let's say I was in a socialist country and had the same
4  situation that your brother did.  You just testified that
5  you would not use your personal credit card to buy my ticket.
6  Is that what I heard you say?  And the reason is because I'm
7  a stranger.
8      A.   That is correct.  And I also wanted to mention
9  that the most important part in that equation is that
10  I brought $3,000 to the company by selling him the ticket,
11  instead of he could travel on Lufthansa probably, or on
12  Polish airlines, but instead I put him on United for a full
13  price.
14      Q.   And so to you, that was the most important part,
15  but you would agree that was not the most important part for
16  United?
17      A.   No.  That's incorrect.  The most important part
18  for United is to bring the revenue, because that's how the
19  money is made.  So the agent is accounted for how many
20  tickets he's selling and how he can bring business to the
21  company, and we get rewards if we sell more tickets.
22      Q.   But you would agree that you using -- you, as an
23  employee of United, using your credit card to purchase a
24  ticket for your brother is a conflict of interest.  Would
25  you agree?

**PAGE 215**

1      A.   I would not.  I would not, because this is --
2  this is purchasing a published fair ticket.  It's you go
3  anywhere and you can get the same price.  I didn't make any
4  discounts.  I didn't apply nothing other than his inability
5  to pay with the form of payment that doesn't go through
6  United Website because it's a socialist country and he
7  cannot do it on a Website that's published in Poland.
8      Q.   I understand, but you used your personal credit
9  card to purchase his ticket, correct?
10      A.   Yes, ma'am.
11      Q.   And then did you waive -- once you used your
12  personal credit card, did you then also waive the booking
13  service fee?
14      A.   Because he was not able to do it online himself,
15  because the United.com/PL does not function in Poland.
16      Q.   But if you purchased the ticket, why would --
17  you purchased the ticket with your credit card.  Why then
18  would you waive the booking service fee if the purchase was
19  on your credit card?
20      A.   Because it was applicable for anybody that calls
21  in and tells me *I cannot book it online.*  I will waive the
22  $25.00.00 fee.  And I did it because he couldn't do it
23  online.  He was unable to do it online.
24      Q.   He didn't purchase the ticket on March 24th.
25  You did.  Correct?

**PAGE 216**

1      A.   Oh, I don't recall that sorry.
2      Q.   On March 24th, the ticket was issued with
3  Ceranek's credit card.
4      MR. BOUZAS:  I don't know what exhibit we're
5  looking at for these purchases.
6      MS. WILLIAMS HARRIS:  I'm relying on myself.
7  This is stuff we provided to you in discovery.
8      MR. BOUZAS:  You're just asking her questions on
9  some random document?
10      MS. WILLIAMS HARRIS:  It's a document that we
11  served to you in discovery.
12      MR. BOUZAS:  Well, okay.
13      MS. WILLIAMS HARRIS:  It's not an exhibit to
14  this deposition, but it is information that you have,
15  because we served it.
16      MR. BOUZAS:  All right.  To the extent she can
17  answer the question, that's fine.
18      Q.   (By Ms. Williams Harris)  Ms. Ceranek, tell me
19  every way you believe you faced retaliation?
20      A.   I'm sorry.  One more time, if I may.
21      Q.   Please explain to me every way that you believe
22  you were subject to retaliation?
23      A.   I was subject to retaliation by Ms. Hamburg
24  because it first started, um, as the, um. . . It first
25  started as age discrimination and the negative comments.

Case 8:20-cv-02292-CEH-SPF    Document 25-1    Filed 02/18/22    Page 58 of 84 PageID 294

## PAGE 217

1　She would get online and ask me, Hi, how are you Barbara?
2　How are you doing? It would start very nicely, and then it
3　would progress into being aggressive, When are you going to
4　retire? Where have you been hiding, under a rock? Are you
5　going to die on the computer taking the calls? Aren't you
6　too old to do the job? You know, why are you still here?
7　You're too old. Retire, retire, retire.
8　　　　　The culmination of the harassment was when she
9　took away my retirement package after a couple of minutes,
10　without ever going what it contained. And then she also,
11　uh -- you know how she said *I would recommend warning*? But
12　when the meeting happened, she actually recommended
13　termination.
14　　　　　So that's, uh. . . that's how I received the age
15　discrimination harassment at this time.
16　　　Q.　I asked you about retaliation.
17　　　MR. BOUZAS: Object to the question in the sense
18　　　it asked for legal conclusions.
19　　　MS. WILLIAMS HARRIS: Well, she's alleged
20　　　retaliation. I'm just trying to get information about
21　　　why she feels she was retaliated against.
22　　　MR. BOUZAS: I understand.
23　　　A.　(By the Deponent) So she retaliated by taking
24　away the most important thing that I had, that I worked for
25　29 years, and that is the retirement package. And that's

## PAGE 218

1　how I feel she retaliated, because from the very beginning,
2　she told me if you don't retire, I'm going to fire you
3　sooner or later. And then when the time came, she gave me
4　the option one more time, took it away from me within a
5　couple of minutes because she got upset, and then I was. . .
6　I was fired. So I considered that termination. Sorry.
7　I considered that retaliation.
8　　　Q.　And I think we've already established that all
9　those statements that you alleged that she made, you never
10　complained to anybody until August 22nd.
11　　　A.　Yes, ma'am. I don't remember the specific date,
12　if it's the 22nd, but it's the E-mail that -- (Ms. Williams
13　Harris overspeaking Deponent) Right, right.
14　　　MR. BOUZAS: Also object to the form on that
15　　　one.
16　　　Q.　(By Ms. Williams Harris) Other than the
17　documents that you've already produced in this case, do you
18　have any other documents relative to your allegations in
19　this Complaint?
20　　　MR. BOUZAS: I'm going to object to the extent
21　　　it calls for disclosure of attorney-client privileged
22　　　conversations.
23　　　Q.　(By Ms. Williams Harris) I'm not asking for any
24　conversation you've had with your attorney, but have you
25　produce all the documents that you have, Ms. Ceranek, in

## PAGE 219

1　this matter, that are responsive to the Request for
2　Production that we served?
3　　　　　DEPONENT: So I can answer?
4　　　MR. BOUZAS: Yeah. I don't want you disclosing
5　　　any communications that you and I have had.
6　　　Q.　(By Ms. Williams Harris) I'm just asking you if
7　we have all the documents that are responsive.
8　　　A.　I provided all documents that I can think of
9　right now at this time.
10　　　Q.　Have you obtained any witness statements in this
11　matter?
12　　　A.　No.
13　　　Q.　Aside from the people that we've already
14　discussed, are there any other individuals who you believe
15　have firsthand knowledge of the allegations in your
16　Complaint?
17　　　A.　I don't think so at this time.
18　　　Q.　Other than what you've already testified to
19　today, do you have any other facts or information in support
20　of either of your claims?
21　　　A.　Not at this time.
22　　　Q.　Have you forgotten to tell me anything at all
23　relative to the allegations in your Complaint?
24　　　A.　Not at this time.
25　　　Q.　Let me make sure. . .

## PAGE 220

1　　　　　MS. WILLIAMS HARRIS: Give me one second and I'm
2　　　about done. I promise this time, Miguel. I told you
3　　　that before, but I think I'm almost done.
4　　　MR. BOUZAS: Okay. Thanks.
5　　　(Recess taken 4:44 to 4:49 PM).
6　　　MS. WILLIAMS HARRIS: I have one more question.
7　　　Q.　(By Ms. Williams Harris) Ms. Ceranek, do you
8　know of any other RSSR, who reported to M. Hamburg, who
9　booked 37 PNRs, to include 42 tickets for themselves and
10　various family members, who was not also terminated?
11　　　A.　I don't have that knowledge. It's privileged
12　for United.
13　　　Q.　So the answer is you don't know of anyone?
14　　　A.　I don't know.
15　　　MS. HARRIS: I have no further questions.
16　　　MR. BOUZAS: Thank you. We'll read.
17　　　(FOREGOING DEPOSITION CONCLUDED AT 4:20 PM).
18
19
20
21
22
23
24
25

**PAGE 221**

### CERTIFICATE O F REPORTER

STATE OF FLORIDA        :

COUNTY OF HILLSBOROUGH  :

I, Patricia Tomory Halliday, Court Reporter,

DO HEREBY CERTIFY that I stenographically reported the foregoing proceedings at the time and place so designated and that the foregoing pages are a true and correct, verbatim record of the proceedings.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor relative or employee of any attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 24th day of September 2021.



**PAGE 222**

### CERTIFICATE OF OATH

STATE OF FLORIDA        :

COUNTY OF HILLSBOROUGH  :

I, Patricia Tomory Halliday, Notary Public, State of Florida at Large, do hereby certify that the witness herein personally appeared before me via Zoom videoconference technology and was duly sworn.

Witness my hand and official seal this 24th day of September 2021.



Notary ID No. 227498
Commission No. GG198588
Expires 4/6/2022



**PAGE 223**

### DEPOSITION TRANSCRI PT ERRATA SHEET
#### PAGE 1 OF _____

**IN RE:** Barbara Ceranek vs. United Airlines, Inc.
**DEPOSITIO N OF:** Barbara Ceranek
**TAKEN:** June 22, 2021
**REPORTED BY:** Patricia Tomory Halliday

**IN STRUCTIONS:**  Carefully review the transcript of your deposition.  In the event you determine a correction or amendment needs to be made, indicate the page and line number where you have determined there needs to be a correction or amendment to the transcript and specifically describe the correction or amendment you wish to make.  **DO NOT MAKE ANY MARKS ON THE TRANSCRI PT ITSELF.**

When you have completed your review, **place your signature where indicated, even if no corrections or amendments are needed**.

After signing below, **furnish the signature and correction pages to the Parties as follow:**

**MI GUEL BOUZAS, ESQUIRE   MONI CA WILLIAM S HARRIS, ESQUIRE**
miguel@fgbolaw.com    monica.harris@jacksonlewis.com
GWuthrich@fgbolaw.com    Denise.Dawson@jacksonlewis.com

**UNDER PENALTY OF PERJURY, I D ECLARE THAT I HAVE READ THE FOREGOING TRANS CRIPT OF M Y DEPOSITION AND EXCEPT FOR ANY CORRECTIONS AND/ OR AMENDMENTS LI STED BELOW, I H EREBY SUBSCRIBE TO THE TRANSCRI PT AS AN ACCURATE RECORD OF M Y TESTIMO NY.**

_____
**BARBARA CERANEK**

**PAGE/LIN E    CORRECTION OR AMENDM ENT**

_____    _____
_____    _____
_____    _____
_____    _____
_____    _____

**PAGE 224**

### DEPOSITION TRANSCRI PT ERRATA SHEET
#### PAGE 2 OF 2

**IN RE:** Barbara Ceranek vs. United Airlines, Inc.
**DEPOSITIO N OF:** Barbara Ceranek
**TAKEN:** June 22, 2021
**REPORTED BY:** Patricia Tomory Halliday

**PAGE/LIN E    CORRECTION OR AMENDM ENT - CONTI NUED**

_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____    _____

**$10.00** [1] – 164:21
**$125.00** [1] – 138:14
**$2.50** [1] – 163:2
**$25.00** [8] – 37:16, 20; 51:8, 11; 208:11, 15; 210:9; 211:11
**$25.00.00** [4] – 211:7; 212:14, 17; 215:22
**$3,000** [2] – 209:11; 214:10
**$33,000** [4] – 180:8, 13; 181:2; 182:7
**$33,333** [1] – 179:21
**$450.00** [1] – 33:6; 37:22
**$50.00** [10] – 37:21; 43:5; 52:12; 101:18; 105:9; 108:13; 109:8, 18
**$500.00** [1] – 34:8
**$75.00** [2] – 37:21; 101:18
**'85** [1] – 30:16
**'86** [1] – 30:16
**'94** [1] – 57:8
**000001** [1] – 3:23
**000002** [1] – 3:23
**000006** [1] – 3:8
**000007** [1] – 3:6
**000170** [1] – 3:14
**000171** [1] – 3:20
**000172** [1] – 3:16
**000191** [1] – 3:3
**000195** [1] – 4:7
**000196** [1] – 4:7
**000213** [1] – 4:5
**000215** [1] – 4:10
**000221** [1] – 4:11
**000225** [1] – 4:13
**000226** [1] – 4:13
**000257** [1] – 4:22
**000485** [2] – 66:2, 16
**000488** [1] – 69:14
**000489** [1] – 70:6
**000626** [1] – 73:8
**000627** [1] – 73:11, 14
**000627)** [1] – 75:23
**000628** [2] – 73:17, 20
**000628]** [1] – 76:18
**000629** [2] – 74:3, 6
**000630** [2] – 74:9, 12
**000630]** [2] – 74:22; 82:14
**000631** [3] – 74:17, 24; 75:3
**000632** [2] – 75:6, 9
**000633** [1] – 75:13
**000667** [1] – 3:18
**000686** [3] – 3:18; 88:24; 89:6
**000872** [1] – 4:15
**000874** [1] – 4:15
**000875** [1] – 4:20
**000877** [1] – 4:20
**03/14/94** [1] – 3:5

**06/04/2019** [1] – 3:23
**1** [6] – 3:2; 48:16, 20; 161:3; 176:1; 223:1
**1,000** [1] – 139:11
**1,200** [1] – 124:17
**10** [8] – 3:21; 14:25; 15:1; 16:5; 30:3; 93:24; 94:1; 197:12
**10/12/92** [1] – 3:8
**100** [2] – 2:3, 8
**100%** [1] – 91:1
**103** [1] – 104:9
**10:00** [3] – 81:15, 17; 147:24
**1:05** [1] – 1:17
**10:30** [5] – 146:21; 171:13; 184:10
**10th** [2] – 86:9; 181:18
**11** [5] – 3:22; 4:9; 36:24; 111:9
**111** [1] – 3:22
**11:00** [4] – 147:18, 22-23; 187:10
**11:09** [1] – 44:16
**11:15** [1] – 44:16
**11th** [1] – 177:8
**12** [5] – 3:24; 4:13; 36:23; 125:4, 7
**125** [1] – 3:24; 111:18, 22
**12:00** [1] – 81:15
**12:17** [2] – 84:2, 20
**12:25** [3] – 127:5; 167:4
**13** [2] – 4:2; 173:14
**14** [5] – 4:3; 104:9; 173:12, 14, 21
**15** [8] – 4:6; 28:2; 90:15; 124:17; 174:20; 175:15; 193:16; 197:13
**155092** [3] – 52:23, 25; 53:6
**15th** [1] – 90:22
**16** [4] – 4:8, 22; 175:17, 19
**16104** [2] – 24:9, 16
**16524** [1] – 2:3
**16th** [1] – 201:10
**17** [4] – 4:12; 186:25; 198:17, 21
**170** [1] – 85:21
**172** [1] – 86:22
**174** [1] – 4:6
**175** [2] – 4:3, 8
**176711** [1] – 54:5
**17th** [4] – 167:12; 168:11; 169:1
**18** [4] – 4:14; 198:19; 199:1, 6
**186** [1] – 4:12
**189** [1] – 49:2
**19** [3] – 4:16; 199:20, 22
**191** [2] – 49:2

**195** [2] – 174:16; 175:15
**1957** [1] – 25:6
**196** [2] – 174:16; 175:15
**1980** [1] – 31:3
**1984** [2] – 29:2; 59:8
**1988** [1] – 30:23
**1989** [1] – 29:4
**199** [2] – 4:14, 16
**1990** [8] – 30:24; 31:5, 13; 112:22; 114:9, 13, 20
**1992** [2] – 58:18; 59:8
**19th** [1] – 187:9
**1:00** [8] – 84:14-17; 130:12, 14; 183:18, 24
**1:05** [1] – 84:20
**2** [15] – 3:4; 56:7; 58:9, 21; 153:3; 154:3, 17, 19, 24; 161:4; 163:5, 18; 183:13; 223:25
**2/10/2105** [1] – 3:14
**20** [5] – 4:19; 199:24; 200:18, 20
**200** [4] – 4:19; 190:5; 195:8, 10
**2000** [1] – 112:22
**2009** [6] – 24:18; 31:16; 35:12; 45:15; 114:8
**201** [1] – 4:21
**2013** [3] – 57:16; 87:3; 112:5
**2015** [3] – 86:10, 13; 88:10
**2018** [6] – 47:1; 57:17; 87:4; 112:6, 22; 113:2
**2019** [39] – 4:4, 7, 9, 13, 15, 17, 20, 22; 20:17; 81:6; 82:2, 5-6; 87:2, 8, 12; 90:15, 22; 91:7; 111:15; 115:1, 4, 10; 117:3; 119:2, 4-5, 9-10, 23; 158:1; 174:24; 177:17, 22; 178:1; 181:18; 200:11; 201:11
**2021** [5] – 1:16; 221:11; 222:7; 223:3; 224:2
**203** [1] – 4:23
**208** [2] – 209:6; 210:4
**21** [3] – 4:21; 201:14, 17
**215** [1] – 176:3
**216** [1] – 183:10
**217** [1] – 184:15
**219** [1] – 181:17
**22** [8] – 1:16; 4:4, 23; 203:22, 24; 210:4; 223:3; 224:2
**220** [1] – 180:1
**2200** [1] – 2:8
**221** [5] – 2:20; 176:4; 177:23; 178:1, 5
**222** [1] – 2:21
**223/224** [1] – 2:22

**225** [1] – 187:3
**226** [1] – 187:3
**227498** [1] – 222:11
**22nd** [15] – 118:2; 119:2, 5, 9, 22; 120:12; 128:3; 157:21; 175:4; 184:16; 189:11; 202:10; 211:2; 218:10, 12
**22nd]** [1] – 183:12
**24** [1] – 159:6
**24-hour** [2] – 79:16, 21
**24/7** [1] – 159:16
**24th** [5] – 211:16; 215:24; 216:2; 221:11; 222:7
**25** [4] – 47:20, 24-25; 209:6
**25th** [2] – 167:12
**26** [1] – 4:15
**29** [10] – 18:16; 41:6; 54:22; 88:21; 103:20; 141:24; 164:19; 180:14; 217:25
**29-year** [2] – 124:19; 134:20
**2:00** [5] – 47:12; 92:19; 116:2; 166:23; 167:3
**2:07** [1] – 122:11
**2:10** [1] – 122:11
**2:15** [3] – 172:4; 184:4, 13
**2:30** [1] – 169:16
**3** [11] – 3:7; 58:4, 7, 10; 153:15, 20; 154:3; 177:15-17; 184:22
**30** [4] – 25:20; 71:24; 135:14; 169:16
**30th** [2] – 178:1, 4
**31st** [1] – 177:17
**33** [1] – 26:3
**33556** [1] – 24:11
**33558** [1] – 2:4
**33602** [1] – 2:8
**37** [5] – 107:7; 110:19; 114:3; 190:5; 220:9
**4** [7] – 3:9; 4:17; 60:1, 3; 64:25; 118:22; 179:18
**4/6/2022** [1] – 222:12
**40** [2] – 25:15; 48:2, 8; 84:12; 205:4; 206:19
**401(k** [2] – 132:16; 142:6
**401(k)** [2] – 132:15; 136:9
**40s** [1] – 183:7
**42** [2] – 205:14; 220:9
**43** [1] – 206:16
**430** [1] – 60:13
**438** [4] – 3:10; 60:8, 12, 14
**439** [1] – 60:15
**440** [2] – 60:15; 61:3
**444** [1] – 61:4
**445** [1] – 62:24
**45** [1] – 183:12

Case 8:20-cv-02292-CEH-SPF    Document 25-1    Filed 02/18/22    Page 61 of 84 PageID 297

2

**465** [2] - 3:10; 60:8
**466** [2] - 3:11; 64:19
**48** [1] - 3:2
**485** [1] - 66:1
**487** [1] - 67:1
**4:00** [1] - 81:18
**4:07** [1] - 202:8
**4:10** [1] - 202:8
**4:20** [2] - 1:17; 220:17
**4:44** [1] - 220:5
**4:49** [1] - 220:5
**4th** [17] - 100:11, 23; 111:15, 25; 112:15; 115:10, 17; 118:8, 11, 14; 119:4, 9; 127:11; 128:21; 158:1; 179:19; 189:4
**5** [8] - 2:19; 3:11; 64:22; 65:2, 7, 12; 84:7; 181:14
**50** [2] - 105:10; 111:19
**52,000** [3] - 114:2; 191:15
**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** [1] - 25:4
**56** [1] - 3:4
**56-year** [1] - 165:1
**57** [1] - 161:2
**58** [1] - 3:7
**5:00** [24] - 92:17; 121:17; 122:22; 123:21, 25; 124:8, 13; 130:10, 15; 134:23; 147:1, 3; 171:19, 21; 172:1, 6, 10, 16-17, 19-20; 183:19, 25
**5th** [2] - 25:6; 87:8
**6** [7] - 3:12; 4:17; 58:10; 85:17; 86:1; 200:11
**6/04/19** [1] - 4:4
**60** [2] - 3:9; 183:9
**61-year-old** [2] - 164:18; 165:12
**626** [2] - 72:15
**627** [1] - 76:7
**64** [1] - 28:4
**65** [1] - 3:11
**657** [2] - 3:11; 64:19
**66** [1] - 206:24
**667** [3] - 87:21, 24
**686** [2] - 87:22, 25
**7** [5] - 3:15; 56:9; 58:9; 86:18, 20
**7/15/2109** [1] - 3:16
**70** [1] - 206:21
**72** [5] - 131:10; 149:11; 150:20; 160:16; 161:5
**73** [2] - 150:4, 7
**75** [1] - 105:10
**7:30** [1] - 170:12
**8** [6] - 3:17; 4:7; 87:16; 91:15; 174:24
**8)** [2] - 88:8; 91:17
**813** [1] - 24:24

**813-5** [1] - 158:19
**813-546-9696** [1] - 158:21
**85** [1] - 3:12
**86** [1] - 3:15
**866-324-4327** [1] - 159:5
**87** [1] - 3:17
**872-825-6183** [1] - 158:18
**8:20-cv-02292-JSM-SPF** [1] - 1:5
**9** [4] - 3:19; 4:20; 90:10, 12
**9-1-1** [1] - 22:25
**90** [3] - 3:19; 96:5, 9
**93** [1] - 3:21
**966-9191** [1] - 24:24
**9:00** [3] - 47:12; 92:18, 21
**9:30** [1] - 184:10
**9th** [1] - 201:11
**A-N-U-A** [1] - 15:24
**abbreviated** [1] - 206:3
**abbreviation** [1] - 212:5
**ability** [9] - 15:6, 9, 13, 16; 23:10, 16; 24:6; 42:4; 50:7
**able** [44] - 5:18; 33:5-7, 9; 34:8; 37:12, 15; 39:2; 42:1, 12, 15; 69:23; 76:12; 80:20; 83:11; 94:21; 95:10; 96:11, 18; 101:9; 132:6; 158:12; 162:7, 16; 166:1, 11; 192:18, 20; 194:17; 195:10; 197:5, 14; 208:12; 210:2, 16, 18-19; 211:4, 13; 215:14
**absolutely** [2] - 145:17; 146:14
**absurd** [1] - 133:7
**abuse** [7] - 83:17; 129:22; 145:24; 148:6; 159:12
**abused** [1] - 83:22
**abusing** [1] - 136:6
**Accept** [3] - 94:17; 95:23
**accept** [9] - 94:18, 21; 95:9; 96:4, 8, 14; 124:4; 189:13; 198:4
**acceptance** [1] - 95:24
**accepting** [4] - 96:14-16; 123:12
**access** [20] - 55:2, 15-16, 19, 25; 56:3; 59:14, 19; 61:1; 65:20; 70:3; 77:13; 82:20; 91:25; 92:11; 103:8; 126:4; 191:16; 194:18; 205:16
**accommodate** [2] - 39:3; 93:4
**accommodated** [2] - 42:21; 43:2
**according** [4] - 39:8; 112:4; 113:4; 114:4

**accordingly** [1] - 176:5
**accordingly)** [32] - 45:6; 56:20; 58:13; 59:1; 61:11; 62:25; 66:7, 14, 17; 67:3; 69:12, 15; 70:10; 71:1; 73:6, 9, 12, 15, 18, 21; 74:4, 7, 10, 13, 18, 25; 75:4, 7, 10, 14; 94:3; 99:23
**Account** [4] - 3:5, 8; 57:3; 58:17
**account** [10] - 34:9; 53:21; 54:10; 101:4, 19-21, 23; 128:23
**accounted** [2] - 210:23; 214:19
**accounts** [1] - 31:2
**accumulated** [2] - 124:18; 139:10
**ACCURATE** [1] - 223:16
**accurate** [11] - 85:3, 13-14; 174:24; 175:10; 190:19; 204:10; 210:15
**accurately** [1] - 50:3
**accuse** [1] - 79:19
**acknowledging** [1] - 95:25
**act** [4] - 156:2, 7; 162:3; 165:24
**action** [5] - 57:12; 76:2; 83:18; 221:10
**active** [1] - 55:3
**activity** [1] - 110:6
**actual** [1] - 186:22
**Adam** [2] - 29:15, 17
**ADAM** [1] - 29:17
**adamant** [2] - 145:19; 146:3
**add** [5] - 118:1; 122:14; 146:18; 169:14; 173:15
**add/collect** [1] - 163:13
**add/collects** [1] - 133:16
**added** [3] - 35:15; 46:9; 211:17
**addition** [2] - 54:19; 70:12
**additional** [4] - 48:1, 4; 159:2
**address** [20] - 10:3; 16:15; 17:6; 19:15; 22:3, 6, 17; 24:8, 12; 26:6; 62:6, 11, 20; 71:2; 175:23; 200:6, 10
**adhering** [1] - 164:17
**administration** [1] - 29:13
**administrative** [2] - 201:1, 3
**admit** [1] - 60:1
**advance** [2] - 93:20; 94:22
**advantage** [1] - 197:18
**advise** [7] - 57:4; 112:14; 118:9; 134:7; 143:3;

186:2, 5
**advised** [7] - 38:8; 113:23; 128:6; 129:11; 158:2, 5; 201:4
**advises** [1] - 140:3
**advising** [2] - 118:23; 137:11
**affect** [6] - 15:5, 9, 13, 16; 23:10, 15
**affirmatively** [1] - 44:15
**afraid** [7] - 67:23; 70:19; 117:16; 166:4; 177:10, 14
**afterwards** [1] - 151:11
**age** [17] - 68:22; 103:24; 115:20; 138:3, 8; 141:3; 164:14; 177:6; 180:20; 182:4, 20; 186:13; 189:7; 216:25; 217:14
**agent** [40] - 9:19; 31:11; 32:1, 4, 18-19, 21-22; 33:22; 34:16; 35:6, 17, 21; 37:12; 38:10, 14; 41:23; 43:11; 46:19; 53:7-10, 13; 101:13; 106:22; 107:16, 19; 108:6, 9, 19-21, 25; 109:23; 116:15; 124:17; 144:17; 160:23; 191:16; 192:2, 25; 201:21, 23; 206:6, 12; 214:19
**agent's** [1] - 50:21
**agents** [13] - 33:18; 43:22; 51:20; 82:3; 93:10; 95:2; 108:6, 9; 116:19; 138:22; 180:22; 182:3, 14
**ages** [4] - 179:15; 181:11; 189:8; 204:25
**aggressive** [1] - 217:3
**ago** [7] - 16:18; 17:12; 18:11; 19:11; 36:23; 88:19
**agree** [43] - 49:24; 57:9; 58:20; 59:3; 67:6; 68:5; 70:1, 13, 16, 20; 71:25; 72:3, 6; 75:16, 24; 77:4; 86:1, 7; 87:5; 89:13, 15; 91:6, 10, 23; 92:3, 11; 102:24; 103:6; 141:12; 168:4; 171:7, 10; 172:7, 11, 16, 21, 24; 178:19; 183:24; 185:4; 214:15, 22, 25
**agreed** [2] - 163:14, 19
**agreement** [2] - 48:6; 190:8
**ahead** [7] - 7:8; 29:16; 43:19; 46:18; 48:10; 73:3; 85:23; 89:7; 102:18; 105:15; 109:8;

