## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BARBARA CERANEK,

     Plaintiff,

v.                                                    Case No: 8:20-cv-2292-CEH-SPF

UNITED AIRLINES, INC.,

     Defendant.

_____

### <u>ORDER</u>

This cause comes before the Court upon Defendant United Airlines, Inc.'s Motion for Summary Judgment (Doc. 24), Plaintiff Barbara Ceranek's Response in Opposition to Defendant's Motion for Summary Judgment (Doc. 34), and Defendant's Reply (Doc. 46).  Also before the Court are Defendant's Motions to Strike Plaintiff's Declarations in Support of Plaintiff's Response (Docs. 48 and 49) and Plaintiff's Responses in Opposition (Docs. 52 and 53).

In this employment discrimination case, Plaintiff alleges that Defendant committed age discrimination and retaliation under state and federal law when it terminated her in 2019 after 30 years of service.  Defendant seeks summary judgment on all four counts (Doc. 24).  Defendant also moves to strike some or all of two declarations that Plaintiff submitted in response to the motion for summary judgment, on the grounds that they contain inadmissible hearsay or are not based on personal knowledge (Docs. 48 and 49).

Upon review and consideration, the Court will deny the motions to strike and grant the motion for summary judgment.

## I.  FACTUAL BACKGROUND[1]

Plaintiff Barbara Ceranek began her employment with Continental Airlines in 1990 as a Reservation Sales Agent. Doc. 44 ¶ 3.  When Continental merged with United Airlines in 2010, she became a Remote Reservation Sales Representative ("RSSR") for United. *Id.* ¶¶ 2, 4.  She was subject to a collective bargaining agreement in this role. *Id.* ¶ 5.

Defendant terminated Plaintiff's employment on September 9, 2019. Doc. 30-5 at 4.  She was 62 years old. Doc. 24-16 at 2.

### A. The Duties of a Reservation Agent and Plaintiff's Performance

As an RSSR, Plaintiff was tasked with providing excellent customer service to the public within United's policy guidelines. Doc. 44 ¶ 16.  She was considered an "empowered agent" who was permitted to make exceptions to United policies in her discretion, as long as the exceptions were properly documented. *Id.* ¶¶ 17-18; Doc. 25-1 at 11:32, 12:33-34.  She explained that making exceptions, which often entailed waiving fees, constituted a large part of her job duties. *Id.* at 16:50-52.  Plaintiff received "extensive training regarding the waivers," which were "encouraged,

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' joint Stipulation of Agreed Material Facts (Doc. 44).  For purposes of summary judgment, the Court considers the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

promoted, and required by United" as part of RSSRs' responsibility to deescalate passengers' problems and avoid the passenger contacting customer service. *Id.* at 12:34.

Plaintiff submitted declarations from two former RSSRs from different teams: Jose Farfan, her close friend, and a woman named Diseree Benedictus, who was also terminated in 2019 but was not acquainted with Plaintiff. Doc. 34-1; Doc. 34-2.  Both affirmed that RSSRs were given "vast discretion to accommodate passenger requests" and waive fees. Doc. 34-1 ¶ 7-8; Doc. 34-2 ¶ 3-6.  A document labeled "Quality Time: Customer Contact Center Quality Assurance, May 2017," states: "If a waiver or empowerment is the right thing to do, please go ahead and waive it and document your record." *Id.* at p.6.  Farfan and Debenedictus explained that prior supervisor approval for a waiver was not required; they needed only to "appropriately document[]" the reason for the waiver. *Id.* ¶ 7; Doc. 34-1 ¶ 8.  Plaintiff agreed that the reason for a waiver needed to be "documented and justified." Doc. 25-1 at 12:34.

Plaintiff received positive performance reviews throughout her employment with Continental and United. *Id.* ¶ 7.  In 2019 she received consistent ratings of "outstanding" and several forms of recognition from customers and staff for her performance. Doc. 25-8 at 29-30; Doc. 30-5 at 5.  She had never received a negative write-up or disciplinary warning and had perfect attendance. *Id.*; Doc. 24-16 at 2.

**B. United's "Waivers and Favors" Policy**

United's employee-wide policies were maintained in documents called the *Working Together Guidelines* and the *Code of Ethics and Business Conduct*. Doc. 44 ¶¶ 9,

12.   Plaintiff was extensively trained on these policies. Doc. 44 ¶ 15; *see* Doc. 24-21 (training records).   The *Working Together Guidelines* contain the parameters for using employee travel privileges, or "pass travel." Doc. 24-19.  Pass travel permits employees and their immediate families to fly standby without cost. *Id.* at 1-2; Doc. 25-6 at 9:35-36.

Pass travel is differentiated from a "revenue" booking, which refers to a reservation that is paid for with miles or cash. *See id.* at 9:35.  Employees are eligible for discounted revenue tickets for themselves and their immediate family.  *Id.* Regarding revenue bookings, the *Guidelines* state:

> Employees and pass riders are not allowed to book or manage revenue reservations for friends or family members unless it's part of their job duties.  If you're allowed to book or manage revenue reservations, you'll need to follow all fare and booking rules.

*Id.* at 3.  Friends and family members are also addressed in United's conflicts of interest policy, known as "waivers and favors."  The waivers and favors policy is contained in the *Code of Ethics and Business Conduct*, which states:

> You should exercise care when providing travel services to family members, friends, people with whom you have close personal relationships and co-workers.   You must avoid providing preferential treatment such as unauthorized deviation from established rules for pricing, issuance, exchange or refunding of tickets, waiving of travel restrictions or other terms applicable to discount fares, inappropriate upgrades, improperly withholding seats from inventory or blocking space and ignoring boarding priorities.  Should there be a valid business reason for deviating from established rules, you must receive prior written approval from your supervisor or manager.

Doc. 24-20 at 4-5.

United employees interpret these written policies in a variety of ways. Farfan and Debenedictus each affirmed that, based on their respective 20 years of experience as a reservation agent, reservation agents are permitted to book and manage the reservations of their family and friends. Doc. 34-1 ¶ 11; Doc. 34-2 ¶ 8. Indeed, it is "routine and common place" to do so, especially because it is the only way to apply their employee discount to the reservation. *Id.* Reservation agents simply need to "follow the regular fare and booking rules," which "empower [them] to make waivers of fees and make other accommodations consistent with [their discretion]." *Id.* ¶ 9, Doc. 34-1 ¶ 12. What is prohibited is performing "special favors" for family members, meaning taking any action that a member of the general public would not be entitled to. *Id.* ¶ 10; Doc. 34-1 ¶ 13. But if a member of the public would be entitled to a waiver, the RSSR can also give that waiver to a family member. *Id.*

Plaintiff's understanding of the waivers and favors policy accords with that of Farfan and Debenedictus. Because it is a reservation agents' job to make revenue reservations, they are permitted to do so for their friends and family as long as they treat friends and family just as they would treat any member of the public—no better but also no worse. Doc. 25-1 at 14:42-43, 30:105-108. Empowered agents may waive fees for a regular customer or for their family member as long as they write down the reason for doing so. *Id.* Those who are not empowered agents would need to document the reason with external records, such as a death certificate for a funeral waiver, or obtain prior supervisor approval. *Id.*

Defendant's witnesses disagree with this interpretation.  Susan House, an RSSR who was assigned to perform random audits on waivers, stated her belief that it is prohibited to make a reservation for a family member at all. Doc. 25-3 at 9:28, 14-15. With respect to waivers for members of the general public, they must be documented with an external record or contain a note stating that the waiver is being done without the external record as an exception to policy. *Id.* at 17:59, 7:21.  This policy applies to all agents, whether or not they are empowered. *Id.* at 7:22.

Laurie Ledonne, a senior Human Resources ("HR") manager, stated that reservations agents are not permitted to make revenue reservations for their friends and family unless they have prior supervisor approval. Doc. 25-6 at 12:45-46.  Tracey Bartlett, a supervisor two levels above Plaintiff, explained that RSSRs may only make reservations for their family members when they are using their employee discount. Doc. 25-4 at 101-102.  She testified that agents are not permitted to give exceptions or waivers to their family members at all. *Id.* at 47:177-78.

Cindi Hamburg, Plaintiff's direct supervisor; Richard Stepanski, a corporate security investigator; and Unise Rosner, a senior manager, shared consistent interpretations of the policy with each other.  While reservations agents are permitted to make reservations for their family and friends, they cannot later "touch" the reservation, meaning make any changes to it themselves. Doc. 25-5 at 19:76; Doc. 25-7 at 11:34-35; Doc. 25-8 at 9:27.  Hamburg, Stepanski, Rosner, and Ledonne all agreed that the only scenario in which an agent could make changes to a family member's booking would be if she had received documented prior approval from a supervisor.

Doc. 25-5 at 21:81; Doc. 25-6 at 34:135; Doc. 25-7 at 11:34-35; Doc. 25-8 at 10:28. Otherwise, the family member must go through the supervisor or an unrelated reservation agent to make the change or waiver. Doc. 25-5 at 27:107-08; Doc. 25-7 at 11:34-35; Doc. 25-6 at 10:37-39, 11:44; Doc. 25-8 at 10:29.