114:15; 135:25; 143:16; 148:2; 157:8, 11; 169:1, 8; 190:23
**airline** [1] - 78:8
**airlines** [1] - 214:12
**AIRLINES** [1] - 1:6
**Airlines** [10] - 2:12, 15; 5:8; 6:18; 28:8; 31:8; 158:9; 163:10; 223:2; 224:1
**airport** [1] - 36:19
**al** [1] - 4:9
**alcohol** [1] - 15:12
**Alexander** [3] - 26:1, 21; 27:10
**allegations** [3] - 218:18; 219:15, 23
**alleged** [7] - 9:24; 10:12; 12:8; 15:2; 177:12; 217:19; 218:9
**allow** [6] - 191:12; 193:1; 195:2, 5, 16; 197:19
**allowed** [20] - 31:18; 40:8, 21; 76:22, 25; 77:8, 23; 78:7, 25; 79:10; 81:14; 82:4; 92:25; 94:11; 115:3; 143:11; 190:7, 21; 196:22
**allowing** [1] - 124:25
**almost** [3] - 168:12; 202:4; 220:3
**alone** [1] - 179:13
**ALSO** [1] - 2:11
**altogether** [1] - 191:7
**AM** [7] - 1:17; 47:12; 81:15, 17; 92:18, 21; 187:10
**AM)** [1] - 44:16
**amendment** [3] - 223:6
**AMENDMENT** [2] - 223:19; 224:4
**AMENDMENTS** [2] - 2:22; 223:15
**amendments** [1] - 223:9
**America** [1] - 213:15
**amount** [4] - 105:10; 149:2; 163:4; 181:3
**amounts** [1] - 37:22
**AN** [1] - 223:16
**ancillary** [2] - 205:21; 208:6
**AND** [1] - 223:15
**AND/OR** [2] - 2:22; 223:15
**announced** [1] - 127:20
**annual** [1] - 41:3
**anonymous** [5] - 62:19; 68:20; 70:17; 71:4; 72:1
**anonymously** [2] - 62:15; 67:24
**answer** [31] - 5:20; 6:3, 6, 24-25; 7:8; 10:24; 12:6;

40:15; 80:3, 6; 114:15; 123:13; 124:5, 10, 12; 142:9; 147:7; 156:15; 172:9, 14, 25; 173:4; 184:12; 203:2; 205:18; 216:17; 219:3; 220:13
**Answer** [2] - 184:7; 209:6
**answered** [1] - 104:11
**answers** [2] - 6:15; 28:13
**Anthony** [6] - 3:25; 4:7, 13, 17; 157:10; 188:22
**anti** [1] - 66:20
**anti-discrimination** [1] - 66:20
**anticipated** [1] - 168:23
**anxiety** [2] - 179:7; 180:21
**ANY** [2] - 223:8, 15
**anytime** [1] - 169:14
**apologize** [5] - 8:12; 18:3; 69:25; 88:19; 92:20; 94:8; 100:2; 101:2; 109:21; 118:13; 128:3; 165:16; 197:9; 204:24
**apologized** [1] - 111:21
**APPEARANCES** [1] - 2:1
**appeared** [1] - 223:6
**applicable** [3] - 63:23; 82:25; 215:20
**applied** [3] - 106:20; 110:10
**apply** [6] - 43:16; 50:7; 77:24; 78:4; 101:16; 215:4
**applying** [2] - 32:7; 101:11
**appointment** [1] - 19:5
**appreciate** [8] - 6:8; 122:12; 154:10; 155:12, 23; 157:2; 170:8, 24
**appreciates** [2] - 138:25; 139:1
**appropriate** [3] - 107:19; 165:9; 208:23
**approval** [1] - 64:8
**arbitration** [4] - 153:16, 21; 154:3; 156:24
**area** [4] - 77:20; 89:16; 128:13; 138:7
**argue** [1] - 51:11
**arguing** [2] - 38:1; 146:10
**arrival** [1] - 39:7
**article** [1] - 14:7
**AS** [1] - 223:16
**Ashley** [1] - 2:8
**aside** [14] - 8:7, 9; 10:10; 13:9, 24; 22:2, 5; 27:10; 29:20; 51:22; 119:13; 154:14; 204:13; 219:13
**assessment** [1] - 172:16

**assign** [1] - 51:16
**assigned** [3] - 46:14, 16; 80:12
**assignment** [1] - 210:19
**assist** [7] - 51:14; 52:5, 8; 102:18; 185:25; 211:14; 212:23
**Assistance** [3] - 159:4, 7, 13
**assisting** [1] - 123:18
**associated** [2] - 87:11; 105:8
**assume** [5] - 33:17, 21; 136:21; 180:16
**assumed** [3] - 116:16; 179:5; 182:12
**assuming** [3] - 37:2; 179:25; 186:3
**AT** [1] - 220:17
**attach** [5] - 107:22, 25; 177:24; 181:20; 182:3
**attached** [6] - 177:22; 178:6; 180:23; 181:7, 15; 182:18
**attack** [7] - 16:14, 17-18; 17:2; 22:23; 121:6
**attempt** [1] - 5:24
**attempting** [1] - 96:24
**attend** [2] - 29:5, 8
**attendance** [4] - 108:1; 124:17; 133:4; 139:9
**attended** [2] - 29:7, 22
**attendee** [1] - 126:6
**attention** [9] - 61:3; 63:10; 69:8; 97:11; 112:6; 175:21; 176:24; 177:15, 17
**Attention** [1] - 211:18
**attest** [1] - 23:21
**attorney** [14] - 5:8; 6:12; 7:15; 8:7, 10, 14; 13:19; 28:14; 173:19; 204:1; 218:21, 24; 221:9
**attorney-client** [1] - 218:21
**audible** [1] - 16:24
**audio** [18] - 120:9; 125:3; 161:8; 171:6; 173:25; 175:6; 184:23; 187:20; 193:20, 22, 24; 196:15; 202:12, 14; 203:7; 209:3
**audit** [4] - 82:20; 83:10; 128:22
**audited** [3] - 82:16, 18
**audits** [1] - 82:15
**August** [14] - 4:7, 9, 13, 15; 116:25; 167:11; 168:11; 174:24; 177:8, 21; 178:10; 187:9; 218:10
**aunt** [1] - 38:13

**AUTOMATED** [1] - 126:3
**automated** [1] - 212:3
**automatically** [4] - 82:21, 25; 83:2; 93:12
**available** [34] - 39:5; 42:22; 77:7, 9, 22; 79:2, 6, 8, 24-25; 80:1, 7, 9-10, 13; 82:10, 12; 89:17; 93:9; 95:4, 6; 97:6, 8; 126:10; 137:14; 149:13-15; 159:4, 6, 15; 171:22; 184:14
**average** [1] - 47:23
**avoid** [3] - 39:17, 22; 63:20
**award** [1] - 77:6
**awarded** [1] - 86:3
**aware** [18] - 14:7; 18:16; 55:11; 56:2; 61:19; 62:2; 67:11, 19, 22; 69:23; 89:21; 106:11; 112:3; 114:18; 177:20; 178:14
**backwards** [1] - 58:1
**bad** [1] - 113:16
**Bank** [1] - 30:23
**bank** [2] - 211:22; 213:17
**banking** [1] - 213:17
**bankruptcy** [1] - 44:7
**Barb** [32] - 127:25; 128:19; 132:6, 25; 133:20; 135:9; 137:8; 139:24; 140:21; 142:11; 143:23; 144:4, 8; 148:2, 11, 24; 150:25; 152:25; 156:22; 157:9-11, 18; 159:21; 162:24; 164:25; 166:1, 6, 23; 167:5, 8; 169:4
**barb** [4] - 127:3; 146:21; 156:1; 168:4
**BARBARA** [4] - 1:3, 12; 5:1; 223:17
**Barbara** [34] - 3:13, 15, 20, 23, 25; 4:4, 7, 9, 13, 15, 17, 19, 21; 90:17; 102:20; 115:24; 122:3; 126:12, 21; 140:11; 148:8, 19; 157:24; 170:10; 175:22; 191:24; 192:3; 217:1; 223:2; 224:1
**barbara.ceranek@united. com** [1] - 200:7
**barbaraceranek** [1] - 200:6
**barely** [1] - 123:16
**Barkett** [1] - 11:15
**Bartlett** [1] - 11:9
**based** [17] - 33:5, 24; 34:9; 37:13, 24; 38:16; 46:17; 50:12; 57:3;

67:14; 105:6; 132:20;
133:1, 3; 149:7; 180:20
**basis** [2] - 51:24; 186:13
**Bates** [2] - 181:17; 204:3
**Bay** [1] - 146:1
**bear** [2] - 156:17; 160:3
**became** [25] - 35:21; 36:7,
13; 37:6, 10; 42:7;
45:17; 46:23, 25; 47:2,
9, 22; 103:21; 105:25;
106:6, 11; 109:15;
112:8, 18; 113:1; 114:8,
10; 115:22; 123:6
**become** [1] - 29:3
**becoming** [1] - 113:5
**bed** [1] - 17:18
**bedroom** [1] - 35:25
**BEFORE** [1] - 1:19
**began** [4] - 31:9, 12;
92:17; 114:19
**begging** [3] - 196:25;
197:3, 19
**beginning** [7] - 77:5;
166:20; 175:23; 177:5;
184:17; 187:5; 218:1
**begins** [1] - 17:18
**behalf** [10] - 13:16; 41:24;
104:6; 131:4; 140:25;
192:14; 196:9, 12; 204:1
**behavior** [8] - 69:10; 70:8;
171:12; 179:10; 182:13,
22
**behind** [2] - 135:20;
158:23
**belabor** [1] - 193:23
**belief** [9] - 8:10, 14;
12:13; 13:7, 11; 14:2, 4;
68:6; 70:16
**below** [2] - 92:1; 223:11
**BELOW** [1] - 223:15
**benefit** [2] - 168:5; 208:3
**benefits** [23] - 28:8; 40:19;
44:10; 123:2, 13; 130:2,
17; 132:7, 11; 140:2, 16;
144:24; 158:13; 162:7;
167:17; 171:8; 177:18,
21; 183:15, 22; 184:4
**beng** [1] - 208:17
**best** [8] - 5:24; 45:22;
102:19; 132:5; 134:23;
148:18; 165:22; 190:2
**better** [3] - 66:8, 10;
179:8
**between** [16] - 3:25; 4:17;
27:7; 31:21, 23; 41:6;
43:8; 46:3; 47:16;
100:15; 119:4, 9;
140:23; 189:12; 190:9;
202:15
**bible** [1] - 95:2
**BID** [1] - 25:13

BID-GAASHT] [1] - 25:13
**bidded** [1] - 46:16
**big** [5] - 62:14; 64:19;
76:1; 130:11; 178:10
**bigger** [1] - 65:9; 66:5;
88:5
**biggest** [1] - 34:3
**birth** [2] - 25:5, 7
**bit** [9] - 44:18; 69:4;
70:23; 72:20; 88:5; 94:2;
99:22; 126:13; 127:1
**blacked** [1] - 175:22
**blank** [2] - 55:22; 60:15
**blanket** [2] - 37:14, 24
**blocking** [1] - 63:25
**blood** [9] - 20:22; 21:1, 7,
9, 14; 22:7, 23; 23:14
**bloodstream** [2] - 22:10,
17
**blown** [1] - 144:21
**blue** [3] - 62:14; 91:18, 22
**board** [1] - 80:11
**boarding** [1] - 64:6
**bold** [1] - 179:20
**book** [17] - 42:1; 51:16,
21; 57:7; 76:13, 23, 25;
155:14; 208:12, 23, 25;
210:8; 212:10, 12;
213:14; 215:21
**booked** [4] - 81:10; 211:2;
220:9
**booking** [34] - 33:4;
37:16; 51:11; 76:19;
77:1, 7, 10, 22, 24;
79:25; 80:1, 8-9, 13;
89:17, 20; 94:5; 97:1, 8,
14; 205:21; 207:5, 10;
208:6, 15; 211:8, 12, 18;
212:10; 215:12, 18
**bookings** [3] - 77:2, 4;
78:15
**bother** [1] - 182:6
**bothering** [1] - 182:13
**bottle** [1] - 21:18
**bottom** [23] - 34:18;
56:23; 65:24; 66:16;
69:14; 73:8, 14, 20;
74:6, 12, 22; 75:3, 9;
82:6; 86:9; 93:20; 94:17;
95:22; 163:1; 178:5;
180:1; 183:10; 199:14
**bought** [3] - 79:14, 16;
102:1
**Bouzas** [4] - 2:3; 99:25;
122:10; 176:6
**BOUZAS** [46] - 2:2; 17:23;
24:3; 44:23; 45:1, 3;
48:9; 49:2, 7, 12; 56:21;
60:6, 12; 64:21; 65:3;
74:19, 23; 84:6, 9, 12,
14, 18; 85:23; 86:23;

87:24; 88:1; 114:14;
122:9; 125:23; 198:19,
24; 199:2; 202:5;
209:22; 216:4, 8, 12, 16;
217:17, 22; 218:14, 20;
219:4; 220:4, 16; 223:12
**Bouzas)** [3] - 49:4; 84:4;
104:5
**box** [3] - 62:14; 83:17;
90:21
**boy** [2] - 36:18; 201:25
**bravo** [1] - 25:10
**break** [13] - 7:1-3, 6, 8;
44:12, 14, 18; 84:3, 10,
22; 122:9; 202:3
**breaking** [3] - 163:14;
165:6
**brief** [20] - 45:6; 61:11;
66:17; 69:15; 73:6, 9,
12, 15, 18, 21; 74:4, 7,
10, 13, 18, 25; 75:4, 7,
10, 14
**Brief** [11] - 56:20; 58:13;
59:1; 62:25; 66:14; 67:3;
69:12; 70:10; 71:1;
85:22; 176:5
**briefly** [1] - 128:12
**bring** [17] - 78:14; 97:10;
98:8; 140:23; 150:23;
151:14; 153:22; 154:6,
13; 155:10; 164:3;
165:17, 24; 195:9;
209:10; 214:18, 20
**bringing** [1] - 71:16
**brings** [2] - 164:16;
165:11
**broad** [2] - 41:14; 42:18
**broke** [2] - 43:20; 141:12
**broken** [2] - 141:14;
163:11
**brother** [15] - 38:12;
207:22; 208:1, 17-18,
21, 24; 211:3; 212:9;
213:10, 21, 23, 25;
214:4, 24
**brother's** [2] - 211:20;
213:22
**brought** [9] - 110:19;
112:6; 128:21; 153:7;
164:11; 168:8; 190:4;
212:7; 214:10
**BSF** [3] - 210:9; 211:6
**build** [1] - 22:10
**buildings** [1] - 158:9
**buildup** [1] - 22:17
**bullet** [5] - 50:2; 52:2;
72:4; 95:19
**bullets** [1] - 76:7
**business** [5] - 29:13;
64:7; 77:12; 101:6;
121:17; 130:10, 16;

214:20
**Business** [6] - 3:9; 4:10;
59:21; 60:22; 64:25;
84:23
**button** [2] - 92:1; 95:23
**buy** [4] - 43:13; 51:10;
103:12; 214:5
**buying** [1] - 141:15
**BY** [4] - 2:19; 5:6; 223:4;
224:3
**Bydgoszcz** [2] - 25:13;
28:23
**bye** [4] - 171:2
**bye-bye** [2] - 171:2
**Calculations** [1] - 96:2
**California** [2] - 25:22;
98:1
**caller** [1] - 71:15
**camera** [3] - 21:13; 53:5,
16
**camera)** [1] - 21:18
**cancel** [1] - 83:1
**cancelled** [1] - 33:11
**cannot** [45] - 17:17;
19:19; 23:21; 36:23;
43:4; 48:24; 49:10;
55:22; 68:3; 79:19;
82:22; 83:3; 100:21;
102:19; 104:6; 105:10;
106:17; 114:25; 121:3;
122:18; 134:7; 148:4;
151:14, 17; 167:16, 18;
171:15; 176:22; 183:22;
185:6; 190:25; 195:14;
204:20; 208:17; 211:11;
212:22; 213:14; 215:7,
21
**capacity** [2] - 80:16;
81:10
**capture** [1] - 210:2
**captured** [1] - 209:23
**car** [2] - 116:23; 117:1
**card** [27] - 101:4, 6-7;
208:14; 210:18; 211:16,
20, 22, 24; 212:6, 12;
213:1, 4-5, 9, 16, 22, 25;
214:1, 5, 23; 215:9, 12,
17, 19; 216:3
**cardiologist** [2] - 16:15;
17:9
**cardiologist's** [1] - 17:4
**care** [13] - 15:18, 25;
16:4, 9, 13; 38:23;
40:4-6, 10-11; 63:17;
102:21
**career** [2] - 124:19;
141:23
**carefully** [1] - 223:5
**Carriage** [2] - 42:9; 103:3
**carried** [1] - 35:7
**carrier** [2] - 33:13; 39:9

Case 8:20-cv-02292-CEH-SPF Document 25-1 Filed 02/18/22 Page 64 of 84 PageID 300

5

**carriers** [1] - 33:11
**cars** [1] - 116:22
**CASE** [1] - 1:5
**case** [16] - 10:20; 28:6; 61:25; 77:22; 79:1, 5; 131:7, 14; 134:11; 153:15; 154:5, 18; 170:4; 187:3; 218:17
**cases** [2] - 110:16; 138:10
**caught** [2] - 113:9; 114:1
**causing** [2] - 69:19; 78:19
**CBD** [1] - 27:7
**Cc** [1] - 170:1
**cell** [3] - 24:24; 147:5; 202:19
**Center** [6] - 69:19, 22, 24; 70:2, 13; 72:13
**center** [5] - 26:18; 35:24; 47:7; 50:20
**centers** [2] - 127:18, 21
**Central** [11] - 47:12; 92:19; 116:2; 130:13-15; 147:3, 24; 172:4; 184:4; 187:10
**CEO** [4] - 11:8, 15; 175:8; 176:21
**Ceranek** [52] - 3:13, 15, 20, 23, 25; 4:4, 7, 9, 13, 15, 17, 19, 21; 5:7; 13:4; 18:2; 44:17; 49:17; 56:11; 58:11; 60:9; 84:21; 85:25; 87:19; 88:4; 90:17; 94:1; 110:18; 126:12, 17; 143:25; 148:8, 11; 171:7; 173:18; 175:22; 187:6; 193:19; 199:7, 24; 200:21; 201:20; 202:9; 205:7; 209:9; 216:18; 218:25; 220:7; 223:2; 224:1
**CERANEK** [76] - 1:3, 12; 5:1; 126:12, 23; 127:5; 133:21, 23; 134:8; 136:10, 16, 19; 137:10, 15, 21; 138:1; 140:9; 141:9, 18, 22; 142:8, 13, 15; 143:21; 144:1, 6, 10; 145:6, 10, 18, 22; 146:16; 147:6, 9, 12; 148:1, 3, 16; 150:8, 11, 23; 151:5, 14, 17; 152:23; 153:10; 154:1, 8, 16, 25; 155:11, 23; 156:14, 19, 21; 157:1, 16, 23; 160:19; 161:25; 162:18; 163:21; 164:15, 24; 165:8; 166:2, 25; 167:10, 16; 168:14, 20; 170:9, 14, 21; 171:1;

223:17
**Ceranek's** [1] - 216:3
**Ceranek000020** [1] - 4:18
**certain** [3] - 39:21; 40:19; 152:7
**CERTIFICATE** [4] - 2:20; 221:1; 222:1
**certificate** [13] - 3:13, 15; 30:9; 85:10, 12; 86:3; 87:6; 88:15; 107:23; 108:1, 7, 9, 19
**certificates** [2] - 29:21; 30:17
**certified** [1] - 30:12
**CERTIFY** [2] - 221:6, 8
**certify** [1] - 222:5
**cetera** [2] - 18:12; 19:9
**chair** [2] - 128:14; 161:13
**chance** [1] - 156:23
**chances** [1] - 135:3
**change** [33] - 33:6, 12; 35:12; 37:21; 38:6; 39:2, 4; 43:5; 46:2, 7, 10; 52:12; 55:10; 56:3; 98:8, 23-24; 99:1, 7, 10, 14-16; 133:15; 147:2; 163:12; 171:15; 207:19; 211:19; 212:19
**changed** [7] - 35:15, 20; 56:4; 99:6; 114:22; 115:1; 127:19
**changes** [4] - 55:14, 17; 115:6
**changing** [1] - 33:4
**charge** [6] - 39:5; 50:23; 52:13; 99:1; 101:18; 211:24
**charges** [10] - 50:14; 80:2; 82:20, 22-23, 25; 83:4, 11; 93:4
**Charlie** [1] - 25:11
**check** [4] - 50:24; 53:2; 127:5; 167:11
**checks** [1] - 34:16
**checkup** [1] - 17:14
**Cheryl** [3] - 127:17, 21
**Chicago** [9] - 36:8; 78:23; 127:11, 18; 159:18; 161:23; 169:25; 170:5
**children** [3] - 25:23; 26:13; 27:14
**chime)** [1] - 16:24
**choice** [1] - 192:11
**choices** [1] - 46:19
**choose** [3] - 62:14, 19; 130:21
**Cindi** [23] - 3:23; 4:4, 7, 13; 17:16; 20:12; 46:23, 25; 47:9, 22; 54:12; 68:14; 78:2; 100:11, 15, 23; 126:22; 178:1, 4;

180:4; 188:19; 198:1; 202:25
**Cindy** [1] - 3:25
**circling** [1] - 67:7
**circumstances** [1] - 43:15
**citizen** [1] - 29:3
**city** [1] - 25:9
**claims** [3] - 8:7; 44:1; 219:20
**clarification** [3] - 5:22; 179:2; 180:12
**clarified** [1] - 155:17
**clarify** [5] - 5:22; 136:19; 154:1, 16; 208:11
**clear** [7] - 43:11; 71:19; 80:11; 98:22; 112:13; 164:10; 190:8
**clearly** [2] - 6:4; 152:18
**click** [3] - 92:5; 93:19; 210:22
**Click** [1] - 91:23
**clicking** [3] - 92:1, 8, 12
**Clicking** [1] - 95:23
**client** [2] - 143:8; 218:21
**close** [16] - 38:11, 19; 52:10; 63:19; 101:14; 106:21; 121:18; 190:4; 192:2; 195:10; 206:21; 207:5, 9; 208:7
**close-in** [3] - 207:5, 9; 208:7
**closed** [6] - 36:4, 6; 121:22; 124:1, 3; 172:5
**closer** [2] - 7:4; 147:21
**Co** [5] - 3:14; 85:8; 86:5, 14; 96:3
**co** [9] - 8:16; 13:9; 63:5, 11, 16, 19; 97:5; 119:8; 206:5
**co-worker** [3] - 8:16; 119:8; 206:5
**co-workers** [6] - 13:9; 63:5, 11, 16, 19; 97:5
**Co-Workers** [5] - 3:14; 85:8; 86:5, 14; 96:3
**code** [2] - 126:4; 170:5
**Code** [6] - 3:9; 4:10; 59:21; 60:22; 64:24; 84:23
**collect** [3] - 82:25; 99:17; 108:19
**collected** [1] - 83:6
**college** [5] - 29:5, 7-8, 14, 20
**Colorado** [3] - 29:23; 30:23; 31:14
**column** [1] - 176:14
**comb** [4] - 135:8; 139:8; 141:22; 166:3
**combination** [2] - 210:8, 17

**combing** [2] - 146:12; 162:19
**comfortable** [1] - 69:18
**coming** [8] - 123:9; 127:8; 144:9; 145:15; 156:1, 3; 165:20; 197:25
**commands** [1] - 126:10
**comment** [4] - 83:16; 104:5; 174:21; 196:23
**comments** [12] - 9:4, 9, 16, 24; 10:15; 12:8; 15:2; 117:6, 24-25; 185:20; 216:25
**Commission** [2] - 13:14; 222:12
**Committee** [1] - 158:19
**committee** [1] - 159:20
**communication** [1] - 49:4
**communications** [1] - 219:5
**companies** [1] - 163:10
**company** [43] - 26:25; 31:20, 22; 77:12; 82:20; 110:24; 122:5; 129:3, 9, 18; 130:2, 5, 18; 132:12, 18; 133:13; 134:10; 140:23; 141:7, 17; 142:1, 5; 145:25; 151:1, 3-4, 10, 20-21; 152:15, 18; 163:3, 6, 15, 18, 20, 25; 165:3; 192:1; 208:9; 209:10; 214:10, 21
**Company** [17] - 131:3-5, 24; 134:15; 135:7, 25; 145:2, 15; 149:1; 150:13; 160:8, 18; 162:16; 166:12
**company's** [1] - 192:19
**comparable** [1] - 138:9
**compare** [2] - 58:22
**comparison** [1] - 99:10
**compass** [1] - 212:19
**compensation** [6] - 28:10; 34:7; 40:3, 12; 50:12
**Compensation** [1] - 44:9
**compiled** [2] - 149:20; 150:15
**compiling** [1] - 149:22
**complain** [7] - 9:10; 11:22; 12:7; 18:13; 68:14; 119:5; 162:20
**complained** [5] - 11:14; 18:15; 68:19; 119:7; 218:10
**complaining** [4] - 18:19; 68:22; 71:8, 13; 177:1
**complaint** [13] - 4:10; 13:13, 22; 50:24; 68:21; 69:24; 71:6; 112:23; 175:6; 185:25; 186:7,

10; 201:8

**Complaint** [9] - 4:23; 203:24; 204:4, 6, 10; 218:19; 219:16, 23

**complaints** [1] - 179:20

**complete** [1] - 125:24

**completed** [9] - 3:20; 85:11; 86:13; 87:6; 90:5, 20, 22; 91:7; 223:9

**completely** [2] - 159:8; 209:2

**completing** [1] - 88:15

**completion** [3] - 3:13, 15; 86:3

**compliance** [7] - 87:10; 88:6; 106:2; 112:18, 20, 22; 177:9

**Compliance** [11] - 3:13, 17; 61:5, 7, 14, 22; 72:14; 85:7; 86:4, 13; 87:20

**complying** [1] - 111:22

**components** [1] - 50:20

**composure** [1] - 18:4

**comprehend** [6] - 121:4; 122:18; 173:1; 194:14

**computer** [18] - 9:6; 37:17; 50:18; 92:21, 23; 93:8, 15, 19; 94:19, 22; 96:12; 113:11; 116:13; 191:18; 202:24; 210:16; 212:20; 217:5