### C. United's Multiple Bookings Policy

The *Working Together Guidelines* also prohibit multiple bookings, which is when an employee holds a revenue reservation along with a standby booking "for the same route and/or the same trip." Doc. 24-19 at 3. The rationale is that a revenue reservation takes away a seat that could be sold, "so it's important that you only [make a booking] when you genuinely intend to use it." *Id.* The *Guidelines* warn that "[m]isuse of pass travel privileges" could lead to disciplinary action up to and including termination. *Id.* at 2.

Plaintiff testified that she was trained that the multiple bookings policy prohibited only multiple bookings on the exact same trip; otherwise, it is a different routing and does not violate the policy. Doc. 25-1 at 23:77-80, 24:81-83. Farfan agreed with Plaintiff's interpretation. Doc. 34-1 ¶ 17. As an example, he explained that the policy did not prohibit making a reservation for a direct flight from Denver to Tampa while also seeking to fly standby for flights from Denver to Houston to Tampa, because a nonstop route was different from a route with a layover. *Id.*

In contrast, Defendant's witnesses testified that the multiple bookings policy prohibited any duplicate bookings between the same two cities, even if they resulted from different routes. Doc. 25-4 at 39:146; Doc. 25-7 at 19:69-70 (explaining that the

7

"same trip" means the same origin and destination, even if one flight is nonstop and the other is not). Rosner's interpretation went further: she stated that the policy prohibited holding any two tickets for the same time period, regardless of the destination, because it would be impossible to travel on both at the same time. Doc. 25-8 at 17:57-58.

### D. Allegations of Ageist Remarks

In early 2019, Cindi Hamburg became Plaintiff's direct supervisor. Doc. 44 at ¶ 20. Hamburg was approximately 44 years old at the time. *See* Doc. 24-5 ¶ 29 (Hamburg was 47 on February 17, 2022).

Plaintiff alleges that Hamburg asked Plaintiff her age in one of their first conversations and thereafter brought up retirement on many occasions. She states that Hamburg made the following comments:

> [W]hen are you going to retire? Aren't you too old to be doing this job? Are you going to die at the computer taking the reservations? When are you going to retire and take the time off? And finally, If you don't retire, I will fire you sooner or later.

Doc. 25-1 at 6:9. Plaintiff felt targeted and harassed by Hamburg with respect to her age and her performance. Doc. 24-16. at 2. As one example, she states that Hamburg "sent me an email regarding retirement[] benefits, even though I never asked for it." *Id.* The email, addressed "Hello Team" and sent on May 31, 2019 to a number of individuals along with Plaintiff, referenced rumors about the possible loss of employees' pension if they did not retire by August or September. *Id.* at 11. Hamburg explained that the rumors were "not all true." *Id.*

For emotional support, Plaintiff would call Farfan to report the comments that Hamburg made to her. Doc. 25-1 at 6-7; Doc. 34-1 ¶ 3.  Farfan affirms that:

> On several occasions throughout the first half of 2019, Mrs. Ceranek expressed to me in confidence that Mrs. Hamburg was harassing her and targeting her because of her age.  For example, Mrs. Ceranek told me that Mrs. Hamburg questioned her about her age and anticipated retirement date, and was pressuring her to retire.  Mrs. Ceranek was extremely distraught over the conversations with Mrs. Hamburg and feared for her job.

*Id.* ¶ 9.

Plaintiff did not report the comments she alleges Hamburg made to her through any of United's official methods of reporting discrimination or harassment. Doc. 25-1 at 19-21, 33:117-119.   Although Farfan encouraged her to do so, she explains that she was afraid of retaliation.  *Id.*; Doc. 34-1 ¶ 9.

Hamburg denies making any age-related comments to Plaintiff or any individual references to retirement. Doc. 25-5 at 9:36.  She explains that she sent an email regarding retirement benefits to her team of approximately 30 to 40 RSSRs because some of them had asked about retirement during a meeting that not all team members had been able to attend. *Id.* at 31:123-24.  She states that she was unaware of Plaintiff's age. Doc. 24-5 ¶ 25.  They had never met in person or seen each other on video, as RSSRs were not equipped with cameras and attended meetings via telephone. *Id.*; Doc. 25-5 at 8:32.

### E. Investigation Into Plaintiff's Alleged Policy Violations

In May 2019, RSSR Susan House conducted a fee waiver audit. Doc. 44 at ¶ 21.  She testified that her job duties at that time required her to conduct monthly "spot

9

checks" so that agents who were not documenting waivers correctly could be coached on how to do so. Doc. 25-3 at 5:11-14, 11:35.  Out of around 400 waivers reviewed per month, House usually flagged about 20 to 30 as improperly documented. *Id.*  She would then contact each agent's supervisor to identify the issue as a training need. *Id.* at 5:11-14.

House's audit identified a miles redeposit fee waiver that Plaintiff had made in February 2019, with the cited reason being "goodwill gesture due to a death in the family." Doc. 44 ¶ 22.  House explained that the waiver lacked documentation in the form of a death certificate, obituary, or specific note stating that documentation was forthcoming or had been waived. Doc. 25-3 at 6:15, 9:27-28, 16:57-58, 17:59.  House observed that the last name of the customer whose fee had been waived was the same as the reservation agent. Doc. 44 ¶ 23.  She then emailed Tracey Bartlett, the senior manager who supervised Hamburg, to explain what she had noticed, stating: "I would think this would be a violation of Friends & Family, but your call.  I wanted to pass along the information to you." Doc. 25-3 at 27.

As a result, Hamburg had a virtual meeting with Plaintiff and a union representative on June 4, 2019, to ask her about what Defendant viewed as a possible policy violation. Doc. 44 ¶ 25.  Plaintiff explained that the passenger was her daughter, and that she had waived the redeposit fee because her daughter had been unable to travel due to the death of her best friend's mother. *Id.* ¶¶ 26-27.  On Hamburg's request, Plaintiff submitted a written statement in which she explained that she had treated her daughter like any other United customer with a paid ticket, showing compassion in

the customer's time of distress by making an exception to the policy that restricted funeral waivers to the death of a close family member. Doc. 24-6 at 1.  Apologizing, she stated that she did not realize making this waiver was not in compliance with the Friends and Family policy. *Id.*

HR manager Laurie Ledonne testified that she, Bartlett, and Hamburg had a "collaborative conversation" in which they decided to begin an investigation into whether it was an isolated incident. Doc. 25-6 at 12:48; Doc. 24-11 ¶ 17.  Hamburg sent Plaintiff's statement to Bartlett and Ledonne on June 6, 2019, along with her notes from the June 4 meeting. Doc. 30-4 at 1-2.  Hamburg's notes indicate that she told Plaintiff that HR would review the situation to determine what if any discipline was appropriate, which would depend on the results of an investigation. *Id.* at 2.  Hamburg also wrote the following:

> In closing, if no other occurrences or situations are found during this investigation, I would request a [documented verbal warning] to be issued.  Barb is a very good employee, who does a great job servicing our customers each and every day.  Hopefully this was a one-time error in judgment and she will learn from this mistake going forward.

*Id.*  A documented verbal warning is the lowest level of discipline. Doc. 25-4 at 11:35.

Richard Stepanski from the Corporate Security department conducted the investigation. Doc. 44 ¶ 28.  He reviewed reservations made by Plaintiff during the last five years, filtering his search results so that he only viewed reservation changes made for customers with the same last name as Plaintiff. *Id.*; Doc. 25-7 at 8:23.  While his investigations "typically" go back only three years, he testified that it is "not

uncommon" to go further back; he did so in this investigation because of the "frequency of the changes being made." *Id.* His investigation did not include a review of the total number of reservations that Plaintiff made during this period, the total number of tickets she booked for her family members, or how much revenue those tickets generated for United compared to the fees that were waived. *Id.* at 9:28-29, 10:31, 15:53. He determined that she had waived fees for family members in 37 reservations, which included 43 tickets. *Id.* at 12:40; Doc. 24-14 at 1. He also asserted that on multiple occasions she and other family members had used her pass travel benefits while holding a confirmed reservation, which violated the multiple bookings policy. *Id.*

After Stepanski had completed his investigation but before he had finalized his report, Ledonne reached out to him to ask for his preliminary results. Doc. 24-1 ¶ 20. He reported that Plaintiff had made multiple waivers for family or friends. *Id.* Ledonne, Bartlett, and Hamburg then had what Ledonne described as another "collaborative conversation" to discuss how to move forward. Doc. 25-6 at 15:57, 16:64-17:65. Ultimately, the decision was made to offer Plaintiff retirement in lieu of proceeding with an Investigative Review Meeting ("IRM"), the termination procedure mandated by the collective bargaining agreement. Doc. 44. ¶ 29.

Ledonne denied being the one to recommend termination, stating that it was a collective decision by Bartlett and Hamburg. Doc. 25-6 at 8:29-31. She alleged that Hamburg advocated in favor of giving Plaintiff the option to retire voluntarily before proceeding with the IRM. *Id.* at 17:65. Bartlett testified that she had been the one to

suggest and recommend termination, but that it had resulted from a mutual discussion with Ledonne. Doc. 25-4 at 12:39, 13:40.  She stated that Hamburg had been part of the discussion but had not recommended termination, and that Ledonne had been the one to suggest the retirement offer. Doc. 23:81, 13:42.  Hamburg testified that she had "never" recommended termination. Doc. 25-5 at 7:27.  She had merely been told by Ledonne and Bartlett that Plaintiff should be subject to an IRM, but that she should offer Plaintiff retirement as an initial alternative. *Id.* at 9:36, 10:37-38.