**concentrate** [2] - 52:1; 80:2

**concern** [2] - 61:21; 62:20

**concerned** [3] - 6:24; 82:11; 179:1

**concerns** [2] - 18:21; 19:15

**concluded** [1] - 197:23

**CONCLUDED** [1] - 220:17

**concluded)** [1] - 171:4

**conclusion** [2] - 116:11; 193:8

**conclusions** [2] - 164:9; 217:18

**condescending** [2] - 171:11; 191:2

**condition** [1] - 15:15

**Conduct** [6] - 3:9; 4:10; 59:22; 60:22; 64:25; 84:24

**conducted** [1] - 189:23

**conducting** [1] - 189:17

**conference** [1] - 126:9

**confidential** [4] - 72:6; 159:4, 8, 15

**confidentiality** [1] - 76:11

**confirmed** [17] - 43:9; 57:22; 77:5, 15-16, 18, 21; 78:1; 80:22; 94:5;

97:1, 7, 14, 25; 102:14; 122:3; 192:23

**confirms** [1] - 95:24

**conflict** [1] - 214:24

**confused** [4] - 95:16; 109:20; 122:4; 196:12

**confusing** [1] - 55:9

**confusion** [1] - 82:2

**congratulations** [1] - 25:16

**connect** [1] - 78:11

**connected** [1] - 221:9

**connection** [2] - 33:10; 42:23

**connections** [1] - 39:2

**consider** [9] - 10:21; 123:21; 139:13; 172:2, 12, 15; 192:25; 208:8

**considered** [9] - 47:14; 81:24; 103:9; 108:15; 198:11; 207:22; 208:2; 218:6

**consist** [1] - 148:8

**consisted** [2] - 121:19; 204:16

**consistent** [1] - 163:14

**constantly** [1] - 203:1

**consumed** [1] - 51:4

**consuming** [1] - 40:13

**contact** [9] - 47:6; 69:22; 122:6; 127:18, 21; 158:16; 166:9; 197:17

**contacted** [1] - 119:16

**contained** [5] - 54:23; 70:2; 72:17; 91:14; 217:10

**contains** [1] - 193:2

**content** [1] - 90:2

**contest** [1] - 96:18

**Continental** [32] - 3:5, 7, 9; 31:8, 13, 15-17, 21, 24; 32:12; 34:21, 23, 25; 37:3; 41:6; 44:20; 45:16; 46:3; 54:17, 22; 57:1; 58:16; 98:6; 114:10, 12, 23; 139:9; 141:25; 163:9

**continuation** [1] - 70:7

**continue** [3] - 70:9; 118:5; 189:14

**continued** [1] - 46:6

**CONTINUED** [1] - 224:4

**Continues** [1] - 88:13

**continues** [2] - 64:3; 158:11

**Contract** [2] - 42:9; 103:2

**contract** [1] - 156:24

**control** [1] - 180:23

**controlled** [1] - 15:9

**conver** [1] - 122:18

**conversation** [23] - 7:5; 8:6, 25; 10:11; 11:4;

109:15; 110:21, 23; 111:25; 112:15; 116:20; 118:13, 23; 122:17, 19; 182:1; 183:13; 185:1; 202:10, 13; 203:5; 218:24

**conversations** [5] - 12:12; 14:12; 117:10; 139:20; 218:22

**convicted** [2] - 28:16, 19

**copies** [13] - 190:6, 10, 12, 21; 192:8, 15-16; 194:21, 24; 195:1, 12, 16

**copy** [14] - 59:2; 107:22; 138:16; 157:18; 159:17, 21; 160:16; 161:6; 162:12; 166:7; 176:6; 190:15; 192:5

**Core** [3] - 95:1, 19

**core** [1] - 95:1

**corporate** [10] - 10:21; 11:11, 24; 44:25; 131:9; 135:10; 176:21; 185:12; 188:16

**Corporation** [1] - 1:7

**correct** [71] - 6:19; 17:1; 31:4; 32:12; 33:17; 41:16; 45:17; 48:11; 51:3; 54:10, 13; 55:2; 56:1; 59:6, 14; 61:23; 62:3, 5, 12; 68:9; 69:6; 72:11, 21, 25; 86:7, 11; 87:18; 89:14; 92:7, 20; 111:20; 113:2; 114:6; 115:5; 120:6; 155:20; 157:22; 158:20, 25; 160:21; 167:4; 172:22; 174:1, 9; 177:2, 9-10, 13-14; 180:4; 184:7; 187:11, 14; 190:16; 192:14; 194:20, 22; 199:1; 202:2; 205:1, 10-11; 211:4; 213:21; 214:8; 215:9, 25; 221:7

**Correct** [2] - 90:16; 171:9

**correction** [4] - 223:5, 7, 11

**CORRECTION** [2] - 223:19; 224:4

**CORRECTIONS** [2] - 2:22; 223:15

**corrections** [1] - 223:9

**correctly** [1] - 67:21

**corresponding** [1] - 162:22

**Cotoia** [45] - 3:25; 4:7, 13, 17; 11:10, 15, 17; 119:25; 120:17; 121:12; 122:2; 128:11; 158:2; 159:19; 170:16; 175:5;

183:8; 188:22; 189:12; 190:4, 15, 18, 20; 191:19, 24; 192:6, 19, 22; 193:5, 11; 194:20, 23, 25; 195:4, 23; 196:5; 202:11, 15, 17-18; 203:3, 9

**COTOIA** [30] - 132:15; 144:7, 11; 145:7, 11, 21; 146:14; 147:19, 23; 152:24; 153:11; 154:7, 11, 22; 155:2, 20; 156:22; 158:22; 159:1; 161:14; 167:21; 169:8, 11, 17, 25; 170:4, 10, 18, 22; 171:2

**Cotoia's** [2] - 189:7; 193:13

**Counsel** [4] - 1:15; 2:5, 9, 12

**counsel** [4] - 5:2; 45:2; 221:9

**counseling** [1] - 159:11

**counselor** [2] - 15:19; 16:12

**counselors** [1] - 159:9

**count** [2] - 64:23; 91:23

**country** [4] - 83:14; 214:1, 3; 215:6

**COUNTY** [2] - 221:4; 222:3

**couple** [17] - 16:18; 33:21; 39:13; 50:16; 65:23; 73:3; 74:15; 83:13; 92:25; 118:3; 124:1; 129:20; 160:10; 192:3; 204:19; 217:9; 218:5

**courage** [1] - 183:1

**course** [16] - 3:13; 9:19; 14:23; 28:11; 61:24; 82:19; 85:6; 86:4, 13; 89:23; 91:4; 92:13; 112:19; 144:25; 154:12; 156:21

**court** [6] - 44:15; 104:10; 147:9; 161:17; 209:6; 210:5

**COURT** [6] - 1:1; 48:24; 49:10; 125:15; 209:2, 25

**Court** [3] - 1:20; 221:5, 14

**courtroom** [5] - 6:14; 121:12; 146:10; 161:18; 164:3

**covered** [2] - 120:25; 127:7

**created** [1] - 82:2

**credit** [27] - 101:4, 6-7; 208:14; 210:18; 211:16, 20, 22, 24; 212:6, 12; 213:1, 4-5, 9, 16, 22, 25; 214:1, 5, 23; 215:8, 12,

17, 19; 216:3
**cried** [1] - 191:10
**crime** [4] - 28:19; 163:22; 164:2; 165:8
**criminal** [1] - 134:12
**cry** [5] - 9:10; 17:21; 23:25; 121:1; 192:12
**crying** [10] - 17:15; 18:3, 12, 19; 19:8; 52:9, 12; 116:21; 122:8; 196:23
**crying)** [1] - 17:18
**culmination** [6] - 103:23; 118:1; 123:6; 171:24; 204:18; 217:8
**current** [3] - 8:2; 13:25; 26:6
**customer** [42] - 10:9; 32:15, 18, 24; 34:5, 13; 35:6, 17; 37:25; 38:1, 4, 23; 39:18, 20, 22-24; 40:4, 9, 11, 15; 42:8; 50:12; 52:8; 99:10; 101:16; 102:11, 21, 25; 103:4, 10, 16; 108:23; 123:18; 146:7; 179:19; 184:17; 211:14; 212:23
**Customer** [2] - 31:25; 33:18
**customers** [7] - 39:18; 40:5; 52:5; 109:25; 110:14; 129:2; 212:18
**Customers** [3] - 63:4, 11, 15
**cut** [2] - 128:18; 197:1
**cuts** [1] - 161:8
**damage** [3] - 78:20; 80:23; 142:1
**damages** [1] - 28:5
**Darcy** [1] - 183:4
**data** [4] - 30:2, 13; 135:19
**DATE** [1] - 1:16
**date** [26] - 17:13; 18:23; 25:5; 31:19; 46:6; 58:17; 86:9; 90:14; 107:17; 135:13, 15; 149:13; 150:17; 160:12, 14; 166:8; 168:15; 174:25; 181:17; 185:15; 186:22; 187:5; 218:11
**DATED** [1] - 221:11
**dated** [16] - 3:14, 16; 4:4, 7, 13, 15, 20, 22; 57:16; 58:18; 59:8; 157:21; 174:24; 178:1; 201:10
**dates** [2] - 48:4; 138:18
**daughter** [20] - 12:17; 25:18; 38:12; 101:3; 102:11, 24; 103:15; 104:17, 19, 24; 106:12; 107:12; 109:19; 110:23; 118:19, 24; 128:22;

138:14; 141:15; 208:5
**daughter's** [3] - 12:25; 100:13; 105:3
**David** [1] - 25:11
**day-to-day** [1] - 51:24
**Daylight** [1] - 187:10
**days** [11] - 96:5, 9; 135:14, 23; 149:2; 159:6; 183:12; 190:3, 9; 211:15
**de** [2] - 50:11; 102:20
**de-escalate** [1] - 102:20
**de-escalated** [1] - 50:11
**deadline** [1] - 183:13
**deal** [1] - 34:20
**death** [6] - 107:22, 25; 108:2, 7-8, 19
**decide** [13] - 28:11; 121:2, 8; 130:13, 21; 135:2, 23; 136:3; 151:2, 10; 153:13; 166:18; 192:2
**decided** [2] - 101:16; 162:6
**decision** [34] - 4:15, 18-19, 21; 108:5, 10; 121:4, 24; 122:2, 7, 25; 124:7, 14; 130:11, 16; 132:5, 23; 134:23; 135:22; 137:15; 141:2; 156:13; 166:19; 171:14; 183:14; 193:18; 197:25; 198:8, 12; 200:4; 201:2
**decisions** [1] - 63:9
**DECLARE** [1] - 223:14
**declared** [1] - 44:7
**decline** [1] - 193:2
**declining** [1] - 193:10
**deducted** [1] - 181:2
**deduction** [1] - 179:21
**deep** [1] - 149:9
**deep-dive** [1] - 149:9
**deescalate** [1] - 34:4
**DEF** [52] - 3:3, 6, 8, 10-11, 14, 16, 18, 20, 23; 4:5, 7, 10, 13, 15, 20, 22; 56:9; 58:9; 60:8; 64:19; 66:2, 16; 69:14; 70:6; 72:15; 73:8, 11, 14, 17, 20; 74:3, 6, 9, 12, 17, 22, 24; 75:3, 6, 9, 13, 23; 76:18; 82:14; 88:24; 89:6; 175:15
**DEF000335** [1] - 3:21
**defend** [3] - 190:11; 191:13; 194:17
**Defendant** [3] - 1:8, 15; 2:9
**Defendant's** [1] - 85:21
**defined** [2] - 38:12, 20
**defines** [1] - 71:7
**definitely** [3] - 80:19;

139:14; 156:23
**definition** [6] - 80:17-19; 98:9, 13, 18
**degrading** [1] - 185:20
**degree** [2] - 29:12, 20
**degrees** [1] - 30:19
**delay** [1] - 128:2
**delayed** [4] - 39:4, 6-7; 42:20
**deleted** [2] - 211:17, 24
**Denise.Dawson@ jacksonlewis.com** [1] - 223:13
**Denver** [2] - 29:23; 31:14
**deny** [2] - 173:15, 17
**department** [3] - 40:13; 93:13; 127:22
**departure** [2] - 2:13; 83:14
**dependent** [1] - 27:14
**dependents** [3] - 27:11, 13, 15
**depo** [6] - 5:12; 48:20; 60:1; 65:12; 86:2, 18
**DEPONENT** [9] - 17:21; 18:3, 7; 100:1; 122:14; 125:9; 126:19; 202:7; 219:3
**Deponent** [17] - 21:13; 24:4; 48:11; 53:5, 16; 56:22; 60:16; 75:1; 100:2; 114:16; 122:10, 16; 174:17; 176:5; 204:5; 217:23; 218:13
**Deponent)** [1] - 99:25
**deposition** [6] - 7:15, 18; 21:15; 22:1; 216:14; 223:5
**DEPOSITION** [7] - 1:12; 220:17; 223:1, 3, 15, 20; 224:2
**depressed** [3] - 17:17; 18:20; 23:24
**depression** [6] - 19:24; 22:6; 23:19; 24:2, 5
**derogative** [1] - 9:4
**describe** [3] - 98:3; 113:12; 223:7
**described** [2] - 51:2, 22
**describes** [1] - 50:6
**describing** [1] - 32:8
**description** [5] - 3:3; 38:15; 49:23; 51:25; 122:20
**designated** [1] - 221:6
**designation** [1] - 39:8
**desk** [3] - 113:14, 21; 139:12
**destination** [9] - 78:10; 97:24; 98:4, 15, 22, 25; 99:16; 100:5; 115:2

**detail** [1] - 62:20
**details** [2] - 91:14; 143:13
**determination** [3] - 152:20; 158:4, 15
**determine** [5] - 19:13; 131:25; 152:14; 198:12; 223:5
**determined** [2] - 189:24; 223:6
**deviating** [1] - 64:7
**deviation** [1] - 63:21
**device** [1] - 16:24
**diagnosed** [2] - 23:20; 24:1
**diaries** [1] - 7:20
**die** [3] - 9:6; 116:13; 217:5
**difference** [5] - 33:8; 47:16; 59:7; 99:1, 14
**different** [33] - 5:14; 9:19; 27:7; 32:5; 33:11, 13; 36:7; 37:22; 38:3; 39:2, 9; 41:5; 47:6; 50:13, 19-20; 51:14; 54:21; 78:24; 79:8, 12, 18; 81:1; 97:22; 98:16, 25; 100:5; 109:6; 127:22; 186:22; 187:6; 210:21
**differentiate** [1] - 43:8
**differentiating** [1] - 31:21
**DIRECT** [2] - 2:19; 5:5
**directly** [1] - 69:18
**director** [1] - 159:18
**disagree** [1] - 103:11
**disciplinary** [2] - 76:2; 83:18
**discipline** [3] - 129:23; 133:2; 136:2
**disclose** [2] - 121:13; 134:1
**disclosed** [1] - 134:3
**disclosing** [1] - 219:4
**disclosure** [1] - 218:21
**disconnected** [1] - 122:10
**discount** [1] - 63:23
**discounts** [1] - 215:4
**discovery** [2] - 216:7, 11
**discriminated** [10] - 8:10, 14; 9:3; 12:14; 13:7, 12; 14:2, 5; 71:9; 204:15
**discriminates** [1] - 71:18
**discriminating** [5] - 68:15; 71:17, 23; 179:6; 180:19
**discrimination** [31] - 9:1; 10:12; 11:5, 7, 14, 22; 43:2; 66:20, 24; 67:11, 15, 20; 68:8, 22, 24; 69:6; 70:15; 72:10; 103:25; 119:6, 11; 138:3, 8; 141:3; 177:2, 6, 13; 186:14; 201:9;

Case 8:20-cv-02292-CEH-SPF    Document 25-1    Filed 02/18/22    Page 67 of 84 PageID 303

216:25; 217:15

**discriminatory** [1] - 182:24

**discuss** [3] - 153:6; 158:16; 169:5

**discussed** [12] - 7:24; 8:13; 10:20; 13:6; 111:2; 120:11; 153:6; 160:2; 185:18; 190:10; 219:14

**discussion** [2] - 10:25; 189:1

**discussions** [2] - 13:10; 202:14

**disgruntled** [1] - 39:22

**dishonesty** [1] - 28:20

**display** [3] - 191:4; 210:21

**Displaying** [25] - 66:2, 16; 69:14; 70:6; 73:8, 11, 14, 17, 20; 74:3, 6, 9, 12, 17, 22, 24; 75:3, 6, 9, 13, 23; 76:17; 82:14; 88:24; 89:6

**disposal** [1] - 166:17

**dispute** [2] - 54:9; 96:19

**dissatisfied** [3] - 40:5, 9, 15

**distress** [3] - 101:16; 102:15, 17

**DISTRICT** [2] - 1:1

**dive** [1] - 149:9

**DIVISION** [1] - 1:2

**DO** [2] - 221:6; 223:7

**doctor** [8] - 16:8; 18:9; 19:7, 21; 20:18; 22:3, 6; 23:21

**document** [46] - 32:6; 33:23; 34:14; 40:2; 41:20; 42:23; 54:12, 15; 56:5; 58:2; 60:10; 66:25; 85:15; 86:7, 17; 87:9, 14; 90:3, 7; 91:6, 9; 94:15, 25; 99:25; 101:16; 102:6; 105:20; 106:15; 108:13; 109:3, 9, 12-13; 110:1; 113:24; 175:12, 16; 176:7; 191:14; 199:9, 11; 212:5; 216:9

**document)** [1] - 61:4

**documentation** [10] - 37:15; 38:2; 54:5, 8; 90:6; 107:9; 108:16; 195:8; 211:17, 25

**documented** [19] - 34:14; 38:11; 40:2; 42:25; 43:21; 101:11, 24; 105:11; 106:14, 24; 107:2, 13-14; 118:9; 209:17; 210:7, 12

**documents** [31] - 7:17;

10:2; 16:16; 17:6; 18:25; 28:11; 45:14; 53:9; 54:3; 88:20; 90:1; 187:24; 190:14; 191:7; 192:8; 194:19-21, 25; 195:5, 18, 24; 196:1; 199:24; 218:17, 25; 219:7

**dollar** [1] - 105:10

**dollars** [2] - 83:13; 163:25

**domestic** [2] - 32:24; 83:12

**done** [57] - 48:22; 56:17, 22; 58:14; 60:11; 66:3, 18; 67:4; 69:13, 16; 70:9, 11, 25; 73:7, 10, 13, 16, 19, 22; 74:5, 8, 11, 14; 75:1, 5, 8, 11, 15; 84:6; 112:1; 115:13, 15; 129:10, 12, 15, 18; 132:25; 133:13; 134:5; 141:1, 6; 145:12; 150:7; 151:8; 152:1, 10; 160:5; 163:11; 168:24; 173:20; 202:4; 220:2

**door** [2] - 138:21; 165:12

**Dorothy** [3] - 2:14; 143:3

**Dorothy's** [1] - 143:7

**DOT** [5] - 180:7, 13-14; 181:5; 182:7

**doubt** [2] - 34:11; 38:1

**down** [19] - 5:18; 6:1; 42:17; 66:13, 15; 67:1; 69:11; 70:5, 9, 23; 72:8, 15; 73:5; 75:21; 76:6; 82:13; 88:22; 125:13; 165:7

**Dr** [11] - 15:23; 16:1, 6-7; 17:11; 18:18; 19:8, 14, 21:4; 22:13; 23:20

**dragging** [1] - 139:12

**draw** [5] - 61:3; 175:21; 176:24; 177:15, 17

**dreams** [1] - 157:3

**drinks** [1] - 182:10

**Drive** [2] - 2:3, 8

**drop** [2] - 153:18, 23

**dropping** [1] - 93:11

**due** [7] - 38:10; 105:11; 106:18; 107:15; 108:13; 111:18; 211:18

**dues** [2] - 152:6; 155:21

**duly** [2] - 5:3; 222:6

**during** [40] - 7:21; 8:15; 47:22; 50:5, 9, 18; 54:16, 18; 61:13; 64:12; 67:10; 103:20; 110:23; 111:2, 24; 112:15; 114:22; 116:20; 118:8, 22; 119:14, 16, 19; 122:17; 129:8; 173:6; 182:22; 186:2, 5; 189:1,

15; 191:23; 192:17; 194:15; 196:5, 18, 21; 203:5, 9; 212:18

**duties** [2] - 35:3; 76:24

**duty** [1] - 144:18

**E-mail** [57] - 4:9; 11:8, 13; 62:7; 68:21; 69:1; 111:7; 119:19; 137:5; 140:5; 157:20; 162:12; 166:7; 169:1; 175:9, 23-24; 176:10, 20, 25; 177:1, 8, 24; 178:1, 7, 16, 19, 22; 179:18, 25; 180:3, 12, 21, 23, 25; 181:4, 7-8; 182:19; 183:11; 184:20; 185:9; 199:25; 200:2, 6, 8, 10-11, 25; 218:12

**E-mails** [5] - 4:9, 17; 92:24; 177:11

**ear** [1] - 181:23

**early** [2] - 96:4; 183:7

**early-out** [1] - 96:4

**easier** [4] - 49:7; 88:6; 128:17; 212:19

**easily** [1] - 53:11

**easy** [1] - 21:16

**EEOC** [3] - 13:15, 21; 14:1

**effect** [2] - 6:16; 114:12

**effective** [6] - 137:19; 140:1, 6; 158:6; 159:23

**effectively** [2] - 52:8; 196:19

**efficient** [1] - 210:22

**Efficiently** [1] - 52:4

**eight** [1] - 204:21

**either** [27] - 29:6; 38:3; 40:3; 55:6, 19; 68:7; 70:15; 88:2; 94:5; 96:25; 97:15; 103:1; 114:23; 121:14; 135:24; 152:13, 20; 161:23; 170:13; 183:13; 219:20

**electronic** [1] - 16:24

**elevated** [1] - 113:17

**Ellen** [1] - 188:19

**email** [3] - 177:18, 22

**embezzled** [1] - 163:18

**emergency** [1] - 23:3

**Emily** [4] - 29:22, 24; 30:11, 14

**emphasize** [1] - 138:13

**employed** [6] - 26:24; 27:2, 8; 30:21; 163:9, 15

**employee** [51] - 8:21; 10:20, 22, 25; 11:4; 32:12; 34:25; 35:8; 37:6, 10; 40:18, 22; 45:17; 52:20; 53:20; 54:18; 55:3; 60:21; 61:13; 65:21; 66:21; 67:10, 18;

68:8; 82:24; 83:10; 97:12; 114:6, 8, 10, 13, 23; 118:10; 122:5; 134:20; 140:1, 3; 151:19, 22; 152:6; 155:14; 157:22; 162:25; 165:1; 214:23; 221:8

**Employee** [10] - 56:24; 69:19, 22-23; 70:1, 13; 72:13; 159:3, 7, 13

**employeeRES** [1] - 76:14

**employees** [15] - 8:2; 10:11; 13:9, 24-25; 31:18; 39:11; 55:11, 14; 57:5; 76:22; 99:5; 146:2; 162:21; 165:5

**employer** [2] - 6:18; 44:2

**Employment** [1] - 13:13

**employment** [14] - 7:21; 8:15; 27:9; 30:21; 44:1; 47:11; 54:20; 83:20; 114:19; 133:12; 150:5; 164:24; 198:9, 12

**employments** [1] - 27:7

**empowered** [26] - 32:1, 3-4, 19, 21-23; 33:15, 21; 35:6, 18; 37:12; 38:13, 15, 18; 39:11; 43:22; 106:22; 108:6, 9, 21, 25; 206:6, 12

**empowerment** [16] - 33:19, 22; 34:6; 35:3; 39:12, 16, 21; 40:1; 101:25; 102:5; 108:21; 109:5, 22; 110:11; 206:6, 11

**empowerments** [3] - 32:5; 40:8, 16

**empty** [1] - 43:10

**encouraged** [3] - 34:2; 38:22; 109:4

**end** [18] - 47:11; 94:11; 116:2; 117:16; 130:10, 15; 132:9; 140:7; 142:5; 164:1; 178:11; 191:1, 11; 194:17; 196:24; 197:4, 21

**ended** [1] - 92:18

**ended)** [22] - 52:19; 57:25; 59:12; 64:11; 84:1; 86:16; 87:13; 89:2, 22; 91:11; 92:14; 100:9; 115:8; 174:7; 175:3; 185:11; 187:12; 199:18; 200:17; 201:6, 19; 204:12

**endurance** [1] - 7:2

**engage** [1] - 181:21

**engaged** [3] - 110:6; 182:13, 21

**engaging** [1] - 181:25

**English** [1] - 6:9
**enjoy** [1] - 116:8
**enlarge** [2] - 94:2; 157:17
**enlarging** [2] - 66:7; 94:3
**enroll** [1] - 208:21
**ensure** [1] - 204:9
**enter** [2] - 126:4, 6
**entitled** [11] - 42:24; 57:2; 63:8; 79:14, 16, 21; 85:7; 132:17; 146:8; 190:9; 206:12
**entity** [1] - 108:12
**entry** [3] - 30:2, 13
**environment** [1] - 179:24
**Equal** [1] - 13:13
**equal** [1] - 31:17
**equation** [2] - 71:16; 214:9
**equipment** [2] - 38:6
**ERRATA** [2] - 223:1, 25
**error** [2] - 201:1, 3
**escalate** [3] - 34:5; 40:3; 102:20
**escalated** [2] - 40:9; 50:11
**especially** [2] - 83:12; 113:11
**ESQUIRE** [4] - 2:2, 6; 223:12
**essentially** [1] - 197:20
**established** [6] - 63:21; 64:7; 204:25; 211:7; 213:17; 218:8
**estimate** [1] - 39:13
**et** [3] - 4:9; 18:12; 19:9
**ethic** [1] - 141:5
**ethical** [1] - 63:9
**Ethics** [11] - 3:9; 4:10; 59:21; 60:22; 61:5, 7, 14, 22; 64:25; 72:13; 84:23
**ethics** [2] - 119:13; 177:9
**eval** [2] - 116:21
**evening** [3] - 20:3; 22:20; 195:20
**event** [1] - 223:5
**events** [1] - 7:21
**evidence** [7] - 54:5; 85:11; 136:4; 178:7; 192:18, 20
**ex** [1] - 160:20
**exact** [1] - 9:25
**exactly** [14] - 6:2; 11:7; 16:10; 28:15; 36:14, 20; 75:20; 80:15; 81:22; 163:21; 189:5; 193:15; 195:7; 201:24
**EXAMINATION** [2] - 2:19; 5:5
**examined** [1] - 5:3
**example** [7] - 81:24; 98:12; 163:6; 182:23; 212:24; 214:2