On July 22, 2019, Hamburg had a phone meeting with Plaintiff and a union representative. Doc 44 ¶ 3.  A transcript is available of this meeting, which was recorded. *See* Doc. 25-1 at 35-45.[2]  Hamburg notified Plaintiff that the preliminary results of the investigation revealed she had engaged in additional policy violations, but that United was offering her the option to voluntarily retire with full retirement benefits. Doc. 44 ¶¶ 29-31.  If she did not accept the voluntary retirement, she would be placed on leave and United would move forward with an IRM. *Id.*  Hamburg initially told Plaintiff she would have until 5:00 PM to decide. *Id.* at 31.  The meeting occurred at approximately 1:00 PM. Doc. 25-1 at 36:130.

Plaintiff asked for specific information regarding the alleged violations, but Hamburg said she could not tell her and could only say they were serious. *Id.* at 37:133-34, 40:148.  Hamburg also denied Plaintiff's request to see the retirement offer in

---

[2] Hamburg also summarized the meeting in written notes that were placed in Plaintiff's personnel file. Doc. 30-4 at 5, Doc. 25-6 at 16:63.  Her notes included Plaintiff's allegation of age discrimination. Doc. 30-4.

writing. *Id.* at  38:137-140.  Plaintiff declined the offer for voluntary retirement. Doc. 44 ¶ 32.  She explained that she welcomed an IRM because an investigation into her record would reveal that she did nothing wrong, as she had only waived fees that any paying customer would have been entitled to. Doc. 25-1 at 39:141-42, 40:146.  She also stated that she intended to sue for age discrimination. *Id.* at 38:138, 39:142-143, 41:150-52.  Both Hamburg and the union representative urged Plaintiff to take the retirement offer, which the union representative said he had never heard of happening before. *Id.* at 39:144; *see also id.* at 39:143, 40:147, 42:156 (Hamburg repeatedly urging Plaintiff to reconsider, offering her time to change her mind, warning her that if she said no "there's no going back.").  Plaintiff continued declining, stating that it was her "final answer." *Id.* at 39:142, 10:147, 42:156.  Hamburg asked Plaintiff to hold on, later testifying that she was sending an instant message to Ledonne for instructions. Doc. 25-5 at 14:53.  When she returned to the call, she stated "I'm just going to go ahead and [place you on unpaid leave] today, Barb.  You repeatedly said that you do not want the retirement, so I will send you over this letter and we will move forward from here." Doc. 25-1 at 43:157.  Hamburg then emailed Plaintiff a letter notifying her that she was being placed on unpaid leave. *See* Doc. 44 ¶ 33; Doc. 25-5 at 14-53; Doc. 30-4 at 6.  At that point, the option to voluntarily retire was no longer present. Doc. 25-6 at 19:74.

Stepanski's report became available on August 9, 2019. Doc. 24-2 at 1.  Bartlett, Ledonne, and a union representative met with Plaintiff to ask whether she had ever committed the type of violations he listed in his report. *See* Doc. 30-3 at 57; Doc. 24-

15 at 1.  Bartlett alleges that Plaintiff did not deny committing the violations but requested specific information about what Stepanski had accused her of, and asked if it was still possible to accept the retirement offer. *Id.*; Doc. 24-11 ¶ 23.  Plaintiff followed up with a written statement in which she said that "it is very hard to comment on a situation without being able to view the related information." Doc. 30-4 at 9.

### F. Termination Proceedings

Plaintiff received an IRM Notice on August 8, 2019, and a revised Notice on August 12, 2019. Doc. 44 ¶¶ 34, 37.  The notices informed her of the date of the IRM and gave a brief statement of the grounds for the proposed termination. *Id.*; Doc. 30-3 at 41, 54.  Both notices were signed by Hamburg. *Id.*  The first notice referred only to the policy violation of making a waiver for a family member. Doc. 30-3 at 41.  The second notice was revised to add a second alleged violation of the multiple bookings policy. *Id.* at 54-55.  Hamburg testified that she did not make the revisions, but that "leadership" or "HR" made them and forwarded her a revised document to sign. Doc. 25-5 at 32:125-127.  She also stated that IRM notifications are physically mailed to the recipient by an administrative office, not by Hamburg. *Id.* at 33:129.  Both notices informed Plaintiff that senior manager Unise Rosner would preside over the IRM as the Hearing Officer, and that it would occur on August 19, 2019. Doc. 30-3 at 41, 54.

Regarding the nature of an IRM, Bartlett testified as follows:

> Question:    And so it's pretty much a foregone conclusion if you're at an IRM you're getting terminated; is that fair?

Answer:  That's what an IRM is, is that you've been terminated, yes.

Doc. 25-4 at 26:92. Bartlett had served as a Hearing Officer for approximately 40 IRMs and could recall only one instance in which she did not uphold termination. *Id.* at 25:91. Rosner, who had served as the Hearing Officer in approximately a similar number of hearings, could not give an exact answer as to how many of them had resulted in termination but agreed that she had ruled in favor of the company more often than not. Doc. 25-8 at 4:5-6. However, she testified that she was not obligated to uphold a termination. *Id.* at 12:38. Rather, her responsibility was to hear the case from both sides, consider the evidence, and come to a conclusion. *Id.* at 7:18. The termination decision does not "become[] final" or "is [not] made" until after the hearing. *Id.* In addition, HR provides "recommendations [and] guidance" during the IRM process. *Id.* at 26:92. Ledonne testified that it is "never a foregone conclusion that anyone going to an IRM hearing with proposed termination is going to be terminated." Doc. 25-6 at 8:32. Hamburg explained that the IRM is "like the court case to determine whether someone should be terminated." Doc. 25-5 at 9:34.

Plaintiff's IRM hearing occurred virtually, and Plaintiff did not appear on camera. Doc. 44 at ¶ 40; Doc. 25-5 at 19:74.[3] Hamburg and Stepanski presented on behalf of Defendant while a union representative presented on behalf of Plaintiff. *Id.* ¶ 41. Hamburg prepared her own presentation based on Stepanski's findings, but

---

[3] Although an official transcription of the hearing is not available to the Court, the record contains unofficial 'minutes' taken by a United representative. *See* Doc. 30-3 at 59-67.

testified that Bartlett had reviewed and edited it in advance. Doc. 25-5 at 17:65-66.  In her presentation, Hamburg detailed the results of Stepanski's investigation and concluded that "termination is warranted and justified" based on the fee waivers and pass travel violations. *See* Doc. 30-3 at 62-63.  In response, the union representative emphasized Plaintiff's positive performance and the fact that the company had offered her the opportunity to retire but abruptly took the option away. *Id.* at 64.  He also briefly questioned some of the policy violations. *Id.* at 65-66.[4]  Plaintiff concluded by making a statement in which she "apologize[d] profusely for wrongdoing" and "begg[ed]" for the opportunity to retire. *Id.* at 67.

Rosner upheld Plaintiff's termination. Doc. 44 ¶ 42.  She testified that she believed the allegations against Plaintiff were so severe as to warrant termination, because of the number of family waivers as well as the multiple booking violations. *Id.* at 12:38, 9-11.  Rosner wrote her conclusions in an IRM Decision Letter dated August 26, 2019. Doc. 30-5 at 1.  However, Rosner retracted the decision letter on September 4. Doc. 25-8 at 26:93-94.  She explained that Ledonne had provided feedback that led her to revise the letter, which she had mistakenly sent too soon. *Id.* at 25:90-91, 26:94, 27:96.  In contrast, Ledonne testified that United's "labor partners" review and edit it to ensure compliance with union rules, but that she personally "has no role

---

[4] Plaintiff explained that she and her union representative had not received the results of Stepanski's investigation, including records comprising hundreds of pages, until two days before the hearing. Doc. 25-1 at 51:190.  She was not permitted to have her own copy of the records and was therefore unable to review them before the hearing. *Id.* at 195-96.

whatsoever" in preparing the letter. Doc. 25-6 at 30-32.[5]  Rosner sent a revised IRM Decision Letter on September 6, 2019. Doc. 30-5 at 4.  The new letter removed details regarding Plaintiff's statement at the hearing and added information regarding the investigation. *Id.* at 1-6.  Plaintiff's termination was then final.