**except** [1] - 119:7
**EXCEPT** [1] - 223:15
**exception** [2] - 37:13, 20
**exceptions** [1] - 57:11
**exchange** [1] - 63:22
**excuse** [1] - 158:14
**excuses** [1] - 128:5
**exercise** [1] - 63:17
**exhaust** [4] - 154:1, 6; 155:18; 166:17
**exhibit** [9] - 59:5; 175:14; 191:5; 193:7; 198:16; 216:4, 13
**Exhibit** [54] - 48:16, 20; 56:7; 58:4, 7, 9-10, 21; 60:1, 3; 64:25; 65:2, 7, 12; 84:7; 85:17; 86:1, 18, 20; 87:16; 88:8; 90:10, 12; 91:15, 17; 93:24; 111:9; 125:4, 7; 161:3; 173:12, 14, 21; 174:20; 175:15, 17, 19; 186:25; 199:6, 20, 22; 200:18, 20-21; 201:14, 17; 203:22, 24
**EXHIBIT** [22] - 3:2, 4, 7, 9, 11-12, 15, 17, 19, 21-22, 24; 4:2, 6, 8, 12, 14, 16, 19, 21, 23
**exhibits** [4] - 131:4; 161:2; 191:9; 193:6
**exist** [1] - 139:18
**existence** [1] - 114:5
**existing** [1] - 101:11
**expect** [2] - 160:9; 171:15
**expectation** [1] - 39:19
**expensive** [1] - 83:15
**experiencing** [2] - 19:16; 22:7
**Expires** [1] - 222:12
**explain** [4] - 79:5; 166:22; 173:7; 216:21
**explained** [4] - 6:12; 34:24; 129:4; 130:1
**explaining** [2] - 81:20; 143:13
**explanation** [4] - 102:4; 111:4; 115:16; 129:1
**explanatory** [2] - 62:4; 71:22
**express** [1] - 115:11
**expressed** [1] - 23:23
**extended** [1] - 113:10
**extensive** [6] - 34:1; 37:1, 3, 5, 7; 85:1
**extent** [2] - 216:16; 218:20
**extenuating** [1] - 43:14
**FAA** [1] - 113:21
**faced** [4] - 9:1; 10:12; 11:5; 216:19

**facility** [2] - 158:10; 161:24
**fact** [7] - 7:24; 37:20; 151:9, 13; 167:10; 171:9; 213:8
**fact-finding** [1] - 37:20
**factor** [1] - 81:11
**facts** [2] - 131:21; 219:19
**fail** [1] - 180:7
**failed** [1] - 180:14
**failure** [8] - 209:17; 210:7, 13, 15, 20; 211:19; 212:3
**fair** [5] - 77:1; 86:12; 213:23; 215:2
**fairly** [1] - 138:20
**familiar** [21] - 54:1; 59:23; 60:23; 61:7, 14, 17; 64:13, 15; 75:17; 88:7, 10; 89:9; 94:9; 96:1, 21; 100:19; 111:11; 170:15; 180:15; 187:25; 188:15
**family** [56] - 13:10; 14:1; 16:8; 38:11, 15, 19; 40:20; 41:24; 42:2, 4, 7, 12, 16; 52:10; 57:8, 11; 63:5, 11, 15, 18; 76:23; 97:13; 101:14; 103:7, 15; 106:4, 21; 108:11, 17; 109:2; 110:4, 8, 13, 17; 112:2, 12, 16; 114:4; 122:6; 129:7; 133:14; 141:14; 158:13; 163:9; 206:9, 14; 207:10, 15, 20, 23; 208:4, 12, 19; 220:10
**Family** [12] - 3:5, 7; 57:2; 58:16; 78:6; 87:3; 111:23; 114:11, 19; 129:5; 136:6; 207:23
**far** [16] - 6:7; 7:12; 24:1; 27:8; 35:3; 85:4; 113:13; 132:2; 137:22; 141:3; 154:2; 156:24; 168:1, 5; 169:18; 192:23
**fare** [1] - 83:19
**fares** [1] - 63:23
**Farfan** [20] - 8:16, 20, 25; 9:12, 21, 23; 10:10, 14; 11:23; 12:2, 7, 9; 14:12; 119:8, 10; 206:5, 8, 16, 19; 207:2
**Farfan's** [3] - 10:1, 4, 7
**fast** [2] - 62:23; 100:10; 119:22
**fast-forward** [2] - 62:23; 100:10
**fast-forwarding** [1] - 119:22
**favors** [6] - 106:4; 129:6; 133:13; 141:13; 163:8,

11
**fear** [3] - 38:5, 7; 179:23
**February** [5] - 86:9, 12; 90:15, 22; 91:7
**FedEx** [2] - 160:13; 197:15
**fee** [58] - 33:6; 37:16, 21-22; 38:6, 9-10; 43:5; 51:8, 12; 52:12; 99:1, 7, 14; 101:18, 24; 102:18; 105:8, 10, 23; 106:11, 16, 19; 107:12, 15; 108:13, 20; 109:1, 19; 110:4, 8, 13, 22; 111:18; 118:18, 24; 141:16; 146:5; 205:21; 208:7, 11, 15; 210:9; 211:6, 8, 12, 14, 18; 212:14; 215:13, 18, 22
**feedback** [5] - 129:14, 21; 132:3, 21; 136:14
**feelings** [1] - 24:5
**fees** [15] - 76:9; 109:24; 110:15, 17; 112:2, 11, 16; 128:25; 133:15; 163:12; 207:5, 10, 14, 19
**felony** [1] - 28:16
**felt** [6] - 72:9; 121:5; 177:13; 185:2, 8
**few** [4] - 140:21; 167:9; 177:16; 183:12
**fight** [2] - 145:16
**figure** [2] - 168:11; 191:25
**figuring** [1] - 39:25
**file** [7] - 106:15; 108:3; 112:24; 125:3; 153:4; 203:13, 18
**filed** [15] - 5:10; 12:2; 13:13, 16, 22; 43:24; 44:5, 7, 9; 68:21; 175:6; 203:25; 204:4, 7
**filled** [3] - 169:19, 22
**final** [13] - 39:8; 123:13; 124:5, 14; 142:9; 147:7; 156:15; 172:9, 14, 25; 192:24; 196:22; 197:25
**Final** [1] - 184:6
**finally** [2] - 9:7; 83:16
**financial** [1] - 26:12
**financially** [1] - 221:10
**findings** [3] - 134:4; 135:11; 160:18
**fine** [28] - 17:25; 21:12; 53:3, 15; 61:10; 84:13, 16; 115:25; 126:23; 135:8; 139:8; 141:22; 142:8; 143:23; 146:11; 151:7; 162:19, 24; 166:3, 5; 169:13; 180:7,

13, 15; 182:8; 216:17
**fine-tooth** [1] - 162:19
**fine-toothed** [2] - 135:8; 146:11
**finish** [4] - 106:10; 107:25; 149:20; 169:9
**finished** [11] - 49:18; 56:14; 58:12; 63:1, 3; 67:2; 69:10; 73:5; 86:25; 176:8; 203:3
**fire** [6] - 9:8; 116:12; 123:8; 164:18; 177:4; 218:2
**fired** [26] - 17:16; 18:16, 22; 20:12; 116:23; 117:21; 140:16; 148:10, 12, 20, 22; 150:3, 6; 163:23; 165:5; 186:11, 18; 188:1; 195:15; 199:13; 200:24; 201:5, 11; 218:6
**fires** [1] - 51:19
**firing** [1] - 198:2
**First** [1] - 30:23
**first** [44] - 5:3; 18:13, 18, 20, 23; 20:10; 21:6; 44:20; 60:14; 65:15, 25; 78:21; 79:20; 92:23; 93:5; 100:23; 127:13; 128:9; 134:3, 15; 136:19, 21; 137:1; 144:12, 14, 16; 145:1, 4-5; 146:1; 155:19; 166:18; 177:1; 178:22; 185:17; 189:1, 3; 201:5; 202:17; 203:24; 213:11; 216:24
**firsthand** [1] - 219:15
**fit** [2] - 163:22; 164:1
**five** [8] - 14:24; 44:14; 47:12; 110:20; 114:1; 149:18; 196:2
**fix** [1] - 102:23
**flight** [29] - 28:8; 33:9; 38:8, 25; 39:2, 4-7; 42:20-22; 43:4, 12; 77:18; 80:11; 81:5, 9; 82:23; 98:13; 99:6; 167:16; 183:15; 210:17; 212:10, 12
**flights** [3] - 37:18; 81:15; 210:8
**FLORIDA** [3] - 1:1; 221:3; 222:2
**Florida** [9] - 2:4, 8; 24:11; 26:5; 128:13; 130:13; 222:5, 10
**Florin** [1] - 2:3
**fly** [1] - 161:24
**flying** [5] - 38:6; 40:20; 80:14; 144:24

**Flying** [4] - 40:23; 41:9, 13; 96:7
**focus** [2] - 63:10; 69:8
**folks** [2] - 98:17; 184:20
**follow** [9] - 4:4; 77:1; 83:23; 109:1; 127:10; 157:25; 163:2; 179:1; 197:16
**follow-up** [3] - 4:4; 127:10; 157:25
**followed** [5] - 43:21; 106:5; 126:5; 155:16
**following** [2] - 140:13; 165:2
**follows** [2] - 5:4; 223:11
**FOR** [2] - 1:1; 223:15
**forced** [2] - 123:18; 173:2
**FOREGOING** [1] - 223:15
**foregoing** [3] - 220:17; 221:6
**foreign** [1] - 83:14
**Foreign** [1] - 1:7
**forget** [2] - 53:18; 127:3
**forgot** [6] - 20:23; 22:11, 21, 25; 53:18
**forgotten** [1] - 219:22
**form** [12] - 6:22; 24:3; 48:9; 53:2; 54:25; 78:3; 114:14; 169:19; 212:15; 215:5; 218:14
**format** [1] - 5:12
**former** [3] - 6:18; 13:19, 25
**forward** [16] - 49:9; 62:23; 100:10; 128:16; 129:23; 130:8, 23; 134:25; 136:7; 142:4; 146:25; 152:21; 157:14; 162:5, 9, 16
**Forwarded** [1] - 4:9
**forwarded** [1] - 175:21
**forwarding** [1] - 119:22
**four** [8] - 29:9; 39:8; 130:12; 149:18; 160:5; 183:19, 25; 196:2
**FP** [1] - 54:4
**FP176711** [1] - 54:1
**Francisco** [7] - 78:11, 22; 81:18; 97:24; 98:13, 24; 99:11
**Frank** [3] - 8:18; 54:4
**frank** [1] - 175:25
**fraudulent** [2] - 110:6
**free** [6] - 5:22; 39:5; 52:13; 58:23; 147:3; 158:17
**frequency** [1] - 41:7
**frequently** [5] - 19:22; 20:1; 21:22; 22:19; 41:4
**Friday** [1] - 128:8
**Fridays** [1] - 170:20

**friend's** [5] - 101:14; 106:18; 107:16
**friendly** [1] - 171:12
**friends** [13] - 8:4; 12:12; 57:7, 11; 63:5, 11, 15, 18; 76:23; 129:7; 133:14; 141:13; 163:8
**Friends** [12] - 3:5, 7; 57:2; 58:16; 78:6; 87:3; 111:23; 114:11, 18; 129:4; 136:6; 207:24
**front** [2] - 60:14; 161:1
**Frontline** [4] - 3:13; 85:8; 86:4, 14
**frqfl1@gmail.com** [1] - 200:12
**fulfill** [1] - 103:3
**full** [13] - 47:14, 17; 79:16; 83:19; 123:2, 12; 129:15; 134:5; 138:1; 162:7; 214:12
**full-fare** [1] - 83:19
**fully** [4] - 5:20; 96:1; 139:25; 140:15
**function** [1] - 215:15
**functions** [1] - 32:23
**funeral** [14] - 38:10; 102:2; 105:1, 11; 106:18; 107:16; 108:2, 14; 109:2; 111:19; 138:17
**furnish** [1] - 223:11
**FURTHER** [1] - 221:8
**GAASHT** [1] - 25:13
**Garrison** [2] - 176:13, 15
**gate** [2] - 43:11; 80:10
**gather** [1] - 135:10
**general** [5] - 55:13; 67:13; 89:8, 19
**generally** [1] - 109:22
**generates** [2] - 113:17
**GG198588** [1] - 222:12
**giant** [1] - 138:5
**gift** [1] - 144:13
**girlfriend** [1] - 101:9
**given** [12] - 7:12; 33:15; 39:16; 144:21; 145:12; 184:1; 190:12; 191:14; 192:24; 193:9, 15
**Gloria** [1] - 183:4
**gmail.com** [1] - 176:1
**goal** [1] - 39:20
**God** [3] - 179:12; 180:23
**goodwill** [4] - 156:2, 7; 162:4; 165:24
**Gorman** [1] - 127:17
**grab** [1] - 17:23
**graduate** [4] - 28:24; 29:10; 30:7, 14
**graduated** [1] - 30:11
**Gray** [1] - 2:3

**great** [1] - 7:14
**greatly** [1] - 94:8
**grief** [2] - 52:9; 159:10
**Griffith** [4] - 29:22, 24; 30:12, 14
**ground** [1] - 39:25
**guarantee** [2] - 165:4; 179:22
**guess** [2] - 88:2; 211:20
**guessing** [1] - 183:7
**guidance** [1] - 132:23
**guided** [1] - 83:5
**Guidelines** [18] - 3:11, 21; 64:14; 65:1, 11; 72:17; 84:24; 88:25; 89:4, 14; 91:24; 92:6, 9; 95:25; 96:5; 104:20; 141:12
**guidelines** [15] - 52:6; 65:16, 18; 72:19, 24; 75:19; 91:14; 92:4, 12; 96:9, 21; 108:25; 143:10; 163:7; 165:2
**guilty** [1] - 146:4
**gun** [7] - 121:2; 124:6; 164:10; 166:19; 171:16; 185:2; 194:1
**gunpoint** [1] - 197:12
**guts** [1] - 182:5
**guys** [1] - 135:19
**GWuthrich@fgbolaw. com** [1] - 223:13
**half** [24] - 66:16; 69:14; 70:6; 73:8, 11, 14, 17, 20; 74:3, 6, 9, 12, 17, 22, 24; 75:3, 6, 9, 13, 23; 88:24; 89:6; 118:13; 144:15
**HALLIDAY** [2] - 221:13; 222:10
**Halliday** [5] - 1:19; 221:5; 222:4; 223:4; 224:3
**Ham** [1] - 203:5
**HAMBURG** [69] - 126:21, 24; 127:6; 132:16; 133:22; 134:1, 9; 136:11, 18; 137:7, 11, 17, 25; 139:24; 140:20; 141:11, 21; 142:2, 10, 14, 18; 143:10, 23; 144:2; 146:17; 147:8, 10, 14, 20, 25; 148:2, 15, 23; 150:10, 12, 25; 151:7, 16, 18; 156:1, 16, 20; 157:6, 18, 24; 158:24; 159:2; 160:21; 161:16; 162:1, 24; 164:4, 23, 25; 165:19; 166:5; 167:2, 13, 18; 168:4, 18, 22; 169:10, 13, 21; 170:3, 6, 23; 171:3

**Hamburg** [95] - 3:23, 25; 4:4, 7, 10, 13; 10:16; 20:12; 46:23, 25; 47:22; 54:12; 68:14; 78:2; 100:11; 102:3; 103:20, 23; 105:19, 22; 106:11; 109:10, 18; 110:22; 111:14, 25; 112:14, 25; 113:1; 115:10, 18; 116:18; 117:5, 19; 118:8, 17, 22; 119:1, 6, 11, 24; 123:1, 11, 19-20; 124:22; 140:12; 171:8, 18; 172:1; 173:24; 174:8; 175:5; 177:2, 13; 178:4; 179:1; 180:4; 183:6; 184:24; 185:20; 188:19; 189:4, 12; 191:1; 192:18; 193:17, 20; 194:4; 197:11; 198:1; 202:11, 15, 19, 25; 203:6, 9, 12, 16; 204:14; 205:1, 3, 13, 21; 207:2, 5, 9, 14, 19; 216:23; 220:8

**Hamburg's** [2] - 179:16; 189:6

**hand** [4] - 72:3; 82:7; 91:20; 222:7

**handbook** [6] - 54:23; 55:1, 18; 69:9; 70:3; 84:7

**handbooks** [2] - 54:24; 84:23

**handle** [4] - 41:24; 52:4; 99:20; 191:14

**handled** [1] - 114:1

**handling** [1] - 109:22

**hang** [2] - 156:18, 20

**happy** [3] - 39:20, 24; 182:10

**harassed** [2] - 68:3; 103:24

**harassing** [1] - 68:1

**harassment** [20] - 66:23; 68:22, 24; 69:24; 70:15; 72:10; 103:23; 118:2; 123:6; 124:14; 171:24; 177:5, 12; 182:24; 185:19, 21; 186:13; 204:16; 217:8, 15

**hard** [4] - 19:13; 113:19; 138:24; 161:6

**HARRIS** [63] - 2:6; 5:6; 17:22, 25; 18:5; 44:12, 24; 45:2, 4; 48:10; 49:3, 8, 16; 56:8; 58:8; 60:4, 7, 13; 64:18, 22; 65:4; 74:21; 84:2, 8, 11, 13, 16, 19; 85:20, 24; 86:22; 87:21, 25; 104:7;

114:15; 122:13, 15; 125:3, 10, 17, 25; 126:16; 143:2, 6; 174:15; 175:14; 187:2; 198:16, 22, 25; 202:3, 6; 204:3; 209:4; 210:1; 216:6, 10, 13; 217:19; 220:1, 6, 15; 223:12

**Harris** [49] - 5:8; 18:8; 44:17; 45:7; 48:15; 49:17; 56:6, 11; 58:3, 11; 60:2, 9; 65:6, 10; 84:21; 85:16, 25; 86:19, 24; 87:15; 88:3; 90:11; 91:16; 93:23; 104:12; 111:8; 125:6; 171:5; 173:13; 174:19; 175:18, 20; 186:24; 187:4; 199:3, 5, 21; 200:19; 201:16; 202:9; 203:21; 209:8; 210:6; 216:18; 218:13, 16, 23; 219:6; 220:7

**HARRIS............** [1] - 2:19

**hate** [4] - 132:5; 156:5; 165:25

**HAVE** [1] - 223:14

**head** [6] - 6:4; 121:2; 124:7; 171:17; 185:2; 194:1

**heading** [1] - 98:12

**headset** [3] - 93:8; 117:5, 24

**hear** [13] - 48:24; 49:10; 52:11; 84:5; 125:11, 15; 127:13; 131:21; 135:17; 202:12; 203:10

**heard** [9] - 39:17; 104:25; 116:10; 183:11; 184:25; 189:11; 202:14; 203:7; 214:6

**hearing** [48] - 66:19; 113:6; 130:24; 131:12; 132:20; 133:10; 134:2, 17; 135:13, 15-16, 20; 149:10-13; 150:13, 16-17, 22; 153:3, 21; 154:3, 17, 20, 24; 155:1, 6-7; 160:9, 14, 16, 20; 161:9, 24; 162:17; 168:13; 188:3; 190:19; 193:13; 196:5, 7; 197:24; 213:4

**hears** [1] - 135:16

**heart** [7] - 16:14, 17-18; 17:2; 22:23; 121:5

**held** [8] - 154:23; 158:3; 159:23; 187:9, 15-16, 18; 197:11

**hello** [1] - 126:12

**Hello** [1] - 178:23

**help** [2] - 159:7; 213:1

**helpful** [3] - 154:9; 155:16; 210:3

**Helpline** [6] - 61:5, 8, 14, 22; 62:15; 72:14

**HEREBY** [2] - 221:6; 223:15

**hereby** [1] - 222:5

**herein** [2] - 5:2; 222:5

**hereto** [1] - 173:14

**hereto** [20] - 48:16; 56:7; 58:4; 60:3; 65:7; 85:17; 86:20; 87:16; 90:12; 93:24; 111:9; 125:7; 174:20; 175:19; 186:25; 199:6, 22; 200:20; 201:17; 203:22

**herself** [1] - 134:24

**Hi** [2] - 126:21; 217:1

**hide** [3] - 42:25; 105:17; 113:24

**hiding** [2] - 116:7; 217:4

**high** [10] - 20:22; 21:1, 7, 9, 14; 22:7; 23:13, 15; 28:22; 29:5

**higher** [2] - 37:19; 40:12

**highlighted** [3] - 90:18; 96:23; 97:10

**HILLSBOROUGH** [2] - 221:4; 222:3

**himself** [1] - 215:14

**hire** [3] - 31:19; 46:5; 138:2

**hired** [2] - 31:1, 8

**hires** [1] - 165:4

**history** [5] - 53:10; 107:4, 9; 129:9; 133:12

**hold** [18] - 29:21; 78:2, 7; 80:21; 82:9; 97:7; 125:5; 130:25; 134:25; 135:5; 148:24; 149:1; 155:18; 157:11; 174:18; 188:17; 209:25

**Holding** [3] - 77:5; 96:25

**holding** [8] - 21:18; 77:15, 21, 23, 25; 78:19; 94:4; 171:16

**home** [12] - 24:21; 27:20-23; 28:1; 35:24; 45:24; 168:20; 192:12

**homes** [1] - 207:17

**honest** [1] - 128:5

**hope** [4] - 48:13; 144:13, 22; 145:3

**hopefully** [1] - 147:22

**hoping** [3] - 6:21; 127:12; 148:18

**horse** [1] - 144:13

**hotline** [1] - 119:14

**hour** [8] - 7:5; 14:19; 164:21; 171:19; 182:10;

193:15; 210:23

**hours** [37] - 39:8; 47:12, 19-20, 24-25; 48:2, 4, 12; 102:22; 121:7; 122:5; 124:18; 130:12; 131:11; 139:11; 149:11; 150:20; 159:6; 160:16; 161:5; 183:13, 19, 25; 184:22; 192:2; 193:16; 195:11, 21; 196:2; 204:21

**house** [2] - 45:2; 143:7

**Houston** [6] - 78:11; 81:16, 18; 116:3; 161:23

**Houston/Houston** [1] - 78:22

**HR** [8] - 118:20; 127:15; 142:21; 157:7; 158:17; 159:19; 176:21

**hu** [3] - 6:2; 151:16, 19

**hu-huh** [2] - 151:16, 19

**hu-huhs** [1] - 6:2

**huhs** [3] - 5:25; 6:2

**Human** [7] - 118:20; 127:16; 131:8; 135:9; 143:15; 146:23; 188:12

**hundred** [1] - 83:13

**hundreds** [13] - 33:21; 39:10, 14; 41:5; 54:21; 88:20; 90:1; 109:25; 110:14, 16; 212:18, 21

**husband** [10] - 12:17; 24:13; 25:14; 27:17, 19; 28:3; 42:20; 43:3; 97:5; 208:20

**husband's** [1] - 12:20

**hypothetical** [2] - 145:22

**I-A-J** [1] - 15:24

**IAM** [1] - 158:18

**ICKEICZ** [1] - 29:18

**ID** [2] - 126:6; 222:11

**idea** [1] - 198:5

**identifiable** [1] - 53:11

**identified** [3] - 51:23; 176:14; 200:11

**identify** [5] - 52:16; 67:25; 71:5, 18; 176:19

**ignoring** [1] - 64:6

**illness** [1] - 15:15

**IM** [5] - 120:14; 147:15; 181:22, 25; 203:1

**imagine** [1] - 133:9

**immediate** [14] - 97:13; 103:7, 15; 108:17; 109:2; 110:17; 206:9, 14; 207:10, 14, 20, 23; 208:19

**immediately** [11] - 22:24; 51:8; 52:15; 122:24; 136:8; 137:19; 140:1, 7; 158:6; 183:14

**impact** [2] - 24:6; 143:24
**implications** [1] - 137:23
**importance** [1] - 5:16
**important** [23] - 5:18; 6:3; 28:7; 40:4; 62:19; 76:8; 81:5; 83:12; 93:2; 137:4; 182:1; 214:9, 14-15, 17; 217:24
**impressed** [1] - 24:25
**impression** [1] - 123:25
**improperly** [1] - 63:24
**improve** [1] - 116:22
**IMs** [1] - 202:25
**IN** [3] - 1:1; 223:2; 224:1
**in-house** [2] - 45:2; 143:7
**in-person** [1] - 120:3
**inabilities** [1] - 51:14
**inability** [2] - 23:9; 215:4
**inaccurate** [1] - 210:13
**inappropriate** [2] - 63:24; 89:12
**inaudible** [2] - 84:4; 104:5
**INC** [1] - 1:6
**Inc** [2] - 223:2; 224:1
**incident** [4] - 106:8; 118:18; 133:3
**include** [2] - 207:1; 220:9
**included** [1] - 51:24
**includes** [1] - 158:9
**including** [5] - 76:2, 9; 83:19; 120:21; 126:9
**income** [1] - 48:1
**incorrect** [5] - 54:6; 83:11; 90:7, 9; 214:17
**indicate** [3] - 72:4; 110:23; 223:6
**indicate** [2] - 82:7; 91:20
**indicated** [11] - 23:13, 18; 67:19; 72:23; 90:5; 104:24; 106:14; 107:12; 192:6; 212:25; 223:9
**indicates** [5] - 91:6; 174:3; 187:8; 189:13; 201:1
**indicating** [4] - 85:10; 86:3; 87:6; 96:17
**indication** [1] - 3:20
**indiscernible** [3] - 49:4; 144:1; 147:13
**Indiscernible** [1] - 158:22
**individual** [1] - 69:18
**individuals** [3] - 71:5; 205:1; 219:14
**inevitably** [1] - 156:13
**information** [33] - 55:5; 71:4; 76:12; 85:12; 90:6, 8; 92:9; 95:5; 96:17; 105:17; 111:13; 115:12; 118:23; 131:6; 138:18; 149:7, 19; 150:14, 19; 157:4; 160:7; 162:15;

185:24; 197:16; 205:16, 23; 211:25; 216:14; 217:20; 219:19
**informed** [1] - 132:22
**ingested** [1] - 15:12
**ingrain** [2] - 98:5; 99:19
**initial** [10] - 118:14; 128:20; 129:14, 19, 21; 132:3, 21; 134:4; 136:14; 157:25
**insomnia** [6] - 17:17; 18:12, 19; 19:8; 23:5
**install** [2] - 179:7; 180:21
**installed** [1] - 178:16
**Instant** [3] - 181:14, 16, 20
**instead** [10] - 37:2; 65:12; 98:24; 99:11; 151:17; 206:2; 211:20; 212:2; 214:11
**instills** [1] - 179:23
**instructions** [1] - 7:12
**INSTRUCTIONS** [1] - 223:5
**interactive** [1] - 55:1
**interest** [2] - 165:22; 214:24
**interested** [3] - 162:18; 172:13; 221:10
**interject** [5] - 6:22; 139:24; 144:3, 7; 152:24
**internal** [1] - 176:18
**internally** [1] - 177:12
**international** [18] - 32:1, 15-16, 19-21, 24; 33:1-4, 7-8; 35:17; 37:23; 83:13; 209:12
**interpretation** [1] - 96:25; 97:11, 17, 20; 98:5, 21; 99:3, 19
**Interrogatories** [1] - 187:24
**Interrogatory** [1] - 28:13
**interrupt** [1] - 213:19
**interrupted** [1] - 46:18
**intimidated** [1] - 179:11
**intranet** [3] - 55:25; 59:17, 19
**introduce** [3] - 86:2, 18; 87:17
**inventory** [5] - 63:25; 78:19; 79:20; 81:3; 97:2
**investigate** [1] - 71:3
**investigated** [3] - 87:3; 140:15; 163:17
**investigating** [2] - 134:14, 16
**investigation** [31] - 57:17; 68:4; 120:21; 121:15; 129:16, 24; 132:10; 134:5; 138:2; 144:19;