### G. Plaintiff's Official Discrimination Complaint

On August 11, 2019, the day before the revised IRM notification letter was sent and one week before her IRM hearing, Plaintiff sent an email making an "official complaint" against Hamburg. Doc. 24-16 at 1-2.  Plaintiff stated that she felt "targeted, attacked and terrorized" by Hamburg, though she had never had a problem with other supervisors and had an exceptional performance at United. *Id.* at 2-3.  She alleged that, after initially asking Plaintiff her age, Hamburg had on "multiple occasions" asked her when she was "finally going to 'retire, move on, enjoy life.'" *Id.* at 2.  Plaintiff attached a copy of the email regarding retirement benefits that Hamburg had sent to the team in May 2019. *Id.* at 7.  She also made several other complaints about Hamburg's supervision that were not related to age discrimination, attaching supporting documents. *Id.* at 2, 5, 6.  Plaintiff concluded with a detailed description of the July 22 conversation, focusing on the fact that Hamburg had retracted the retirement offer while the meeting was still ongoing despite telling her she would have until 5:00 to decide. *Id.* at 2-3.  Plaintiff said that she wanted to take the retirement option right after the conversation, but it was too late. *Id.* at 3.  She also explained that she had treated

---

[5] Hamburg and Bartlett each testified that they had no input into the decision letter, and there was no evidence to the contrary. Doc. 25-5 at 36:141-42; Doc. 25-4 at 26:95-27:96.

her daughter like any other passenger when she waived the redeposit fee in February 2019. *Id.*

Plaintiff sent the email to Rosner, Stepanski, her union representative, United Airlines' CEO, and others. *Id.* at 1.  It was forwarded to Bartlett and Ledonne the following day.[6] *Id.*  Rosner testified that she received the email but did not read it before the IRM because she "did not want to go in with any preconceived ideas or thoughts about the case." Doc. 25-8 at 28:100-101.  However, she "probably did realize [Plaintiff] was making claims against Ms. Hamburg" at the time she received it. *Id.* at 28:102.  Ledonne forwarded Plaintiff's email to "the corporate security team that handles internal harassment and discrimination investigations." Doc. 25-6 at 27:107.

The discrimination investigation was assigned to Corporate Security Investigations Manager Monique Morris on August 13, 2019. Doc. 44 ¶ 39.  Morris's investigation entailed interviewing Plaintiff on August 20, 2019, the day after the IRM, and Hamburg on August 21. Doc. 24-10 at 2.  She also listened to the recording of the July 22 call and reviewed the documents attached to Plaintiff's email. *Id.* at 4-5.  She concluded that the recording and documentation did not support Plaintiff's allegations of discriminatory conduct. *Id.*  Morris also found that the alleged ageist comments were unsubstantiated because Hamburg denied making them and there were no witnesses. *Id.*  Morris detailed her findings in a report dated September 30, 2019 and closed the investigation file. *Id.* at 1; Doc. 24-9 ¶¶ 20-23.

---

[6] Although "laurie.ledone@united.com" is listed as a recipient of Plaintiff's original email, it is unclear whether Ledonne received it directly because her name is spelled incorrectly.

After exhausting her administrative remedies, Plaintiff filed the instant action on September 29, 2020.  She asserts claims of age discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA") and the Florida Civil Rights Act ("FCRA").

Defendant now moves for summary judgment (Doc. 24), which Plaintiff opposes (Doc. 34).  Defendant also moves to strike all or part of two of the declarations Plaintiff offers in support of its opposition (Docs. 48, 49).

## II.    MOTIONS TO STRIKE

At the outset, the Court will address Defendant's motions to strike.  Defendant first moves to strike two paragraphs of the Declaration of Jose Farfan because they are purportedly comprised of inadmissible hearsay. Doc. 48.  One paragraph recounts Plaintiff's contemporaneous reports to Farfan of the harassing and ageist comments Hamburg allegedly made to her during the first half of 2019. Doc. 34-1 ¶ 9.  The second paragraph at issue refers to Farfan's reaction of shock upon learning the reason for Plaintiff's termination, which he states was contrary to his 20 years of experience as a Reservation Agent. *Id.* ¶ 11.  Defendant asserts that these paragraphs are entirely based on out-of-court statements made by another party and do not fall within a hearsay exception. Doc. 48 at 3-4.

In response, Plaintiff argues that the statements are not offered for their truth, but rather to corroborate testimony that Defendant claims Plaintiff fabricated or for their effect on the listener. Doc. 52 at 1-3.  Plaintiff also contends that the statements may be rendered admissible for their truth if additional foundation is laid to establish

the hearsay exceptions of state of mind, excited utterance, or present sense impression. *Id.*

Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that evidence offered in support of or opposition to a motion for summary judgment must contain facts that would be admissible in evidence. Accordingly, the "general rule" is that inadmissible hearsay cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999). Not all out-of-court statements are inadmissible, however. District courts may consider hearsay statements that can be "reduced to admissible form"; the "most obvious way" to do so is by calling the affiant as a witness at trial. *Id.* (collecting cases); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996). In addition, the court may consider out-of-court statements that are not hearsay or fall within an exception to the hearsay rule. *Macuba*, 193 F.3d at 1323-24.

Federal Rule of Evidence 801(d)(1)(B) explains that prior consistent statements are not hearsay as long as they are consistent with the witness's testimony and are offered "to rebut an express or implied charge that the declarant recently fabricated it[.]" In addition, statements that are not offered for their truth are not hearsay. *See* Fed. R. Evid. 801(c). For example, if a statement is being offered only to show its effect on the person hearing it, it does not qualify as hearsay. *See*, *e.g.*, *United States v. Harris*, 886 F.3d 1120, 1129-30 (11th Cir. 2018). Courts have therefore considered out-of-court statements for these limited purposes in a motion for summary judgment. *See*, *e.g.*, *Blash v. City of Hawkinsville*, 856 F. App'x 259, 261 n.2 (11th Cir. 2021) (out-of-

court statements that were introduced to show effect on the listener could be considered on summary judgment).

Here, the Court agrees with Plaintiff that the out-of-court statements in Farfan's declaration are not inadmissible hearsay. Paragraph Nine contains his account of Plaintiff contemporaneously reporting Hamburg's harassing comments related to her age. Doc. 34-1 ¶ 9. Plaintiff reported the same comments in her deposition and the underlying Complaint. Doc. 25-1 at 6:9, 7:14-15, 32:115-116; Doc. 1 ¶¶ 18-20. Hamburg denies making the comments or even being aware of Plaintiff's age, thereby raising a question about the veracity of Plaintiff's account. Doc. 24-5 ¶¶ 23, 25; Doc. 25-5 at 9:36, 10:37. Plaintiff's contemporaneous reports of the alleged comments—consistent with her current testimony and made before any motive to fabricate could have arisen—thus qualify as prior consistent statements that are not hearsay under Rule 801(d)(1)(B).[7]

Farfan's statement in Paragraph Eleven is also not hearsay. Defendant takes issue with the first line of this paragraph that Mr. Farfan "was similarly shocked *to hear that* Mrs. Ceranek was terminated for managing reservations of family members…" Doc. 34-1 ¶ 11 (emphasis added); Doc. 48 at 4. But Plaintiff is correct that the statement of Defendant's alleged reason for terminating Plaintiff is not offered for its truth, but rather to show Farfan's reaction to hearing it. *See* Doc. 52 at 3; *Blash*, 856 F.

---

[7] For this reason the Court need not address Plaintiff's additional arguments raising other alleged hearsay exceptions. *See* Doc. 52 at 2.

App'x at 261 n.2.  The statement is therefore not hearsay.  Defendant's Motion to Strike the Declaration of Jose Farfan is due to be denied in all respects.

Next, Defendant argues that the entire Declaration of Diseree Debenedictus (Doc. 34-2) must be struck because it is conclusory and not based on personal knowledge.  Doc. 49.   Specifically, Debenedictus does not have any personal knowledge of "any fact related to this case," such as "Plaintiff, Plaintiff's manager, the events surrounding Plaintiff's termination, and the policies and procedures that Plaintiff violated." *Id.* at 3.  In addition, her statements about Defendant's policies are conclusory because she can only speak to the policies of her own team. *Id.* at 4.  In response, Plaintiff argues that Debenedictus's declaration consists of her own experience working in the same position as Plaintiff during the same time period. Doc. 53.  Debenedictus does not attempt to offer any opinions or statements regarding Plaintiff, only her direct knowledge of the company-wide policies to which they were both subject. *Id.* at 2-3.

Under Federal Rule of Civil Procedure 56(c)(4), evidence that is offered in support of or opposition to a motion for summary judgment must be based on personal knowledge.  The Declaration of Diseree Debenedictus complies with this requirement. In arguing otherwise, Defendant relies on caselaw that is inapposite. Doc. 49 at 3-4. In *Broughton v. School Bd. of Escambia Cnty., Fla.*, 540 F. App'x 907, 911 (11th Cir. 2013), the court upheld the district court's decision to strike an affidavit due to the affiant's lack of personal knowledge.  The affiant had alleged that he was aware of the events at issue and had opined about the ultimate issue in the case, even though he did not

work for the school board during the relevant time period. *Id.* In contrast, here Debenedictus does not offer opinions or information that is outside the scope of her own experience and direct knowledge. Doc. 34-4. She does not make any statements regarding Plaintiff, Hamburg, or the reason for Plaintiff's termination, and speaks only to company-wide policies during the time period that is relevant to the case. *Id.*

Further, Defendant's implication that different policies applied to different teams of reservations agents, Doc. 49 at 3-4 ("Debenedictus failed to reference any policy that applied to both herself and Plaintiff, as [Debenedictus's supervisor] had no oversight of Plaintiff"), is belied by its employees' deposition testimony and its own motion for summary judgment—all of which assert that Plaintiff violated company-wide policies that applied to all reservation agents. *See*, *e.g.*, Doc. 24 at 2-4. Debenedictus's description of the application of company-wide policies during the relevant time period is within her direct and personal knowledge. To the extent Defendant now seeks to argue that company-wide policies may have been applied differently within different teams, this subject would go to the weight to be given to her testimony rather than its admissibility. *See Cinquini v. Synchrony Bank*, 8:16-cv-03409-CEH-TGW, 2018 WL 7284359 (M.D. Fla. 2018) (Honeywell, J.) (objections to witness declaration went to the weight of the evidence and the declarant's credibility rather than admissibility). Because the Declaration of Diseree Debenedictus complies with Rule 56(c)(4), Defendant's Motion to Strike is due to be denied.