149:9, 20, 22, 24-25; 158:4, 11; 166:9; 168:9; 174:5, 9; 185:25; 186:6, 10; 189:14, 18, 21, 23
**Investigative** [23] - 4:6, 12; 130:25; 132:8; 135:4; 140:22, 25; 142:3; 149:3, 6; 152:9; 160:2; 162:5, 9; 174:12, 23; 186:16; 187:8, 13, 22; 188:9; 198:20
**investigative** [1] - 130:24
**involved** [3] - 41:19; 129:21; 189:20
**IRM** [19] - 130:8, 24; 131:11; 135:4; 144:24; 155:3; 188:8, 18; 190:1, 11; 192:10, 14, 17, 21; 194:15; 196:21; 197:5, 23
**isolated** [1] - 207:17
**issuance** [1] - 63:21
**issue** [9] - 40:11; 42:4; 69:19; 104:22; 211:5; 213:2, 7, 16
**issued** [8] - 77:13; 82:2; 88:9; 101:3, 8; 207:19; 211:16; 216:2
**issues** [2] - 18:14; 19:15
**item** [1] - 177:23
**itself** [2] - 155:2; 193:23
**ITSELF** [1] - 223:8
**Jackson** [1] - 2:7
**job** [21] - 9:5; 10:7; 17:20; 31:4, 7, 10, 24; 32:24; 35:11; 46:7; 49:23; 51:20, 25; 76:24; 116:6; 138:25; 164:22; 196:25; 197:3; 207:16; 217:6
**Job** [3] - 3:3; 50:1, 8
**jobs** [1] - 127:19
**John** [2] - 150:2, 6
**join** [1] - 128:11
**joining** [1] - 126:9
**José** [2] - 8:16; 206:5
**journals** [1] - 7:20
**judge** [1] - 135:21
**judgment** [10] - 32:5, 7; 33:5, 24; 34:9; 37:13, 24; 38:16; 40:1; 109:7
**Judi** [2] - 182:4; 183:1
**July** [19] - 87:2, 8; 116:25; 118:2; 119:2, 5, 9, 22; 120:12; 127:14; 128:3; 157:21; 175:4; 179:19; 181:18; 183:12; 184:16; 189:11; 202:10
**jump** [3] - 164:9; 166:19
**June** [23] - 1:16; 4:4; 100:11, 23; 111:15, 25; 112:15; 115:10, 17;

116:20, 25; 118:8, 11, 14, 22; 119:4, 9; 127:11; 128:21; 158:1; 189:4; 223:3; 224:2
**jury** [1] - 28:11
**justifiable** [3] - 43:15; 102:17; 109:8
**justified** [2] - 33:24; 34:15
**K-Y-R-A-K-O-P-O-U-L-O-S** [1] - 188:20
**K]** [2] - 16:2
**Karpier** [1] - 143:3
**Karpierz** [3] - 2:14; 143:5
**KARPIERZ** [1] - 143:5
**keep** [5] - 64:23; 70:17; 84:3; 153:14; 168:25
**Keep** [1] - 71:3
**keeping** [1] - 39:25
**Kempner** [1] - 159:18
**key** [1] - 30:3
**kids** [2] - 97:5; 208:20
**kind** [11] - 15:8, 12; 88:4; 92:22; 125:13, 20, 23; 128:1; 131:2; 154:5; 160:6
**knowing** [2] - 142:4; 170:16
**knowledge** [4] - 36:4; 45:23; 219:15; 220:11
**known** [2] - 133:7, 23
**knows** [2] - 131:17; 132:23
**Kyrakopoulos** [1] - 188:19
**land** [1] - 99:12
**landing** [1] - 99:11
**language** [1] - 6:9
**Large** [1] - 222:5
**last** [21] - 8:17; 14:16; 15:24; 17:11; 21:3; 23:7, 10; 50:16; 55:9; 75:12; 88:22; 89:3; 104:8; 143:4; 144:15; 155:5; 173:5; 175:14; 182:10; 210:1
**late** [1] - 33:10
**Laurie** [6] - 127:23; 158:18; 159:19; 188:7, 11
**law** [3] - 207:22; 208:1, 24
**lawsuit** [9] - 5:10; 11:1; 12:3; 43:24; 44:4; 203:14
**lawyer** [30] - 13:18; 138:2, 8, 19; 139:17; 140:10, 24; 143:22; 146:10; 148:6; 150:24; 151:3, 5, 7-8; 153:12, 16, 19, 22-24; 154:4, 13; 155:18
**lawyers** [2] - 138:7; 164:2
**lead** [3] - 129:22; 130:3;

Case 8:20-cv-02292-CEH-SPF    Document 25-1    Filed 02/18/22    Page 72 of 84 PageID 308

149:25
leads [2] - 152:25; 153:1
learn [1] - 162:20
learned [3] - 105:22; 106:7
learning [1] - 30:2
least [3] - 39:13; 61:1; 70:14
leave [10] - 68:18; 89:5, 12-13; 130:6; 132:17; 139:4; 142:17; 153:2; 209:4
leaves [1] - 53:10
leaving [4] - 98:11; 127:21; 128:4
LeDonne [5] - 127:23; 158:18; 159:19; 188:7, 11
legal [5] - 136:25; 151:20; 154:2; 155:15; 217:18
Leisure [6] - 3:19; 45:12; 89:24; 90:5, 16, 21
length [2] - 14:18; 27:9
lengthy [4] - 44:14; 65:12; 75:17; 160:7
less [1] - 14:24
letter [38] - 4:15, 18-19, 21; 69:3; 121:21; 122:1, 23; 128:25; 157:13; 159:22; 160:13; 161:1; 162:13; 171:21; 172:4, 18; 173:22, 24; 174:3; 183:21, 23; 184:3, 13; 186:12; 189:2; 199:7, 12, 15; 200:4, 23; 201:5, 8, 10, 13
Letter [1] - 4:4
letters [2] - 102:22; 179:20
level [4] - 34:18; 35:2; 40:6
Level [7] - 153:3, 15, 20; 154:3, 17, 19, 24
Lewis [1] - 2:7
life [4] - 17:19; 116:8; 150:5; 171:15
life-change [1] - 171:15
lifetime [1] - 137:16
light [1] - 100:13
Lima [4] - 12:24; 21:20; 24:10
limbo [1] - 128:4
limited [1] - 39:1
Line [3] - 104:9; 209:6; 210:4
line [11] - 113:22; 115:23; 117:25; 136:21; 159:20; 163:1; 177:9; 185:20; 204:17; 223:6
lingo [1] - 78:8
link [5] - 91:18, 22; 92:4,

12; 96:6
linked [21] - 48:16; 56:7; 58:4; 60:3; 65:7; 85:17; 86:20; 87:16; 90:12; 93:24; 111:9; 125:7; 173:14; 174:20; 175:19; 186:25; 199:6, 22; 200:20; 201:17; 203:22
Lisinopril [1] - 21:17
list [12] - 79:4; 80:10; 81:15-17; 82:23; 96:13; 176:17; 177:16; 180:4; 188:19
LISTED [1] - 223:15
listed [5] - 11:21; 13:25; 50:10; 117:4; 189:8
listen [1] - 145:2
listened [6] - 171:7; 172:7, 21, 24; 173:25; 184:23
listens [1] - 135:21
listing [13] - 78:4, 12, 16; 79:2, 6-7; 81:9; 83:1, 5; 96:12
listings [3] - 78:13; 79:1; 103:22
live [4] - 9:12; 24:12; 25:21; 26:4
lived [1] - 24:16
lives [1] - 25:22
LLC [1] - 2:3
located [3] - 31:12; 36:17; 45:21
LOCATION [1] - 1:18
location [2] - 5:3; 71:5
locations [2] - 1:18; 62:15
log [3] - 92:23; 94:19; 142:19
logged [2] - 92:21; 93:14; 94:20
logic [1] - 71:16
login [2] - 76:14; 93:15
lonely [1] - 207:16
look [27] - 6:2; 17:13; 26:7, 10, 20; 27:1; 48:22; 60:10; 62:13; 63:4; 88:10; 94:9; 95:7, 17, 22; 111:11; 136:15; 137:13; 143:21; 144:13; 145:14; 150:20; 155:24; 157:3; 195:5; 204:1; 209:25
looked [2] - 113:15; 191:10
looking [11] - 49:14; 54:11; 58:12, 14; 60:16; 149:7; 155:12; 157:1; 159:9; 162:13; 216:5
looks [3] - 49:25; 60:23; 88:7
lose [4] - 178:14, 17;

179:7; 183:15
losing [4] - 18:4; 79:3; 177:20; 178:9
lost [8] - 17:19; 94:4; 144:24; 145:25; 159:11; 209:2
lowest [1] - 40:6
loyal [2] - 139:13; 165:5
loyalty [2] - 139:1; 141:7, 9; 164:14
Lufthansa [1] - 214:11
lunch [3] - 7:4; 84:10, 22
Lutz [1] - 2:4
ma'am [119] - 6:20; 7:10; 10:2; 11:17; 13:5, 20; 18:10; 19:17; 21:5; 23:3, 25; 28:15, 25; 29:4, 11; 32:13, 19; 33:16; 35:22; 41:17, 25; 45:18; 46:1; 49:19, 25; 52:18; 54:14; 56:13; 57:24; 58:6, 18; 59:2, 11, 15; 60:17; 62:4, 6, 17, 22; 63:13; 65:22; 67:5; 68:6, 12; 69:1, 7, 21; 70:4; 72:7, 11; 74:8; 75:2; 85:19; 86:6; 87:8, 12; 89:4, 21; 90:24; 91:2; 93:17; 100:8; 104:15; 105:1; 111:16, 20; 113:3, 7; 114:21; 115:7, 21; 116:17; 118:1, 16; 119:3; 120:13; 122:14; 123:4; 126:19; 137:16; 141:10, 20; 171:10, 23; 174:2, 10, 17, 25; 176:9; 177:10; 180:2, 6; 181:10, 19; 184:19; 185:12; 186:18; 187:1, 7; 188:10, 23; 189:5, 16; 190:17; 194:22; 197:22; 199:8; 200:1, 13, 16, 22; 201:10, 18; 204:5, 8; 206:4; 210:11; 215:10; 218:11
maiden [1] - 13:2
mail [58] - 4:9; 11:8, 13; 40:14; 62:7; 68:21; 69:1; 111:7; 119:19; 137:5; 140:5; 157:20; 162:12; 166:7; 169:1; 175:9, 23-24; 176:10, 20, 25; 177:1, 8, 24; 178:1, 7, 16, 19, 22; 179:18, 25; 180:3, 12, 21, 23, 25; 181:4, 7-8; 182:19; 183:11; 184:20; 185:9; 199:25; 200:2, 6, 8, 10-11, 25; 218:12
mailbox [1] - 55:24
mailing [2] - 62:11; 69:3

mails [5] - 4:9, 17; 92:24; 177:11
main [2] - 51:13, 20
maintain [1] - 76:11
MAKE [1] - 223:8
malfunction [4] - 50:21; 210:16; 212:20
manage [3] - 76:13, 23, 25
management [1] - 10:22
manager [11] - 11:9; 53:11; 64:9; 106:1; 113:22; 127:14; 131:15-17; 158:17; 188:2
managers [5] - 77:11; 112:7, 21; 176:17, 22
Managing [1] - 2:12
managing [1] - 76:19
mandated [1] - 48:3
mandatory [1] - 48:5
manipulate [1] - 83:4
Manor [1] - 167:23
manuals [1] - 55:18
March [4] - 211:2, 16; 215:24; 216:2
mark [2] - 198:20; 203:23
marked [1] - 48:20
MARKS [1] - 223:8
married [1] - 25:14
Mary [6] - 2:11; 12:23; 29:18; 44:23; 143:6
matter [10] - 4:23; 7:22; 114:1; 164:25; 165:7; 167:1, 10; 219:1, 11
mean [15] - 17:21; 33:1; 71:20; 76:1; 116:5; 125:18; 129:16; 139:2; 154:17; 169:17; 171:6; 188:8; 192:15; 193:22
meaning [7] - 17:19; 33:10; 35:23; 78:16; 83:3; 173:1; 182:2
means [8] - 33:3; 67:15; 69:5; 97:12; 98:7; 129:25; 158:8; 183:22
meant [5] - 116:5; 124:12; 179:2; 180:12; 181:6
meantime [3] - 158:16; 166:10; 202:24
measures [1] - 113:11
mediator [1] - 152:11
medical [4] - 18:25; 23:21; 26:18
medication [21] - 19:14, 23-24; 20:11, 18, 20, 22-23; 21:2, 7, 10, 18; 22:2, 5, 9, 12, 14, 16, 21, 25; 23:14
medications [2] - 15:5; 22:8

**meet** [18] - 121:23; 124:9; 128:7, 10; 130:20; 137:12; 142:10, 22; 146:19, 25; 148:3, 23, 25; 165:19; 166:6

**meeting** [69] - 4:4; 40:7; 100:11, 15, 23; 111:3, 14; 115:9, 17, 19; 118:5, 8, 11, 14; 119:1, 4-5, 23; 120:1, 3, 7, 12; 127:9; 128:19; 130:22; 131:11; 136:12, 21; 137:7; 146:24; 148:24; 149:17; 151:14; 153:5; 155:3, 5, 8; 157:25; 160:3; 169:4; 170:7, 24; 174:9; 175:5; 186:20; 189:3, 11, 15; 190:1, 11-13, 20, 24; 191:2, 23; 192:14, 17; 194:15; 196:18; 217:12

**Meeting** [22] - 4:6, 12; 130:25; 132:8; 135:4; 140:22; 141:1; 142:4; 149:3, 6; 152:9; 160:2; 162:5, 10; 174:12, 23; 186:16; 187:9, 14, 22; 188:10; 198:21

**member** [25] - 38:11, 15, 19; 42:7; 52:10; 101:14; 103:7, 15; 106:21; 108:17; 109:2; 110:4, 9, 13, 17; 112:16; 207:10, 15, 20, 23; 208:4, 12

**members** [21] - 13:10; 42:2, 5, 13, 16; 57:11; 63:5, 11, 15, 18; 76:24; 106:4; 108:11; 112:2, 12; 181:15, 22; 206:9, 14; 208:20; 220:10

**mental** [1] - 9:11

**mention** [9] - 6:8; 22:21; 42:6; 50:15; 77:25; 83:9; 96:10; 214:8

**mentioned** [18] - 18:14; 25:18; 36:25; 45:15; 54:16; 85:1; 91:13; 102:6, 10; 106:1; 110:14; 141:4, 8; 181:14; 200:14; 201:7; 206:5

**mentions** [1] - 174:8

**menu** [1] - 126:10

**merged** [2] - 31:17; 45:16

**merger** [18] - 31:23; 32:11; 35:4, 12, 16, 20; 36:1, 3, 5, 12, 21; 45:19; 46:2, 8, 12-13, 15, 21

**Message** [2] - 181:16, 20

**message** [3] - 68:18; 139:4; 175:21

**messaging** [1] - 157:7

**messed** [1] - 198:17

**Messenger** [1] - 181:14

**met** [5] - 127:10; 188:17; 190:4; 195:7, 20

**Mickiewicz** [2] - 29:15, 18

**microphone** [1] - 121:1

**MIDDLE** [1] - 1:1

**middle** [3] - 39:25; 76:17; 82:14

**middleman** [1] - 128:18

**might** [5] - 57:15; 97:19; 120:23; 161:11; 168:12

**Miguel** [21] - 6:22; 48:24; 49:3, 10; 56:8; 60:4; 64:18; 84:2; 85:20; 86:22; 87:21; 125:18; 174:15; 176:3; 187:2; 198:23; 202:4; 204:4; 220:2

**MIGUEL** [2] - 2:2; 223:12

**miguel@fgbolaw.com** [2] - 2:2; 223:13

**Mike** [1] - 159:18

**mileage** [6] - 77:6; 101:22; 102:13; 103:2; 105:2; 111:17

**MileagePlus** [11] - 53:21, 23; 54:4, 10, 13; 57:7; 101:4, 20-21; 104:13; 128:23

**miles** [16] - 34:9; 77:17; 101:1, 3, 5, 7, 19, 23; 104:14, 21, 24; 105:3, 6, 11; 128:23; 141:15

**million** [2] - 163:5, 18

**mind** [5] - 71:3; 81:19; 147:3; 165:11; 168:25

**mine** [1] - 25:1

**minute** [14] - 18:1; 44:14; 48:21; 60:10; 94:14; 121:20; 122:22; 123:17; 176:2; 182:15; 184:17; 204:1

**minutes** [12] - 84:12; 92:25; 118:3; 124:1; 169:16; 183:12; 192:3; 193:16; 197:13; 204:19; 217:9; 218:5

**misdemeanor** [1] - 28:17

**mispronounce** [2] - 16:7; 143:4

**missed** [1] - 33:10

**misstated** [1] - 92:20

**misstating** [1] - 72:25

**misuse** [1] - 83:17

**Misuse** [1] - 75:25

**misused** [1] - 83:22

**mixing** [1] - 53:1

**module** [1] - 3:19

**Module** [1] - 90:22

**modules** [1] - 88:17

**moment** [4] - 18:6; 115:18; 184:8

**momentarily** [3] - 21:13; 53:5, 16

**Monday** [2] - 160:9; 187:9

**Mondays** [1] - 170:19

**monetary** [2] - 28:5, 10

**money** [14] - 50:25; 51:10; 77:17; 79:17, 21; 83:6; 99:17; 102:14; 103:2; 138:22; 178:17; 179:8; 181:3; 214:19

**MONICA** [2] - 2:6; 223:12

**Monica** [4] - 5:7; 17:23; 44:23; 74:19

**monica.harris@ jacksonlewis.com** [2] - 2:7; 223:13

**Monique** [8] - 4:21; 10:21; 11:10, 15, 23; 68:20; 119:16; 185:12

**monitored** [1] - 113:12

**month** [3] - 165:1; 168:12; 186:11

**morning** [7] - 5:7; 15:13; 20:3-5; 22:18; 147:15

**Morris** [19] - 4:21; 10:21; 11:10, 15, 23; 68:19; 119:16; 185:12, 14, 17-18, 23-24; 186:2, 5, 9, 12; 201:8

**most** [11] - 28:7; 62:15; 82:10; 99:13; 193:1, 17; 214:9, 14-15, 17; 217:24

**mostly** [1] - 38:12

**mother** [5] - 101:9, 14; 106:19; 107:16

**motion** [1] - 143:19

**mouth** [3] - 21:23; 144:13; 165:14

**move** [15] - 29:1; 120:20; 129:23; 130:8, 23; 134:25; 142:3; 146:25; 152:21; 157:13; 162:9, 16; 168:17

**moves** [3] - 21:13; 53:5, 16

**moving** [2] - 128:16; 162:4

**MR** [74] - 17:23; 24:3; 44:23; 45:1, 3; 48:9; 49:2, 7, 12; 56:21; 60:6, 12; 64:21; 65:3; 74:19, 23; 84:6, 9, 12, 14, 18; 85:23; 86:23; 87:24; 88:1; 114:14; 122:9; 125:23; 132:15; 144:7, 11; 145:7, 11, 21; 146:14; 147:19, 23; 152:24; 153:11; 154:7, 11, 22; 155:2, 20;

156:22; 158:22; 159:1; 161:14; 167:21; 169:8, 11, 17, 25; 170:4, 10, 18, 22; 171:2; 198:19, 24; 199:2; 202:5; 209:22; 216:4, 8, 12, 16; 217:17, 22; 218:14, 20; 219:4; 220:4, 16

**MS** [204] - 2:19; 5:6; 17:22, 25; 18:5; 44:12, 24; 45:2, 4; 48:10; 49:3, 8, 16; 56:8; 58:8; 60:4, 7, 13; 64:18, 22; 65:4; 74:21; 84:2, 8, 11, 13, 16, 19; 85:20, 24; 86:22; 87:21, 25; 104:7; 114:15; 122:13, 15; 125:3, 10, 17, 25; 126:12, 16, 21, 23-24; 127:5; 132:16; 133:21-23; 134:1, 8-9; 136:10, 16, 18-19; 137:7, 10-11, 15, 17, 21, 25; 138:1; 139:24; 140:9, 20; 141:9, 11, 18, 21-22; 142:2, 8, 10, 13-15, 18; 143:2, 5-6, 10, 21, 23; 144:1, 6, 10; 145:6, 10, 18, 22; 146:16; 147:6, 8-10, 12, 14, 20, 25; 148:1-3, 15-16, 23; 150:8, 10-12, 23, 25; 151:5, 7, 14, 16-18; 152:23; 153:10; 154:1, 8, 16, 25; 155:11, 23; 156:1, 14, 16, 19-21; 157:1, 6, 16, 18, 23-24; 158:24; 159:2; 160:19, 21; 161:16, 25; 162:1, 18, 24; 163:21; 164:4, 15, 23-25; 165:8, 19; 166:2, 5, 25; 167:2, 10, 13, 16, 18; 168:4, 14, 18, 20, 22; 169:10, 13, 21; 170:3, 6, 9, 14, 21, 23; 171:1, 3; 174:15; 175:14; 187:2; 198:16, 22, 25; 202:3, 6; 204:3; 209:4; 210:1; 216:6, 10, 13; 217:19; 220:1, 6, 15

**multiple** [11] - 9:20; 77:3; 78:14; 117:1; 172:8, 12; 193:19, 21; 194:4, 7

**Multiple** [1] - 77:2

**Munos** [1] - 4:9

**Munoz** [2] - 175:8, 10; 176:14

**must** [2] - 63:19; 64:8

**mute** [1] - 44:15

**MY** [2] - 223:15

**mysterious** [1] - 202:23

**name** [42] - 5:7; 8:17; 12:20, 25; 13:2; 15:24; 16:7, 15; 17:4, 6; 20:7, 19-20; 21:9; 22:11, 25; 25:25; 26:19, 25; 29:14; 32:16; 45:9; 68:2; 70:18; 71:8, 12-13, 15, 22; 72:18; 80:9; 90:17; 100:17; 143:4; 157:21; 158:23; 173:5; 187:25; 188:15

**named** [1] - 25:19
**names** [4] - 11:16; 90:1; 148:5; 187:24
**narcotic** [1] - 15:8
**narrow** [2] - 42:17; 55:7
**necessarily** [1] - 182:24
**necessary)** [1] - 176:7
**need** [22] - 5:22; 6:15; 7:1, 6; 18:1, 5; 49:8; 65:8, 14; 76:13; 77:1; 87:23; 93:13; 137:12, 18; 152:18; 159:7, 14, 24; 160:15; 169:15
**needed** [2] - 144:4; 223:10
**needs** [3] - 168:24; 223:6
**negative** [1] - 216:25
**nervous** [2] - 20:24; 53:1
**never** [48] - 38:8; 43:20; 70:17; 71:10; 77:12; 83:22; 103:22; 105:16; 106:4; 112:6; 113:5, 9, 23; 117:22; 119:7, 13, 16, 19; 120:22; 121:3; 122:8; 123:24; 124:7, 18; 134:12; 136:20; 139:11; 141:3; 157:3; 167:21; 171:8; 177:8, 11, 19-20; 180:14; 184:21; 185:3; 188:17; 190:12; 191:13; 193:15; 195:17, 25; 218:9
**nevertheless** [1] - 67:22
**new** [10] - 31:2; 55:4, 11-12; 82:1, 3-4; 165:4; 182:9; 200:4
**newspaper** [1] - 14:8
**Next** [1] - 91:23
**next** [19] - 39:5; 42:22; 43:4; 44:13; 62:18, 24; 64:1, 3; 69:9; 93:20; 119:1; 123:18; 158:16; 160:1, 4, 9; 167:9; 171:13; 175:16
**nicely** [1] - 217:2
**night** [2] - 23:7, 10
**night's** [1] - 23:7
**NO** [23] - 1:5; 3:2, 4, 7, 9, 11-12, 15, 17, 19, 21-22, 24; 4:2, 6, 8, 12,

14, 16, 19, 21, 23
**no-show** [2] - 81:11
**nobody** [3] - 138:25; 139:1; 140:18
**non** [2] - 96:12; 109:2
**non-immediate** [1] - 109:2
**non-revenue** [1] - 96:12
**none** [1] - 105:25
**NOO** [1] - 16:1
**noon** [2] - 81:15; 147:21
**normal** [1] - 167:14
**normally** [2] - 101:13; 144:16
**NOT** [1] - 223:8
**Notary** [4] - 1:20; 222:4, 10
**note** [3] - 62:18; 197:6; 210:14
**note-taker** [1] - 197:6
**noted** [1] - 108:2
**notes** [5] - 7:20; 58:8; 161:17, 19; 191:22
**nothing** [5] - 6:23; 95:11; 139:22; 164:13; 215:4
**Notice** [1] - 1:14
**notice** [2] - 135:6; 174:13
**notification** [4] - 174:11, 24; 175:1; 186:16
**Notification** [3] - 4:6, 12; 198:21
**notified** [1] - 55:14
**notify** [1] - 160:13
**notifying** [1] - 160:13
**November** [3] - 8:19; 21:21; 47:1
**number** [31] - 9:25; 10:11; 24:23; 25:1, 3; 39:1; 52:20; 53:23; 54:4, 13; 57:7; 60:14; 62:9; 64:21; 68:17; 82:24; 147:4; 157:22; 158:18, 25; 176:1; 177:16; 178:5; 180:1; 181:14; 201:22; 210:23; 223:6
**numbers** [5] - 61:5; 72:8, 12; 87:18; 198:17
**nursing** [5] - 27:20-23, 25
**o'clock** [15] - 84:14; 123:21; 130:10, 12, 14-15; 134:23; 147:1, 3, 24; 166:23; 171:19; 172:1; 183:18
**O'Neil** [3] - 2:11; 44:23
**O'Neil's** [1] - 2:13
**Oakland** [3] - 98:1, 25; 99:12
**oath** [4] - 5:3, 11; 6:13
**OATH** [1] - 222:1
**OATH** ................................. . [1] - 2:21
**obituary** [2] - 107:23;