## III.   MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2).   In determining whether a genuine issue of material fact exists, the Court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003). Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).   A fact is "material" if it may affect the outcome of the suit under governing law.   *Id.*

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "Only when that burden has been met does the burden shift to the non-moving party." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

"[I]n order to survive summary judgment, the nonmoving party must set forth specific facts showing there is a genuine issue for trial." *Johnson v. New Destiny Christian Ctr. Church, Inc.*, 826 F. App'x 766, 770 (11th Cir. 2020) (citing *Anderson*, 477 U.S. at 249-50). "[U]nsupported 'conclusory allegations' do not suffice." *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 596 (11th Cir. 2019). Likewise, "[a] 'mere existence of a scintilla of evidence' cannot suffice to create a genuine issue of material fact." *Johnson*, 826 F. App'x at 770 (quoting *Anderson*, 477 U.S. at 252).

## B. Discussion

Defendant is entitled to judgment as a matter of law on Plaintiff's state and federal claims.  Viewing all evidence in the light most favorable to Plaintiff, she has failed to provide either direct or circumstantial evidence from which a reasonable jury could conclude that age discrimination was the but-for cause of her termination.  She has also failed to establish that Defendant retaliated against her for making an age discrimination complaint.  Accordingly, summary judgment in favor of Defendant is warranted on all four claims.

## 1. Summary Judgment is Warranted on the Age Discrimination Claims.

### a) *The Parties' Arguments*

Plaintiff raises a claim of age discrimination under the FCRA and the ADEA, respectively.  In moving for summary judgment on these claims, Defendant first asserts that Plaintiff has not presented any direct evidence of age discrimination. Doc. 24 at 16 n.12.  Nor has she made out a prima facie case of age discrimination or presented

circumstantial evidence from which a reasonable jury could conclude that age was the but-for cause of her termination. *Id.* at 16.  Defendant argues there is no evidence that Hamburg specifically targeted Plaintiff because of her age, or that she—or anyone involved with the investigation into her misconduct—was even aware of Plaintiff's age. *Id.* at 16-17.  There is also no evidence that the decisionmaker of her termination, Rosner, terminated her based on her age or knew of her age. *Id.* at 18-19.

Defendant further asserts that Plaintiff cannot make a showing of pretext. *Id.* at 19-21.  She was fully aware of the policies she was violating, given her training and decades of experience. *Id.* at 17-18.  Plaintiff also cannot identify anyone in her role who engaged in the same behavior and was not terminated. *Id.* at 20.  In all, Plaintiff's disagreement with Defendant's policies is not enough to survive summary judgment given the deference courts must give to an employer's business decisions. *Id.* at 21.

Responding in opposition, Plaintiff argues that she has established age discrimination in multiple ways. Doc. 34.  First, Hamburg's repeated ageist comments—corroborated by Jose Farfan—constitute direct evidence of discrimination. *Id.* at 10-11.  Hamburg's forcing her to choose between retirement and termination was consistent with her prior warnings that Plaintiff had better retire. *Id.* at 11.  In the alternative, Hamburg's comments are compelling circumstantial evidence of discrimination. *Id.*  Plaintiff has provided a "convincing mosaic" of evidence from which a reasonable jury could infer discrimination. *Id.* at 10.  To Defendant's argument that the decisionmakers were not aware of her age, Plaintiff contends that

Hamburg and the others involved in Plaintiff's termination had constructive awareness based upon her length of service, access to her personnel file, and Hamburg's inquiry of Plaintiff. *Id.* at 11 n.30.

Moreover, Defendant's reasons for terminating Plaintiff were pretextual because Plaintiff did not violate Defendant's policies. *Id.* at 11-12. The policies allow reservation agents like Plaintiff to make bookings for their family and friends without prior approval as long as they follow all fare and booking rules, which permit them to use their discretion to waive fees while documenting the reason. *Id.* at 12-14. They are only prohibited from giving *preferential* treatment to their family and friends. *Id.* at 14. The declarations of Jose Farfan and Diseree Debenedictus demonstrate that reservation agents' understanding of the policy is the same as Plaintiff's. *Id.* at 15. Similarly, Plaintiff did not violate the "multiple bookings" policy. *Id.* at 16. Defendant's rationale for terminating her is further undermined by its employees' inconsistent interpretations of what she did wrong. *Id.* at 14-15. As a result, Defendant is not entitled to the "honest belief" defense. *Id.* at 17.

Additional evidence from which a jury can infer that Defendant discriminated against Plaintiff comes from the fact that Defendant ignored its progressive discipline policy when terminating her, disregarded the thousands of dollars in revenue that Plaintiff's friends and family have generated for United, offered her the opportunity to voluntarily retire despite supposedly egregious violations, and failed to even monitor whether reservation agents are committing the same errors it claims she made. *Id.* at

17-18.  Defendant's actions against Plaintiff are also consistent with other instances in which it has gotten rid of its oldest employees. *Id.* at 19.

In reply, Defendant contends that Hamburg's alleged remarks, even if credited, do not constitute direct evidence because it is "undisputed" that Hamburg was not the decisionmaker of Plaintiff's termination, and the remarks were not made contemporaneously with the termination. Doc. 46 at 1-2.  Plaintiff failed to present a convincing mosaic of circumstantial evidence for the same reasons. *Id.* at 3.  She did not present any similarly situated employees who were not terminated, and the investigation into her misconduct occurred before she made any complaints of age discrimination. *Id.* at 4.  Further, Plaintiff has not demonstrated pretext. *Id.* at 5.  She admits that she engaged in the conduct that violated Defendant's policies, which are neither ambiguous nor inconsistently interpreted. *Id.* at 5-6.  Even if Plaintiff were correct that her actions did not violate the policies, she failed to present any evidence that the "real reason" for her termination was age discrimination. *Id.* at 7.  Defendant is entitled to use its discretion within the progressive discipline policy and within its determination of business decisions such as Plaintiff's termination. *Id.* at 8-9.

### b) *Legal Framework*

Age discrimination claims under the FCRA and ADEA are analyzed under the same framework. *See Mazzeo v. Color Resolutions Intern., LLC*, 746 F.3d 1264, 1266 (11th Cir. 2014).   A plaintiff seeking to withstand summary judgment on an age discrimination claim may do so in three potential ways: (1) direct evidence of age discrimination; (2) the *McDonnell Douglas* burden-shifting framework; or (3) by

presenting a "convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination." *Tsavaris v. Savannah L. Sch., LLC*, 847 F. App'x 634, 637 (11th Cir. 2021) (citation omitted). Regardless of the method she chooses, the plaintiff must show that age was the "but-for" cause of the challenged employer decision. *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 178 (2009); *Sims v. MVM, Inc.*, 704 F.3d 1327, 1336 (11th Cir. 2013).

Direct evidence of age discrimination is defined as evidence reflecting a discriminatory attitude that indicates the adverse "employment decision was *motivated* by the decisionmaker's ageism." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999) (emphasis in original). "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age will constitute direct evidence." *Id.* at 1359 (citation omitted). Evidence that "merely suggests discrimination and leaves the trier of fact to infer it is not direct evidence." *Tsavaris v. Savannah L. Sch., LLC*, 847 F. App'x 634, 637–38 (11th Cir. 2021), citing *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990). The Eleventh Circuit has given "the quintessential example" as "a management memorandum saying, 'Fire [plaintiff]—he is too old.'" *Id.* at 1081.

The discriminatory animus must be explicitly tied to the employment decision to constitute direct evidence. For example, the court found direct evidence of age discrimination that survived summary judgment where the employer stated "I need someone younger I can pay less" when he fired the plaintiff. *Mora v. Jackson Memorial*

*Foundation, Inc.*, 597 F.3d 1201, 1203 (11th Cir. 2010).  The court concluded a reasonable jury could find that the remarks were "sufficient evidence of a discriminatory motive which was the 'but for' cause of Plaintiff's dismissal." *Id.* at 1204.  But the statement that "what the company needed was aggressive young men like [plaintiff's replacement] to be promoted" was not direct evidence, because it required an inference that the decisionmaker's interest in promoting young men motivated his decision to terminate the plaintiff. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358–59 (11th Cir. 1999); *see also Williams v. Hous. Opportunities for Persons with Exceptionalities*, 777 F. App'x 451, 454–55 (11th Cir. 2019) (the statement "I can't stand your black ass" clearly evinced discriminatory animus but did not bear any explicit relation to the termination decision).

Where there is only circumstantial evidence of discrimination, rather than direct evidence, a plaintiff may show that discrimination was the but-for cause of the adverse action using the *McDonnell Douglas* framework or the "convincing mosaic" analysis. *See Tsavaris*, 847 F. App'x at 637.  Under the *McDonnell Douglas* framework, the court first considers whether the plaintiff has made out a prima facie case of age discrimination through the following elements:

> (1) she was a member of the protected group of persons between the ages of 40 and 70;
> (2) she was subject to adverse employment action;
> (3) she was qualified to do the job from which she was terminated; and
> (4) she was replaced by a younger individual, or her employer treated similarly-situated employees who were not members of the protected group more favorably.

*Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012); *Washington v. United Parcel Serv., Inc.*, 567 F. App'x 749, 751 (11th Cir. 2014); *Connor v. Bell Microproducts-Future Tech, Inc.*, 492 F. App'x 963, 965 (11th Cir. 2012).  If the plaintiff chooses to present a similarly-situated employee, or comparator, that person "must be nearly identical to the plaintiff" and "similarly situated in all relevant respects." *Id.* Once the plaintiff has established a prima facie case, the burden of production shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action. *See, e.g., Bogle v. Orange County Bd. of County Comm'rs,* 162 F.3d 653, 658 (11th Cir.1998).  The plaintiff must then offer enough probative evidence that a reasonable jury could conclude the employer's reason was a pretext for age discrimination. *Damon*, 196 F.3d at 1361.

In the alternative, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent"; in other words, if "the record presents a 'convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Aristyld v. City of Lauderhill*, 543 F. App'x 905, 908 (11th Cir. 2013), quoting *Smith v. Lockheed–Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011). The 'convincing mosaic' analysis often overlaps with the *McDonnell Douglas* analysis. *See Holland v. Gee*, 677 F.3d 1047, 1056 n.2 (11th Cir. 2012) (a convincing mosaic "may consist only of the plaintiff's prima facie case and of the evidence rebutting the employer's proffered reasons"); *Melvin v. Federal Express Corp.*, 814 F. App'x 506, 512

n.3 (11th Cir. 2020) (the convincing mosaic theory is "at least in this case, largely indistinguishable from our ordinary pretext analysis"); *Alsobrook v. Fannin Cnty., Georgia*, 698 F. App'x 1010, 1015 (11th Cir. 2017) ("For the same reasons [plaintiffs] failed to offer evidence establishing pretext under the burden shifting framework, they have also failed to establish a 'convincing mosaic' of circumstantial evidence").

Examples of circumstantial evidence upon which a plaintiff may rely to establish a convincing mosaic include: suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn; systematically better treatment of similarly-situated employees; and evidence that the employer's justification for the employment decision is pretextual. *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019).  Comments that evince discriminatory animus but do not rise to the level of direct evidence can provide a compelling piece of a plaintiff's convincing mosaic. *Melvin v. Fed. Express Corp.*, 814 F. App'x 506, 513 (11th Cir. 2020).

Demonstrating pretext may also create an inference of discriminatory intent, by pointing out "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale" for the adverse employment decision. *Id.* at 514, quoting *Holland*, 677 F.3d at 1055-56.  However, "[s]imply introducing evidence of discriminatory animus unconnected to the employer's proffered reasons is insufficient to establish pretext." *Tsavaris*, 847 F. App'x at 640-41, quoting *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).  Moreover, courts give great deference to an employer's discretion.  The Eleventh Circuit has "repeatedly and

emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law.  We are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon*, 196 F.3d at 1361 (citations omitted).  A plaintiff may not establish pretext merely by "substitut[ing] his business judgment for that of the employer" or "questioning the wisdom of the employer's proffered reason." *Elrod*, 939 F.2d at 1470; *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000); *see also Minard v. Sam's E., Inc.*, No. 21-11494, 2022 WL 854541, at *4 (11th Cir. Mar. 23, 2022) ("The issue here is not whether it was a wise business decision to fire Minard despite his years of hard work and his success garnering truckload sales.").

Where an employer alleges that the plaintiff was terminated for violating a work rule or for performance issues, evidence that another person in the plaintiff's position committed similar errors during the same time period and was not terminated provides support for pretext. *Melvin*, 814 F. App'x at 515.  But "when an employee is fired for poor performance, the 'inquiry into pretext centers on the employer's beliefs, not the employee's beliefs.'" *Bligh v. Collier Cnty., Dist. Sch. Bd.*, 818 F. App'x 942, 943–44 (11th Cir. 2020), quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).  In *Bligh*, for example, the plaintiff pointed out that he had received positive evaluations, but the court found that they were not sufficient to cast doubt on the performance issues that the employer had documented over a period of years. 818 F. App'x at 944-945.  Although the plaintiff provided witnesses who disputed that there

were performance issues, the court held that it was not their perspectives that mattered—only those of the decisionmaker, who had not been shown to act with discriminatory intent. *Id.* at 945.  Similarly, the employer's interpretation of policy is the one that matters.  In *Ekokotu v. Boyle*, 294 F. App'x 523, 527 (11th Cir. 2008), the court upheld summary judgment for the employer where the employer concluded the plaintiff's punctuality fell below the minimum requirement of 96%, despite the plaintiff's argument that his punctuality of 95.7% was the "mathematical equivalent" of 96%.  "[T]he record reflects that the company distinguished between levels of punctuality by tenths of a percentage point.  Thus, under the policy…[the plaintiff's] punctuality fell below the acceptable range." *Id.*

An employment decision will stand even where the decisionmakers were mistaken about the facts they relied on to take the adverse action. *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002).  The plaintiff must demonstrate that the decisionmakers "did not honestly believe the facts upon which [they] allegedly based the decision." *Id.*  In *Jones v. RS & H, Inc.*, 775 F. App'x 978, 988-89 (11th Cir. 2019), for example, the court found that the fact that projections about the company's workload that led to the plaintiffs' layoffs were somewhat inconsistent and proved to be inaccurate did not show that they were pretextual.  Nor did the company's overall profitability and subsequent hiring of more employees two years later cast sufficient doubt on its decision to conduct layoffs in plaintiff's unit that would permit a reasonable jury to conclude the rationale was a pretext for age discrimination. *Id.* at 989; *see also Alsobrook*, 698 F. App'x 1010, 1013 (evidence that a reduction in force was

not necessary based on the company's budget at the time was not sufficient to allow a reasonable jury to infer that the decisionmakers did not honestly believe it was).

### c) Analysis

Applying those principles to the instant action, the Court concludes that plaintiff has not met her burden to survive summary judgment on her claims of age discrimination.

First, Plaintiff has not established direct evidence of discrimination. Plaintiff alleges that Hamburg made the following comments to her during the course of several months, after initially asking her age:

> "Like when are you going to retire? Aren't you too old to be doing this job? Are you going to die at the computer taking the reservations? When are you going to retire and take the time off? And finally, If you don't retire, I will fire you sooner or later."

Doc. 25-1 at 6:9; Doc. 24-16 at 2.[8] Jose Farfan affirms in his declaration that Plaintiff contemporaneously reported to him that Hamburg was pressuring her to retire. Doc. 34-1 ¶ 9.

The statement "If you don't retire, I will fire you sooner or later," would constitute direct evidence of age discrimination if made by the decisionmaker of her termination. Although Hamburg denied making the statement, referring to retirement in any individual conversation with Plaintiff, or being aware of her age, on summary

---

[8] *See also id.* at 32:115-116 ("'Why are you still here? Aren't you too old to do the job? … You should retire, enjoy life. Why are you still here? Retire, retire, retire.' And that's all I heard from her. And the conclusion of it was actually when she said, 'If you don't retire, I'm going to fire you sooner or later. Are you going to die at the computer taking the calls?'"); Complaint, Doc. 1 at ¶ 19 ("If you don't retire on your own, I will fire you sooner or later.").

judgment the Court must credit Plaintiff's version of events absent a finding that no reasonable jury would do so. Just like the examples in *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-82 ("Fire Earley—he is too old"), and *Mora v. Jackson Memorial Foundation, Inc.*, 597 F.3d 1201, 1203 ("I need someone younger I can pay less"), Hamburg's alleged statement requires no inferences, is explicitly tied to an adverse employment action, and can only be interpreted as expressing an intent to discriminate against Plaintiff based on her age. Plaintiff is correct that this statement would, on its face, constitute direct evidence of age discrimination. *See* Doc. 34 at 10-11. [9]

However, the statement is not direct evidence in this case because it is not "sufficient evidence of a discriminatory motive which was the 'but for' cause of Plaintiff's dismissal." *Mora*, 597 F.3d at 1204. As Defendant argues, it cannot be direct evidence because Hamburg was not the decisionmaker in the adverse action. [10] If

---

[9] Although Defendant does not argue this, a question of fact exists as to whether Plaintiff was referring to the July 22, 2019 conversation, which could accurately be summarized as Hamburg telling her that she would be fired if she did not retire, but which would not constitute direct evidence of discrimination given its context. It is noteworthy that Plaintiff did not include "If you don't retire I will fire you sooner or later" in her August 11 email in which she described other, less-discriminatory comments that Hamburg made to her. *See* Doc. 24-16 at 2. Similarly, Farfan's declaration referred only to "pressure" to retire rather than such an explicit threat. Doc. 34-1 ¶ 9. However, on summary judgment the Court cannot assume, without proof, that Plaintiff was referring to the July 22 conversation; on the contrary, the Court must assume that she was referring to a previous, independent comment that Hamburg made.