108:1
**object** [7] - 24:3; 48:9; 114:14; 125:23; 217:17; 218:14, 20
**objection** [2] - 6:22; 125:19
**obligated** [2] - 103:3; 198:3
**obligation** [1] - 42:8
**obligations** [1] - 103:5
**observer** [1] - 161:15
**obtained** [3] - 91:8; 101:5; 219:10
**obviously** [2] - 131:17; 146:11
**October** [2] - 4:22; 201:11
**octopus** [1] - 202:1
**Odessa** [1] - 24:11
**OF** [17] - 1:1, 12; 2:20; 221:1, 3-4; 222:1-3; 223:1, 3, 14-16, 25; 224:2
**offense** [2] - 162:22; 180:8
**offensive** [2] - 69:9; 70:8
**offer** [25] - 120:18; 121:5; 122:5, 19, 23; 123:2, 23; 124:5, 21-22; 125:1; 144:11; 156:8; 172:2, 13; 189:13; 192:25; 193:11, 14, 18; 194:5; 196:3; 197:13; 203:12, 17
**offered** [9] - 68:10; 118:2; 144:16; 145:1, 5; 147:2; 191:24; 192:4; 204:20
**offering** [2] - 145:15; 162:3
**office** [16] - 36:2, 4-7, 9, 13-14, 16; 127:18; 131:15; 147:17; 150:17; 159:19; 197:24
**officer** [1] - 131:13; 133:10; 134:18; 135:16, 20; 149:13; 150:16; 161:9; 188:3
**Official** [1] - 4:10
**official** [2] - 68:21; 222:7
**often** [1] - 144:14
**old** [14] - 9:5; 25:19; 26:2; 28:3; 116:6; 183:3, 6, 8; 188:5, 13; 206:22; 217:6
**older** [1] - 182:5
**ON** [1] - 223:8
**onboard** [1] - 39:3
**once** [32] - 22:20; 34:14; 42:7; 73:25; 103:1, 12; 104:23; 129:24; 132:7, 18; 134:5, 25; 135:15; 140:25; 141:3; 142:20; 143:18; 146:7; 150:13,

25; 151:2; 153:8, 12, 16, 22; 154:13; 158:15; 160:12; 177:3; 192:25; 215:11
**One** [7] - 14:20; 21:23; 30:6; 53:14; 54:7; 67:17; 184:17
**one** [79] - 8:12; 9:18; 10:18; 14:13, 20; 16:25; 22:21; 25:2; 31:22; 34:3; 40:19; 41:9; 43:24; 50:18; 52:1, 4; 59:7; 64:19; 65:3; 75:12; 77:24; 78:1-3, 12; 79:7; 80:25; 81:9, 15; 82:3; 85:9; 88:1, 22; 91:12; 95:6, 19; 103:24; 107:6, 8; 109:6, 15; 112:5, 9; 115:1; 116:20; 120:7; 123:17; 129:11; 136:5; 138:22; 140:14; 144:7; 145:4; 152:8, 24; 155:24; 156:18, 20; 169:21; 177:25; 178:3; 179:22; 186:11; 193:7; 199:23; 200:14; 216:20; 218:4, 15; 220:1, 6
**one-off** [2] - 129:11; 136:5
**OnePass** [4] - 3:5, 7; 57:2; 58:16
**online** [17] - 54:25; 72:5; 91:4; 120:16; 211:1, 9-12; 212:14, 22; 215:14, 21, 23; 217:1
**opened** [1] - 180:25
**opening** [1] - 101:4
**opinion** [3] - 68:5; 133:9
**opportunity** [10] - 5:20; 60:18, 21; 124:1, 4; 130:7; 173:19; 176:2; 194:16
**Opportunity** [5] - 13:14; 29:22, 24; 30:12, 15
**option** [25] - 70:2; 121:22; 128:20; 130:1, 3; 137:2; 143:20; 144:19, 21; 145:12; 153:12; 160:22; 162:8; 171:22; 172:5; 183:20; 184:14; 192:3; 197:12; 202:20, 22; 204:19; 218:4
**options** [9] - 137:6, 13, 22; 140:12, 18; 155:18; 156:4; 166:17
**OR** [2] - 223:19; 224:4
**order** [3] - 89:15; 93:20; 208:3
**origin** [9] - 78:9; 97:22; 98:4, 15, 22; 99:16; 100:5; 115:2

original [7] - 4:9; 31:19; 186:22; 192:4; 193:16; 200:4; 201:2
originally [1] - 172:5
Orlando [2] - 97:25; 98:12
Oscar [6] - 4:9; 162:20; 175:7; 176:14
otherwise [3] - 43:1; 97:2; 106:20
out-of-service [1] - 183:21
outlined [1] - 176:25
outrageous [1] - 165:10
outside [5] - 36:15; 38:14; 57:12; 108:10
overcharge [1] - 50:22
overspeaking [1] - 218:13
overspeaking) [1] - 143:25
overview [3] - 50:1, 8; 87:10
Owens [1] - 2:3
own [19] - 24:19; 51:5, 16; 76:13; 80:20; 83:15; 95:17; 108:12; 140:25; 143:24; 151:12; 153:24; 165:13; 196:9; 197:16; 211:24; 213:25

**P.C** [1] - 2:7
package [12] - 118:3; 120:18-20; 121:19; 122:21; 123:9; 124:15; 193:2; 217:9, 25
page [17] - 3:19; 60:14; 62:24; 63:2, 7; 64:1, 3; 65:25; 74:20; 75:2, 12; 76:6; 146:1; 183:10; 203:24; 223:6
**PAGE** [5] - 2:18; 3:1; 4:1; 223:1, 25
**Page** [5] - 61:4; 76:7; 104:9; 209:6; 210:4
**PAGE/LINE** [2] - 223:19; 224:4
pages [10] - 60:19; 65:14, 23; 74:15; 95:7; 190:5; 195:8, 10; 221:7; 223:11
paid [11] - 48:7; 142:16; 155:21; 158:5, 7; 166:15; 167:15, 25; 168:16, 21
panicked [1] - 180:9
paper [5] - 6:5; 53:17; 59:5; 111:11; 176:6
paperwork [5] - 137:19; 140:8; 142:12, 22-24; 143:15; 146:23; 169:9
paragraph [20] - 62:13; 63:4, 10, 14; 67:6; 71:2, 7, 11, 14; 72:5; 75:25; 76:7, 20; 89:10; 91:22, 24; 95:23; 183:11; 184:16

**Paralegal** [1] - 2:15
parallel [1] - 143:7
paralyzed [2] - 173:9; 194:13
**Pardon** [1] - 198:24
parents [1] - 208:21
parking [1] - 158:10
part [19] - 10:22; 28:7; 32:23; 47:14-16; 74:5, 8; 76:24; 97:10; 98:20; 131:18; 140:9; 141:4; 165:24; 214:9, 14-15, 17
**Part** [8] - 3:13, 16-17; 44:21; 45:8; 85:7; 87:7, 20
participant [1] - 126:10
participants [3] - 1:18; 96:4; 126:8
particular [11] - 35:23; 38:25; 46:15; 51:2; 63:2; 81:20; 91:4; 94:25; 106:8, 16; 209:11
particularly [1] - 115:13
parties [2] - 98:11; 221:9
**Parties** [1] - 223:11
partners [1] - 31:17
party [1] - 44:4
**Pass** [22] - 3:19, 21; 45:12; 72:19; 75:19; 82:15; 88:25; 89:4, 11, 14, 24; 90:5, 16, 21; 91:24; 92:5, 9; 95:24; 96:1, 6; 97:4; 104:20
pass [42] - 40:24; 41:1, 8, 13, 15; 42:2, 5; 43:8, 10; 75:25; 76:1, 8, 10, 12-13, 22; 77:13; 79:23; 82:16; 83:10, 17, 22, 24; 91:14; 95:4-6, 20; 97:4, 7, 12; 98:11; 103:8; 114:4, 19; 130:18; 191:17; 208:17, 19
passed [1] - 101:9
passenger [27] - 33:12; 42:9, 24; 43:14, 16; 50:22, 25; 51:9, 14; 93:5; 98:7, 23; 102:15, 18, 21; 103:12; 104:1; 138:15; 141:19; 155:13; 181:1, 23-24; 206:1
passengers [4] - 34:5; 42:21; 51:15; 146:9
passes [6] - 82:12; 87:3; 89:21; 97:6; 158:14; 208:19
passion [1] - 197:10
password [1] - 93:15
past [2] - 171:19; 172:1
**Pat** [1] - 167:23
patience [1] - 6:9
**PATRICIA** [2] - 221:13;

222:10
**Patricia** [5] - 1:19; 221:5; 222:4; 223:4; 224:3
**Patsy** [5] - 5:17; 6:11; 58:8; 64:24; 104:8; 125:12; 175:14; 198:17; 210:2
pattern [7] - 129:22; 145:24; 148:5, 7-8; 163:14
**Paul** [1] - 54:4
pause [32] - 45:6; 56:20; 58:13; 59:1; 61:11; 62:25; 66:14, 17; 67:3; 69:12, 15; 70:10; 71:1; 73:6, 9, 12, 15, 18, 21; 74:4, 7, 10, 13, 18, 25; 75:4, 7, 10, 14; 126:16; 143:2; 176:5
pause) [1] - 85:22
paused) [2] - 126:15; 143:1
pay [12] - 43:4; 46:11; 77:17; 135:5; 144:18; 152:6; 153:2; 154:23; 167:6; 212:16; 215:5
paycheck [3] - 83:7; 179:22; 181:2
paying [2] - 103:2; 146:7
payment [3] - 48:11; 212:15; 215:5
payroll [2] - 82:21; 167:23
pays [1] - 138:4
pen [1] - 147:5
penalties [1] - 133:15
penalty [1] - 6:15
**PENALTY** [1] - 223:14
pending [4] - 154:23, 25; 158:3; 174:4
pension [5] - 130:5; 132:13; 136:9; 177:20; 178:10
**Pension** [1] - 132:16
people [30] - 11:20-22; 12:16; 51:5, 21; 63:18; 71:24; 77:12; 81:11; 138:10; 144:23; 145:11; 150:1; 151:9; 156:5; 159:10; 161:20; 165:4; 176:19, 23; 178:20; 179:15; 180:4; 187:23; 188:17; 189:8; 219:13
per [7] - 47:17; 48:6; 140:22; 155:21; 210:9, 23; 211:7
perceived [1] - 9:1
percentage [1] - 178:10
perception [2] - 185:1, 7
perfect [5] - 6:6; 91:8; 124:17; 139:9; 170:6
performance [4] - 116:22;

117:10; 133:3; 181:6
performed [1] - 50:9
period [6] - 47:21; 50:17, 19; 119:14, 19; 189:24
periodic [1] - 7:3
periodically [1] - 93:18
**PERJURY** [1] - 223:14
perjury [1] - 6:15
perks [1] - 132:11
permission [2] - 38:17, 20
permit [1] - 5:19
permitted [2] - 40:19; 158:8
person [29] - 5:15; 52:11; 67:25; 68:1, 3; 70:18; 71:4, 8-9, 13, 18; 116:24; 120:3; 131:20; 134:13; 152:12; 158:19; 159:20; 160:23; 161:22; 163:24; 164:18, 21; 171:15; 187:19; 191:22; 192:13; 210:10; 211:7
personal [7] - 63:19; 71:21; 200:10; 213:9; 214:5; 215:8, 12
personally [1] - 222:5
persons [1] - 175:10
perspective [1] - 43:6
pertain [1] - 10:23
pertaining [1] - 82:9
pertains [3] - 81:7; 82:10
pet [2] - 38:25; 39:3
**Peter** [2] - 12:22; 21:21
pets [1] - 39:1
**Phillips** [2] - 176:13, 15
phone [3] - 9:10, 14, 18; 10:1; 17:6; 24:23; 25:1; 62:9; 72:8; 93:8, 12; 113:22; 115:23; 116:14; 117:14; 123:17; 137:5; 147:5; 161:8; 177:8, 11; 184:16; 185:6, 10; 186:2, 5; 202:18; 204:17; 205:4
phones [1] - 127:8
phonetic [1] - 167:23
phrase [1] - 85:2
**Physical** [1] - 27:24
physical [1] - 36:14
physically [2] - 45:21; 195:24
physician [3] - 15:18; 16:9, 11
picked [1] - 47:25
piece [2] - 33:1; 53:17
pieces [1] - 40:14
pill [1] - 22:22
**Place** [2] - 24:11, 17
place [5] - 25:7; 122:20; 173:4; 221:6; 223:9
placed [3] - 142:16;

Case 8:20-cv-02292-CEH-SPF    Document 25-1    Filed 02/18/22    Page 76 of 84 PageID 312

17

174:4; 177:8
**Plaintiff** [2] - 1:4; 2:5
**plane** [2] - 43:11; 78:17
**planning** [1] - 21:25
**plaque** [3] - 22:9, 17
**PLAQUE** [1] - 22:10
**platform** [1] - 50:18
**platforms** [1] - 212:19
**play** [3] - 125:5, 21, 25
**played** [1] - 126:2
**Playing** [1] - 171:4
**pleased** [1] - 145:14
**PM** [21] - 1:17; 47:12; 81:18; 92:17, 19; 116:2; 121:17; 122:22; 123:25; 124:8, 13; 171:21; 172:6, 10, 16-17, 19-20; 183:24
**PM)** [5] - 84:20; 122:11; 202:8; 220:5, 17
**PNR** [3] - 205:25; 206:2; 210:9
**PNRs** [1] - 220:9
**point** [52] - 6:21; 7:6; 29:3; 31:22; 43:20; 45:16; 46:23; 52:2; 55:16; 57:15; 72:4; 77:20; 78:9; 80:25; 87:1; 94:10; 97:22; 98:3, 15, 22; 99:16; 100:4; 102:3; 103:20; 107:19; 112:8; 114:25; 115:2; 117:19; 119:4; 121:6; 130:3; 132:1, 9; 136:3; 137:24; 142:8; 153:11, 18, 23; 171:22; 173:6; 175:4, 9; 186:15; 187:13; 196:18; 201:7; 203:10
**Pointe** [1] - 2:3
**points** [4] - 50:2; 78:1; 95:19
**Poland** [11] - 25:8; 28:23; 29:6-8, 14, 20; 213:2; 215:7, 15
**Policies** [4] - 89:12; 91:24; 92:5; 96:1
**policies** [7] - 54:20, 22-23; 55:2; 59:14, 16; 87:10
**policy** [61] - 3:5, 9; 44:21; 55:4, 8-12, 18; 56:3; 57:1, 4, 19, 22; 58:20; 59:4, 10, 22; 60:17, 22; 66:20; 70:8; 72:17; 73:24; 74:1; 75:17; 79:17, 22; 81:20; 82:1, 4; 83:24; 95:3, 7, 18; 103:8; 108:24; 109:1; 110:24; 114:5, 11, 16, 19, 22; 115:1; 129:3; 141:17; 152:15, 18;

164:17; 207:23; 208:9, 23
**Policy** [9] - 3:5, 8; 4:10; 57:3; 58:17; 111:23; 129:5; 136:6; 207:24
**Polish** [7] - 12:21; 208:12; 211:22; 213:12, 16; 214:12
**pop** [4] - 90:21; 93:19; 94:17; 95:16
**pop-out** [1] - 90:21
**popped** [1] - 94:20
**portion** [5] - 44:13; 76:17; 82:14; 96:23; 175:23
**posed** [3] - 7:7; 173:18; 195:25
**position** [9] - 32:17; 45:1; 103:19; 139:12; 144:15; 176:16; 193:11, 13
**positions** [1] - 176:22
**positive** [9] - 77:7, 9, 11, 13, 24; 82:9; 94:5; 97:1, 8
**positive-space** [3] - 94:5; 97:1, 8
**possess** [1] - 30:17
**possibility** [1] - 140:15
**possible** [4] - 40:7; 99:14; 113:8; 148:16
**possibly** [5] - 132:1; 148:4, 12; 183:7; 206:24
**pound** [3] - 126:5, 7, 11
**power** [2] - 32:4; 108:22
**prefer** [1] - 161:21
**preferential** [1] - 63:20
**preliminarily** [1] - 134:19
**preliminary** [2] - 129:15; 149:23
**premises** [1] - 82:3
**preparation** [1] - 7:17
**prepare** [2] - 7:15; 190:11
**prerecorded** [1] - 93:10
**prescribe** [2] - 20:16; 21:4
**prescribed** [10] - 19:14, 18; 20:11, 14, 19; 21:6; 22:3, 6, 12, 16
**prescription** [1] - 20:8
**presence** [1] - 158:1
**present** [21] - 5:2; 131:23; 134:3, 17; 135:20; 139:16; 142:22, 24; 143:16; 150:18; 152:11; 160:15; 161:3; 187:21; 188:7; 189:1, 3; 192:18, 20; 193:6
**PRESENT** [1] - 2:11
**presented** [20] - 99:4; 123:1; 131:22, 24; 134:9; 140:11; 149:9; 160:17, 25; 161:21; 162:2; 163:7; 172:6;

190:14; 192:13; 193:7; 197:18
**presenting** [1] - 150:21
**presents** [1] - 131:3
**preserved** [1] - 31:19
**presiding** [1] - 190:25
**press** [1] - 126:10
**pressure** [9] - 20:22; 21:2, 7, 9, 14; 22:7, 23; 23:14
**presume** [4] - 54:18; 57:22; 59:3, 9
**pretty** [6] - 65:12; 75:16; 90:25; 125:19; 133:6; 144:25; 168:17; 169:19
**prevent** [1] - 38:22
**prevents** [1] - 22:9
**previous** [13] - 10:19; 38:2; 59:4; 74:20; 78:6; 91:12; 112:20; 138:10; 203:6; 209:16; 211:17
**previously** [20] - 12:5; 45:15, 20; 48:20; 54:16; 58:21; 72:21; 84:25; 91:13; 92:16; 96:24; 105:3; 106:24; 112:16; 115:13, 15, 21; 200:15; 201:7; 211:21
**price** [4] - 37:19; 138:22; 214:13; 215:3
**pricing** [1] - 63:21
**primary** [1] - 16:9
**print** [4] - 65:3, 25; 87:22; 88:1
**printed** [2] - 49:5; 176:3
**priorities** [1] - 64:6
**private** [1] - 71:10
**privilege** [1] - 79:15
**privileged** [3] - 205:23; 218:21; 220:11
**privileges** [17] - 40:20, 24-25; 41:1, 8, 13, 15; 42:5; 76:1, 3; 83:18, 22, 25; 103:9; 114:5; 158:10
**problem** [14] - 34:5; 37:16; 51:17, 20; 61:21; 64:17; 71:5; 122:13; 127:16; 139:3; 141:20; 156:19; 213:11
**problem-solving** [1] - 51:20
**problems** [2] - 34:4; 76:2
**procedure** [4] - 93:4; 95:3, 7, 18
**proceed** [2] - 68:3; 146:11
**proceeding** [2] - 136:25; 151:20
**proceedings** [1] - 121:13; 151:8; 221:6
**process** [7] - 51:17; 120:21; 121:15; 162:9; 197:25; 210:18; 211:23

**processed** [1] - 208:14
**produce** [1] - 218:25
**produced** [3] - 7:22; 199:24; 218:17
**Production** [1] - 219:2
**Professional** [2] - 1:20; 221:14
**Profit** [1] - 1:7
**profusely** [1] - 197:9
**Program** [1] - 159:4
**program** [7] - 30:4; 82:24; 83:2, 5; 87:10
**progress** [1] - 217:3
**progressive** [1] - 179:24
**promise** [1] - 220:2
**promised** [1] - 177:4
**promoted** [3] - 31:1; 34:2; 101:5
**promoting** [1] - 179:24
**promotional** [1] - 101:7
**prompted** [2] - 96:4, 8
**prompts** [1] - 93:18
**pronounce** [2] - 19:19; 25:12
**propeller** [1] - 38:8
**proper** [1] - 209:13
**properly** [1] - 40:16
**property** [2] - 24:19; 158:9
**protected** [1] - 103:2
**Protection** [1] - 66:23
**provide** [13] - 26:8, 10, 12; 42:12; 50:11; 62:20; 71:13; 115:12; 138:17; 163:8; 192:7; 194:24
**provided** [16] - 10:2; 11:16; 16:15; 17:5; 28:14; 70:22; 102:4; 111:13; 150:13; 176:5; 177:11; 187:23; 195:5; 201:8; 216:7; 219:8
**provides** [2] - 70:14, 20
**providing** [3] - 63:17, 20; 138:18
**Przemyslaw** [1] - 12:22
**psychiatrist** [3] - 15:19; 16:11; 19:1
**psychologist** [1] - 15:19
**Public** [3] - 1:20; 222:4, 10
**published** [2] - 215:2, 7
**pull** [2] - 95:20; 191:18
**pulled** [1] - 114:3
**punishable** [1] - 164:7
**punished** [1] - 138:11
**punishment** [9] - 138:9; 148:14, 19; 162:22; 163:21; 164:1; 165:9
**purchase** [11] - 79:13; 101:2; 102:14; 105:3; 213:5, 9, 22; 214:23;

215:9, 18, 24
**purchased** [12] - 42:7, 19; 43:3; 78:3; 101:1; 103:1; 104:13, 16, 23, 25; 215:16
**purchases** [2] - 103:16; 216:5
**purchasing** [2] - 104:19; 215:2
**purposes** [2] - 60:5; 125:21
**purse** [1] - 21:11
**Pursuant** [1] - 1:14
**push** [1] - 121:10
**pushed** [1] - 165:12
**pushing** [2] - 124:11; 138:20
**put** [19] - 22:22; 39:9; 50:25; 93:8; 96:13; 121:2; 143:18; 144:12, 20; 153:2; 167:2; 169:15; 170:19; 171:21; 182:5; 193:25; 210:25; 211:24; 214:12
**putting** [3] - 51:19; 79:3; 80:9
**queen** [1] - 176:1
**questioned** [4] - 110:20; 141:9
**questions** [16] - 5:9, 20; 6:7; 7:11; 56:15; 73:4, 25; 92:3; 94:13; 133:20; 159:3; 166:13; 169:2; 173:19; 216:8; 220:15
**queue** [3] - 34:16; 107:18; 113:14
**quick** [5] - 44:12, 14; 125:5; 170:10; 202:3
**quickly** [8] - 53:2; 54:16; 61:9; 65:5; 93:22; 143:3; 168:17; 202:10
**quote** [2] - 148:4; 178:12
**raising** [1] - 43:25
**ran** [1] - 192:21
**random** [3] - 9:9; 105:24; 216:9
**randomly** [2] - 82:16; 115:23
**rank** [1] - 11:1
**Ratcliff** [2] - 100:18; 188:24
**rate** [3] - 46:11; 99:1, 14
**rather** [2] - 179:23; 187:5
**rationale** [1] - 122:7
**RE** [2] - 223:2; 224:1
**re** [2] - 43:2; 93:4
**re-accommodate** [1] - 93:4
**re-accommodated** [1] - 43:2
**reach** [7] - 159:12, 14; 166:13; 169:3; 175:7;

197:13
**reached** [3] - 19:7; 127:14; 159:5
**READ** [1] - 223:14
**read** [33] - 55:18, 20-22; 56:3; 57:3, 23; 59:9; 61:9, 15; 63:14; 71:14; 73:24; 74:1; 76:20; 88:6; 89:9; 92:24; 93:1; 94:1, 6, 8; 104:7, 9; 156:23; 180:10, 25; 181:1; 197:6; 209:6; 210:4; 220:16
**reading** [9] - 56:22; 63:1; 66:3; 67:2, 4-5; 69:10; 73:5; 86:25
**reads** [1] - 91:24
**real** [3] - 72:24; 125:5; 170:10
**realize** [2] - 111:22; 120:25; 138:6
**realized** [2] - 177:3; 181:4
**really** [12] - 6:23; 64:20; 89:17; 129:20; 140:4; 143:2; 151:24; 153:5; 155:8, 17; 202:10
**reason** [21] - 23:4; 35:13; 39:16; 43:1; 64:7; 70:18; 105:19; 136:12; 153:8; 156:1, 11; 163:16; 172:3, 19; 208:16; 210:6; 211:13; 212:6; 213:14; 214:6
**reasoning** [1] - 135:20
**reasons** [1] - 33:12
**receive** [5] - 29:12; 30:9; 37:2, 5; 64:8
**received** [12] - 37:1, 7, 9; 48:11; 54:20; 55:19; 85:1; 117:1; 161:6; 178:25; 217:14
**receiving** [2] - 174:11; 175:1
**Recess** [3] - 84:20; 202:8; 220:5
**recess** [1] - 44:16
**recognize** [7] - 94:14; 126:17; 173:22; 199:9, 23-24; 200:23
**recollection** [19] - 41:18, 22; 57:3; 67:14; 72:24; 75:18; 88:14, 16; 91:3; 92:8; 119:10; 190:2; 193:20, 22, 24-25; 194:3; 197:7; 203:11
**recommend** [4] - 49:13; 133:24; 156:22; 217:11
**recommendation** [2] - 154:7; 198:4
**recommended** [6] - 19:2; 136:2; 191:3, 11; 198:1;

217:12
**record** [7] - 6:23; 118:11; 125:21; 206:1; 209:20; 221:7
**RECORD** [1] - 223:16
**recorded** [8] - 116:14-16; 120:1; 136:20, 24; 139:20; 171:4
**Recorded** [6] - 3:25; 126:2, 15, 20; 143:1, 9
**recording** [13] - 6:1; 113:17; 125:19; 172:7, 11, 22, 25; 173:6, 25; 174:8; 184:23; 194:11
**records** [2] - 7:21; 133:4
**red** [1] - 170:5
**redacted** [1] - 195:8
**redeposit** [21] - 37:21; 101:18; 105:8, 11, 23; 106:11, 16; 107:11, 15; 108:13; 110:22; 111:18; 118:18, 24; 128:23, 25; 141:16; 163:13; 207:14; 208:7
**redeposited** [3] - 101:19, 21; 111:18
**redeposits** [1] - 133:16
**reference** [2] - 179:18
**referenced** [3] - 110:16; 173:25; 175:6
**referencing** [1] - 180:1
**referred** [2] - 89:4; 93:2
**referring** [12] - 6:18; 28:13; 55:8; 99:12; 122:17; 177:25; 178:3, 18; 193:4; 201:15; 205:10
**refers** [2] - 32:23; 99:21
**reflect** [1] - 6:4
**reflected** [1] - 210:9
**refund** [6] - 50:13, 25; 79:16; 83:2
**refundability** [1] - 79:21
**refunded** [1] - 105:5
**refunding** [2] - 33:4; 63:22
**regarding** [13] - 4:4, 17; 34:1; 37:7; 41:23; 83:24; 95:3; 177:18; 179:19; 181:5; 201:8; 212:21
**regardless** [1] - 10:25
**regards** [3] - 4:10; 11:7; 109:21
**regret** [1] - 117:18
**regular** [8] - 17:14; 101:13; 108:9, 19-20; 130:19; 161:18; 191:17
**regulations** [3] - 43:21; 106:3, 5
**reimburse** [1] - 105:5
**reimbursed** [1] - 105:2