[10] Defendant also argues that the statement cannot be direct evidence unless it was made concurrently with the adverse action, relying on an unpublished Eleventh Circuit opinion for support. Doc. 46 at 1. Under the particular circumstances of this case, however, the Court finds that concurrency is not required because the statement itself causally links the adverse action (a future firing) with the speaker's discriminatory animus. This causal link compels the conclusion that "the bias necessarily motivated the decision" without the need for any inferences. *See Williamson v. Adventist Health System/Sunbelt, Inc.*, 372 F. App'x 936, 940 (11th Cir. 2010).

Hamburg had made this statement and then been responsible for firing Plaintiff, the statement alone would have been direct evidence of age discrimination.  But the record does not permit the conclusion that Hamburg was responsible for the termination such that it would not have happened without her discriminatory animus.

On the other hand, it is not, as Defendant claims, "undisputed" that Rosner was the decisionmaker. *Cf.* Doc. 46 at 1, 3.  Plaintiff does dispute this, arguing that several individuals—Hamburg, Bartlett, and Ledonne—participated in the decision to recommend termination, and that Rosner's IRM decision was not entirely independent. Doc. 34 at 6, 6 n.16, 8-9.  To the latter point, Plaintiff points out that Hamburg presented the termination decision and grounds on United's behalf, Rosner testified she sent her decision letter to Ledonne for review before finalizing it, and the overwhelming majority of IRMs confirm a termination. *Id.*  The Court agrees it is far from clear-cut that Rosner was the sole decisionmaker of Plaintiff's termination, particularly given Bartlett's testimony that termination is a "foregone conclusion" of an IRM.  It is true that a "completely independent" review of an adverse employment action can remove any discriminatory animus from the decision. *See*, *e.g.*, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001).  Here, however, making all reasonable inferences in Plaintiff's favor, the Court cannot find that Rosner's decision was completely independent or uninfluenced by the other individuals involved in the investigation and termination process.

However, even viewing the evidence in the light most favorable to Plaintiff, there is no evidence that Hamburg made the decision or had determinative influence

over it.   Hamburg was certainly involved in several crucial steps of the process: she was part of the collective decisions to investigate Plaintiff's reservation history and to proceed to an IRM, and she advocated for termination at the IRM.   She was also the 'face' of the process from Plaintiff's perspective, as the individual who confronted her about the initial policy violation, informed her she would either need to voluntarily retire or face an IRM, signed both IRM notices, and prosecuted the IRM.   But there is no evidence from which a reasonable jury could conclude she initiated or drove these actions herself, or that they would not have happened without her.   Critically, Plaintiff has offered nothing to demonstrate that Hamburg played a role in discovering the initial violation or that she impacted the results of the investigation on which the IRM prosecution was based.   Even if the Court were to ignore the evidence that Hamburg advocated in Plaintiff's *favor* after the initial allegation, it still cannot conclude that the discriminatory animus revealed by Hamburg's statement was the but-for cause of Plaintiff's termination. *See Mora*, 597 F.3d at 1204.   The statement is not direct evidence of discrimination.

Plaintiff next asserts that she has established a convincing mosaic of circumstantial evidence from which a reasonable jury could determine that age discrimination was the cause of her termination.[11]   The Court concludes that she has not.

---

[11] While Plaintiff makes the bare assertion that she can also establish age discrimination via the *McDonnell Douglas* framework, she does not analyze her claim under this theory. *See* Doc. 34; Doc. 46 at 2 n.1.   In any event, the Court would find that she did not make out a prima facie case of discrimination under the *McDonnell Douglas* framework because she did not

First, Plaintiff has not established that Defendant's reasons for terminating her were a pretext for discrimination.  Plaintiff has consistently argued that she did not violate United's policies, offering the testimony of two other longtime RSSRs to demonstrate that her interpretation of the policies is the reservation agents' understanding and practice.  The Court agrees that the written policies are indeed ambiguous and subject to more than one reasonable interpretation.  However, Plaintiff has not offered evidence to show that the individuals involved in her termination did not honestly believe that her actions violated the policies.  Beginning with the waivers and favors policy, all of Defendant's witnesses—including those removed from any suggestion of discriminatory influence, such as House and Stepanski—consistently testified that the policy prohibits a reservation agent from using her own discretion to waive a fee on a family member's reservation.[12]  After all, the "inquiry into pretext centers on the employer's beliefs, not the employee's beliefs." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010); *see also Bligh v. Collier Cnty., Dist. Sch. Bd.*, 818 F. App'x 942, 943–44 *and Ekokotu v. Boyle*, 294 F. App'x 523, 527 (employer's view of performance or interpretation of policy controls).  Whether or not those involved in the decision to terminate Plaintiff were *correct* in their interpretation

provide evidence that she was replaced by a younger individual or identify any younger comparators who engaged in the same conduct and were not terminated. *See Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308; *Washington v. United Parcel Serv., Inc.*, 567 F. App'x 749, 751.

[12] Because they all agree on the reason that Plaintiff's actions violated the policy, the Court does not find that their disagreement with the other details of the policy's implementation, such as whether prior supervisor approval may permit an exception, is relevant to the honest belief analysis. *Cf.* Doc. 34 at 17.

of the policy is irrelevant unless Plaintiff can offer evidence to demonstrate that they did not honestly believe it. *See Woodward v. Fanboy, LLC*, 298 F.3d 1261, 1265 (11th Cir. 2002); *Alsobrook v. Fannin Cnty., Ga.*, 698 F. App'x 1010, 1013 (11th Cir. 2017); *cf. Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1311 (11th Cir. 2012) (evidence that the actual decisionmaker did not believe its proffered reasons for the adverse action created a jury question on the ultimate issue of discrimination).

Similarly, Plaintiff's argument that she did not violate the multiple bookings policy turns on her interpretation of the phrase "the same route" compared to that of the United decisionmakers.  Here, too, there may be ambiguity in the multiple bookings policy, but Plaintiff has not demonstrated that the decisionmakers involved in her termination did not honestly believe that her actions violated it.[13]

Plaintiff also points to Defendant's failure to abide by the progressive discipline policy as evidence of pretext. Doc. 34 at 17-18.  However, the policy explicitly permitted United to discharge an employee for a "single serious offense." *Id.* at 17. Because the decisionmakers testified that the violations that Plaintiff was found to have committed were egregious, her termination was not a "drastic departure" from the

---

[13] Plaintiff also disputes the underlying facts of alleged violation of the multiple bookings policy in June 2018, which Defendant highlighted at her IRM. *See* Doc. 34 at 16, citing Farfan Declaration, Doc. 34-2 at ¶ 17.  For the purpose of summary judgment the Court will credit Plaintiff's explanation.  However, Rosner's IRM Determination Letter referred to violations of the multiple bookings policy on six different occasions, not only the June 2018 incident. Doc. 30-5 at 5.  Several such violations were also detailed in Stepanski's report. Doc. 24-7. Moreover, Plaintiff has not demonstrated that the decisionmakers did not honestly believe that her actions violated the policy even if they were factually mistaken. *See Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002).

disciplinary policy. *Cf. id.*  Further, Defendant was entitled to conclude that Plaintiff's violations overcame her exemplary performance record as well as the revenue that her family members had generated for United over the years.  Plaintiff cannot "substitute [her] business judgment for that of the employer" nor "question [the] wisdom" of its decisions: "more than an employee's subjective disagreement is required to establish pretext." *See Blackmon v. Lee Mem'l Health Sys.*, 2:19-CV-625-JES-NPM, 2021 WL 808848, at *8 (M.D. Fla. Mar. 3, 2021) (citations omitted).  After all, "[t]he issue here is not whether it was a wise business decision to fire [Plaintiff] despite [her] years of hard work and [her] success garnering…sales." *See Minard v. Sam's E., Inc.*, No. 21-11494, 2022 WL 854541, at *4 (11th Cir. Mar. 23, 2022).

Even if the justification for terminating Plaintiff were questionable, however, evidence of pretext is not enough unless it can be shown that the real reason for the decision was age discrimination. *Tsavaris v. Savannah L. Sch., LLC*, 847 F. App'x 634, 642 (11th Cir. 2021) (despite "strong evidence" that the employer's explanation was pretext, jury could not infer that the real reason was discriminatory.").  Here, Plaintiff has failed to provide evidence that would permit a reasonable jury to conclude that age discrimination is the real reason for her termination.

The only evidence in the record that could lead to a finding of age discrimination comes from the comments that Hamburg allegedly made to Plaintiff.  There is no hint of discriminatory animus that can be attributed to anyone else involved in the termination process—Rosner, Bartlett, Ledonne, House, or

Stepanski—nor evidence that any of them were even aware of her age.[14]   And, as discussed *supra*, the Court does not find that Hamburg had enough influence over the termination decision to permit the conclusion that her discriminatory animus was its but-for cause. *See Wineberger v. RaceTrac Petroleum, Inc.*, 672 F. App'x 914, 918-19 (11th Cir. 2016) (upholding summary judgment for employer where supervisor who had previously made an age-related comment was the one to report the plaintiff for stealing candy, but different supervisors who were unaware of plaintiff's age independently reviewed the video footage and receipts before deciding to terminate her for the theft).