**reimbursement** [1] - 83:19
**reject** [1] - 193:14
**rejected** [1] - 171:9
**related** [3] - 15:2; 44:1; 213:3
**relation** [1] - 5:9
**relationships** [1] - 63:19
**relative** [4] - 218:18; 219:23; 221:8
**relatives** [3] - 8:4; 12:13; 13:6
**release** [3] - 18:24; 203:13, 17
**relieved** [1] - 144:18
**relying** [1] - 216:6
**remain** [1] - 62:19
**remember** [53] - 9:14; 11:18; 13:15; 16:19; 17:5; 18:23; 19:6, 10; 20:10, 13, 20, 25; 41:7; 42:3; 45:8; 46:11, 13, 22; 53:23; 59:21; 60:25; 65:19; 66:19; 68:11; 76:8; 90:2; 100:14, 16, 20; 104:2; 105:10; 106:17; 119:12; 120:13; 121:3, 23; 123:7, 15; 159:3; 163:1; 185:8, 14, 16-17; 186:17; 187:21, 23; 189:15; 201:9; 209:8; 212:1; 218:11
**remind** [2] - 6:5
**remote** [15] - 1:18; 5:2; 10:9; 35:15, 21; 36:7, 11, 13; 45:22; 46:4; 47:5; 51:4; 160:23
**REMOTE** [1] - 2:1
**remotely** [1] - 45:24
**remotes** [2] - 113:11; 179:12
**removed** [1] - 212:4
**rentals** [1] - 116:23
**renting** [1] - 24:19
**rep** [10] - 11:10; 44:25; 100:16, 24; 119:25; 120:17; 128:13; 137:8; 143:8; 150:15
**Rep** [1] - 205:13
**repeatedly** [3] - 157:12; 184:9; 204:17
**report** [15] - 67:8, 11, 15, 19, 22; 68:7, 24; 69:6; 70:14, 21; 72:1; 117:15, 20, 22; 207:2
**REPORTED** [2] - 223:4; 224:3
**reported** [8] - 205:13, 20; 207:4, 9, 13, 18; 220:8; 221:6
**reporter** [3] - 14:10; 44:15; 161:18

**REPORTER** [6] - 48:24; 49:10; 125:15; 209:2, 25; 221:1
**Reporter** [3] - 1:20; 221:5, 14
**reporter)** [3] - 104:10; 209:7; 210:5
**REPORTER.......................
.......** [1] - 2:20
**reporters** [1] - 14:4
**Reporting** [2] - 69:9; 70:7
**reports** [1] - 71:4
**represent** [6] - 50:3; 111:25; 152:7; 155:22; 192:9; 196:14
**representation** [6] - 18:20; 131:2; 151:15; 152:5; 166:14; 196:17
**representative** [4] - 44:20; 47:4; 196:13
**Representative** [4] - 3:3; 48:21; 49:22; 50:5
**represented** [1] - 151:19
**representing** [6] - 166:12; 190:18, 20; 191:20; 192:7; 196:19
**reprotecting** [1] - 33:11
**request** [1] - 39:18
**Request** [1] - 219:1
**requested** [2] - 132:25; 133:4
**requests** [1] - 52:5
**require** [3] - 99:14; 108:10, 23
**required** [5] - 34:2; 38:21; 55:21; 109:4; 110:1
**requirement** [2] - 99:4; 108:22
**requirements** [1] - 77:3
**rescinded** [1] - 122:24
**research** [1] - 129:18
**reservation** [66] - 31:11; 32:6, 10-11, 15, 17-18; 35:6, 17; 37:17; 38:2; 39:19; 41:23; 42:1; 44:19; 47:3; 50:20, 24; 51:21; 52:13; 53:9, 12; 57:7, 10, 13; 77:5, 15-16, 21; 78:3; 80:22; 83:1; 94:5; 95:2, 10, 12; 97:1, 7, 14, 25; 100:13; 101:1, 11, 24; 102:6; 103:22; 105:12, 18; 107:6, 9; 109:9, 12, 22; 116:19; 117:25; 191:16, 18; 192:23; 205:8; 206:2; 210:17; 212:6; 213:15
**Reservation** [3] - 31:25; 33:18; 205:12
**Reservations** [8] - 3:3, 5,

7; 48:21; 49:22; 50:4; 57:2; 58:16
**reservations** [26] - 9:6; 41:24; 51:5; 57:16; 76:19, 23, 25; 78:2; 81:1; 96:11; 103:22; 107:5-8; 109:24; 110:19; 114:2; 190:5, 10, 22; 191:4, 15, 17
**reside** [1] - 128:13
**residential** [3] - 24:8, 23; 25:1
**resolution** [5] - 148:16-18; 168:15
**resolve** [1] - 34:7
**Resources** [9] - 91:25; 92:1; 118:20; 127:16; 131:8; 135:10; 143:15; 146:23; 188:12
**respect** [8] - 8:5; 37:11; 41:8, 13; 42:3, 12, 16; 170:17
**respective** [1] - 1:18
**respond** [2] - 191:6
**response** [6] - 10:15; 12:10; 111:14; 172:8; 209:9; 212:3
**responsibilities** [10] - 33:14; 35:3, 5; 46:7, 9; 50:1, 4, 6, 9; 77:3
**Responsibility** [2] - 75:22, 25
**responsibility** [5] - 34:3; 50:23; 89:11, 20; 95:25
**responsible** [3] - 76:8; 124:25; 180:15
**responsive** [2] - 219:1, 7
**rest** [2] - 23:7; 180:10
**restate** [1] - 5:24
**restaurant** [6] - 190:4; 195:7, 11, 18, 24; 196:4
**restrictions** [1] - 63:23
**result** [2] - 83:18; 164:1
**resumes)** [2] - 126:20; 143:9
**retain** [4] - 13:2; 130:17; 140:2, 24
**retaliated** [3] - 217:21, 23; 218:1
**retaliation** [18] - 61:24; 67:7, 12, 16, 20; 68:8, 25; 69:6; 70:15, 19; 72:10; 216:19, 22-23; 217:16, 20; 218:7
**retire** [50] - 9:5, 7-8; 103:25; 116:8, 12; 121:10; 122:6; 123:8, 19; 124:20; 130:2, 9, 17; 132:7, 10; 135:2; 137:2, 18; 139:25; 140:1, 3, 6, 8, 14; 145:13; 162:6;

165:13; 177:21; 178:10, 17; 179:8; 183:14, 22; 192:3; 197:19; 204:18; 205:5; 217:4, 7; 218:2
**retired** [4] - 8:22; 137:20; 206:24
**retiree** [1] - 130:19
**retirees** [1] - 96:3
**retirement** [50] - 28:8; 117:17; 118:3; 120:18, 20, 22; 121:14, 22; 122:21; 123:2, 12; 124:15; 142:6; 144:16, 20; 145:1, 5, 20; 156:8, 14, 16; 157:12; 165:22; 171:8, 22; 172:2, 5, 9, 13, 25; 173:3; 177:4; 184:4, 9, 13; 189:13; 191:2, 25; 192:4, 25; 193:3, 11, 18, 21; 194:5; 197:18; 204:19; 217:9, 25
**retirements** [2] - 177:18, 21
**retracting** [2] - 200:3; 201:2
**returned** [1] - 155:6
**revenue** [26] - 76:19, 23, 25; 79:6; 80:15; 81:2, 8; 83:24; 96:12; 97:2; 99:9, 12-13; 102:1; 103:1, 16; 104:25; 208:23; 209:1, 10; 211:3, 5, 18; 212:7; 214:18
**revenue/myUAdiscount** [1] - 77:6
**reverse** [1] - 43:1
**reversed** [1] - 101:23
**review** [36] - 7:17; 45:14; 60:18, 22, 24; 65:14, 18; 70:24; 73:3; 83:15; 107:7, 19-20; 118:20; 122:22; 131:7, 9, 11; 144:19; 152:13; 155:8; 174:9; 176:2, 9; 189:24; 194:25; 195:2, 10, 18, 24; 196:1; 204:6; 223:5, 9
**Review** [24] - 4:6, 12; 91:24; 130:25; 132:8; 135:4; 140:22, 25; 142:4; 149:3, 6; 152:9; 160:2; 162:5, 9; 174:12, 23; 186:16; 187:9, 13, 22; 188:9; 198:20
**reviewed** [1] - 198:12
**reviewing** [5] - 49:18; 56:15; 75:18; 154:5; 155:9
**Revised** [1] - 4:12
**revised** [7] - 4:18; 55:5, 8;

186:15; 187:5; 198:20
**rewards** [2] - 117:1; 214:21
**Richard** [1] - 188:15
**rid** [1] - 103:25
**rider** [2] - 97:4, 12
**riders** [7] - 76:1, 10, 12, 22; 97:4, 7; 98:11
**rights** [4] - 42:8; 103:4; 156:24; 203:13
**rise** [1] - 102:21
**Riverview** [1] - 9:13
**Robert** [3] - 12:23; 21:21; 175:25
**rock** [2] - 116:7; 217:4
**role** [1] - 49:24
**room** [1] - 179:14
**rosen** [1] - 190:25
**Rosner** [11] - 4:15, 17, 19; 187:25; 188:5; 197:24; 198:3, 6; 199:16; 200:3, 25
**route** [8] - 77:8, 22; 78:5; 81:21, 24; 97:15; 98:14
**routine** [2] - 57:10; 128:22
**routing** [14] - 78:24; 79:10, 18; 81:1, 14; 94:12; 97:9, 21; 98:2, 6-7, 10
**routings** [2] - 79:8
**RSSR** [12] - 82:16; 205:9, 12, 20; 206:25; 207:4, 9, 13, 18; 208:6; 220:8
**RSSR's** [1] - 82:17
**RSSRs** [2] - 117:6, 10
**rule** [12] - 33:22; 38:13, 18; 41:22; 42:3, 11; 99:19; 108:11; 197:16
**rules** [23] - 34:24; 39:9; 43:7, 20; 63:21; 64:8; 77:1; 79:14; 81:6; 83:23; 95:3, 7, 20; 106:3, 5; 110:11; 112:4; 163:1, 11, 20; 165:6
**rumors** [5] - 177:20; 178:8, 15; 179:3
**Rxi** [1] - 201:22
**RXI** [1] - 201:25
**S-O-N-I-A** [1] - 13:1
**Sacramento** [2] - 25:22; 78:23
**sales** [6] - 32:15, 18; 35:6; 44:19; 47:3; 205:8
**Sales** [3] - 3:3; 31:25; 33:18; 48:21; 49:22; 50:4; 205:12
**salesman** [2] - 26:22; 27:6
**San** [7] - 78:11, 22; 81:18; 97:24; 98:13, 24; 99:11

**sarcastic** [2] - 121:20; 141:24
**satisfactorily** [1] - 87:6
**Saturday** [1] - 128:8
**savvy** [1] - 51:15
**saw** [6] - 17:11; 18:18; 88:15; 128:7; 180:8
**scared** [3] - 61:24; 179:11; 180:22
**scenario** [2] - 154:18
**schedule** [2] - 149:12, 17
**scheduled** [1] - 167:8
**school** [4] - 28:22; 29:5; 30:5, 7
**School** [4] - 29:22, 24; 30:12, 15
**scope** [1] - 57:17
**score** [1] - 91:8
**Scout** [1] - 36:18
**screen** [58] - 48:15; 49:9; 56:6, 12; 58:3; 60:2; 65:5; 66:16; 69:14; 70:6; 73:8, 11, 14, 17, 20; 74:3, 6, 9, 12, 17, 22, 24; 75:3, 6, 9, 13, 23; 76:17; 85:16; 86:19; 87:15, 23; 88:24; 89:3, 6; 90:11; 91:16; 93:19, 23; 94:20; 111:8; 125:6; 157:8, 15; 173:13; 174:19; 175:18; 181:24; 185:11; 186:24; 199:5, 21; 200:19; 201:16; 203:21; 209:3
**Screen** [21] - 52:19; 57:25; 59:12; 64:11; 84:1; 86:16; 87:13; 89:2, 22; 91:11; 92:14; 100:9; 115:8; 174:7; 175:3; 187:12; 199:18; 200:17; 201:6, 19; 204:12
**screen)** [1] - 66:2
**screenshot** [2] - 157:17; 181:16
**Screenshot** [1] - 3:19
**screenshots** [3] - 190:6; 195:13, 17
**scribe** [3] - 161:15, 17, 19
**scroll** [18] - 66:13, 15; 67:1; 69:11; 70:5, 23; 72:8, 15; 73:5; 74:19; 76:6; 82:13; 87:23; 88:4, 22; 99:22; 177:23; 184:15
**Scrolling** [1] - 88:8
**scrolling** [5] - 61:4; 70:9; 88:13; 99:23; 176:6
**seal** [1] - 222:7
**searched** [1] - 150:14
**seat** [14] - 51:16; 77:18; 78:18; 79:2, 19; 80:12,

15, 22-23; 81:3; 97:2; 210:19
**seats** [1] - 63:24
**second** [26] - 6:9; 11:3; 18:1; 22:4; 45:5; 53:14; 59:25; 62:13; 63:7; 75:24; 77:4; 78:22; 96:3; 118:6; 156:18, 20; 161:12; 182:16; 183:10; 189:10; 198:7; 200:24; 201:11; 213:16; 220:1
**seconds** [1] - 171:16
**section** [3] - 69:9; 91:25; 157:4
**secure** [1] - 72:5
**security** [17] - 10:22; 11:11, 24; 34:18; 103:21; 112:6, 21; 113:10, 13, 20; 131:9; 135:10; 176:21; 185:13; 188:16
**Security** [1] - 25:3
**see** [95] - 18:13; 34:13; 41:20; 48:17; 49:15; 50:2; 56:11; 57:14; 58:5; 61:5; 62:16, 21; 63:12; 64:15; 65:24; 69:17; 73:5; 76:4, 15; 78:5, 9; 79:9; 82:6, 22; 83:16, 20-21; 85:18; 86:5, 21; 87:1; 88:5, 25; 89:25; 90:13, 16, 22; 91:1, 18; 92:1; 93:25; 94:6, 24; 98:20; 100:20; 101:13; 102:13; 108:6, 11; 112:16; 123:17; 125:8; 131:21, 23; 132:5; 135:3; 139:9; 141:25; 147:9; 155:11; 156:5; 157:15; 161:1; 164:8; 166:3, 20; 167:16; 169:6; 171:11; 176:13; 178:8; 179:12, 22; 181:18; 184:10, 18; 186:23; 187:3, 6; 188:16; 191:1; 199:7; 200:21; 208:17; 212:16
**See** [1] - 177:22
**seeing** [4] - 17:8; 19:1; 65:16
**seek** [4] - 149:4; 151:3, 5
**seeking** [1] - 28:6
**seldom** [1] - 51:21
**select** [1] - 160:22
**selecting** [1] - 96:6
**self** [6] - 26:24; 27:2, 8; 62:4; 71:21
**self-employed** [3] - 26:24; 27:2, 8
**self-explanatory** [2] - 62:4; 71:22

**sell** [2] - 27:6; 214:21
**selling** [3] - 116:22; 214:10, 20
**send** [29] - 69:1; 102:22; 111:4; 115:16; 122:23; 127:25; 135:12; 137:9; 140:5, 18; 142:21; 150:19; 157:13, 18-19; 162:12; 166:6; 169:8, 23, 25; 175:9; 176:20; 181:8, 15; 182:21; 184:13; 197:15
**sending** [5] - 69:2; 177:7; 180:12; 185:24; 202:25
**sends** [1] - 121:21
**Senior** [1] - 2:12
**senior** [5] - 34:16; 46:17, 19; 107:18; 127:14
**seniority** [1] - 46:17
**sense** [2] - 125:24; 217:17
**sent** [36] - 4:9, 17; 11:8-10, 14; 28:10, 12; 55:23; 68:21; 111:7; 119:19; 120:14; 160:13; 176:11; 177:1, 18; 178:3, 19; 179:5, 9, 19; 180:16, 18-19, 21; 181:9, 16; 182:12, 19; 184:4, 6; 185:9
**sentence** [5] - 62:14, 18; 77:4; 96:3; 178:22
**September** [9] - 4:17, 20; 25:6; 177:22; 178:11; 200:11; 201:12; 221:11; 222:7
**serious** [2] - 129:23; 137:22
**serve** [1] - 157:25
**served** [3] - 216:11, 15; 219:2
**Service** [11] - 31:25; 33:18; 49:22; 50:4; 69:19, 22, 24; 70:2, 13; 72:13; 205:13
**service** [59] - 10:9; 18:17; 32:15, 18, 25; 34:6; 35:17; 39:18, 23; 44:19; 47:3; 50:14; 76:9; 101:17; 121:21; 122:1, 23; 126:4; 132:6; 135:1, 5-6; 141:25; 148:25; 149:1; 154:23; 155:14; 156:3, 9; 157:11; 158:3, 7; 159:24; 164:19; 167:6; 168:7, 10, 16; 171:21; 172:4, 18; 174:4; 183:21; 184:3; 191:15; 205:21; 208:7; 210:7, 12, 15; 211:8, 18; 212:3, 13; 215:13, 18

**Services** [2] - 3:3; 48:21
**services** [3] - 63:18; 83:4; 138:17
**set** [12] - 19:5; 37:17; 41:25; 76:13; 96:11; 126:25; 135:13; 146:24; 150:17; 160:12; 210:17
**seven** [2] - 135:23; 159:6
**several** [5] - 9:19; 14:13, 15-16, 22
**severe** [1] - 132:3
**severity** [1] - 132:21
**shaking** [1] - 121:1
**shall** [2] - 147:8
**share** [30] - 9:11; 49:8; 52:19; 57:25; 59:12; 64:11; 65:4; 84:1; 86:16; 87:13; 89:2, 22; 91:11; 92:14; 96:24; 100:9; 104:3; 115:8; 157:8; 174:7; 175:3; 185:11; 187:12; 199:4, 18; 200:17; 201:6, 19; 204:12; 205:14
**shared** [1] - 204:13
**shares** [2] - 103:14; 161:7
**sharing** [23] - 48:15; 56:6; 58:3; 60:2; 65:6; 85:16; 86:19; 87:15; 90:11; 91:16; 93:23; 111:8; 125:6; 162:23; 173:13; 174:19; 175:18; 186:24; 199:5, 21; 200:19; 201:16; 203:21
**SHEET** [2] - 223:1, 25
**SHEET....** [1] - 2:22
**shift** [9] - 46:14-16, 21; 47:10; 92:17; 116:2; 140:7
**shifts** [2] - 46:17, 20
**shock** [3] - 123:16; 173:9; 194:13
**shocked** [3] - 120:24; 123:17; 124:16
**shortcuts** [1] - 212:5
**shorter** [2] - 14:21; 206:3
**shortly** [1] - 19:12
**show** [25] - 48:13; 49:5, 13; 54:15; 56:5; 58:2; 65:1, 25; 81:11; 86:17; 87:14; 90:10; 93:22; 170:17; 173:11; 174:14, 18; 175:12, 16; 195:9; 198:15; 199:19; 200:18; 203:23
**showed** [6] - 58:21; 89:3; 91:13; 108:25; 191:9
**showing** [12] - 48:19; 49:20; 59:25; 72:16; 81:4; 85:15; 87:19; 109:3; 111:10; 173:21;

201:14

**shows** [3] - 136:4; 155:15; 178:9

**sibling** [1] - 208:8

**sibling's** [1] - 208:8

**siblings** [1] - 208:21

**sic** [2] - 179:20; 190:25

**sic]** [1] - 29:18

**sick** [6] - 89:5, 12-13; 124:18; 139:11

**side** [7] - 131:24; 136:23; 145:13; 152:13; 192:19

**sides** [3] - 135:16, 21; 139:21

**Sierra** [2] - 12:23; 21:20

**sign** [12] - 88:20; 93:7; 126:5, 7, 13; 129:5; 152:1, 16; 169:23; 203:12

**SIGNATURE** [1] - 2:22

**signature** [8] - 56:23; 57:21; 58:15, 19; 199:14; 223:9, 11

**Signature** [1] - 56:24

**signed** [7] - 3:5, 8; 57:8, 23; 59:10; 159:17; 203:18

**significant** [2] - 33:8; 52:11

**signing** [1] - 223:11

**similar** [3] - 57:19; 90:1; 148:13

**simple** [4] - 53:19; 57:12; 194:3; 213:20

**simply** [2] - 42:22; 101:23

**sine** [9] - 53:7, 10, 13; 107:16; 201:21-23; 205:14

**SINE** [1] - 53:7

**single** [3] - 112:23; 133:3

**sister** [4] - 38:12; 207:22; 208:1, 24

**sister-in-law** [3] - 207:22; 208:1, 24

**sit** [1] - 161:13

**sites** [1] - 50:19

**sits** [1] - 161:14

**sitting** [1] - 168:20

**situation** [18] - 34:7, 11; 42:17; 51:2; 81:19; 102:21, 23; 105:23; 106:16; 113:13; 123:5; 172:17; 173:2; 193:10; 212:11; 213:2, 8; 214:4

**situations** [5] - 9:19; 109:6; 110:3, 7, 13

**six** [7] - 44:14; 88:19; 160:11; 165:1; 196:3; 204:21

**six-minute** [1] - 44:14

**six-month** [1] - 165:1

**six-year** [1] - 165:1

**SKIPPED** [1] - 4:2

**skipped)** [1] - 173:14

**slammed** [1] - 40:5

**slash** [1] - 141:25

**sleep** [2] - 17:17; 23:8

**slept** [1] - 23:9

**slides** [1] - 88:23

**slowly** [1] - 88:8

**slowly)** [1] - 88:13

**small** [2] - 38:6

**Smith** [5] - 148:9, 20; 150:2

**snow** [2] - 48:4; 93:3

**Social** [1] - 25:3

**social** [2] - 15:19; 16:12

**socialist** [4] - 213:17; 214:1, 3; 215:6

**sociologist** [1] - 16:11

**sold** [1] - 97:3

**sole** [2] - 70:18; 212:6

**solving** [1] - 51:20

**someone** [10] - 38:19; 124:23; 131:15; 132:5; 161:14, 17-18; 168:20; 205:4; 212:9

**sometimes** [4] - 54:25; 55:1; 81:11; 161:11; 168:18, 22

**somewhere** [1] - 93:3

**son** [5] - 25:24; 26:9, 21; 38:12; 208:4

**Sonia** [9] - 13:1; 25:19, 23; 26:15; 27:10; 101:10; 109:23

**Sonia's** [2] - 26:6; 111:17

**soon** [8] - 19:6; 146:23; 147:16; 162:14; 166:8; 170:25; 200:5

**sooner** [4] - 9:8; 116:12; 123:8; 218:3

**sophisticated** [2] - 113:15, 20

**Sorry** [1] - 184:11

**sorry** [87] - 14:21; 16:25; 17:5, 21; 19:10, 20; 20:15, 24; 22:11; 31:6; 32:3; 34:22; 36:24; 41:7, 20; 43:19; 46:10, 18; 48:25; 52:24; 53:18, 25; 56:18; 58:24; 60:14; 61:12; 64:4, 16; 66:9; 67:17; 71:19; 78:7; 79:23; 80:5; 83:2, 9; 85:9; 87:4; 89:7, 25; 92:10; 95:14; 98:8; 99:9; 100:17; 104:21; 105:14; 106:19; 112:9; 114:9; 116:21; 119:12; 122:8, 12; 123:19; 125:5; 126:13, 24; 127:9;

141:10; 147:13; 155:24; 156:17; 157:6; 165:17; 169:4; 176:9, 23; 178:4; 179:17; 182:17; 185:16; 190:22; 195:9; 196:4; 197:1; 201:23; 204:21; 209:2; 216:1, 20; 218:6

**sort** [2] - 136:1; 153:4

**sorts** [1] - 129:10

**sound** [4] - 54:1; 100:18; 188:15; 203:1

**sounded** [1] - 170:15

**sounds** [5] - 54:2, 11; 59:23; 64:15; 141:24

**South** [1] - 2:8

**space** [33] - 43:10; 63:25; 77:7, 9, 11, 13, 22, 24; 78:17; 79:6-8, 24-25; 80:1, 7, 9-10, 13; 82:10; 89:17; 94:5; 95:4; 97:1, 6, 8; 102:14

**space-available** [1] - 97:8

**spark** [1] - 75:18

**SPEAKER** [1] - 126:3

**speaking** [6] - 69:18; 84:4; 119:10; 196:9, 11

**speaking)** [1] - 147:13

**speaks** [1] - 193:23

**spec** [1] - 145:21

**special** [1] - 52:5

**specialist** [1] - 39:20

**specialize** [1] - 138:7

**specific** [17] - 17:13; 33:6; 67:24; 81:5; 89:13, 16; 90:2; 98:21; 105:10; 107:10; 109:6; 176:22; 207:8; 210:17; 213:21; 218:11

**specifically** [22] - 20:13; 27:5; 37:10; 41:25; 42:14; 55:9, 20; 65:14; 85:9; 88:18; 91:5; 109:23; 112:17; 113:25; 116:24; 119:12; 120:13; 185:22; 206:10, 15; 210:20; 223:7

**specifics** [5] - 59:24; 79:11; 92:4, 12; 136:16

**specified** [1] - 97:21

**specify** [2] - 71:15; 108:14

**speculate** [1] - 114:25

**spell** [5] - 8:17; 12:21; 21:19; 25:10; 29:15

**spelled** [2] - 12:22; 15:23

**spend** [1] - 51:10

**spent** [1] - 138:4

**spinned** [1] - 180:10

**split** [1] - 181:24

**spokesperson** [2] - 196:6, 8

**spouse** [3] - 159:11; 208:4, 8

**spreading** [1] - 178:8

**stamped** [1] - 204:3

**stand** [2] - 139:14; 205:25

**standard** [1] - 79:22

**Standard** [5] - 47:13; 92:19; 116:3; 172:4; 184:5

**standby** [12] - 79:4; 80:11, 14, 22; 81:4, 8; 82:11; 96:13; 97:14; 98:1; 154:5

**star** [1] - 126:11

**start** [15] - 92:22; 93:11; 115:23; 117:17; 129:24; 137:19; 139:2; 140:8; 142:12, 21; 146:21; 147:18; 149:2; 217:2

**started** [14] - 92:15, 18; 106:6; 121:1; 123:6; 128:1; 138:14; 162:8; 164:22; 177:5; 192:12; 216:24

**starting** [4] - 125:20; 143:21; 144:18; 145:2

**starts** [2] - 60:15; 134:6

**STATE** [2] - 221:3; 222:2

**state** [2] - 83:21; 115:15

**State** [2] - 222:4, 10

**statement** [18] - 55:13, 22; 85:3; 89:19; 93:10; 103:11; 115:11; 122:3; 128:25; 137:1; 191:21, 23; 192:24; 197:5; 213:23

**Statement** [1] - 3:23

**statements** [3] - 117:15; 218:9; 219:10

**states** [3] - 29:1; 57:6; 90:25

**STATES** [1] - 1:1

**stats** [1] - 138:24

**status** [2] - 33:15; 158:5

**stay** [8] - 36:10; 195:11, 18, 21, 23; 196:1, 3

**stenographically** [1] - 221:6

**step** [3] - 10:18; 143:7; 158:16

**Stepanski** [3] - 11:11, 16; 188:15

**Stephanie** [3] - 100:18; 128:16; 188:24

**stepped** [1] - 127:24

**steps** [3] - 152:7; 154:14; 160:1

**Steward** [1] - 158:2

**still** [16] - 6:1; 8:20; 13:2; 32:11; 47:3; 95:15; 116:1, 5-6, 8; 122:21;

124:13; 167:14; 168:1, 5; 217:6
**stole** [1] - 163:24
**stolen** [1] - 163:3
**stop** [4] - 73:25; 165:16; 182:1
**stopped** [1] - 209:21
**stopping** [1] - 125:20
**straight** [1] - 211:14; 212:23
**stranger** [1] - 214:7
**stranger's** [1] - 213:6
**stressed** [4] - 22:11; 53:18; 118:12, 15
**strike** [11] - 19:22; 22:4, 18; 23:5, 19; 27:13; 113:1; 180:17; 187:17; 198:6; 207:1
**stripped** [1] - 140:16
**strongly** [2] - 132:4; 136:13
**stuck** [1] - 124:6
**stuff** [10] - 95:8; 138:24; 139:16; 155:13, 15, 20; 156:25; 166:20; 181:24; 216:7
**subject** [4] - 4:23; 164:16; 216:22
**Subject** [1] - 4:9
**subjected** [1] - 72:9
**submit** [2] - 131:10; 135:12
**submitted** [1] - 3:23
**SUBSCRIBE** [1] - 223:16
**subsequently** [1] - 115:10
**substance** [2] - 15:9; 159:11
**substantial** [1] - 136:4
**substantiate** [1] - 108:1
**substantiated** [2] - 37:15; 108:5
**successful** [1] - 86:3
**sudden** [1] - 209:3
**sue** [5] - 138:2, 8; 142:9; 151:3, 11
**suffer** [7] - 16:17; 17:17; 22:23; 23:6, 13, 19
**suffered** [1] - 16:14
**suffering** [2] - 15:15; 18:12
**sufficient** [2] - 62:20; 108:16
**suggest** [3] - 85:12; 136:13; 196:11
**suggested** [1] - 123:11
**suggesting** [1] - 109:17
**suicidal** [1] - 19:25
**suing** [2] - 7:25; 8:5
**suit** [1] - 203:19
**Suite** [2] - 2:3, 8
**summarize** [1] - 67:20

**summary** [2] - 50:2; 171:10
**Summons** [2] - 4:23; 203:25
**supervised** [2] - 117:7; 205:1
**supervisor** [39] - 9:3, 17, 24; 10:4; 12:8; 15:2; 17:16; 18:22; 36:22; 46:24; 47:2, 10, 22-23; 53:11; 64:9; 102:19; 103:21; 105:19, 25; 106:6; 108:8; 109:16; 112:8, 19; 113:2, 6; 115:22; 123:7; 124:19; 127:4; 167:4; 177:18; 179:12; 181:5, 25; 182:6; 197:10
**supervisors** [3] - 77:11; 106:1; 112:7
**support** [6] - 9:11; 26:12; 170:12, 15, 20; 219:19
**supposed** [4] - 133:19; 138:25; 179:11; 206:7
**surprised** [1] - 144:11
**suspended** [1] - 158:11
**suspension** [1] - 76:3
**sweep** [1] - 112:7
**sweeps** [1] - 103:21
**switch** [1] - 34:21
**sworn** [6] - 5:3, 11; 6:11, 13-14; 222:6
**system** [16] - 34:19; 56:1; 83:1, 6; 96:13; 113:16; 208:15; 209:17; 210:7, 13, 15, 20; 211:18; 212:3
**systemwide** [1] - 36:8
**tab** [3] - 93:8, 12; 96:6
**tablet** [1] - 21:23
**TAH** [3] - 16:2
**TAH-UHN-K** [1] - 16:2
**TAH-UHN-K]** [2] - 16:2
**TAKEN** [3] - 1:14; 223:3; 224:2
**taker** [1] - 197:6
**talks** [3] - 77:2; 89:17; 135:18
**Tampa** [13] - 2:8; 26:5; 36:2, 10, 15; 78:10, 22-23; 81:16; 97:24; 146:1
**TAMPA** [1] - 1:2
**Tampa-Houston/Houston -San** [1] - 78:22
**TAN** [1] - 16:1
**TAN-NOO** [1] - 16:1
**tango** [2] - 15:24; 24:10
**tanua** [1] - 16:3
**Tanua** [13] - 15:23; 16:1, 6-7; 17:11; 18:18; 19:8,

14; 21:4; 22:13; 23:20
**taught** [1] - 98:19
**tax** [1] - 83:14
**Tax** [1] - 96:2
**taxes** [4] - 76:9; 83:3, 14
**Team** [1] - 178:23
**team** [11] - 71:24; 131:18; 178:21; 179:9, 16; 181:9, 12, 15, 22
**tear** [1] - 201:4
**technicalities** [1] - 196:16
**technology** [1] - 222:6
**teleconference** [1] - 126:4
**telephone** [1] - 185:18
**teller** [1] - 31:1
**ten** [1] - 27:4
**tenders** [1] - 99:25
**terminate** [7] - 135:25; 149:7; 152:4, 19, 22; 155:9; 198:8
**terminated** [36] - 16:21; 17:1; 19:7; 130:4; 132:1, 9, 12, 18; 136:8; 142:5; 150:1, 25; 151:1, 4, 10, 24; 153:1, 7-8; 154:14, 17, 21-22; 156:6; 165:3; 167:1, 5; 183:14, 23; 205:15, 22; 207:6, 11; 220:10
**termination** [22] - 19:12; 76:3; 83:19; 120:21; 130:4; 132:19; 136:7; 139:7; 142:7; 149:3-5, 25; 154:24; 155:7; 164:7; 174:5; 191:3, 11; 217:13; 218:6
**terms** [6] - 39:16; 51:23; 63:23; 75:18; 112:1; 197:25
**test** [3] - 7:2; 180:7; 182:7
**testified** [6] - 5:4; 106:24; 206:20; 213:3; 214:4; 219:18
**testify** [8] - 15:6, 10, 13, 16; 23:10, 16; 24:6; 176:6
**testifying** [1] - 201:9
**testimony** [4] - 73:1; 117:23; 193:5; 195:4
**TESTIMONY** [2] - 223:16
**testing** [2] - 3:16; 87:7
**THAT** [1] - 223:14
**THE** [5] - 1:1; 223:8, 14, 16
**theirs** [1] - 131:3
**themselves** [1] - 220:9
**therapist** [3] - 15:20; 16:12; 19:4
**Therapist** [1] - 27:24
**they've** [5] - 129:18; 141:1; 145:4, 12; 159:11

**thick** [1] - 64:19
**Thompson** [2] - 13:16
**thousands** [1] - 163:25
**threaten** [1] - 117:19
**three** [15] - 70:14; 126:8; 141:7; 146:19; 148:11; 149:16; 150:4, 6; 160:5; 171:16; 177:24; 190:3, 9; 202:16
**throwing** [1] - 165:14
**Thursdays** [1] - 170:18
**ticket** [5] - 33:8; 37:23; 42:7, 20; 43:3, 9, 13; 51:11, 16; 77:6; 78:21, 24; 79:6, 13-18, 20; 81:2, 4, 8; 82:10; 83:24; 97:6; 98:1, 8; 99:9, 13; 101:3, 8, 11, 18, 22; 102:1, 14; 103:1, 13, 17; 104:13, 16, 19, 22-23, 25; 105:4; 111:17; 138:16; 141:15; 208:13, 25; 209:1; 211:3, 5, 16; 212:16; 213:6, 9, 14, 22; 214:5, 10, 24; 215:2, 9, 16-17, 24; 216:2
**tickets** [16] - 33:5, 7; 50:14; 63:22; 79:22; 98:4; 99:13, 20; 205:14; 206:17; 207:19; 208:24; 209:11; 214:20; 220:9
**tie** [2] - 34:12; 37:25
**TIME** [1] - 1:17
**time-consuming** [1] - 40:13
**timeframe** [2] - 184:1; 191:14
**timestamp** [1] - 107:17
**tissues** [1] - 17:24
**title** [9] - 31:10, 24; 32:14; 35:11; 46:2, 5, 10; 205:8
**titled** [4] - 3:3, 5, 13; 63:4
**TO** [1] - 223:16
**today** [32] - 5:9, 18; 7:15; 15:6, 16; 21:24; 23:11, 16; 24:6; 128:3, 8, 19; 130:7, 10; 134:23; 137:8, 20; 139:25; 140:7; 144:21; 146:24; 157:11, 21; 159:23; 165:21; 170:12, 24; 182:10; 204:14; 213:13; 219:19
**Together** [12] - 3:11; 40:23; 41:9, 13; 64:13; 65:1, 11; 70:3; 72:17; 84:24; 96:7; 141:12
**together** [1] - 31:17
**Tomorrow** [2] - 142:19
**tomorrow** [35] - 121:24; 124:9; 130:20, 22;

135:1, 4; 137:12; 142:11, 16, 18, 20; 146:19; 147:10, 15, 18; 148:3, 13, 23, 25; 149:17; 151:6; 159:24; 160:4; 170:13; 171:13; 184:10, 22

**Tomory** [5] - 1:19; 221:5; 222:4; 223:4; 224:3

**TOMORY** [2] - 221:13; 222:10

tone [2] - 113:17; 171:12

tongue [1] - 22:22

tonight [1] - 170:13

**Tony** [51] - 11:10, 15, 17; 128:11, 14, 17; 130:1, 23; 131:2; 132:13, 23; 135:18; 142:23; 144:3, 5; 145:23; 146:17, 25; 147:17, 21; 149:14; 150:15; 154:9; 155:12, 17; 157:10; 158:2, 19-20; 159:19; 160:5, 15; 161:5, 10-11; 162:14; 166:7, 14-15; 167:7, 13, 19; 169:3, 7, 14; 191:19

took [20] - 79:19; 102:22; 118:4; 122:24; 123:9; 126:13; 127:1, 17; 171:8, 11, 23; 177:3; 183:20; 184:3; 191:2; 197:12; 204:18; 217:9; 218:4

tool [3] - 72:4; 82:7; 91:20

tooth [1] - 162:19

toothed [2] - 135:8; 146:11

top [19] - 50:2; 70:6, 12; 73:11, 17; 74:3, 9, 17, 24; 75:6, 13, 23; 88:24; 89:6; 90:18; 109:5; 139:3; 180:9; 187:5

total [1] - 142:1

totally [2] - 79:18; 146:14

touch [1] - 93:12

touches [1] - 53:9

traceable [1] - 133:17

**Tracey** [2] - 11:9, 15

track [1] - 64:23

trackable [1] - 133:17

trained [8] - 40:25; 41:2, 9, 15; 102:16; 109:4; 115:5

**Training** [6] - 3:13, 17; 85:7; 86:4, 14; 87:20

training [39] - 3:15, 19; 31:20; 33:25; 34:1; 37:1, 3, 5, 7, 9; 40:18; 41:3, 12, 19; 44:19, 21; 45:8,

10, 13; 54:17; 55:1; 85:1, 6, 11; 87:7, 9; 88:7, 15; 89:23; 90:6; 113:21; 152:1, 17; 164:4

trainings [2] - 37:1; 41:6

transactions [1] - 76:9

**TRANSCRIPT** [5] - 223:1, 8, 15-16, 25

transcript [3] - 6:2; 223:5, 7

transfer [1] - 35:2

transferred [3] - 35:1; 36:7, 14

transferring [1] - 50:17

transfers [1] - 117:1

transition [4] - 35:7; 50:17, 19; 59:13

transitioned [2] - 31:3, 6

**Travel** [20] - 3:19, 21; 45:12; 88:25; 89:4, 12, 14, 24; 90:5, 17, 21; 91:24; 92:5, 9; 95:25; 96:1, 6; 104:20

travel [43] - 42:2; 43:8, 10; 63:17, 22; 72:19; 75:19, 25; 76:3, 9, 13; 78:6, 9; 81:5; 82:15-17; 83:10, 18, 22, 24; 89:5, 17; 95:4, 20; 96:12; 101:10; 102:2; 105:1; 114:11, 19; 116:15; 130:18; 158:10, 12; 168:5; 191:17; 208:17, 19; 209:12; 214:11

traveled [1] - 138:16

traveling [3] - 38:25; 77:12; 97:6

treat [1] - 31:20

treated [6] - 42:24; 102:11; 138:20; 146:2; 162:21; 197:10

treatment [1] - 63:20

trial [4] - 131:1; 150:21, 24; 190:25

tried [4] - 37:17; 95:7; 191:25; 211:10

trip [19] - 77:8, 23; 78:6; 79:10; 81:21, 25; 94:12; 97:9, 15-16, 21; 98:10, 14, 16; 99:11; 100:4, 6

trips [1] - 79:12

trouble [1] - 133:18

true [6] - 103:6; 178:11, 13; 183:16; 221:7

truth [1] - 128:5

truthful [1] - 6:15

truthfully [3] - 23:11, 16; 24:6

try [7] - 6:5; 21:16; 42:25; 88:4; 125:15

trying [7] - 64:22; 126:25;

155:24; 156:4, 7; 211:9; 217:20

**Tuesdays** [1] - 170:18

turn [1] - 5:19

turning [3] - 52:7; 129:25; 134:6

twice [4] - 50:23; 138:21; 186:19; 188:2

two [30] - 14:22; 19:10; 21:3; 72:8, 12; 78:13; 79:1, 8, 12; 81:1, 15; 84:23; 102:22; 121:7; 122:5; 127:12; 138:22; 144:15; 164:24; 183:19, 25; 190:3; 192:2; 193:7, 15-16; 209:11; 211:15

two-and-a-half [1] - 144:15

twofolded [1] - 213:11

tying [1] - 40:13

type [9] - 44:5; 50:13; 107:15; 108:13; 125:12; 179:10; 203:17; 205:16; 212:4

typed [1] - 211:25

types [1] - 39:22

typical [1] - 212:21

typically [2] - 47:19

typing [2] - 5:17; 6:1

**U155092** [1] - 157:22

**U15902** [1] - 52:22

**u15902** [1] - 52:24

**UA.com** [1] - 210:8

uh-huhs [2] - 5:25; 6:2

**UHN** [3] - 16:2

unable [3] - 210:8; 213:25; 215:23

unauthorized [2] - 63:20; 83:17

unbiased [2] - 131:20; 152:12

uncle [1] - 38:13

uncontrollably [1] - 196:23

**UNDER** [1] - 223:14

under [31] - 5:11; 6:13-15; 15:18, 25; 16:3, 12; 22:22; 40:23; 42:5, 9; 50:1, 8; 62:13; 63:4, 11; 75:25; 76:7; 77:2; 103:7; 109:3, 7; 116:7; 118:20; 123:24; 175:21; 205:4; 207:23; 208:22; 217:4

underline [1] - 99:18; 105:16; 116:25; 180:6; 182:25

underneath [2] - 50:3; 76:20

understandable [1] - 210:24

understood [4] - 6:10;

80:24; 171:20

unfortunately [2] - 144:23; 170:11

unhappy [1] - 144:25

unheard [1] - 154:19

union [16] - 11:10; 48:6; 100:16, 24; 119:25; 120:17; 128:13; 135:13; 191:20; 192:7; 193:8; 196:10, 12-14, 17

**Union** [35] - 131:4, 10, 22; 134:17; 137:8; 145:3; 149:11; 150:15, 19; 151:17-19, 21, 23; 152:5-7; 153:13, 17, 23; 154:2, 6, 14; 155:18, 21; 158:1; 160:17; 161:11; 166:14-16; 170:19; 190:9, 20

**Unise** [6] - 4:15, 17, 19; 187:25; 188:5; 199:16

**UNITED** [2] - 1:1, 6

**United** [147] - 2:12, 15; 4:15, 19, 21; 5:8; 6:17; 7:25; 8:5, 15, 21; 9:2; 10:3, 8, 11, 20, 22, 25; 11:1, 4, 6, 8; 12:3; 13:9, 12, 25; 14:2; 16:16, 21; 17:7; 18:16; 28:8, 10, 12; 29:1; 30:22; 31:16, 21, 23; 34:3, 9, 21; 35:1, 7; 37:6, 8, 10; 38:21; 39:11; 40:18, 22-23; 41:6; 42:8; 43:14, 21, 25; 44:20; 45:16; 46:3; 47:17; 50:5, 10, 16; 52:21; 53:21; 54:19, 22; 57:19; 59:13; 60:21; 61:13; 64:12; 65:21; 66:21; 67:11, 19; 68:9; 78:20; 79:3, 11, 13-15, 22; 80:19, 23; 81:23; 83:6; 85:2; 87:11; 97:13; 98:5, 17; 99:19; 101:4; 103:3, 14, 19; 104:3, 6, 20; 108:15, 20; 109:4, 25; 110:5; 112:4; 113:10, 15; 114:6, 12, 24; 138:4; 141:25; 146:2; 158:8; 163:9; 176:16, 18, 21; 190:9; 195:5; 197:9; 199:12; 200:7; 203:16; 205:24; 206:23; 208:14; 209:13, 15; 212:7, 10; 213:8; 214:12, 16, 18, 23; 215:6; 220:12; 223:2; 224:1

United's [18] - 3:13, 17; 11:14; 42:11; 43:7; 52:5; 59:17; 66:20; 80:18;

85:7; 86:4, 13; 87:20; 88:6; 103:8; 106:3; 207:23; 208:22
**United.com** [2] - 37:18; 211:23
**United.com/PL** [3] - 208:13; 213:13; 215:15
**University** [2] - 29:15, 17
**unless** [7] - 6:24; 61:24; 73:24; 76:24; 93:12; 125:18, 21
**unprofessional** [4] - 181:21; 182:13, 22
**unveiled** [1] - 55:11
**up** [74] - 4:4; 17:13; 19:5; 21:18; 22:3, 23; 23:19; 26:7, 10, 20; 27:1; 34:8; 37:17; 40:7, 13; 47:25; 53:1; 76:14; 78:14; 80:20; 81:10; 83:18; 90:17; 93:19; 94:17, 20; 95:6, 16-17, 20-21; 96:11; 98:8; 99:3, 22; 102:10; 103:23; 107:7; 110:19; 112:6, 22, 24; 122:8; 126:25; 127:10; 128:21; 135:14; 141:2; 146:24; 148:14; 150:17; 151:2; 152:25; 153:1; 155:12, 24; 156:23; 157:3, 25; 164:3, 11; 165:17; 167:22; 168:2; 169:9; 179:1; 189:10; 191:18; 198:7, 18; 201:4; 207:1; 210:17
**updated** [1] - 55:6
**updates** [3] - 92:25; 93:1
**upgrade** [1] - 51:17
**upgrades** [1] - 63:24
**uphold** [1] - 135:24
**ups** [1] - 124:18
**upset** [4] - 51:10; 102:22; 172:17; 218:5
**upsetting** [1] - 182:3
**urge** [1] - 166:13
**urging** [1] - 132:4
**utilized** [1] - 102:5
**utmost** [1] - 5:16
**vacation** [9] - 127:12, 19; 167:8, 11, 14, 20; 168:1, 6
**valid** [1] - 64:7
**valued** [1] - 163:4
**various** [5] - 12:8; 87:10; 175:10; 178:20; 220:10
**Venice** [1] - 196:4
**venues** [2] - 154:2, 6
**verbal** [4] - 111:6; 118:9; 156:7; 162:3
**verbally** [2] - 6:4, 7
**verbatim** [3] - 106:17;

185:7; 221:7
**verify** [3] - 37:19; 41:21; 64:16
**versus** [1] - 82:10
**vested** [1] - 139:25
**via** [4] - 117:24; 120:5; 212:10; 222:5
**VIA** [1] - 2:1
**Viaj** [1] - 15:23
**victory** [1] - 15:23
**video** [2] - 6:1; 171:6
**videoconference** [1] - 222:5
**VIDEOCONFERENCE** [2] - 1:12; 2:1
**view** [5] - 66:7; 94:3; 96:5; 104:4; 137:24
**viewpoint** [1] - 103:15
**Village** [1] - 2:3
**violate** [1] - 81:20
**violation** [6] - 43:7; 104:20; 110:24; 113:8; 190:8; 208:9
**violations** [1] - 113:4
**virtual** [7] - 5:15, 25; 120:3; 187:18, 20
**voice** [4] - 113:18; 120:8; 126:18; 170:14
**vs** [3] - 1:5; 223:2; 224:1
**Wait** [1] - 122:22
**wait** [8] - 94:4; 121:20; 142:21; 143:14; 149:19; 153:20; 182:15; 197:15
**waiting** [1] - 48:5
**waive** [31] - 33:6; 37:16; 38:6, 9-10; 51:8; 82:23; 93:4; 99:7; 101:17; 102:18; 105:7; 108:13, 20, 22; 109:1, 8, 18; 110:8, 13; 146:6; 163:22; 211:13; 212:13, 23; 215:11, 18, 21
**waived** [25] - 101:23; 105:9; 106:17; 107:15, 18; 109:24; 110:15; 111:18; 112:11, 15; 118:18; 138:15; 146:5; 205:21; 207:5, 9, 14, 19; 208:6, 11, 15; 209:23; 211:18; 212:16, 18
**waiver** [46] - 32:7; 33:6, 23; 34:15; 37:14, 24; 38:14, 19; 42:15, 25; 51:1; 52:12; 101:12, 17; 102:9; 105:6, 18, 21; 106:15, 20, 22; 107:2, 11, 14; 108:4, 8; 109:13; 110:10, 22; 113:14, 25; 118:24; 128:24; 152:1, 16; 164:6; 203:13, 17; 209:14; 212:17; 213:8

**waivers** [44] - 32:5, 8; 34:1, 13-14; 37:7, 11; 38:5, 22, 24; 39:10, 17, 22; 40:2; 42:4, 12; 43:15; 50:7, 12-13; 52:7; 57:12; 85:4; 93:2; 106:1; 109:6; 112:7, 18; 113:23; 114:3; 129:6; 133:13; 141:13; 163:8, 12; 205:14; 206:7, 14, 16; 210:21
**waiving** [14] - 63:22; 105:23; 106:8, 11, 18; 108:12; 110:3, 17; 111:22; 112:2; 133:15; 141:14, 16
**walk** [1] - 92:22
**wall** [1] - 193:25
**wants** [4] - 51:10; 98:23; 125:21
**warning** [5] - 118:10; 133:1, 5, 24; 217:11
**ways** [6] - 68:7, 10-11; 69:5; 70:14; 103:24
**wearing** [1] - 170:5
**weather** [1] - 182:9
**Web** [1] - 160:20
**Webex** [6] - 125:5-7; 126:25; 146:24; 160:24
**Website** [11] - 40:24; 51:7; 62:5; 72:6; 176:18; 208:12; 212:11; 213:12; 215:6
**Wednesdays** [1] - 170:18
**week** [7] - 17:12; 18:11; 47:19; 127:11, 13; 159:7; 168:8
**weekend** [1] - 182:10
**weeks** [9] - 127:12; 149:16-18; 160:5, 10-11; 167:9
**welcome** [5] - 45:4; 66:12; 84:19; 126:3; 199:2
**welcoming** [1] - 93:10
**Westchester** [3] - 27:20, 23, 25
**wheels** [1] - 143:18
**wherein** [1] - 158:2
**whole** [17] - 17:19; 31:20; 34:19; 36:3; 40:13; 73:24; 74:1; 125:22; 126:1; 168:3; 178:21; 179:9; 181:9; 185:1; 193:10
**Whoop** [1] - 22:18
**wife** [2] - 208:18; 211:3
**William** [2] - 12:24; 24:9
**Williams** [47] - 5:8; 18:8; 44:17; 45:7; 48:15; 56:6; 58:3, 11; 60:2, 9; 65:6, 10; 84:21; 85:16, 25;

86:19, 24; 87:15; 88:3; 90:11; 91:16; 93:23; 104:12; 111:8; 125:6; 171:5; 173:13; 174:19; 175:18, 20; 186:24; 187:4; 199:3, 5, 21; 200:19; 201:16; 202:9; 203:21; 209:8; 210:6; 216:18; 218:12, 16, 23; 219:6; 220:7
**WILLIAMS** [63] - 2:6, 19; 5:6; 17:22, 25; 18:5; 44:12, 24; 45:2, 4; 48:10; 49:3, 8, 16; 56:8; 58:8; 60:4, 7, 13; 64:18, 22; 65:4; 74:21; 84:2, 8, 11, 13, 16, 19; 85:20, 24; 86:22; 87:21, 25; 104:7; 114:15; 122:13, 15; 125:3, 10, 17, 25; 126:16; 143:2, 6; 174:15; 175:14; 187:2; 198:16, 22, 25; 202:3, 6; 204:3; 209:4; 210:1; 216:6, 10, 13; 217:19; 220:1, 6; 223:12
**window** [2] - 124:1, 3
**wish** [3] - 104:22; 161:22; 223:7
**withheld** [7] - 135:6; 143:12; 158:6; 167:6; 168:7, 9, 16
**withholding** [1] - 63:24
**Witness** [1] - 222:7
**witness** [3] - 5:2; 219:10; 222:5
**woman** [4] - 18:9; 165:12; 188:1
**wonderful** [1] - 170:23
**word** [2] - 48:25; 113:16
**words** [1] - 111:10
**worker** [5] - 8:16; 15:19; 16:12; 119:8; 206:5
**workers** [6] - 13:9; 63:5, 11, 16, 19; 97:5
**Workers** [5] - 3:14; 85:8; 86:5, 14; 96:3
**Workers'** [1] - 44:9
**workplace** [2] - 69:9; 70:8
**works** [6] - 26:18, 22-23; 48:14; 167:19; 213:12
**Worlington** [3] - 24:9, 11, 16
**worries** [1] - 127:2
**worry** [2] - 144:1; 178:15
**worst** [2] - 154:18; 157:3
**worst-case** [1] - 154:18
**write** [3] - 112:24; 124:18; 139:15
**write-up** [1] - 112:24
**write-ups** [1] - 124:18

**writing** [20] - 111:5;
121:16, 19; 137:3, 5, 9,
16, 18, 21; 139:17,
22-23; 140:4, 14, 17, 19;
156:11; 162:20; 193:12
**written** [8] - 64:8; 82:1;
122:3, 20; 132:25;
133:5; 191:21, 23
**wrongdoing** [1] - 197:9
**wrote** [2] - 115:11; 128:25
**year** [14] - 16:19; 20:16;
25:15; 30:6; 117:2;
129:5; 141:13; 152:1,
17; 164:6; 165:1;
178:11; 181:3
**years** [37] - 16:5, 18;
18:16; 19:10; 21:3;
25:15, 20; 27:4; 28:2;
29:9; 36:23; 41:7; 50:16;
54:22; 88:19, 21; 90:1;
103:20; 109:25; 110:20;
114:1; 117:17; 124:17;
129:20; 132:6; 138:23;
139:10; 141:24; 144:15;
156:3, 9; 164:19, 24;
180:14; 217:25
**you-all** [1] - 55:5
**younger** [1] - 205:4
**yourself** [5] - 68:2; 105:2;
157:20; 178:20; 213:14
**zebra** [1] - 12:23
**zero** [1] - 112:24
**Zitnak** [2] - 182:4; 183:1
**ZOOM** [2] - 1:12; 2:1
**Zoom** [3] - 120:7; 122:10;
222:5

TAMPA COURT REPORTING ASSOCIATES