Moreover, Plaintiff has not provided any comparators to demonstrate that individuals outside of her protected class were accused of the same policy violations but not terminated.    While she suggests that Defendant's actions reflect a broader pattern of terminating older employees, Doc. 34 at 19 (citing to Debenedictus Dec., 34-2 ¶ 4), the evidence is insufficient to show that this alleged pattern occurred on Bartlett's team or that the "mass hiring mode" Defendant is now in is targeting younger hires. *Cf. Damon v. Fleming Supermarkets Of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) (defendant's pattern of replacing the majority of older store managers, including plaintiff, with younger hires,   coupled with discriminatory remark by decisionmaker, constituted probative circumstantial evidence of pretext).   It is also

---

[14] In this regard, the undisputed fact that RSSRs were not equipped with cameras cuts against Plaintiff's argument that Defendant's employees had constructive knowledge of her age. *Cf.* Doc. 34 at 11 n.30.  Moreover, while it is reasonable to infer that Ledonne, Bartlett, and Rosner were likely aware of the length of Plaintiff's tenure, there is no evidence that House or Stepanski would have come across that information.

relevant that several individuals involved in the termination process were of a similar age and work history to Plaintiff.[15]

The recent case of *Melvin v. Fed. Express Corp.*, 814 F. App'x 506 (11th Cir. 2020), is instructive.  In *Melvin*, the plaintiff's new supervisor had pressured him to resign in their first one-on-one meeting because of his age. *Id.* at 510.  The supervisor issued him a disciplinary letter one month later, and fired him within six months. *Id.*  Until this point the plaintiff had enjoyed an exemplary record during more than 30 years of service. *Id.* at 509.  Although the comments and their timing supported a showing of discriminatory intent, *id.* at 513, ultimately the court found that the plaintiff had not established that the legitimate reason offered for his termination was pretext.  Notably, the plaintiff presented evidence to contradict some of the factual grounds for the termination, but the court found that he failed to show that the decisionmaker did not honestly believe those grounds. *Id.* at 515-518.  The court also pointed out that he had failed to identify comparators who were not disciplined for the same conduct. *Id.*  Accordingly, it upheld summary judgment for the employer because the plaintiff had not presented sufficient circumstantial evidence for a reasonable jury to conclude that his age was a but-for cause of the termination decision. *Id.* at 519.

Here, too, Plaintiff has not presented sufficient circumstantial evidence that her age was a but-for cause of her termination.  Despite her allegations of discriminatory

---

[15] Rosner, born in 1959, has been a United employee for 37 years. Doc. 25-8 at 4:6.  Stepanski was born in 1964 and has worked for United for 31 years. Doc. 25-7 at 3:5-6.  Bartlett worked for United from 1991 until her voluntary retirement in 2020. Doc. 25-4 at 5:8, 6:14-15.  House has been a United or Continental employee for 35 years. Doc. 25-3 at 3:4.

comments and disagreements regarding the purported policy violations, she has not shown that Defendant did not honestly believe, applying its own business judgment, that it had legitimate grounds to terminate her or that age discrimination was the true reason. Summary judgment in favor of Defendant on the age discrimination claims is therefore warranted.

### 2. Summary Judgment is Warranted on the Retaliation Claims.

Plaintiff also raises claims of retaliation under the ADEA and FCRA. To establish a prima facie case for retaliation, a plaintiff must prove the following elements: (1) she engaged in statutorily protected conduct; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between the two. *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006); *see also Jurriaans v. Alabama Coop. Extension Sys.*, 806 F. App'x 753, 757 (11th Cir. 2020). As with discrimination, the employee ultimately must prove that retaliation was the but-for cause of the employment action. *Id.*, citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

For the element of casual connection between the protected activity and the negative employment action, a plaintiff must prove only that they are not "wholly unrelated." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (citations omitted). This element is satisfied upon a showing of the decisionmaker's awareness of the protected activity coupled with its close temporal proximity with the adverse action. *Id.* The decision-maker must have actual knowledge of the protected activity, not merely constructive knowledge. *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d

1192, 1197 (11th Cir. 1997); *Mohammed v. GHX Global Healthcare Exchange, Inc.*, No. 21-10108, 2022 WL 1615925, *3 (11th Cir. May 3, 2022) (rejecting argument that knowledge could be inferred or that constructive knowledge was sufficient).

However, "when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice[.]" *Drago*, 453 F.3d at 1308.  In *Drago*, for example, undisputed evidence demonstrated that the employer had considered demoting the plaintiff for performance reasons several months before the protected activity. *Id.*  Similarly, the plaintiff in *Jurriaans v. Alabama Coop. Extension Sys.*, 806 F. App'x 753 at 757, was "on notice of serious job-performance issues well before she complained of age discrimination."

Even where the plaintiff has made out a prima facie case of retaliation, she cannot demonstrate but-for causation without showing that any legitimate, non-retaliatory reason for the adverse action offered by the employer is pretextual. *Id.*, citing *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016) (abrogated on other grounds by *Babb v. Wilkie*, 140 S.Ct. 1168 (2020)).

Here, Plaintiff alleges that she experienced retaliation after she sent an email to Rosner, Ledonne, and members of senior management in which she alleged age discrimination. Doc. 34 at 19.  The next day, Defendant issued a revised IRM hearing notification that expanded upon the basis for her proposed termination by adding an additional violation. *Id.* at 19-20.  Plaintiff alleges that she has made out a prima facie case for retaliation because "fabricating additional reasons for termination" constitutes

an adverse employment action, and there is close temporal proximity between the action and her email, a protected activity. *Id.* at 19.[16]  In response, Defendant argues that plaintiff has failed to demonstrate that the decisionmaker, Rosner, was actually aware of the protected conduct because she testified that she did not read Plaintiff's email. Doc. 46 at 9-10.

For the purpose of this analysis the Court will assume, without deciding, that the issuance of a revised IRM hearing notice constitutes an adverse employment action.  The Court also agrees that Plaintiff's August 11 email was a protected activity, which Defendant does not dispute.  Despite close temporal proximity between the email and the revised hearing notice, however, the Court finds that Plaintiff has not established a causal connection.

First, contrary to Defendant's argument, a reasonable jury could find that the decisionmaker was actually aware of the protected activity at the time of the adverse action.  It is undisputed that Plaintiff sent her email to Rosner, whom Defendant asserts is the relevant decisionmaker. *See* Doc. 24-16; Doc. 46 at 9-10.  Although Rosner testified that she did not actually read the email until years later, she also acknowledged that she "probably did realize [Plaintiff] was making claims against Ms. Hamburg" at the time she received it. Doc. 25-8 at 28:101-102.  A reasonable jury could therefore conclude Rosner was sufficiently aware of Plaintiff's protected activity

---

[16] Plaintiff does not argue that she was retaliated against for raising age discrimination in the July 22 conversation with Hamburg, or that her termination itself was the adverse action that resulted from her email to senior management.

to retaliate.  But it is unclear whether Rosner was the decisionmaker of this situation; the evidence is ambiguous as to which individual was actually responsible for the content of the IRM notices.  Hamburg signed them but testified that any decisions about their content came from "[l]eadership, HR, I'm not sure." Doc. 25-5 at 32:125-126.  Taking all reasonable inferences in Plaintiff's favor, the Court will infer that either Rosner, Ledonne, or Bartlett—all of whom received Plaintiff's email, *see* Doc. 24-16, and were therefore aware of Plaintiff's protected activity—were responsible for the content of the IRM notice letters.  Plaintiff has adequately established the element of actual awareness of her protected activity for the purpose of summary judgment.

However, the element of causation is defeated by the uncontroverted evidence that Defendant had contemplated the basis for the revised IRM notice well before Plaintiff's email.  Defendant sent its initial IRM notice on August 8, 2019. *See* Doc. 24 at 11.  Stepanski's completed investigation report was not available until August 9. Doc. 24-2.  At the time of the initial IRM notice, the February 2019 waiver was the only substantiated and documented policy violation.  Stepanski's report, which predated Plaintiff's email by two days, provided a basis to revise the IRM notice with additional policy violations.  Moreover, Stepanski mentioned these additional violations to Ledonne as early as July 22, although he had not yet documented them in his report. *See* Doc. 24-1 ¶ 20; Doc. 25-6 at 15:57.  As in *Drago* and *Jurriaans*, then, the basis for the revised IRM notice existed well before the protected activity. *See* 453 F.3d at 1308; 806 F. App'x 753 at 757.  Plaintiff has not established a prima facie case for retaliation.  In the alternative, for the same reasons, Plaintiff has not demonstrated

that the recent availability of Stepanski's report—a legitimate, non-retaliatory reason to revise the IRM notice—was pretext for retaliation.   Summary judgment for Defendant on the retaliation claims is therefore warranted.

Accordingly, it is **ORDERED:**

1. Defendant United Airlines, Inc.'s Motion to Strike Paragraphs 9 and 11 from Plaintiff's Declaration of Jose Farfan (Doc. 48) is DENIED.

2. Defendant's Motion to Strike Plaintiff's Declaration of Diseree Debenedictus (Doc. 49) is DENIED.

3. Defendant's Motion for Summary Judgment (Doc. 24) is GRANTED as to all claims. As no genuine issues of material fact exist, Defendant is entitled to judgment in its favor as a matter of law.

4. The Clerk is directed to enter judgment in favor of Defendant, terminate any pending motions, and close this case.

**DONE** and **ORDERED** in Tampa, Florida on September 19, 2022.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties